ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 18 2002

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

ORLANDO CORDIA HALL,
*Defendant.*

CIVIL ACTION NO. 4:00-CV-422-Y
(Criminal No. 4:94-CR-121-Y)

---

# EXHIBITS (Vol. 1)
# (1-30)
## TO SECOND AMENDED MOTION OF ORLANDO CORDIA HALL TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

---

Robert C. Owen
Texas Bar No. 15371950
Owen & Rountree, L.L.P.
510 South Congress Avenue
Suite 308
Austin, Texas 78704
(512) 320-0334

Marcia A. Widder
Louisiana Bar No. 23367
636 Baronne Street
New Orleans, Louisiana 70113
(504) 529-5955

1070

Exhibit 1

FBI-302 re: Larry Nichols, dated 2/28/95

2

FD-302 (Rev 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    3/3/95

On February 28, 1995, Special Agent (SA) ARTHUR L. GROVNER of the FEDERAL BUREAU OF INVESTIGATION, received information from LARRY DONNEL NICHOLS (protect), regarding a possible escape attempt from the MANSFIELD DETENTION CENTER by an inmate who was involved in the LISA RENE kidnapping case.

NICHOLS advised SA GROVNER that he is a cellmate of one of the HALL brothers who had kidnapped LISA RENE. NICHOLS did not say which one of the HALL brothers was his cellmate, but indicated that it is the brother that is being tried for the death penalty.

NICHOLS stated that HALL told him of a plan to escape from custody as he is being transported from the Mansfield facility to the Federal courthouse in Fort Worth. According to NICHOLS, HALL seems to think the best time to escape is when the prison vehicle reaches a point in the trip where there is a wooded area and the guards are not paying much attention to the inmates.

NICHOLS further advised that HALL was despondent over the idea of getting the death penalty. HALL has been talking about his involvement in the kidnapping and what role he actually played. HALL has mentioned some details to NICHOLS that he supposedly has not mentioned to his attorney.

NICHOLS was only able to provide sketchy information as he was sitting in the courtroom awaiting arraignment on Federal bank robbery charges. NICHOLS will be interviewed for more details.

On February 28, 1995, Deputy U. S. Marshal JIM FRANCISCO, (817) 334-3161, was advised of the above information. Assistant United States Attorney (AUSA) PAUL MACALUSO was also advised.

---

Investigation on    2/28/95    at Dallas, Texas    File #  91A-DL-70062
                                                          7A-DL-70351

by  SA ARTHUR L. GROVNER/gm    Date dictated  3/2/95

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency

Exhibit 2

FBI 302 re: Larry Nichols, dated 3/7/1995

4

FD-302 (REV. 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___3/13/95___

      LARRY DONELL NICHOLS, black male born April 23, 1973, was interviewed in the lockup of the U.S. Marshal's Office, Dallas, Texas, were he was being held as a federal prisoner. The interview had been arranged between NICHOLS' attorney and Assistant U.S. Attorney (AUSA) PAUL MACALUSO.

      At the outset of the interview, NICHOLS was advised of the identities of BOBBY R. OAKLEY and KENNETH L. BERSANO who identified themselves as Special Agents of the Federal Bureau of Investigation and AUSAs RICHARD ROPER and PAUL MACALUSO. AUSA MACALUSO instructed NICHOLS not to discuss his current case, but only discuss the information concerning ORLANDO HALL. NICHOLS voluntarily furnished the following information:

      NICHOLS is being held as a federal prisoner at the Mansfield Correctional Facility, Mansfield, Texas. He had been locked up with ORLANDO HALL and other inmates in B-Zone at the jail for almost one month. NICHOLS was moved out of the cell

Investigation on ___3/7/95___ at ___Dallas, Texas___ File # ___7A-DL-70351___

by ___SA KENNETH L. BERSANO /afu/
SA BOBBY R. OAKLEY/BRO/smf___ Date dictated ___3/13/95___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency.

FD-302a (Rev 11-15-83)

7n DL-70351

Continuation of FD-302 of ___LARRY DONELL NICHOLS_____ , On __3/7/95__ , Page __2__

block Sunday, March 5, 1995. NICHOLS had previously been in separate cell blocks with ORLANDO's brother, DEMETRIUS HALL and BRUCE WEBSTER. NICHOLS stated ORLANDO HALL knew him from being in church and seeing him with DEMETRIUS HALL in the jail.

NICHOLS was told by ORLANDO HALL that he, HALL, was in jail charged with kidnapping and murder of a girl in Arlington, Texas. ORLANDO HALL told NICHOLS they grabbed the girl from through the back patio door. ORLANDO HALL told NICHOLS there were five guys involved.

He told NICHOLS he has been involved in selling drugs and "jacking" and kidnapping. ORLANDO told him of a deal in Pine Bluff, Arkansas where HALL and another person (not named) robbed a guy at a motel. ORLANDO HALL went to the motel, grabbed a guy and held him until another man showed up. HALL and his partner took one of the men to another location and got drug money. HALL told NICHOLS he was arrested but HALL bought someone a plane ticket to go to California to get the charges dropped.

When ORLANDO HALL talked about the kidnapping of the girl in Arlington, Texas, he identified as LISA RENE, HALL stated

6

FD-302a (Rev 11-15-83)

7ᴀ-DL-70351

Continuation of FD-302 of ___LARRY DONELL NICHOLS___ , On __3/7/95__ , Page __3__

he hated it happened but was glad it happened.  He said they did it because LISA's brothers robbed him of $5,000.  HALL said it was a $5,000 marijuana deal but he never got the dope, just got ripped off.  HALL said he was going to kill LISA's brothers if he caught them.  ORLANDO HALL told NICHOLS that  LISA was raped and that she sucked plenty of dick.  NICHOLS stated ORLANDO HALL did not say much about LISA's appearance but that she looked alright and was strong.  HALL stated they all raped her and they had condoms.  HALL stated while LISA was being held, she wanted to call her sister but was not allowed to.  HALL told NICHOLS that LISA died by throwing her in a hole.  He said LISA tried to run and was beat in the face with a shovel.  ORLANDO HALL said they were going to put it all on WEBSTER at first, but stated he, ORLANDO HALL, hit her with the shovel.

NICHOLS stated ORLANDO HALL cried a lot about his kids. HALL's sister, CASSANDRA ROSS, brought ORLANDO's kids to the Mansfield Correctional Facility to visit him.  HALL also talked to his girlfriend, TONYA, by telephone.  TONYA has visited him at the Mansfield jail.  NICHOLS stated he has made three-way telephone calls for HALL, getting him in contact with TONYA. HALL has been upset with TONYA and thinks she, TONYA, has talked

FD-302a (Rev. 11-15-83)

7A ᴊL-70351

Continuation of FD-302 of ___LARRY DONELL NICHOLS_____, On ___3/7/95____, Page ___4____

to the FBI and also has a new boyfriend. HALL has talked of beating TONYA in the past. He said he was going to get back at TONYA because she was involved also. HALL called TONYA a "bitch" and said if he were to get out he would kill her.

HALL told NICHOLS how he liked to beat girls and about beating (dog out) girls in Arkansas.

NICHOLS stated ORLANDO HALL wished STEVE (STEVE BECKLEY) who was locked up in Fort Worth, had not turned evidence because the police had no evidence on them. HALL has called STEVE a bitch and said he would kill him if he could get to him.

ORLANDO HALL said he had done dope deals with LISA's brothers before. He said during a previous dope deal with LISA's brothers, LISA's sister was present.

ORLANDO HALL told NICHOLS of flying and going by bus to Houston, Texas to get dope. He said once in Hobie Airport at Houston, he was carrying "crack" around his waist and in his boots. He went into the rest room and one of the packages broke open. HALL said he left all of the "crack" in the rest room.

8

FD-302a (Rev. 11-15-83)

7A-DL-70351

Continuation of FD-302 of _____LARRY DONELL NICHOLS_____, On __3/7/95__, Page __5__

HALL also talked of having $30,000 to $40,000 and two or three cars. HALL said he bought the cars with dope money and put the cars in CASSANDRA ROSS' name.

ORLANDO HALL said he and some other guys were arrested in Minden, Louisiana after he wrecked a rent car. He said he had been drinking and the other guys had dope on them.

ORLANDO HALL also told NICHOLS a friend (not named) who used to live with him took three attempted murder charges for him but gave no further details.

HALL told NICHOLS that his brother, DEMETRIUS HALL (JACK) used to "dog out" girls and "run a train on them" meaning having group sex.

NICHOLS stated HALL frequently talked of killing himself. NICHOLS read a suicide note HALL wrote to his mom telling her to take care of his kids. The note said by the time she got the letter he would probably be dead. HALL tore the note up and it was never mailed. HALL never mentioned LISA in the note.

FD-302a (Rev 11-15-83)

7A-DL-70351

Continuation of FD-302 of ___LARRY DONELL NICHOLS_____ . On ___3/7/95____ . Page __6____

     HALL asked NICHOLS to save him aspirin and asked how many aspirin it would take to kill you if swallowed. HALL talked of collecting aspirin from other inmates. HALL also talked of hanging himself. He said he was going to tie a bed sheet around his neck and tie the sheet to an iron bracket in the ceiling near a smoke detector then jump off the bed. HALL mentioned this as recent as Friday, March 3, 1995.

     ORLANDO HALL also talked of escaping from the Mansfield Correctional Facility. NICHOLS stated there was a six inch shank and razor blade hidden above the door just inside B Cell door that HALL and other inmates could get to them. HALL and a Mexican inmate (not further identified) had planned to use the "shank" to take a female guard hostage and escape but they did not have a car on the outside. HALL also talked of taking his attorney hostage when the attorney came to visit him at the jail. HALL was going to put a pen or pencil to the attorney's throat and force his way outside, but again said he did not have a car on the outside. HALL said if there was anyway he could escape, he would.

FD-302a (Rev. 11-15-83)

7A-DL-70351

Continuation of FD-301 of ____LARRY DONELL NICHOLS_____. On ___3/7/95___. Page ___7___

NICHOLS said ORLANDO HALL had called B-LOVE (BRUCE WEBSTER) a warrior, but NICHOLS said WEBSTER was not respected in the cell block. NICHOLS said WEBSTER had been hit once in the face by another inmate.

NICHOLS stated "JACK" (DEMETRIUS HALL) told him how B-LOVE beat up girls and once pulled his (B-LOVE's) girlfriend out of her car at a stop sign and beat her. NICHOLS stated there was a long "shank" made from part of a mop bucket hidden in the vent of cell #141 at the Mansfield jail. NICHOLS advised that was all the information he could furnish.

At the conclusion of the interview, AUSA MACALUSO explained in detail to NICHOLS that all the defendants involved in the kidnapping murder with ORLANDO HALL had lawyers. AUSA MACALUSO told NICHOLS he was not to go back to the Mansfield jail and ask ORLANDO HALL, B-LOVE, or DEMETRIUS HALL anything about the case or attempt to get information from them.

Exhibit 3

Sealed Motion For Appointment Of Mitigation Specialist



COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUN 3 0 1995
NANCY DOHERTY, CLERK
By _____
Deputy

UNITED STATES OF AMERICA

VS.                                      CRIMINAL NO. 4:94-CR-121-Y

ORLANDO CORDIA HALL (2)

## EX PARTE MOTION FOR
## APPOINTMENT OF MITIGATION SPECIALIST

TO THE HONORABLE TERRY R. MEANS, UNITED STATES DISTRICT COURT JUDGE:

COMES NOW, ORLANDO CORDIA HALL, Defendant in the above-styled and numbered cause, by and through Jeff Kearney and Michael Logan Ware, his attorneys of record, and pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution and state to the Court as follows:

1.      Defendant has been given notice that, upon conviction under 18 U.S.C. Section 1201, the government intends to seek the penalty of death.

2.      In order to effectively prepare and present evidence at a second or punishment trial, capital defense attorneys know from experience that the services of a mitigation specialist is indispensable.

3.      Trial counsel in capital cases arising under 18 U.S.C. Section 1201 are uniformly reliant on the expertise provided by mitigation specialists. Federal district courts have recently appointed such specialists to assist counsel in every case, to counsel's knowledge, where it was requested, including the case of co-defendant Bruce Webster. Other cases where a mitigation specialist was appointed include: *United States v. Cooper*

MW 00209    13

(N.D. Ill. No. 89-CR-580) [see attached order]; *United States v. Pretlow* (D.N.J. 90-CR-238); *United States v. Tipton* (E.D. Va. No. 3-92-CR-68); *United States v. Roane* (E.D. Va. No. 3-92-CR-68); *United States v. Thomas* (E.D. Va. No. 3-92-CR-68); *United States v. Green* (E.D. La. No. 92-46); *United States v. Molina* (E.D. Okl. No. 1:92-032-S); *United States v. McCullah* (E.D. Okl. No. 1:92-032-S); *United States v. Mathis* (M.D. Fla. No. 91-301-CR-T); *United States v. Williams* (M.D. Ga. No. 1:92-CR-142); *United States v. Brown, et al.* (E.D. Mich. No. CR-92-81127); and *United States v. Murray* (M.D. Penn. 1-CR-92-200).[1]

4.      Mitigation specialists provide essential and necessary services. They include *inter alia*, the following:

- Interviewing the client, family and friends regarding sensitive areas of mitigating evidence;
- Obtaining and evaluating birth, school, social welfare, employment, jail, medical and other records;
- Analyzing any alcohol and drug history;
- Working with family, community, and clergy in the development of other evidence favorable to the accused at the penalty phase;
- Suggesting testing in particular medical fields based on the mitigation investigation;
- Structuring the actual presentation of mitigation testimony at the sentencing hearing.

5.      Undersigned counsel simply do not have the time, expertise or experience to ferret out all types of potential mitigation in this case. While some areas of mitigation may be self-evident, *see, e.g., Stevens v. State*, 552 So.2d 1082 (Fla. 1989) (drug and

---

[1]     The same is true in state cases. As a matter of policy, for example, the Cook County, Illinois, Public Defender employs the services of a mitigation specialist in all death penalty trials. In Ohio and Indiana the State Public Defender each has a mitigation specialist section.

2

MW 00210

alcohol abuse); *Perry v. State*, 522 So.2d 817 (Fla. 1988) (cooperation with law enforcement officials); *Caruthers v. State*, 465 So.2d 496 (Fla. 1985) (remorse); *Pope v. State*, 441 So.2d 1073 (Fla. 1983) (military service), much is not. For example, it is very difficult to document a dysfunctional family life. *See, e.g., Hitchcock v. Dugger*, 481 U.S. 393, 397 (1987) (eighth amendment requires consideration of evidence that capital defendant may have been suffered permanent brain damage from ingestion of gasoline fumes as a child).

6.      Defendant relies upon the attached general memorandum of law in support of appointment of investigative and expert assistance.

WHEREFORE, defendant Orlando Hall request of this Court an order appointing a mitigation specialist for defendant Orlando Hall.

Respectfully submitted,

MICHAEL LOGAN WARE
State Bar Number: 20864200
LAW OFFICES OF
MICHAEL LOGAN WARE
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas 76102
Telephone: (817) 338-4100
Telecopier: (817) 338-1020

3

MW 00211

15

JEFF KEARNEY
State Bar Number:  11139500
JEFF KEARNEY & ASSOCIATES
Sundance Square
120 West Third Street, Suite 300
Fort Worth, Texas 76102
(817) 336-5600
(817) 336-5610 (fax)

ATTORNEYS FOR ORLANDO CORDIA HALL

4

MW 00212

16

Exhibit 4

Sealed Order, dated July 20, 1995



SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

JUL 20 1995

NANCY DOHERTY, CLERK
By _____
Deputy

| UNITED STATES OF AMERICA | § | |
| :--- | :--- | :--- |
| | § | |
| VS. | § | ACTION NO. 4:94-CR-121-Y |
| | § | |
| ORLANDO CORDIA HALL (2) | § | |

### SEALED AND EX PARTE ORDER PARTIALLY GRANTING EX PARTE MOTIONS FOR EXPERT AND OTHER ASSISTANCE (With Special Instructions to the Clerk of the Court)

Pending before the Court are the following motions, all of which were filed in the above-styled and numbered cause by defendant Orlando Cordia Hall on June 30, 1995:

(1) Ex Parte Memorandum and Ex Parte Motion for Appointment of Certain Experts;

(2) Ex Parte Motion for Appointment of Mitigation Specialist; and

(3) Ex Parte Motion and Brief for Jury Selection Expert.

An ex parte hearing was held regarding the foregoing motions on July 14, 1995. At the hearing, Defendant's counsel indicated their desire to pursue these motions, at this time, only insofar as they request appointment of a jury selection expert, a psychiatrist, a psychologist, and a forensic pathologist. After careful consideration of these motions, the arguments made at the ex parte hearing, and the applicable law, the Court finds that Defendant has shown that the appointment of a psychiatrist, psychologist, and forensic pathologist are reasonably necessary for the representation of the defendant. See 21 U.S.C.A. § 848(q)(9) (West Supp. 1995). At this time, however, the Court does not believe

MW 00254

18

that the appointment of a jury selection expert is reasonably necessary for the representation of Defendant, especially in light of the government's representation that it does not intend to use such an expert. *Cf. United States v. Bari*, 750 F.2d 1169, 1181-82 (2d Cir. 1984) (finding that district court abused its discretion in refusing to grant the defendant's 18 U.S.C. § 3006A request for daily transcripts when the government ordered daily transcripts for itself). The Court believes that Defendant's experienced counsel will be sufficiently able to ensure that the jury selected in this cause is fair and impartial.

It is, therefore, ORDERED that Defendant's June 30 Motion for Appointment of Certain Experts should be and is hereby PARTIALLY GRANTED, in that Defendant's counsel are hereby authorized to obtain the services of a psychiatrist and psychologist, but compensation for their services shall not exceed the total sum of $5,000 without further permission from the Court upon an ex parte showing that additional services are reasonably necessary. Defendant's counsel are further authorized to obtain the services of a forensic pathologist, but compensation for his services shall not exceed the sum of $2,500 without further permission from the Court upon an ex parte showing that additional services are reasonably necessary.

It is further ORDERED that Defendant's June 30 Motion for Appointment of Mitigation Specialist is hereby RENDERED MOOT.

It is further ORDERED that Defendant's June 30 Motion for Jury Selection Expert is hereby DENIED.

SEALED AND EX PARTE ORDER PARTIALLY GRANTING MOTIONS FOR EXPERT AND OTHER ASSISTANCE - Page 2
chr - m:\user\rsper\94cr121\hallorl\expert.ord

MW 00255

It is further ORDERED that this order shall remain sealed pending further order of the Court, and the clerk of the Court is hereby DIRECTED to transmit a copy of this order to Defendant's attorneys of record only.

SO ORDERED.

SIGNED July __20__ , 1995.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

SEALED AND EX PARTE ORDER PARTIALLY GRANTING MOTIONS FOR EXPERT AND OTHER ASSISTANCE - Page 3
chr - m:\user\raper\94cr121\hallorf\expert.ord

MW 00256

**Exhibit 5**

9/7/95 Motion For Appointment Of Mitigation Specialist



COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
SEP - 7 1995

| UNITED STATES OF AMERICA | * | |
| | * | |
| VS. | * | CRIMINAL NO. 4:94-CR-121-Y |
| | * | |
| ORLANDO CORDIA HALL (2) | * | |

## AMENDED EX PARTE MOTION AND MEMORANDUM FOR APPOINTMENT OF MITIGATION SPECIALIST

\* \* \* \* \* \* \* \* \* \* \* \*

TO THE HONORABLE TERRY R. MEANS, UNITED STATES DISTRICT COURT JUDGE:

COMES NOW, ORLANDO CORDIA HALL, Defendant in the above-styled and numbered cause, by and through Jeff Kearney and Michael Logan Ware, his attorneys of record, and pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution and 21 U.S.C. Sections 848(q)(9) and (10), and state to the Court as follows:

1.    Defendant has been given notice that, upon conviction of a homicide allegation, the government intends to seek the penalty of death.

2.    If defendant is convicted of a capital offense, a penalty phase will occur before a jury who will determine whether the defendant lives or dies.

3.    In order to effectively prepare and present evidence at this second or punishment phase in this case, the services of a mitigation specialist are necessary.

4.    Trial courts in state and federal capital cases arising under state or federal jurisdiction have come to employ the expertise provided by mitigation specialists. Federal district courts have appointed such specialists to assist counsel in every case, to

MW 00215

22

counsel's knowledge, where it was requested.[1] The same is increasingly true in state cases.[2] Retained counsel in federal capital cases have similarly spent private dollars to present the testimony of a forensic social worker. *United States v. Juan Raul Garza* (S.D. Texas No. CR-93-0009).

5.     Many capital cases, such as this one, involve life history investigation in both local and remote locations.   Counsel require assistance to fulfill their professional obligation to conduct such an investigation.

6.     The Mitigation specialists provide essential and necessary services. They include *inter alia*, the following:

*     interviewing the client, family and friends regarding sensitive areas of mitigation evidence;
*     obtaining and evaluating birth, school, social welfare, employment, jail, medical and other records;
*     analyzing any alcohol and drug history;
*     working with family, community, and clergy in the development of other evidence favorable to the accused at the penalty phase;

---

[1] *See e.g., United States v. Davis* (N.D. Ill. No. 89-CR-580); *United States v. Pretlow* (D.N.J. 90-CR-238); *United States v. Pitera* (E.D.N.Y. No. CR 90-024 (RR)); *United States v. Tipton* (E.D. Va. No. 3-92-CR-68); *United States v. Roane* (E.D. Va. No. 3-92-CR-68); *United States v. Thomas* (E.D. Va. No. 3-92-CR-68); *United States v. Green* (E.D. La. No. 92-46); *United States v. Molina* (E.D. Okl. No. 1:92-032-S); *United States v. McCullah* (E.D. Okl. No. 1:92-032-S); *United States v. Mathis* (M.D. Fla. No. 91-301-CR-T); *United States v. Williams* (M.D. Ga. No. 1:92-CR-142); *United States v. Jean Claude Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Frantz Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Reginald Brown* (E.D. Mich. No. CR-92-81127); *United States v. Michael Williams* (E.D. Mich. No. CR-92-81127); *United States v. Michael Murray* (M.D. Penn. No. 1-CR-92-200); *United States v. Darryl Johnson* (W.D.N.Y. No. 92-CR-474); *United States v. Edward Alexander Mack* (93-0252-CR-Ungaro Benages); *United States v. Moore* (E.D. Va. Cr. No. 2:93CR162); *United States v. Walker* (N.D.N.Y. No. 94-CR-328); *United States v. Paul Hardy* (E.D. La. No. 94-381) and *United States v. McVeigh* (W.D.Okl. No. M-94-98-H).

[2] As a matter of policy, for example, the Cook County, Illinois, Public Defender and the Philadelphia state defender employ the services of a mitigation specialist in all death penalty trials. Many other local public defender offices do likewise. In Ohio and Indiana, the State Public Defender each has a mitigation specialist section, as does the California Appellate Project.

MW 00216

23

    ✩      suggesting testing in particular medical fields based on the mitigation investigation;

    ✩      structuring the actual presentation of mitigation testimony at the sentencing hearing.

7.    Sections 848(q)(9) and (10) contemplate the utilization of such services:

(9)    Upon a finding *in ex parte proceeding* that investigative, expert or other services are reasonably necessary for the representation of the defendant, *whether in connection with issues relating to guilt or sentence*, the Court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefor, under Paragraph (10). [Emphasis added].

8.    Undersigned counsel do not have the time, expertise, or experience to ferret out all types of potential mitigation. While some areas of mitigation may be self-evident, *see, e.g., Stevens v. State*, 552 So.2d 1082(Fla. 1989)(drug and alcohol abuse); *Perry v. State*, 522 So.2d 817 (Fla. 1988)(cooperation with law enforcement officials); *Caruthers v. State*, 465 So.2d 496 (Fla. 1985)(remorse); *Pope v. State*, 441 So.2d 1073 (Fla. 1983)(military service), much is not. *See, e.g., Hitchcock v. Dugger*, 481 U.S. 393, 397 (1987)(eighth amendment requires consideration of evidence that capital defendant may have been suffered permanent brain damage from ingestion of gasoline fumes as a child).

9.    Counsel for defendants have contacted Tena Francis, an experienced mitigation specialist. Ms. Francis would be willing to serve as a mitigation specialist on behalf of defendant.

3

MW 00217

24

10.    Defendant relies upon the following memorandum in support and/or any memorandum in support of appointment of investigative and expert assistance filed by a co-defendant.

MW 00218

## MEMORANDUM IN SUPPORT

In the case of indigent persons facing a sentence of death, the Anti-Drug Abuse Act of 1988, Title 21 U.S.C. Section 848(q)(9), requires the court to authorize employment of experts, investigators and other expenses which are "reasonably necessary." The Judicial Conference has promulgated the following guidelines to implement this provision:

> In accordance with Section 848(q)(9) of Title 21, U.S.C., upon a finding in *ex parte* proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant in a federal capital case ... whether in connection with issues relating to guilt or sentence, the presiding judicial officer shall authorize the defendant's counsel to obtain such services on behalf of the defendant.

*Guide to Judiciary Policies and Procedures*, Vol. VII, Chapter 6, Section 6.03A. The guidelines track the mandatory language of the statute. The U.S. Supreme Court confirmed this interpretation in a related context (habeas corpus proceedings):

> *The services of investigators and other experts may be critical ... when possible claims and their factual bases are researched and identified.* Section 848(q)(9) clearly anticipates that capital defense counsel will ... need ... such technical assistance ...[T]he statute requires "the defendant's attorneys to obtain such services" from the court. Section 848(q)(9).

*McFarland v. Scott*, 114 S.Ct. 2568, 2572 (1994)(emphasis added). The Supreme Court has also interpreted the due process clause to require that an indigent defendant be provided with expert assistance if it is reasonably necessary to provide an adequate defense or relevant to a material issue. *Ake v. Oklahoma*, 470 U.S. 68 (1985), held:

> ...when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

5

MW 00219

26

470 U.S. at 883. The Court in *Ake* found that petitioner satisfied that burden where the facts of the case and the law of the state made Ake's insanity a significant factor in the guilt state of trial, and his future dangerousness an issue in the penalty stage of trial. *Id.* 83-94. In a death penalty case, the scope of relevant issues may be quite broad in light of *Lockett v. Ohio*, 438 U.S. 586 (1978), which provides that the sentencer must be permitted to consider "any aspect" of the defendant's "background and character" which is offered in mitigation of punishment. There are also a number of cases in which lawyers have been found ineffective for failing to investigate penalty stage issues. Thus, this motion is necessary for counsel to fulfill their professional obligation.

"Mitigation specialists" are trained or experienced punishment investigators who perform the necessary leg work the law demands of appointed counsel... and at a lower hourly rate. In this sense, a motion for a punishment investigator is no different than the not uncommon request for a guilt/innocence investigator, which similarly must be granted upon a showing of reasonable necessity. *See, e.g., Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir. 1974)("effective assistance of counsel ... requires, when necessary ... investigative expenses or appointment of investigative assistance ..."). In every capital case, there is need to investigate statutory and non-statutory mitigating facts. Records must be gathered and interviews conducted. It seems the real question is who should perform these necessary tasks and at what rate of compensation. The case for employment of a mitigation specialist, that is, an experienced and/or trained penalty investigator, hinges on the superior product they produce but also on their cost effectiveness. In any case, a penalty investigator will perform necessary services cheaper

6

MW 00220

27

than a lawyer and more cost-effective than a traditional guilt phase investigator -- neither of whom have been trained or have been experienced, for example, interviewing a client or family member about physical, sexual or emotional abuse within the client's family or, for another example, picking up subtle or even obvious signs of mental illness.

Likely for these reasons, in the federal death penalty context, district courts have uniformly appointed guilt and/or penalty investigators where requested.  This Court should do likewise.

WHEREFORE, pursuant to 21 U.S.C. Section 848(q)(9) and (10), the defendant requests of this Court an order under seal authorizing the employment of a mitigation specialist for defendant

Respectfully submitted,

MICHAEL LOGAN WARE
State Bar Number: 20864200
LAW OFFICES OF
MICHAEL LOGAN WARE
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas  76102
Telephone:  (817) 338-4100
Telecopier: (817) 338-1020

MW 00221

JEFF KEARNEY
State Bar Number:  11139500
JEFF KEARNEY & ASSOCIATES
Sundance Square
120 West Third Street, Suite 300
Fort Worth, Texas 76102
(817) 336-5600
(817) 336-5610 (fax)

ATTORNEYS FOR ORLANDO CORDIA HALL

8

MW 00222

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:94-CR-121-Y |
| | ) | |
| | ) | |
| ORLANDO C. HALL, | ) | |
| | ) | |
| Defendant. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF KEVIN McNALLY

I, Kevin Michael McNally, having been duly sworn, state the following:

1. I currently serve, along with David Bruck of South Carolina, as Federal Death Penalty Resource Counsel to assist court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Defender Services Division of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases under the Criminal Justice Act.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Criminal Justice Act appropriations in these cases. This information is regularly updated, and is checked for accuracy whenever possible against

MW 00223

30

any available United States government statistical information regarding federal capital prosecutions. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. The information detailed in the attached *ex parte* motion for appointment of a mitigation specialist is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project, was not prepared in anticipation of its being used in litigation, and is accurate to the best of my knowledge, ability and belief.

Kevin McNally
Federal Death Penalty Resource Counsel

Subscribed and sworn to before me, a notary public, on this 31$^{At}$ day of August, 1995.

Notary Public
State of Kentucky at Large

My commission expires 2|6|97 .

MW 00224

31

Exhibit 6

9/12/95 Order

32



SEALED

SEP 1 9 1995

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

SEP 1 2 1995

NANCY DOHERTY, CLERK

By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA        §
                                §
VS.                             §    ACTION NO. 4:94-CR-121-Y
                                §
ORLANDO CORDIA HALL (2)         §

## EX PARTE, SEALED ORDER GRANTING AMENDED MOTION FOR APPOINTMENT OF MITIGATION SPECIALIST

Pending before the Court is defendant Orlando Cordia Hall's Amended Ex Parte Motion and Memorandum for Appointment of Mitigation Specialist, which was filed in the above-styled and numbered cause under seal on September 7, 1995. In the motion, Defendant requests that Tena Francis be appointed as a mitigation specialist pursuant to 21 U.S.C. § 848(q)(9). After consideration of the motion and the arguments of counsel at the status conference held on Friday, September 8, 1995, the Court finds that motion should be and is hereby GRANTED, in that Defendant's counsel are hereby authorized to obtain the services of Tena Francis as a mitigation specialist, but compensation for her services shall not exceed the total sum of $5,000 without further permission from the Court upon an ex parte showing that additional services are reasonably necessary.

It is further ORDERED that this order and Defendant's September 7 Amended Ex Parte Motion and Memorandum for Appointment

MW 00413

33

of Mitigation Specialist are hereby SEALED pending further order of the Court.

    SO ORDERED.

    SIGNED September ___||___, 1995.

                                                         TERRY R. MEANS
                                                          UNITED STATES DISTRICT JUDGE

MW 00414

34

Exhibit 7

Affidavit of Tena Francis

35

## DECLARATION OF TENA S. FRANCIS

TENA S. FRANCIS, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.   I am the Director of Investigations for Capital Punishment Investigations & Educational Services, located in Texas. I am over eighteen years of age and competent to testify to my personal knowledge of the matters set forth herein.

2.   I graduated from Eastern Kentucky University in 1986 with a Bachelor of Science degree in Police Administration. I earned my Master of Science degree in Criminal Justice from the same university in 1990. Since that time I have continued my education by regular attendance of state and national training programs with topics pertaining to capital case litigation and forensic social work. Since 1987, I have provided investigative services for more than 100 capital murder cases in both the pre-trial and post-conviction stages of prosecution. These cases have been litigated in both federal and state courts, including California, Kentucky, Georgia, Louisiana, Nevada, New Mexico, Texas, and Virginia. I have provided training to attorneys, law students, investigators, and mitigation specialists during the last several years regarding topics related to punishment phase preparation and social history investigation.

3.   I have previously provided a sworn affidavit in this case. It was signed and notarized on August 10, 1999, and is attached to this Declaration as Appendix A. That affidavit, and all Exhibits thereto, are incorporated here by reference.

36

4. I was appointed by court order dated September 14, 1995, to assist defense counsel in the matter of United States v. Orlando Cordia Hall, N.D.Tex., Fort Worth Division, No. 4:94-CR-121-Y. I was appointed to work as a mitigation specialist investigating and developing evidence for presentation at the penalty phase of trial. Prior to my appointment, I had performed no work on Mr. Hall's case.

5. In this declaration, I recount conversations with Mr. Hall's trial counsel and other relevant persons in the Hall case. While I do not recall the exact words of any speaker, I believe my descriptions of these conversations accurately and fairly capture the spirit of what was said on each occasion.

6. My first contact with Mr. Hall's trial counsel was a telephone call from Michael Ware on September 5, 1995, prior to my appointment. I had never met Mr. Ware or worked with him on any case before that time. Mr. Ware made a statement to the effect that "I don't know what mitigation is or what a mitigation specialist does, but Kevin McNally told me we needed one and to call you." Kevin McNally is a highly regarded attorney specializing in the defense of death penalty cases, and is one of the attorneys retained by the federal courts to provide assistance and consultation to attorneys appointed in federal capital trials. I told Mr. Ware I was willing to work on the case if my appointment could be secured.

7. I spoke again with Mr. Ware on September 6, to discuss funding and his plans to seek my appointment. We talked again on September 14, when he confirmed my appointment and I scheduled a meeting with Mr. Ware at his office for the following day, to review his file.

37

8.    I met with Mr. Ware in his office the following day, September 15. We spoke for a few minutes, and then I spent most of the day going through several boxes of documents which had been provided in discovery by the Government. I also accompanied Mr. Ware to the jail and met with Orlando briefly.

9.    While I was in Mr. Ware's office on September 15, he reviewed the federal capital sentencing statute with me, pointing out its provisions on aggravating and mitigating circumstances. I had never worked on a federal death penalty case, so the statute was new to me, but I was very familiar with most of the concepts expressed in its provisions. Mr. Ware said that the mitigation theme he had in mind in the event Mr. Hall was convicted was that equally culpable co-defendants in the case were not going to receive the death penalty. He did not seem familiar interested in discussing any of the other mitigating circumstances enumerated in the federal statute, or any of the wide range of potentially available non-statutory mitigating circumstances.

10.   I also learned in the September 15 meeting that neither Mr. Ware nor anyone else connected with Mr. Hall's defense had conducted any meaningful fact investigation prior to my appointment, despite the fact that a fact investigator had been obtained in November 1994 by Mr. Hall's original appointed counsel. Although Mr. Ware advised me that he thought the mitigating factor that equally culpable co-defendants would not be sentenced to death was the best avenue to pursue in the penalty phase, virtually nothing was known about the co-defendants beyond what had been disclosed by the Government in discovery. Mr. Ware and I discussed the need to learn as much as possible about the four co-defendants in order both to obtain possible impeachment evidence and to present information demonstrating that the co-defendants were

equally as culpable as Mr. Hall.

11.    Mr. Ware also stated on September 15 that there was "nothing in the family" and that he thought the Halls were "really good people" based on his contact with them prior to that time, which consisted of brief office visits and phone calls from members of the family. I cautioned him that my experience had taught me that there was almost always something in my clients' family backgrounds that could help explain the crime.

12.    We also discussed the potential impact of anticipated testimony from jail inmate Larry Nichols, involving an alleged plan by Mr. Hall to take his attorneys hostage and escape, and the need to gather information about Nichols and other potential inmate witnesses for the Government.

13.    I further explained the importance of a full and complete social history investigation of Mr. Hall's background, and how such information could benefit expert witnesses in looking for mitigating circumstances and issues. Prior to September 15, 1995, no one working for Mr. Hall's defense had had any meaningful contact with his family. Defense counsel knew essentially nothing about Orlando's background.

14.    I learned during my first meeting with Mr. Ware that he had engaged the services of Dr. Lisa Clayton, a psychiatrist, although she had not yet evaluated Mr. Hall. Later, I was surprised to hear Mr. Kearney comment with some pride that although they had not succeeded in hiring Dr. Grigson, they had gotten one of his "protégées." I was startled to learn that Dr. Grigson seemed to them a model of the ideal defense expert in a capital case.

15.    On September 23, I drafted an investigation plan for Mr. Ware's information. I urged in that memorandum that Dr. Clayton not speak with Mr. Hall before the social

39

history investigation was complete. My aim was to make sure that she was the appropriate expert based on what the investigation uncovered, and if so, to ensure that her evaluation of Mr. Hall could be informed to the fullest extent possible by the results of a thorough investigation into circumstances that might be important to her forming reliable conclusions. When I brought this up personally with Mr. Ware after he had reviewed the investigation plan, however, he said words to the effect that "she's already been there."

16. As I indicated in my prior affidavit, the social history investigation was seriously crippled by the inadequate time I had for conducting it. It was apparent to me after one short meeting with Mr. Hall and one short meeting with his sister, Cassandra Ross, that the Hall children had been subjected to serious domestic violence in the family throughout their childhoods. Unfortunately, it was difficult to elicit information from even the most cooperative members of the family because they had never discussed the abuse among themselves, much less with a virtual stranger. The challenge was in dealing with witnesses who had never discussed their abusive past, had not dealt with their own feelings about the abuse, and who became emotional at just the thought of talking about it.

17. Orlando's sister, Cassandra, become so emotional during our first meeting that it was not possible to continue digging deeper into the subjects we were discussing, and I decided to reserve more difficult questions for a later meeting. Because of the number and variety of investigative tasks I was trying to accomplish in the short time before trial, however, that next meeting never happened. In my view, Cassandra -- easily the most articulate and poised member of the family -- could have been a

40

compelling witness had she been properly developed as a witness and properly prepared to testify. Mr. Hall's mother Betty, was likewise completely unprepared to testify about these painful facts by the time of trial. Although Betty was helpful in providing details about the abuse, the interview process was extremely slow because she would become very emotional (to the point of having to change the subject). She never reached a stage where she could talk more freely about those experiences, because I had insufficient time to prepare her.

18. In the course of my investigation, I uncovered numerous facts which suggested, based on my knowledge, experience, and training as a mitigation investigator, that neuropsychological testing of Mr. Hall was indicated. His mother Betty was beaten severely while she was pregnant with Mr. Hall and may have been abusing alcohol at the time; Mr. Hall performed poorly at school, even in remedial classes; and as a child he was diagnosed with hearing problems and suffered from a poor memory. In conversations with Mr. Ware, I repeatedly pointed out the potential significance of these facts (both that they indicated possible neuropsychological impairment and that such impairment had significant potential as a mitigating factor), and the need for neuropsychological testing to confirm or refute the possibility of impairment.

19. I had been advised by Mr. Ware in one of our earliest conversations that the court had approved payment for a psychologist to work on Mr. Hall's case, and that Mr. Ware had lined up Dallas neuropsychologist Randy Price to evaluate Mr. Hall. Throughout much of my work on Mr. Hall's case, I assumed that Dr. Price would be an important part of the defense team and that he was 100 percent involved. Although the subject of neuropsychological testing came up repeatedly in my

41

conversations with Mr. Ware and I was aware that testing had not yet been performed, he never indicated that there were any difficulties with Dr. Price. That was one part of the case that I thought was under control, although I do recall expressing dissatisfaction to Mr. Ware at some point after September 23 that Dr. Clayton had already seen Mr. Hall, but that Dr. Price had not yet evaluated him.

20.    On more than one occasion since my appointment to the case, I had tried unsuccessfully to contact Dr. Price by phone to discuss the results of my ongoing investigation. I complained to Mr. Ware and, later, to Mr. McNally that Dr. Price was not returning my calls. However, I did not come to understand that there was any problem with Dr. Price's participation in the case until after *voir dire* began (*i.e.*, sometime after October 2, 1995). Kevin McNally had come to Fort Worth for a short visit, to observe jury selection and offer his assistance to Mr. Ware and lead counsel Jeff Kearney. At some point, I was present at Mr. Ware's office along with Mr. McNally and Mr. Hall's attorneys. It was then that I learned for the first time that there was a serious problem with getting Dr. Price to move forward on Mr. Hall's case. Mr. McNally, who had worked with Dr. Price on an earlier case, said that he would call him to speak with him directly about Mr. Hall's situation. He did so, from Mr. Ware's office. After he hung up the phone, Mr. McNally said words to the effect that Dr. Price had gotten "cold feet" about the case. It was my understanding from Mr. McNally's description of his conversation with Dr. Price that Dr. Price's reluctance to work on Mr. Hall's case arose from his personal reaction to the facts of the crime. I do not know what further contact, if any, defense counsel had with Dr. Price after that point. I did have a conversation later with Mr. Ware in which he said

42

that he guessed that Dr. Price had been the "wrong guy," that they should have discovered the reason for his reluctance to work on the case, and that they should have gotten a different neuropsychologist.

21. The same day Mr. McNally phoned Dr. Price was the first and only meeting or conversation I had with lead counsel Jeff Kearney about Mr. Hall's case. I recall that Mr. Kearney came to Mr. Ware's office that afternoon; this was the first time I had met him. Mr. Kearney invited me and Mr. McNally to join him and Mr. Ware for dinner. I expected that we would be discussing the case. However, when we arrived at a local steak house, we were joined by Mr. Kearney's associates and the wives of several of those present. There were at least ten people present for the meal, and of course under those circumstances there was no working discussion of the case at all. That was my sole meeting with Mr. Kearney.

22. Mr. McNally arrived in Texas on or shortly after October 2. He discussed with Mr. Ware and Mr. Kearney the gravely incomplete state of the investigation of the penalty-phase issues, and it was decided that Mr. Ware would go to Arkansas to attempt to help with the investigation, while Mr. McNally remained in Fort Worth to provide such assistance as he could to Mr. Kearney, who would handle the jury selection in Mr. Ware's absence. Mr. Ware went to Arkansas on October 4 and returned on October 7. I traveled to Arkansas on October 6 and returned to Dallas on October 10. Mr. Ware was generally pursuing information about Mr. Hall's co-defendants on his trip to Arkansas, and I was continuing to focus on my investigation of Mr. Hall's social history.

43

23. On November 1, 1995, I received a telephone call from Mr. Ware's assistant Jena, who advised me that Mr. Ware wanted to meet with all the punishment phase witnesses that night. Several of the witnesses were on the road, traveling to Texas from Arkansas. Mr. Hall's parents were staying with his sister Cassandra Ross in Dallas. Later that night, Mr. Ware telephoned me and told me that he had tried to question Mrs. Hall (Orlando's mother) over the phone, and that her answers lacked the kind of details I had noted in my reports. He seemed very discouraged, and said words to the effect that, "They're not saying anything you said they would say." For my part, I was frustrated that Mr. Ware was trying to conduct these sensitive conversations by telephone. I had explained to him more than once in the course of working on the case that it was next to impossible to elicit painful and embarrassing details from witnesses about the intimate facts of their lives without spending time with them in person, to get to know them and form some kind of relationship with them. I don't remember my words but I am sure I expressed my dissatisfaction to Mr. Ware in that conversation.

24. Early the next morning, on November 2, Mr. Ware telephoned me again and asked if I would write down some questions and answers for the punishment phase witnesses, in essence drafting his direct exam and indicating the anticipated answers. I started to work on this project but had to stop when I was called a bit later to come to court. I remember that I hand-wrote some questions for Mr. Ware, in addition to the ones I typed on the computer prior to leaving home that morning.

25. During the lunch break on November 2, Mr. Ware asked me to join him while he prepped Mrs. Hall and Cassandra Ross to testify after lunch. Our meeting with them

took place in the hallway outside the courtroom. Tearful members of the victim's family were standing nearby in the same hallway while Mr. Ware was trying to go over his anticipated questions with Mrs. Hall and Mrs. Ross. In addition, FBI agents were continuously circulating in the same hallway. Because of these circumstances, Mr. Ware was forced to conduct his preparation of these witnesses by whispering to them so that no one else could hear what was being said.

26.    After Mrs. Hall and Mrs. Ross had testified, there was a break in the proceedings and Mr. Ware sought my input about what the rest of the potential defense witnesses would say if called to testify. It was my impression that he already had his mind made up at that point that he was not going to call any additional witnesses. In fact, I recall that even before he asked me for information about the other witnesses, he said words to the effect that, "This is stupid, it's not working, people are laughing at us." In any event, that was when Mr. Ware announced that the defense case was at an end.

27.    Throughout the course of my work investigating Mr. Hall's case, I expressed to his attorneys my view that a full and thorough social history investigation could not be completed before the scheduled start of trial on October 2, and thus that a continuance would be necessary. It was apparent from my first days on the case that it would not be possible to take the investigative steps required by the relevant standard of practice in 1995 before the scheduled start of trial. However, my impression was that trial counsel either did not appreciate the urgency of the need for a continuance, or else were resistant to the idea and not genuinely interested in continuing the case.

45

28.    My experience working on this case left me with lasting feelings of regret and led me to re-evaluate my role in assisting attorneys in developing mitigation, as well as what had previously been my willingness to get involved in any case no matter how "late in the game." I will never again agree to assist on a case in which the penalty phase preparation has been left to the last minute, nor work with attorneys who are not prepared to obtain adequate time to investigate and develop mitigation. My negative feelings about this case are not merely a consequence of my knowledge that necessary work was not completed and my strong belief that Mr. Hall's resulting death sentence might well have been avoided. I also feel that the way in which the penalty phase investigation was truncated and compressed left added victims scattered by the wayside. In a very real sense, I feel that we, the defense team, "raped" Mrs. Hall and Mrs. Ross by ripping from them long-buried and emotionally fraught information about their lives and then failing to prepare them so that they could convey this information in the stressful environment of a courtroom -- so that the pain that we caused to Mr. Hall's mother and sister was all for nothing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *June 11, 2002*

*Tena S Francis*
TENA S. FRANCIS

46

APPENDIX A

47

STATE OF TEXAS            }}

COUNTY OF COLLIN          }}

## AFFIDAVIT OF TENA S. FRANCIS

TENA S. FRANCIS, being duly sworn according to law, deposes and says as follows:

1. I am a private investigator licensed in the State of Texas and have personal knowledge of the matters set forth herein.

2. On September 14, 1995, I was retained by trial counsel in the matter of United States v. Orlando Cordia Hall, N.D.Tex., Fort Worth Division, No. 4:94-CR-121-Y, to work as a mitigation specialist investigating and developing the penalty phase defense of this federal death penalty matter. A copy of the Order authorizing my appointment is attached as Exhibit "A" hereto. Prior to my appointment, I had done no work on this case. Trial of this matter was scheduled to, and did, commence on October 2, 1995.

3. On September 15, 1995, I met with trial counsel, Michael Ware, and reviewed two boxes of discovery previously provided by the Government. I learned at this meeting that neither Mr. Ware nor anyone else connected with Orlando's defense had conducted any meaningful fact investigation prior to my appointment, despite the fact that a fact investigator had been hired in November 1994. Although Mr. Ware advised me that he thought the mitigating factor that equally culpable co-defendants would not be sentenced to death was the best avenue to pursue in the penalty phase, virtually nothing was known about the co-defendants. Mr. Ware and I discussed the need to learn as much as possible about the four co-defendants in order both to obtain possible impeachment evidence and to present information demonstrating that the co-defendants were as culpable as Orlando. We also discussed the impact of the anticipated testimony of jail house informant Larry

48

Nichols, involving an alleged plan by Orlando to take his attorneys and the trial judge hostage and escape. And, Mr. Ware and I discussed the need to gather information about Nichols and other potential inmate witnesses for the Government. I further explained the importance of a social history investigation and how such information could benefit expert witnesses in looking for mitigating circumstances and issues. Prior to September 15, 1995, no one working for Orlando's defense had had any meaningful contact with his family. Defense counsel knew essentially nothing about Orlando's background.

4. During the short time that I had to work on this case, my mitigation investigation was constantly interrupted to deal with issues relating to the guilt phase. There was insufficient time for me to do either investigation thoroughly, as detailed below:[1]

5. Little was known about the Government's main witness, Steven Beckley, by the time of his testimony at trial. Indeed, the night before Beckley was to testify, Mr. Ware telephoned me worried that we did not know enough about Beckley. This was a matter of concern, as Beckley was the only witness who would testify that Orlando raped the victim, was the only defendant to testify about the killing, and seemed to have the most pristine background. The minimal investigation that was made into Beckley's background provided grounds to suspect that Beckley was not as wholesome as the discovery would lead one to believe -- he had been arrested twice for thefts as a juvenile, had been fired for employee dishonesty, and was an alcoholic. Moreover, there were stories floating around that he sometimes exhibited violent tendencies. For example, I learned from one witness that Beckley had once told him he needed a gun to "mess up a girl who was messing with

---

[1] The fact investigator in the case made his first trip to Arkansas several weeks into the voir dire. Prior to this trip, he had done little or no investigation into the facts of this case.

2

49

him." Moreover, after the trial began, Orlando provided Mr. Ware with a list of inmates he knew Beckley associated with at the federal jail. Until Mr. Ware called me the night before Beckley's testimony, no one had attempted to obtain records of Beckley's thefts and employment termination; nor had any one made efforts to interview persons familiar with Beckley. Although I checked out Beckley's firing from his job, I did not have time to make any further efforts concerning him before his testimony.[2]

6. Similarly, little was known about Marvin Holloway, who was portrayed as the least culpable defendant during the trial, even though it was clear that he was fronting money for the drug operation and seemed to have been overseeing the kidnaping and murder.

7. The social history investigation was seriously crippled by the inadequate investigative time I had. It was apparent to me after one short meeting with Orlando and one short meeting with his sister, Cassandra Ross, that the children had been subjected to serious domestic violence in the family throughout their childhoods. Unfortunately, it was difficult to immediately elicit detailed information from even the most cooperative members of Orlando's family because the family members had never discussed the abuse among themselves, much less with a virtual stranger. The challenge was in dealing with witnesses who had never discussed their abusive past, had not dealt with their own feelings about the abuse, and who became emotional at just the thought of talking about it.

8. Orlando's sister, Cassandra, become so emotional during our first meeting that I decided

---

[2] Because Mr. Ware had told me, during our first and subsequent meetings, that he would assign the tasks concerning the Beckley investigation to his fact investigator, I did not assume this aspect of the investigation myself. It was not until the night prior to Beckley's testimony when I learned that little or nothing had been done with regard to investigating the credibility of this witness.

3

to reserve more difficult questions for a later meeting. That meeting never happened. It was my feeling that Cassandra, who was the most articulate and poised member of the family, could have been a compelling witness had she been prepared to testify.

9. Orlando's mother, Betty, was likewise completely unprepared to testify about the sensitive issue of domestic abuse by the time of trial. Although she was helpful in providing details about the abuse, the interview process was extremely slow because she would become very emotional (to the point of having to change the subject). She never reached a stage where she could talk more freely about the abuse, because I had insufficient time to prepare her.

10. Cassandra and Betty were the only family members called to testify during the penalty phase. Neither had discussed their testimony with the trial attorneys before the day of their testimony. Indeed, their only real contact with the attorneys occurred during the lunch break prior to their testimony, when Mr. Ware and I spoke with them for about fifteen minutes in the hallway of the courthouse, an environment that was not conducive to a good conversation about domestic violence or about their testimony generally. On the stand, it was obvious that they were unprepared for questioning from both the defense and the prosecutor. Their testimony went so badly that Mr. Ware made the decision not to call any of the remaining family members and friends seated in the courtroom.

11. A significant portion of my investigation focused on the anticipated testimony of Larry Nichols, a federal inmate housed in the same cell block as Orlando at the Mansfield Correctional Center. Nichols was prepared to testify that Orlando had bragged to him about raping the victim, had threatened to kill Steven Beckley, and had confided a plan to escape from the jail by taking his

4

lawyers and/or the trial judge hostage with a shank. In the course of my investigation, I interviewed another former inmate of the Mansfield facility, Alonzo Airy, on two occasions. Airy told me that there was no discussion of any escape plan and that Orlando was extremely remorseful and, indeed, suicidal in the jail. He also provided a lot of information about how Nichols constantly discussed his desire for a 5K1 reduction in his sentence, bragged about how easy it was for an inmate to lie about other inmates in order to get a 5K1, and that Orlando's case was viewed by all of the inmates as their ticket out of the jail, since it was such an important case to the Government. Airy had previously testified as an impeachment witness against Nichols, and I had been informed by the federal public defender who used him that he was unshakeable as a witness. Airy was listed as a defense witness and subpoenaed to the trial.

12. On the morning of November 2, 1995, when the penalty phase was set to begin, the government handed the defense an FBI 302 report which detailed an agent's October 30 interview with Airy. According to the report, Airy told the agents that Orlando had no remorse, bragged about raping and murdering the victim and planned an escape. In other words, he told the FBI exactly the opposite of what he had told me during two interviews. Although the Government attempted to add Airy to its witness list on November 2, the trial court did not allow it and Airy did not testify.

13. I feel that a great deal more could have been done in this case had I had sufficient time to investigate. This was a case in which the only details regarding the offense came from the testimony of co-defendants who cut deals with the Government. The background and character of these co-defendants was inadequately developed. My mitigation investigation, moreover, merely touched the tip of the iceberg. As a result of the inadequate defense that was prepared, the jury

5

52

caught only a glimpse of Orlando's seriously troubled childhood and, because the witnesses were

unprepared, caught a glimpse that was not even in focus.

Further sayeth Affiant not.

TENA S. FRANCIS

Sworn to and subscribed before me
this 10ᵗʰ day of August, 1999.

NOTARY PUBLIC, State of Texas

DAWN D. CHANDLER
Notary Public
STATE OF TEXAS
My Commission Expires 12-15-2001

6

53

## Exhibit 8

10/12/95 *Ex Parte* Motion for Additional Services Required of Mitigation Specialist

54



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

OCT 1 2 1995

NANCY DOHERTY, CLERK

BY _____
Deputy

UNITED STATES OF AMERICA              *
                                      *
VS.                                   *       CRIMINAL NO. 4:94-CR-121-Y
                                      *
ORLANDO CORDIA HALL (2)               *

EX PARTE MOTION FOR ADDITIONAL SERVICES
REQUIRED OF MITIGATION SPECIALIST

* * * * * * * * * * * *

TO THE HONORABLE TERRY R. MEANS, UNITED STATES DISTRICT COURT JUDGE:

COMES NOW, ORLANDO CORDIA HALL, Defendant in the above-styled and numbered cause, by and through Jeff Kearney and Michael Logan Ware, his attorneys of record, and files this Motion for Additional Services Required of Mitigation Specialist and pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution and 21 U.S.C. Sections 848(q)(9) and (10), and state to the Court as follows:

1.     Tena Francis, Mitigation Specialist who was appointed to the above case on September 12, 1995 filed with this court on October 5, 1995 a CJA 31 for compensation of $3,425.00 with expenses of $594.95. According to the court order of September 12, 1995 if Ms. Francis services were to exceed $5,000.00 than additional compensation needs to be approved by this court. Ms. Francis who has worked diligently on this case since being appointed estimates that an additional 50 hours of investigation is mandatory to the effective representation of Orlando Cordia Hall. The investigation will involve trips to Arkansas and Louisiana. Several of the investigative tasks noted below will benefit the defense in both phases of the trial.

MW 00248

55

2.    As the defense may present evidence of the relative culpability of Orlando Hall's co-defendants (and since it is obvious, through failed polygraphs that these three co-defendants may have lied to the authorities about their role regarding this case) there is an essential need for further investigation into their backgrounds.  Motivation to testify falsely (in addition to their plea agreements with the government) and other evidence to discredit the co-defendants may be uncovered during investigations of their reputations, criminal histories, histories of violent behavior, relationships to each other and other government witnesses, statements made in reference to the crime to persons other than the police, etc.

3.    In reference to the fourth co-defendant, Bruce Webster, his culpability should be further investigated also.  It is obvious from the government documents that this co-defendant played perhaps the most important role in the kidnapping, sexual assault, murder, and destroying evidence.  The investigation thus far has revealed that he has a history of violent behavior and psychiatric problems.  To date, about fifteen (15) witnesses have been identified that will have information pertinent to these background investigations.  These witnesses reside in both Texas and Arkansas.  Some have been interviewed but there are others who need to be interviewed.

4.    The two jailhouse informants (who provided information that Orlando Hall planned to take a hostage and escape from the Mansfield detention center) must be investigated thoroughly.  This alleged escape plan will be a critical aspect of the government's punishment phase.  Testimony about the planned escape, if believed by the jury, will assist the government in portraying Orlando Hall as a danger to society and

2

MW 00249

56

will effective undercut any mitigation evidence presented by the defense. The government has not provided any discovery to the defense concerning this alleged escape plan. Therefore, the defense must further investigate the witnesses involved. Further, it has been learned that one of these witnesses has a reputation as a "professional informant". This witness is suspected of providing information to authorities on cases other than Orlando Hall's in exchange for leniency regarding his own criminal charges and sentence. (There is an eight (8) count indictment pending against this witness, and his sentencing is scheduled for late October. This is suspicious because the witness's co-defendant's have been tried and sentenced several months ago. Therefore, the witness fulfilled his agreement to testify against his co-defendants. His role in Orlando Hall's case and maybe others is most probably what is delaying his sentencing.) Orlando Hall's defense must investigate this witness's criminal history, other cases for which he is a government witness, and his relationship to law enforcement personnel. The defense currently knows very little about a second government informant. A similar investigation needs to be conducted concerning his background and motivation. Since witnesses and records pertaining to these witnesses are located in Texas and Louisiana, a trip to Louisiana may be necessary in order to thoroughly investigate one of these informants.

5.      The government has listed fifteen (15) "reputation" witnesses to date. Many have been interviewed but the rest of these witnesses must be interviewed in order to determine whether they have the knowledge of Orlando Hall and/or the contact with him necessary to form an opinion as to Orlando Hall's reputation. It is also possible some of these witnesses can provide helpful information (concerning Orlando Hall's family life, for

3

MW 00250

57

example, which will assist experts developing the punishment phase information). Some of these witnesses have arrest/criminal records and some may have been offered immunity in exchange for their testimony against Orlando Hall. All possible impeachment material must be investigated.

6.    Several prior adjudicated and uncharged offenses will be presented by the government during the punishment phase of the trial. Many of the witnesses who will testify as to these events have been involved in criminal activities themselves. It is necessary to investigate the backgrounds of each witness, as well as the possibility of immunity agreements with the authorities. The events in question must also be further researched. Even though Orlando Hall was accused of some offenses, he was not prosecuted. Understanding the reason for this lack of prosecution will enable the defense to deal with the testimony concerning the events, as well as to enable the defense to more effectively present evidence of mitigation.

7.    The mitigation/social history investigation into the life of Orlando Hall is not complete. This type of investigation is particularly tedious and time consuming since it involves very private and sensitive issues. The complete social history will then be used by expert witnesses to complete their evaluation process.

8.    The investigation has led to information that serious domestic violence existed in Orlando Hall's family. The violence between Orlando Hall's parents often extended to the children. The extent and effect of this trauma is not yet realized and more information needs to be developed. For the most part, the victims of, witnesses to, and perpetrators of this abuse have never discussed it outside their family and there has

4

MW 00251

58

not been any counseling for any persons involved. For these reasons, the process of gathering information about Orlando Hall's childhood is a slow one, as the investigator must first deal with a variety of emotions from the witnesses (anger, denial, hurt, fear of retribution from the abuser, etc.) in order to elicit the needed information. Orlando Hall has five siblings and five half-siblings. Two of these potential witnesses reside in states other than Texas or Arkansas. Two are in prisons in Texas and Arkansas. Each of Orlando's siblings must be interviewed.

9.    Information has been obtained that Orlando Hall's mother was beaten with a two-by-four board during the second trimester of her pregnancy with Orlando. This significance of this information is clear and further investigation is mandatory in order to assist the expert witnesses. School records indicate Orlando had difficulty learning, even in remedial classes. Witnesses report Orlando has always had difficulty following instructions and with his memory. This information, coupled with available medical records, is vital to the mitigation investigation.

WHEREFORE, pursuant to 21 U.S.C. Section 848(q)(9) and (10), the defendant requests of this Court an order under seal authorizing additional compensation for the employment of a mitigation specialist for defendant, Orlando Hall in the amount of $2,500.00.

5

MW 00252

59

Respectfully submitted,


_____
MICHAEL LOGAN WARE
State Bar Number: 20864200
LAW OFFICES OF
MICHAEL LOGAN WARE
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas  76102
Telephone:  (817) 338-4100
Telecopier: (817) 338-1020

JEFF KEARNEY
State Bar Number:  11139500
JEFF KEARNEY & ASSOCIATES
Sundance Square
120 West Third Street, Suite 300
Fort Worth, Texas 76102
(817) 336-5600
(817) 336-5610 (fax)

ATTORNEYS FOR ORLANDO CORDIA HALL

6

MW 00253

60