Exhibit 9

10/13/95 Funding Order

61



OCT 1 4 1995

**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**
OCT 1 3 1995
NANCY DOHERTY, CLERK
By _____
Deputy

UNITED STATES OF AMERICA § 
§ 
§ 
VS.  §     **CRIMINAL NO. 4:94-CR-121-Y**
§ 
§ 
ORLANDO CORDIA HALL (2) § 

## ORDER

The Court, having considered the Exparte Motion for Additional Services Required of Mitigation Specialist filed herein by Defendant, ORLANDO CORDIA HALL, and being of the opinion that same should be in all respects granted,

It is hereby ORDERED that additional compensation in the amount of $2,500.00 is approved.

SIGNED this the 12th day of October , 1995.

_____
TERRY R. MEANS,
United States District Judge

7

MW 00251

62

Exhibit 10

"11-16-95" Note From Trial Counsel's File

63

11/16/95 — Arlandel says listening to
radio afterwards to jurors
(a.m. station) heard one woman
say celebrated Lisa's birthday
on Saturday (between
deliberations)

[see if we can get tape
at program]
[file action to intenue jurors?]

64

Exhibit 11

Declaration of Danny LaRue

65

## DECLARATION OF DANNY LARUE

Danny LaRue, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Danny LaRue. I am a licensed investigator in the State of Texas. My Texas license number is A07409. I am over eighteen years of age and have personal knowledge of the facts set forth below.

2. I worked as an investigator on Orlando Hall's defense team. I was originally contacted in November, 1994, by Fort Worth attorney Mark Daniel, who had been appointed to represent Mr. Hall. However, I had performed less than ten hours' work on the case by the time that Mr. Daniel and his co-counsel Michael Heiskell withdrew from the case and were replaced by Jeff Kearney and Mike Ware.

3. My work on the Hall case did not involve investigating Mr. Hall's family background or social history. I was not responsible for developing mitigating evidence and never interviewed any members of Mr. Hall's family. It was my understanding that Tena Francis, who came into the case just before jury selection began, was responsible for those tasks. I met with Ms. Francis on one occasion in Mike Ware's office. That meeting was very brief. I had only very limited contact with her after that.

4. My investigation focused mostly on Mr. Hall's co-defendants in our case and his prior offenses in Arkansas. I served a number of subpoenas in Arkansas to obtain records and other documents on the co-defendants and on Mr. Hall's priors. I made one trip to Arkansas, in which I spent about two days in El Dorado and three days in Pine Bluff. I talked to Mr. Hall's girlfriend and other people in El Dorado and Pine Bluff who had had information about Bruce Webster and Marvin Holloway. I also interviewed a number of

66

the reputation witnesses we anticipated the Government would call to testify.

5. I also spoke with the FBI agents on the case, and with law enforcement officers in Arkansas who had dealt with Bruce Webster in the past. I reviewed the Government's exhibits and examined physical evidence.

6. The investigators who worked on the Webster case were Clint Brown and Mike Connolly, a former FBI agent. After the conclusion of the Hall trial, I turned all my files on the Hall case over to Mike Connolly to use for Webster's case.

7. A true and correct copy of my billing records in the Hall case is attached to this declaration and incorporated here by reference. Those records consist of three statements respectively dated October 3, 1995 (2 pages); November 1, 1995 (5 pages); and November 6, 1995 (2 pages). These records accurately reflect the entirety of the investigative services I performed on the Hall case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___5/3 8/0.2___ (date).

DANNY LARUE

9501003

## LaRUE INVESTIGATIONS

P. O. Box 101432
Fort Worth, Texas 76185

Office
(817) 922-9855

Pager
(817) 630-2376

October 3, 1995

Mr. Michael L. Ware
Attorney at Law
909 Throckmorton
Fort Worth, Texas  76102-6321

RE:  United States of America
     v. Orlando Cordia Hall
     Criminal Number 4:94-CR-121-Y

### BILLING STATEMENT

11/15/94    1.0 Office conference with attorney Mark Daniel re:
            initial case facts and receive copy of case file.

11/17/94    2.0 Review and analyze attorney's case file.

12/6/94      .5 Met attorney Daniel at Criminal Justice Center and
            discuss case facts and possible plea bargain.

1/23/95     1.0 Office conference with attorney Daniel re: trial
            setting and government's position on death penalty.
            Receive instructions relating to witness interviews
            to be conducted in Arkansas.

1/24/95     3.0 Met attorney at Mansfield Federal Prison and
            interview defendant.  Discuss defense strategy and
            character witnesses in Arkansas.

3/17/95      .3 Briefed by attorney Daniel re: defendant's planned
            escape attempt.  Informed of attorneys' Daniel and
            Heiskel's withdrawal from case.

6/5/95       .3 Telephone conferences with attorneys Kearney and
            Ware.

6/7/95      2.5 Interview defendant with attorney Ware at Federal
            Correction Institute.

68

October 3, 1995
Mr. Michael L. Ware
Page -2-

9/1/95      5.8 Assist attorneys Kearney and Ware at suppression hearing.

9/25/95     1.1 Three telephone conferences with attorneys and staff re: request to obtain racial statistics in Northern District supporting to contest jury panel.

            Several telephone conversations with government agencies re: census and vital statistics. Information obtained from Texas A&M University "Texas State Data Center".

            1.6 Office conference with attorney Ware re: appointment with defendant's girlfriend. Discuss discovery items and new instructions to contact witnesses.

9/26/95     .4 Two telephone conferences with attorney Ware re: defense witnesses.

            .3 Telephone conference with defendant's sister.

9/27/95     3.0 Met both attorneys at Mansfield Federal Jail and conduct interview with and co-defendant, Demetrius Hall, and his attorney.

            .3 Telephone conference with both attorneys re: future meeting with Latonya Anders, government's witness.

            .2 Telephone conference with Anders re: schedule interview for 9/30/95.

9/30/95     4.0 Interview Anders with both attorneys. Discuss defense strategy. Met Assistant US Attorney Richard Roper at his office and review exhibit list.

            27.3 Total Hours at $65.00 per Hour:    $1,774.50
            Expenses:
            Parking                                      9.50
            Mileage (130 miles @ .30 per mile)          39.00
            BALANCE DUE:                             $3,822.00

TAX ID# 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

#9501101

**LaRUE INVESTIGATIONS**

P. O. Box 101432
Fort Worth, Texas 76185

*Office*
(817) 922-9855

*Pager*
(817) 630-2376

November 1, 1995

Mr. Michael L. Ware
Attorney at Law
909 Throckmorton
Fort Worth, Texas 76102-6321

RE:   United States of America
      v. Orlando Cordia Hall
      Criminal Number 4:94-CR-121-Y

BILLING STATEMENT

10/2/95    1.0 Research defendant's and co-defendant's criminal
               history at state district clerk's office.

           2.0 Office conference with attorneys and mitigation
               attorney, Tena Francis re: investigating
               government's informants that will testify against
               defendant re: planned escape at punishment phase.

10/3/95     .2 Telephone conference with co-defendant, Webster's
               court appointed investigator, Mike Connelley re:
               meeting to share defense information.

            .3 Two telephone conferences with attorney Ware re:
               styling of subpoenas for criminal history
               information on co-defendants and government
               informants and discuss Connelley meeting.

           2.8 Office conference at Mansfield Federal Jail with
               Administrator Jim Owens and Operations Director
               Gary Cardinale re: discuss escape plan, serve
               subpoena. secure records of defendant and both
               informants.

10/4/95     .3 Two telephone conferences with attorney Ware re:
               Arkansas witnesses to be interviewed.

November 1, 1995
Mr. Michael L. Ware
Page -2-

               3.2 Office conference with Ware. Review subpoenaed records and government witness list. Discuss which witnesses to be interviewed in Arkansas.

10/8/95      2.0 Office conference with both attorneys re: attorney Ware's findings in Arkansas. Supplied with information and instructions re: contacts to be made during Arkansas investigation.

10/10/95    1.5 Office conference with Ware. Supplied subpoenas to be served at various Arkansas locations. Receive additional instructions for witnesses to be interviewed and documents to be secured.

               5.5 Travel to El Dorado, Arkansas.

10/11/95    1.8 Office conference with El Dorado Police Lt. Carolyn Dykes (government witness) re: defendant's reputation and offenses suspected in El Dorado area.

               .7 Attempt to locate government witness Keith Cooper, former police officer, through wife's law firm in El Dorado (Shackelford, Shackelford and Phillips).

              1.5 Office conference with El Dorado Probation Department Officer Richard McKinnon (government witness) re: defendant's reputation. Computer check of 8 other listed government witnesses.

               .4 Telephone conference with Arkansas State Parole Officer Jim Ford (government witness) re: his and Curtis Lewis' knowledge of defendant's reputation and parole records.

              1.0 Office conference with Juvenile Probation Officer Mary Nelson (government witness) re: juvenile records and reputation of defendant. Serve subpoena to same for records. Referred to Circuit Court Judge Anthony.

               .3 Office conference with Judge Anthony re: her review of above subpoena and instructions to secure records.

               .8 Office conference with El Dorado Municipal Court Clerk re: misdemeanor and felony records of defendant and 7 government witnesses. Secure records.

November 1, 1995
Mr. Michael L. Ware
Page -3-

> 1.0 Office conference with County Judge Charles Skinner (government witness) re: defendant's reputation and character.
>
> 1.2 Office conference with defendant's El Dorado attorney James Bennett (government witness) re: civil suit against Keith Cooper and purged search warrant affidavit.
>
> 1.5 Interview Erma Willis (government witness) at her El Dorado residence. Discuss extraneous offense alleging defendant's role in El Dorado abduction. Discuss Willis' children's (additional government witnesses) involvement.
>
> 1.5 Travel to Pine Bluff, Arkansas.

10/12/95

> 1.2 Serve subpoena at Circuit Court Clerk's Office in Pine Bluff for multiple government witnesses' criminal history and convictions.
>
> .6 Serve subpoena to Pine Bluff Police Chief Brad King for government witnesses' criminal records.
>
> 1.1 Office conference with Pine Bluff FBI Agents Eubanks and Crewdson (government witnesses).
>
> 1.3 Interview Sylvia Henry Jackson (government witness) at her residence re: co-defendants' Webster and Holloway actions during offense.
>
> .8 Interview employees at Pine Bluff Beauty Salon owned by co-defendant Holloway's wife, Latosha Holloway (government witness).
>
> .6 Office conference at Pine Bluff Federal District Court Clerk's Office re: Holloway's bankruptcy suit.
>
> .8 Office conference with Pine Bluff Police Lt. Pritsen (defense witness) re: defendant and co-defendant's reputations and prior arrest of co-defendant Webster.
>
> .5 Office conference with Pine Bluff Police Officer Sanders (government witness) re: traffic stop and seizure of defendant's vehicle at time of offense.

November 1, 1995
Mr. Michael L. Ware
Page -4-

.7 Office conference with Tri-County Narcotic Task Force Officer Alexander re: defendant and co-defendant's drug dealings.

1.0 Office conference with defendant and co-defendant's Parole Officer Greg Barber (government witness) re: parolees' records and reputations.

.8 Telephone conference with attorney Ware re: details of Arkansas investigation.

2.0 Interview neighbors Mickey and Jessica Luneau (defense witnesses) at Pine Bluff residence re: Holloway's drug activities and discuss their knowledge of events surrounding the discovery of victim's body.

10/13/95   1.3 Office conference with Arkansas State Police Trooper Maxcie Thomas (defense witness) re: physical confrontation with co-defendant Webster and discuss defendant and co-defendant's reputations.

.8 Office conference with Pine Bluff Police Records Sergeant Terrell. Secure subpoenaed documents of defendant and co-defendant's criminal history.

3.0 Office conference with Pine Bluff Police Captain of Detectives Kenneth Heroman (defense witness) re: suppressed records and discuss government witness Dennis Holloman's unsolved murder in connection with co-defendant Holloway's family drug dealings.

1.5 Office conference with Pine Bluff Circuit Judge Tommy Brown and service of 2 subpoenas to same re: co-defendant Holloway's juvenile criminal records.

.7 Secure conviction records at Pine Bluff Circuit Court Clerks Office re: above subpoena.

1.0 Secure County Juvenile Probation case files of co-defendant Holloway and his juvenile criminal records re: above subpoena.

1.2 Interview Eddie Holloman (defense witness) father of murdered government witness Dennis Holloman re: Holloway drug connections.

6.0 Return trip to Fort Worth from Pine Bluff.

November 1, 1995
Mr. Michael L. Ware
Page -5-

10/14/95    3.0 Office conference with attorney Ware re: Arkansas investigation and provide all subpoenaed records.

10/24/95    1.8 Interview Michael Davis (government witness) at Mansfield Federal Jail.

2.0 Office conference with attorney Ware re: Davis interview. Review case facts and defense strategy. Review of trial testimony thus far.

10/25/95    2.5 Attend trial and assist attorneys.

10/30/95    .7 Three telephone conferences with attorney Ware re: coordination of defense witnesses to travel from Arkansas to Texas for testimony.

.3 Telephone conference with Pine Bluff Police Lt. Pritsen re: subpoena to testify as defense witness.

.2 Telephone conference with Arkansas State Police Officer Thomas re: subpoena to testify as defense witness.

.4 Telephone conference with Tena Francis re: details of Dallas lawsuits involving Dallas police officer Scahille and Haywood Alexander (government witness).

.3 Telephone conference with Officer Scahille re: civil suits.

10/31/95    .2 Two attempts to contact by telephone Jessica Luneau in Pine Bluff re: subpoena to testify as defense witness.

.8 Attend trial for verdict proceedings re: defense guilt/innocence and discuss Officer Scahille's interview.

69.6 Total Hours at $65.00 per Hour:     $4,524.00
Expenses:
Out of State of Meals (3 days)          23.09
Hotel (3 days)                          176.10
Mileage (821 miles @ .29 per mile)      238.09
BALANCE DUE:                            $4,961.28

TAX ID# 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

#950104

(Replaces #9501102)

**LaRUE INVESTIGATIONS**

P. O. Box 101432
Fort Worth, Texas 76185

*Office*
(817) 922-9855

*Pager*
(817) 630-2376

November 6, 1995

Mr. Michael L. Ware
Attorney at Law
909 Throckmorton
Fort Worth, Texas  76102-6321

     RE:  United States of America
          v. Orlando Cordia Hall
          Criminal Number 4:94-CR-121-Y

BILLING STATEMENT

11/1/95    6.0 Assist attorneys in trial proceedings re: cross-examination of government witnesses who were interviewed during defense's Arkansas investigation.

         1.0 Office conference with attorney Ware re: defense witnesses scheduled to testify.

         .3 Telephone contact with two defense witnesses at local hotels.

11/2/95    7.0 Assist attorneys in trial proceedings re: defense witness testimony.

11/3/95    N/C Attend closing arguments.

11/6/95    3.0 Telephone conference with attorney Kearney. Two telephone conferences with attorney Ware. Two telephone conferences with attorney Ware's office staff. Telephone conference with Jim Reed, News Director KDFW Television. Serve subpoena to Mr. Reed re: video tape. Secure tape in Dallas and deliver to attorney Ware. The above are reference to a 11/5/95 news broadcast by channel 4 (KDFW) re: the Orlando Hall capital murder trial and

November 6, 1995
Mr. Michael L. Ware
Page -2-

subsequent political debate re: the death penalty.
The tape was subpoenaed for evidence in a hearing
on Motion for Mistrial.

| | | |
|---|---|---|
| 17.3 Total Hours at $65.00 per Hour: | $1,124.50 | |
| Expenses: | | |
| Mileage (55 miles @ .29 per mile) | ~~15.95~~ | 15.95 |
| BALANCE DUE: | $1,140.45 | |

TAX ID# 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

**Exhibit 12**

Declaration of Michael E. Tigar, Esq.

## DECLARATION OF MICHAEL E. TIGAR

Michael E. Tigar, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.  My name is Michael E. Tigar.

### Qualifications of Declarant

2.  I am a lawyer. I have been continuously engaged in the practice of law, focusing on civil and criminal litigation, for more than thirty years.

3.  In addition to practicing law, I am a Professor of Law at American University's Washington College of Law in Washington, D.C. I have been a member of that faculty since 1998. I currently teach Federal Courts, Criminal Procedure, Criminal Law, and International Human Rights. Prior to joining the law faculty at American, I taught for fourteen years at the University of Texas School of Law in Austin, Texas, where I held the Joseph D. Jamail Chair in Law.

4.  I received my B.A. from the University of California at Berkeley in 1962, and my J.D. degree from the same school in 1966.

5.  I am admitted to practice in the District of Columbia and in New York State, as well as most of the United States Courts of Appeals and the U.S. Supreme Court.

6.  I was Editor-in-chief of the California Law Review. I am a recipient of the John Minor Wisdom Public Service Award and the Letelier-Moffitt Human Rights Award. From 1989 to 1990, I chaired the American Bar Association's 60,000-member Section of Litigation. When majority rule came to South Africa, I worked with the African National Congress in drafting the post-apartheid constitution for that nation.

7.  I am the author of *Examining Witnesses*; *Persuasion: the Litigator's Art*; *Federal*

78

*Appeals: Jurisdiction and Practice*; and *Law and the Rise of Capitalism*. In addition to these books, I have written more than 50 scholarly articles, essays, and book reviews published in law reviews and legal journals.

8. I have extensive experience litigating both criminal and civil matters, in both state and federal courts. I have practiced in the state courts of at least six different states, as well as at least ten different United States District Courts. I have handled federal appeals in the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, District of Columbia, and Federal Circuits. I have served as counsel of record in at least twelve cases before the Supreme Court of the United States.

9. I have defended in many criminal cases tried to a verdict before a jury. I have also served as counsel in dozens of civil jury trials.

10. I have represented capital defendants at every stage of the process from trial to postconviction, and have appeared in capital cases at every level of the American court system from state trial courts to the Supreme Court of the United States.

11. I have been an expert witness on attorney duties in several prior federal cases, and appointed counsel as to such issues in other cases.

12. I have been asked to render an opinion whether, in the matter of *United States v. Orlando Hall*, No. 4:94-CR-121Y (N.D. Tex.), the defendant's attorneys provided effective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

### Documents Reviewed

13. In preparing to render an opinion, I have reviewed the following materials: the superseding indictment; the Government's notice of intent to seek the death penalty; the

charge of the court, jury notes, and verdict at the guilt phase; the charge of the court, jury notes, and verdict from the punishment phase; the Statement of the Case from Hall's opening brief on appeal; excerpts from the Fifth Circuit's opinion affirming Hall's conviction and sentence; a summary of the guilt-phase testimony of Steven Beckley, Demetrius Hall, and Marvin Holloway; the Government's closing argument from the guilt phase; a summary of the penalty-phase testimony of all witnesses; portions of the trial transcript relating to the defense motion that Hall be allowed to make a statement in allocution; a summary of the time records submitted by the members of Hall's defense team; several statements by Orlando Hall; an affidavit of Tena Francis; the defense's offer of proof regarding its medical expert; declarations by the following persons: Jill Miller, M.S.S.W.; Betty Hall; Cassandra Ross; Rev. D.L. Hegler; Charles Chastain; Jerry and Gracie Ross; Alonzo Airy; Javier Solis; and portions of the testimony of Larry Nichols from *United States v. Miller and Reliford*, No. CR3-94-343G (N.D. Tex.) (Fish).

## Basis and Standards for Review

14. For all opinions set out below, I rely upon *Strickland v. Washington*, the Supreme Court's definitive teaching on the 6th Amendment right to the effective assistance of counsel. My opinion is also informed by the Court's most recent application of the *Strickland* test in *Williams v. Taylor*, ___ U.S.___, No. 98-8384 (U.S., April 18, 2000).

15. My opinions here pertain only to trial counsel's acts and omissions in this particular trial. Otherwise competent and skillful attorneys can, in a particular case, make mistakes which either alone or in combination are so serious that they render the representation constitutionally ineffective.

## Summary and Scope of Opinion

16. Upon reviewing the materials described above, and considering them in light of the Supreme Court's pronouncements in *Strickland* and *Williams*, it is my opinion that Mr. Hall did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, based on the acts and omissions of counsel described in this declaration.

17. The instances of deficient performance and resulting prejudice set out below may not constitute a complete list of the Sixth Amendment violations in Hall's trial. I continue to review information provided by Hall's current counsel, and have not yet formed an opinion respecting whether other specific instances of attorney performance in this case constitute ineffective assistance under *Strickland*.

## Failure to Conduct Timely Investigation

18. Counsel performed deficiently in failing to undertake timely investigation of the case.

19. At the time they were formally appointed on March 21, 1995, counsel had access to investigator Danny LaRue, who had been appointed to assist Hall's original attorneys. Although Mr. LaRue possessed no special skills in investigating mitigation, and thus might not have been able to conduct appropriate investigation in any event, counsel neglected to take any advantage of Mr. LaRue's availability between the end of March and the beginning of jury selection on October 2. According to Mr. LaRue's time records, during that six-month span Mr. LaRue performed a total of 13.7 hours of work, barely more than 2 hours per month. Thus, between the day they were appointed and the week jury selection began, counsel directed their investigator to conduct a total of 13.7 hours of work.

20. Nor did counsel themselves conduct necessary penalty-phase investigation during the

8 1

same period. From the date of appointment to October 1, lead attorney Jeff Kearney spent approximately 110 hours of out-of-court time working on Hall's case. Approximately half of that time was devoted to reviewing discovery materials and transcripts provided by the Government. Thus, even if Mr. Kearney spent all his remaining time on factual investigation, he spent less than 10 hours per month for the six months prior to the beginning of jury selection. During the same time period (*i.e.*, from appointment through October 1), attorney Michael Ware appears to have spent about 140 hours of out-of-court time working on Hall's case. That figure likewise includes a substantial amount of time spent reviewing discovery materials and transcripts.

21. Equally striking is the fact that for the first four months counsel were on the case – April, May, June, and July – the total amount of out-of-court time spent on Hall's case by all three members of his defense team was less than 50 hours. In a case where this four-month interval represented two-thirds of the total time available for pre-trial investigation and preparation, this constitutes an objectively unreasonable failure to conduct a timely investigation. Indeed, waiting four full months to undertake any meaningful mitigation investigation in any capital case is, in my view, objectively unreasonable.

22. I find it remarkable that counsel failed to take advantage, in a timely way, of the statutory entitlement to resources for investigation and other reasonably necessary services. 21 U.S.C. § 848(q) gives defense counsel in capital cases access to many resources, by simply filing an *ex parte* motion. Failure to make timely and intelligent use of this resource is, in and of itself, a substantial departure from the standards that a federal capital defendant has the right to expect. 21 U.S.C. § 848(q) codifies many of the understandings about the scope of the right to counsel in capital cases that have been part

82

of federal law since 1790.

23. Counsel waited until June 30, 1995, three months into their representation, to move the Court *ex parte* for appointment of a mitigation specialist to conduct investigation into potential mitigating evidence. When their motion was heard in mid-July, however, counsel affirmatively decided not to pursue the motion further at that time. Counsel did not renew the request for a mitigation specialist until September 7, which motion was granted on September 12, less than three weeks before jury selection began.

24. This timetable demonstrates that counsel conducted the bulk of their mitigation investigation during the trial itself, while the jury was being selected and while the Government was presenting its case. For several reasons, I believe such a practice was objectively unreasonable.

25. First, acquiring a full understanding and appreciation of the events of the client's life requires counsel or their investigator to ask the client and important people in his life to talk about events and memories that are profoundly painful and difficult to recall. This takes time and cannot necessarily be compressed into a short period, even one in which counsel or the investigator spends substantial time with the client or witness. Developing the case for life requires counsel or her investigator to form relationships of trust with the most important individuals who will become penalty-phase witnesses for the defense. Such relationships may take repeated visits and long hours of conversation – or companionable silence – to develop. In addition, in order vividly and persuasively to convey the locations and events of the client's life for the jurors, counsel needs a genuine appreciation for those circumstances, and needs to consider thoughtfully how to communicate that information to the jury. These tasks all demand substantial,

83

*unpressured* time. They cannot be effectively pursued mid-trial.

26. Reasonably competent counsel, moreover, are obliged to prepare these individuals to testify at trial, and to prepare them for whatever cross-examination may reasonably be anticipated. Simply put, the decisions about what mitigating evidence to present, and how defense witnesses are to be examined, are too important to leave until trial is underway, when counsel's energy and attention are necessarily focused on (and drained by) the numerous demands of being in trial. Preparing such witnesses to testify, particularly when their testimony will cover subjects and events which are extraordinarily personal or painful, takes extensive time and emotional energy on the part of counsel and the witness alike. Simply because the witness has been able to acknowledge painful facts to counsel or his investigator does not mean the witness will be able, without patient and time-consuming preparation, to talk openly and expressively about the same events to a roomful of strangers in a formal, artificial setting. Waiting until mid-trial to begin those tasks usually ensures they will not be completed adequately.

27. Part of preparing defense witnesses for cross-examination is anticipating likely subjects of cross-examination by the Government. In 1995, reasonably effective counsel in a death penalty case would have anticipated that if the defense presented mitigating evidence to show that the defendant was raised in a turbulent home environment marked by violence, the prosecution would attempt to rebut this evidence, in part, by focusing on the lives of any siblings who had grown to adulthood without committing violent crimes. The Government pursued this line of questioning and argument with Hall's sister Cassandra Ross, who testified as a mitigation witness at punishment. Had Ms. Ross been properly prepared for cross-examination, she could have neutralized the effect of this

84

theme by pointing out that each of her siblings has led a troubled and unsuccessful life, and that she has succeeded in life only by going to great lengths to distance herself from her family and enjoyed, through her childhood and adolescent years, the love and support of the man who became her husband and his family. Those important facts went unpresented.

28. In much the same fashion, reasonably effective counsel defending a capital case in 1995 should have anticipated that the Government would focus on Hall's prior involvement in selling drugs and his failure, even after serving a prison term for a drug offense, to "go straight" on the outside and pursue a law-abiding job. This point was emphasized during the Government's cross-examination of Hall's mother at the penalty phase. Reasonably effective capital defense counsel representing a young African-American man in a drug-related homicide case in 1995 would have anticipated the need to provide jurors a *mitigating* explanation for why young men like Hall came to engage in such conduct. Counsel in this case failed to connect the circumstances of Hall's background with his subsequent criminal activity. Their failure to do so, in my view, is a result, at least in part, of their having waited until trial was already underway to pursue the investigation necessary to support such an explanation.

29. I also find it troubling that counsel failed to undertake any meaningful investigation into the facts surrounding Hall's alleged "escape plot" until October. Counsel were aware of these allegations, of course, from the time they entered the case. The allegations formed an important part of the Government's case for the death penalty and reasonably effective counsel would have initiated their investigation of these matters immediately upon being appointed to represent Hall. Indeed, without initiating an aggressive inquiry into the

85

Government's proof of the supposed "escape plot," it is difficult to imagine how counsel could have formed an effective attorney-client relationship with Hall, whom I understand consistently denied the allegations.

30. In addition, investigation must be substantially complete before trial to inform counsel's decisions during the formation of the jury. Defense counsel in this case plainly always expected the jury to convict Hall of a death-eligible offense. Thus, their primary goal in selecting the jury would be to look for jurors who might be persuaded not to impose the death penalty. If counsel has only a vague idea during jury selection what kind of information about the client's character and background the defense will present at sentencing, and, indeed, has no idea what witnesses will testify for the defense and what their manner and the content of their testimony will be, counsel will have a difficult time performing the essential task of attempting to seat jurors who might respond personally to those witnesses and their stories. At a minimum, counsel whose penalty-phase theory and investigation are barely underway during jury selection will be handicapped in exercising peremptory challenges to remove jurors who pose too great a risk of unfairness toward the defendant's case. Attempting to accomplish that task "in the dark," without a substantially completed mitigation investigation, was objectively unreasonable.

## Failure to Make Closing Argument at the Guilt Phase

31. Counsel performed deficiently in failing to make a closing argument at the guilt phase of trial. While failure to make a closing argument is not *per se* deficient performance under *Strickland*, in the factual context of this case counsel's decision to waive closing was objectively unreasonable. In my opinion, counsel's failure to make a closing argument at guilt may not have been prejudicial with respect to Hall's conviction, but it

86

was manifestly prejudicial with respect to his sentence.

32. My opinion is based on several factors. First, this is a multiple-defendant case in which there were disputes of fact concerning who did what and the comparative legal and moral responsibility of the various participants. One key Government witness, Steven Beckley, made numerous concessions during his testimony which would have provided an evidentiary foundation for defense counsel to argue against the central inference urged by the Government in its closing – that Hall was the man who "made the decision that Lisa Rene was going to die," and the person ultimately responsible for her death. This claim regarding Hall's alleged leadership was argued based primarily on Beckley's testimony. Yet, Beckley, during his testimony, admitted having lied repeatedly throughout the prosecution's investigation of his involvement in Lisa Rene's kidnapping and murder. And, of course, the defense had elicited Beckley's powerful motivation to shape his testimony favorably to the Government – his plea agreement, pursuant to which the Government would decide, in its discretion, whether to move the district court to reduce Beckley's sentence in return for his "substantial assistance" against Hall. It was objectively unreasonable for defense counsel not to make a closing argument to develop these points, all of which were centrally relevant to the jury's eventual decision whether to condemn Hall to die.

33. In addition, another very important part of the Government's emotional demand for the death penalty was its insistence that Hall had been the first person to rape Lisa Rene, a claim included in the prosecution's guilt-phase summation and plainly intended to support the inference that Hall was the most culpable among the defendants. During defense counsel's cross-examination of Beckley, they had elicited the fact that his claim

to have seen Hall rape the victim first was inconsistent with every FBI report of the agents' first five interviews with Beckley, spanning two months. Those reports confirmed that Beckley had consistently admitted his own actions in raping the victim, but prior to December 1994 had never claimed to have seen Hall rape the victim. Counsel's failure to address these matters in summation effectively conceded the truth of Beckley's trial testimony on this vital question.

34. These instances do not comprise an exhaustive list of the compelling points which could have been made in reply to the Government's guilt-phase closing argument, but they illustrate that the material for an effective closing was readily available. Even in a case focused on punishment, reasonably effective counsel would not forego an opportunity to talk to the jurors at the close of the guilt phase about what weight the testimony of different witnesses deserved. This is especially true where the defense fully intends to contest at the penalty phase the Government's view of who was the most culpable defendant, and where so many facts crucial to resolving that dispute were brought before the jury through Government witnesses whose credibility could be challenged without counsel's losing their own. The fact that the defense apparently conceded Hall's guilt as a party to the offense did not require them to refrain from making any guilt-phase summation at all. On the contrary, since the outcome of the penalty phase might well turn on the jury's view of Hall's precise role in the events of the crime, it was objectively unreasonable not to make a closing argument directed to that issue.

35. Federal law prefers that the trial jury also be the sentencing jury in capital cases. Thus, in any federal capital case, counsel must always be alert to the need to build a bridge between the guilt and sentencing phases. In waiving closing argument at the guilt phase,

88

counsel left the jurors with only the Government's theory of the case to structure and shape their receipt and consideration of evidence at the sentencing phase.

**Failure Effectively To Cross-Examine Larry Nichols**

36. Counsel performed deficiently in cross-examining Government witness Larry Nichols at the penalty phase. Nichols was an important witness because he provided not only an evidentiary basis for the non-statutory future dangerousness aggravator, but also an extremely damaging portrait of Hall as boastful, unrepentant, and cruelly coarse toward the victim. Accordingly, destroying Nichols' credibility in the eyes of the jurors was vital. In counsel's attempts to accomplish this goal, he inexplicably failed to employ the best proof that Nichols was a liar -- prior sworn testimony by Nichols that contradicted his testimony in Hall's trial. Counsel's cross-examination was deficient because counsel failed to impeach Nichols on important points after eliciting denials from the witness, with available prior inconsistent testimony that Nichols gave as a Government witness in the trial of his co-defendants.

37. For example, one apparent theme of counsel's cross was that Nichols was knowledgeable about how an offender might obtain a sentence reduction by cooperating with the Government. Pursuing that theme, counsel asked Nichols whether "some inmates out there at Mansfield" had "helped" Nichols to "know how to take certain steps to help yourself in the legal system." Nichols denied it. Counsel twice repeated the same inquiry, "in the trial you testified in in Dallas, did you say there was some inmates out there that helped you learn to take steps to help yourself?" Nichols repeated his denials. Counsel moved on, without impeaching Nichols on this point.

38. The transcript of Nichols' testimony from the Dallas trial would have permitted counsel

to demonstrate to the jurors that Nichols was lying. In his testimony in that case, Nichols admitted explicitly that in sending a letter to one of his co-defendants and asking him to sign a false affidavit exculpating Nichols, he was following "steps to go by" which were given him by other prisoners at Mansfield. Nichols also admitted in that trial that he had gone "to the law library" for information and was getting "advice from [his] fellow inmates" about how to "get out of this jam." Nichols repeated substantially the same admission seven different times during his testimony in the Dallas trial. Reasonably effective counsel would have impeached Nichols on this point with Nichols' own prior testimony.

39. Counsel also asked Nichols whether he had "used some of that money [from the robberies] to buy some drugs for resale." Nichols answered, "No." Counsel persisted, asking whether Nichols "ever told anyone that [he] used some of that money [obtained in the robberies] to buy drugs with to resell the drugs?" Nichols' answer: "No, I didn't." Counsel asked Nichols whether he was "sure about that," and Nichols answered, "Positive." Counsel moved on to a different subject without impeaching Nichols.

40. Reasonably effective counsel would have employed the transcript of Nichols' testimony from the Dallas trial to demonstrate to the jurors that Nichols was lying to them. In that trial, Nichols admitted that he purchased and re-sold drugs with his part of the proceeds from the robberies, and in fact that he did so "after every robbery."

41. More generally, Nichols attempted in answering counsel's questions to minimize his own involvement in the robberies that gave rise to his federal exposure, claiming that he never went inside any of the establishments that were robbed and only participated in two robberies in any event. Nichols also left the jury with the impression that he owned or

possessed only two firearms. Faced with these representations by Nichols, reasonably competent counsel would have used Nichols' own testimony from the Dallas trial to establish for the jurors that (1) prior to committing the robberies, Nichols was living on "drug proceeds," by "selling dope;" (2) that Nichols, after participating in the Louisiana robberies, accompanied his robbery cohorts on a trip to Florida with the intent to rob a bank there, but the plan went awry; (3) that Nichols and another man had stolen two Jet Ski watercraft, which they took across state lines from Louisiana to Florida in order to sell them; (4) that Nichols was involved in defrauding merchants by passing fraudulent checks, including writing a fraudulent check for $1700 to purchase a car, and that charges based on that conduct were foregone as part of his plea deal to testify against his co-defendants in the robbery case; (5) that Nichols owned or possessed no fewer than five firearms at various times: a .44 caliber Beretta, a 9mm Ruger, a .380 caliber Taurus, a 12-gauge Mossberg shotgun, and a 9mm Glock; (6) that Nichols acquired the Glock by trading illegal drugs for it; and (7) that Nichols had purchased at least one gun under a false name.

## Failure to Investigate, Develop, or Present *Skipper* Evidence

42. Counsel performed deficiently in failing to investigate, present and argue available, affirmative evidence of Hall's successful adjustment during prior incarceration. First, of course, the Supreme Court has recognized in *Skipper v. South Carolina*, 476 U.S. 1 (1986), that evidence tending to show that a defendant has lived peacefully and productively in a prison environment can persuade jurors to impose a sentence less than death. Reasonably competent capital defense counsel in 1995 would be aware of *Skipper* and would, as part of their investigation into mitigating evidence, have pursued

91

developing and presenting such evidence.

43. Although some of Hall's penitentiary records from Arkansas were placed in evidence by the Government, and one of Hall's attorneys referred briefly to those records in arguing at the penalty phase that Hall had shown no violence during that prior prison term, it was not reasonable for defense counsel to count on the jurors to be able to understand the full mitigating significance of the records without testimony from defense witnesses. For example, the records indicate that Hall was assigned as a "C-2 trusty" during his prior incarceration. A qualified witness with experience in Arkansas corrections could have explained to the jury that this classification indicates that Hall was in the category of offenders receiving the most good-time credit, and that he occupied a trusted status because "C-2" trusties were actually allowed outside the prison walls with an escort, in contrast to lower-grade trusties who were forbidden from leaving the prison grounds. In addition, such a witness could have testified that Hall achieved this trusty status more quickly than comparable inmates, demonstrating the prison authorities' confidence that he had a low propensity for violence and other misbehavior. Such a witness could also have pointed out that Hall's record of zero disciplinary infractions, a record to which defense counsel did not even specifically direct the jury's attention, indicates that he was an ideal inmate. In addition, Hall's incarceration record establishes that he was successful in obtaining release under "Act 814," an Arkansas law providing for certain inmates to be placed in the community on work-release status; an appropriately qualified witness could have emphasized to the jury that offenders were carefully scrutinized for this type of release and that no inmate obtained it unless the Department of Correction viewed his behavior as above reproach. Hall's counsel were aware of his early release

92

from the Arkansas DOC, which should have alerted them to the potential availability of such evidence.

44. Hall's Arkansas DOC records also offered other important opportunities to humanize their client, of which defense counsel failed to take advantage. The records show, for example, that on several occasions Hall made urgent requests to telephone home and check on his family when other family members underwent unexpected health crises. This information could have helped corroborate the views of other defense witnesses (whom counsel also failed to call) that Hall was capable of generosity and compassion.

45. In addition, relying on cold documents alone is unreasonable where there are available live witnesses to corroborate them and add credibility to the defendant's cause. Testimony from actual guards or correctional personnel who had observed Hall as a prisoner would have increased the persuasiveness of the documents themselves as well as providing independent mitigating evidence about his character. Counsel's argument concerning the negative inferences that could be drawn from the Government's failure to point to evidence of violent behavior by Hall during his earlier incarceration did nothing to develop positive evidence of Hall's productive adjustment to imprisonment.

46. While it is my opinion that counsel in any death penalty case is obliged to develop and present available "*Skipper* evidence," counsel's failure to develop and present such evidence in Hall's case is noteworthy for two reasons. First, the Government had given formal notice that it would ask the jury to sentence Hall to death based on the non-statutory aggravating factor of future dangerousness. The Supreme Court emphasized in *Skipper* that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness. Knowing that future dangerousness

would form an important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence that Hall had been a "model prisoner" in the past. Second, counsel knew that the Government intended to rely on specific allegations that Hall had plotted to escape from custody while awaiting trial on the present capital offense, and that he had planned to take his own attorneys hostage in order to do so. Reasonably effective counsel, anticipating this evidence from the Government, would have developed and presented the readily available "*Skipper* evidence" in order to bolster their argument that Hall's prior history was reason to disbelieve the Government's allegations.

47. Counsel's failure to investigate, develop, or present "*Skipper* evidence" points to a more general deficiency in the preparation for, and presentation of, the penalty phase. Namely, counsel appear to have focused almost exclusively on mitigating evidence relating to the circumstances of the offense, rather than also developing evidence about the character and background of their client. This dual nature of constitutionally mitigating evidence has been well described in the opinions of Justice O'Connor, who has emphasized since her concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987) that punishment must constitute a "reasoned moral response" to a defendant's "personal moral culpability." *See also Penry v. Lynaugh*, 492 U.S. 302 (1989) (adopting this principle). In my view, reasonably competent capital defense counsel must attend to both types of mitigation in preparing for trial. The record of Hall's case strongly indicates that his attorneys virtually ignored his personal characteristics in favor of abstract arguments about the injustice of sentencing Hall to death when equally culpable co-defendants were not receiving such a harsh punishment. While relative culpability is a legitimate

94

mitigating circumstance, counsel fell substantially below the minimal standard of practice in limiting their punishment-phase investigation and presentation almost exclusively to that area.

## Failure to Argue Effectively for the Opportunity for Hall to Allocute

48. Counsel performed deficiently in failing to argue effectively to persuade the trial court to allow Hall to make a statement in allocation before the jury retired to decide his fate. While the Court of Appeals concluded on direct review that Hall possessed no unconditional right to make such a statement (by which I mean an unsworn statement, not subject to cross-examination) prior to the jury's deliberations on penalty, it specifically declined to express any opinion as to whether a district court could properly exercise its discretion to allow a defendant to make a statement in allocution. In my view, the district court had the authority to make just such a decision (indeed, some district courts have done precisely that – *see, e.g., United States v. Nichols* (W.D. Okl. No. M-95-98-H) (Matsch); *United States v. Battle* (N.D. Ga. No.1:95-CR-528) (Evans); *United States v. Johnson* (N.D. Ill. No. 96-CR-379) (Conlon); *United States v. Beckford* (E.D. Va. 3:96-CR-66-01 (Payne)), and Hall's counsel failed to perform effectively in attempting to persuade the court to do so.

49. My conclusion follows from the premise that most of the decisions a trial judge makes in the course of a trial represent exercises of discretion, rather than legal mandates. Accordingly, reasonably professional representation must encompass making appropriate and timely efforts to persuade the presiding authority to exercise its discretion to the benefit of one's client.   This duty includes the obligation to locate favorable case authority and urge the Court to consider it. During the colloquy at trial concerning Hall's

request to make a statement in allocution, the judge asked the attorneys, "Is there case law based on state experience where death penalties are assessed where the defendant is allowed to – to give his testimony without cross-examination before a jury passes sentence?" The Government's lawyer responded that he hadn't "found one," and that he didn't "think they [the defense] can provide any case law showing it." Id. The trial judge immediately agreed and denied Hall's request for allocution.

50. Reasonably effective defense counsel, in seeking to persuade the court to exercise its discretion in their client's favor on such a vitally important issue, would have taken two steps Hall's attorneys failed to take. First, reasonably effective counsel would have researched previously the question whether any state-court decisions from death penalty jurisdictions had endorsed the practice of allocution by a capital defendant, and would have had those favorable cases or citations available for the trial judge upon making the request. At a minimum, reasonably effective counsel would have made such inquiries after hearing the Court express its interest in knowing the answer before deciding, and would have moved the Court to delay its ruling until such support for the request could be provided. At a minimum, reasonably effective counsel would have obtained and provided the relevant caselaw, then moved the Court to reconsider its ruling. Cases illustrating that many death-penalty states permit allocution by capital defendants were readily at hand. *See, e.g., State v. McCall*, 770 P.2d 1165, 1171 (Ariz. 1989), *cert denied*, 497 U.S. 1031 (1990); *People v. Davis*, 794 P.2d 189, 191 (Colo. 1990), *cert. denied*, 498 U.S. 1018 (1991); *Harris v. State*, 509 A.2d 120 (Md. 1986); *Homick v. State*, 825 P.2d 600, 604 (Nev. 1992); *State v. Zola*, 548 A.2d 1022, 1046 (N.J. 1988), *cert. denied*, 489 U.S. 1022 (1989); *State v. Young*, 853 P.2d 327(Utah 1993); *State v.*

96

*Mak*, 718 P.2d 407, 429-30 (Wash.), *cert. denied*, 479 U.S. 995 (1986); *see also State v. Clark*, 772 P.2d 322, 339 (N.M.)(discussing capital defendant's allocution), *cert. denied*, 493 U.S. 923 (1989); *Tomlinson v. State*, 647 P.2d 415, 417 (N.M. 1982)(allocution statute "extends the common law doctrine of allocutus to non-capital felonies....").

51. Second, it was objectively unreasonable for defense counsel not to proffer, either orally or in writing, the contents of Hall's proposed statement in allocution at the time the trial court addressed their motion. Reasonably effective counsel would have anticipated the need to respond to a Government objection that allowing Hall to allocute might create unfair prejudice, confuse the issues, or mislead the jury. Indeed, during the colloquy the Government's attorney described what he opposed as permitting Hall "to stand up and give his – essentially his version of the whole offense in the sentencing phase" without being cross-examined.

52. However, according to the record, the defense never contemplated having Hall tell "his version of the whole offense." Instead, the anticipated statement in allocution was the following: "I want to apologize to my family and ask them to forgive me, and I hope somehow they can forgive me. I want to apologize to Lisa Rene's family and ask them to forgive me, even though I know that there is no possible way they can forgive me and I understand that. I want to ask God to forgive me, however, I question in my own mind whether even God can forgive me." There is a world of difference between these three spare sentences and the spectre raised by the Government's counsel, of a lengthy, fact-based recitation untested by cross-examination, and reasonably effective counsel was obliged to make that distinction clear for the trial court.

53. The record shows that the trial court was open to persuasion on the issue of whether Hall



should have been allowed to make a statement in allocution. However, because defense counsel apparently was not prepared to provide relevant legal authority from death-penalty jurisdictions in support of the request, or to discuss the contents of the proposed statement in allocution in order to rebut the Government's suggestion that Hall sought to tell his "version of the offense" without being subjected to cross-examination, the opportunity to persuade the trial court was lost. In my view, reasonably effective counsel would have done both.

## Failure to Include Possible Juror Misconduct in Motion for New Trial

54. It appears that, sometime after the jury returned its verdict at the penalty phase on November 6, 1995, one of Hall's trial counsel was advised by Hall's sister Cassandra Ross that, shortly after the jury returned its sentencing verdict, an interview with one of the trial jurors had aired on a local news report. Counsel was advised that in that interview, the juror had stated that during the weekend that interrupted the penalty-phase deliberations (during which time the jury was not sequestered), the juror had held a birthday party for her own daughter. At the birthday party, the juror had placed an additional candle on the cake in memory of Lisa Rene. The guests at the birthday party had prayed for Lisa Rene.

55. Reasonably effective counsel would have viewed these allegations as raising a distinct concern that outside influences might have affected the jury's sentencing decision. In numerous capital cases, reviewing courts have found that third-party contact with jurors can taint their deliberations, especially as to the appropriate punishment in a particular case. *See, e.g., United States v. Maree*, 934 F.2d 196 (9th Cir. 1991); *Stockton v. Commonwealth of Virginia*, 852 F.2d 740 (4th Cir. 1988). If the juror and other persons

unknown prayed over Lisa Rene's fate during the birthday party, reasonable counsel would be concerned about whether and to what extent they had also discussed the case or the outcome of either phase of trial.

56. Hall's counsel later filed a motion for new trial which did not recite these allegations. Nor did counsel seek to subpoena any news footage from local television stations which might have included the referenced interview. Although counsel requested leave to interview the jurors concerning a separate and distinct issue, which had been resolved during trial, they never raised this specific ground as a basis for interviewing the jurors.

57. In my opinion, counsel performed deficiently in not including these allegations in Hall's motion for new trial and in not seeking to acquire proof of the alleged interview by means of subpoena. The privacy concerns which usually support not permitting the parties to interview jurors post-trial are less weighty where a juror has voluntarily taken part in a publicly broadcast interview concerning the events into which inquiry might be sought. Had counsel made the request and supported it with proof that such an interview took place and that the juror made the statements alleged, it is likelier that the trial court would have authorized at least limited juror interviews to explore the issue.

## Failure to Request Continuance After Being Surprised by Change in Testimony

58. Counsel performed deficiently in failing to request a continuance when the Government suddenly proffered a previously undisclosed FBI 302 indicating that anticipated defense witness Alonzo Airy, who had been interviewed by the defense and who had provided extensive information to impeach and rebut the testimony of Larry Nichols, had changed his story and supposedly was now prepared to corroborate Nichols' testimony. Counsel were evidently surprised by this turn of events and managed to persuade the trial court

not to permit the Government to call Airy in its own case. However, simply keeping Airy off the stand did not assist counsel in undermining Nichols; it just avoided further immediate damage to Hall's case. Because convincing the jury that Nichols was a liar was so important to defeating the Government's case for the non-statutory future dangerousness aggravator, reasonably effective counsel would have requested a continuance in order to assess whether other witnesses were available to rebut Nichols, or to explore other options regarding Airy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___May 11, 2000___ (date).

_____
MICHAEL E. TIGAR

100

Exhibit 13

Declaration of Kevin McNally(6-11-02)

101

## DECLARATION OF KEVIN McNALLY

KEVIN McNALLY, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Kevin McNally. I am an attorney in private practice in Frankfort, Kentucky. I presently serve as a member of the Federal Death Penalty Resource Counsel project funded by the Defender Services Division of the Administrative Office of the United States Courts.

2. Since 1976, my practice has been largely, but not exclusively, devoted to the trial, appellate, and post-conviction representation of defendants in capital cases. I have represented persons in many murder and capital cases in four states and in seven federal district courts. Although my work has been heavily oriented toward the trial level in recent years, I have considerable experience in capital and non-capital appellate and post-conviction cases. I have argued two cases before the Supreme Court of the United States, *Carter v. Kentucky*, 450 U.S. 288 (1981) and *Buchanan v. Kentucky*, 483 U.S. 482 (1987).

3. Because of my experience, I was retained by the Defender Services Division of the Administrative Office of the United States Courts in 1992, along with David Bruck of Columbia, South Carolina, to serve as Federal Death Penalty Resource Counsel (FDPRC). Our project has since grown to include several other attorneys. Our mission as Resource Counsel is to advise and consult with court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts. In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States,

102

FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), the work of our project was described as "essential to the delivery of high quality, cost-effective representation in death penalty cases... ." *Id.* at 50.

4. In 1995, in my capacity as Federal Death Penalty Resource Counsel, I had contact from time to time with Mike Ware and Jeff Kearney, the attorneys appointed to represent federal capital defendant Orlando Hall in a kidnapping-murder case in the Fort Worth Division of the Northern District of Texas. This declaration recounts some of my interactions with Mr. Ware and Mr. Kearney, and my impression of their performance in handling certain parts of that representation. The views I express are based on my twenty-six years of experience in handling death penalty cases at trial, on appeal, and in post-conviction proceedings, as well as my personal contact with Mr. Ware and Mr. Kearney, investigator Tena Francis, the client and my general familiarity with the events of their representation of Mr. Hall.

5. In the summer of 1995, I had contact with Mr. Hall's defense attorneys, who were facing an approaching trial date in the fall of that year. This was not the first time I had contact with his attorneys; I had consulted with them from time to time earlier in the year, after they were appointed in March following the withdrawal of Mr. Hall's original attorneys. I inquired about the status of their investigation, particularly their pursuit of evidence for what appeared to be an inevitable penalty phase given the circumstances of the Government's case against Mr. Hall. I was startled to learn that they had done essentially nothing to investigate the case since being appointed. No one had undertaken the complex, time-consuming, and essential task of exploring Mr.

103

Hall's background in order to develop evidence that could persuade jurors to spare his life. In 1995, the national standard of practice for defending capital cases required such an investigation, as a necessary prerequisite to making vital decisions about motion practice, defense strategy, jury selection, use of experts, and a wide range of other potentially pivotal choices in the course of the representation. It was understood that preparation for trial simply could not be approached meaningfully unless such an investigation was performed.

6. I have been advised by Mr. Hall's post-conviction counsel that Mr. Kearney's voucher for his legal services rendered during this period reflects that he performed a total of 19.7 hours of work on Mr. Hall's case from mid-March to the end of July, 1995 (inclusive), a period of almost five months -- less than one hour per week during this period. Counsel's court-appointed investigator Danny LaRue had performed a total of 10.6 hours of work on the case from November 1994 to the end of August 1995 -- only a little more than an hour per month. These figures are consistent with the impression I formed, which was that a great deal of absolutely indispensable work was not being performed.

7. I urged Mr. Ware, and through Mr. Ware, Mr. Kearney, to seek funds for the services of a mitigation investigator to conduct an appropriately broad and deep inquiry into Mr. Hall's social history and assist them in developing evidence for the penalty phase. I recommended that counsel secure the assistance of Tena Francis, a former Kentucky colleague who had relocated to Texas in the early 1990's. I was familiar with the high quality of the work of which Ms. Francis was capable, and her diligence and skill in developing mitigating evidence.

104

8. Counsel initially filed a motion for funds for a mitigation specialist on June 30, 1995, along with requests for funds for other experts. I was unaware that counsel abandoned that aspect of their funding request, however, in the course of the July 14 *ex parte* hearing on their motions, stating that they felt the psychiatrist they had in mind -- Dr. James Grigson, infamous as "Dr. Death" for having testified against more than a hundred men sentenced to death in Texas -- "probably could effectively [supplant] the need for [a] mitigation specialist." When I learned of this, I was stunned. In my opinion, Dr. Grigson is unprofessional. Beyond that, he would not be doing the necessary investigation needed.

9. When I subsequently had contact with Mr. Hall's counsel, and learned that they still had not undertaken any meaningful investigation into Mr. Hall's background, I redoubled my efforts to persuade them to seek funding for a properly qualified mitigation specialist. I drafted the motion for that purpose which Mr. Hall's attorneys filed on or about September 7, less than a month before the scheduled trial date of October 2. This motion was granted and Tena Francis was appointed to assist counsel as their mitigation investigator.

10. I actually came to Fort Worth to meet with counsel and consult with them about the case on two occasions. It is unusual for me, in my role as a consultant, to make more than one in-person visit to assist counsel in any given case, and the fact that I made two such trips in Mr. Hall's case reflects my strong concern at the time that critical investigation was not being done.

105

11. One of my trips to Fort Worth took place around the time jury selection began, on October 2, 1995. While I was there, I discussed the status of the needed neuropsychological testing of Mr. Hall. It was my understanding that counsel had or were going to retain Dallas neuropsychologist Randy Price for that purpose. I had worked with Dr. Price in the past on a capital case in Oklahoma and felt he was a competent expert. I may have recommended that counsel contact him. In Fort Worth, however, I learned that there was some problem with Dr. Price, and that he had not been responsive to inquiries from Tena Francis about the status of his work, if any, on Mr. Hall's case. I offered to speak to Dr. Price myself, and telephoned him using the phone in Mike Ware's office. I do not recall the specifics of my conversation with Dr. Price, but I came away with the impression that Dr. Price was reluctant to assist Mr. Hall's defense due to the allegations and perhaps attendant publicity. I communicated Dr. Price's response to Mr. Hall's defense team. Due to the fact that the trial had begun, or was about to, I again urged counsel to seek a continuance due to the need for neuropsychological testing and many other reasons. I believe counsel made such a motion, although I do not know the grounds stated.

12. As jury selection got underway, it became increasingly apparent to me that Mr. Hall's attorneys had simply waited too long to undertake a proper investigation to prepare for a penalty phase. I was in frequent contact with Tena Francis as she began to interview family members and gather information, and it was already apparent that Mr. Hall's background included significant trauma. Working with witnesses who have suffered from trauma is a demanding and time-consuming task which is nearly impossible to compress artificially to accommodate an imminent deadline. It was, in

my opinion, impossible to uncover all the relevant information about Mr. Hall's childhood, and to prepare witnesses to give compelling testimony about it, since jury selection had already begun.

13. Unfortunately, there was little our part-time project could do in this situation. Our project has and had neither the time nor the resources to become directly involved as counsel in cases. This is not our function or our assignment.

14. Mr. Hall's attorneys knew they were not ready to proceed. Mike Ware admitted in conversations with me that he knew there was much work still to be done. Nevertheless, counsel were reluctant to seek a continuance. Although counsel apparently ultimately did so, it was only after repeated suggestion on my part.

15. When jury selection began, it was so apparent that the investigation was critically unfinished that counsel decided that Mike Ware should go to Arkansas himself to pursue some of the investigation while Jeff Kearney remained in Fort Worth to conduct the jury selection. To my knowledge, neither counsel had before -- in the more than six months as Mr. Hall's lawyers -- traveled to Arkansas to conduct any work on the case. This is the only capital case (state or federal) in which I have had any involvement in which the defense case was in such bad shape at the start of trial that one of the lawyers had to abandon the client during *voir dire* in order to try to conduct out-of-state investigation which should have been completed long before. Because I was in Fort Worth, I spent a couple of days in court with Jeff Kearney, offering such advice as I could during *voir dire*, but not participating as counsel. I could not remain for the entire jury selection. I was a consultant, not a member of Mr. Hall's defense team. I was there for three days, as I recall.

16. I have been involved to one extent or another in well over 100 capital trials. In my experience as Federal Death Penalty Resource Counsel, and before, I have not directly encountered other defense attorneys in other cases who failed to perform their essential duty to investigate in a timely manner to this extent. In the context of my experience consulting with lawyers handing federal (and state) capital trials, the failure to investigate here in advance of trial fell far below any prevailing professional norms for capital defense practice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ (date).

_____
KEVIN McNALLY

Subscribed and sworn to before me, a notary public, on this ____ day of June, 2002.

_____
Notary Public
State of Kentucky at Large

My commission expires _____

108

Exhibit 14

Declaration of Jill Miller, M.S.S.W.

109

## DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

### INTRODUCTION

1. My name is Jill Miller. I have previously provided three declarations in this case. The first was executed April 22, 2000, and is attached to this Declaration as Appendix A and incorporated here by reference. The second was executed May 22, 2000, and is attached to this Declaration as Appendix B and incorporated here by reference. The third was executed November 13, 2000, and is attached to this Declaration as Appendix C and incorporated here by reference. A copy of my current curriculum vitae is attached to this Declaration as Appendix D and incorporated here by reference.

### QUALIFICATIONS AND EXPERIENCE

2. I am a forensic social worker in private practice in Madison, Wisconsin. I have been in private practice since January, 1984. I received my Bachelor's of Science degree, with a major in Social Work, from the University of Wisconsin-Madison in 1967. I received my Master's of Science – Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Independent Clinical Social Worker, State of Wisconsin License Number 1662.

3. I am a member of the National Association of Sentencing Advocates, the National Legal Aid and Defender Association (NLADA), and the American Academy of Experts in Traumatic Stress. I am certified as a diplomate in forensic traumatology by the American Academy of Experts in Traumatic Stress.

4. I have testified in capital cases about thirty times, qualified as an expert in the field of forensic social work.

5. I have practiced as a social worker in legal settings for over thirty years. I was on the faculty of the University of Wisconsin-Madison School of Social Work from 1973 until 1985. My work in agency settings, as well as private practice, has primarily involved the preparation of sentencing reports in criminal cases, and the preparation of dispositional plans and reports in juvenile cases, as well as some work in mental health and

DECLARATION OF JILL MILLER -- 1

110

family matters.    Since 1986, my work has primarily involved preparation for the penalty phase of capital trials, review of the penalty phase of capital trials, and preparation for post-conviction proceedings in capital cases.

6. Since 1986, I have worked on about ninety capital murder cases in state, federal, and military courts, both at trial and in post-conviction proceedings, including federal habeas corpus proceedings. In those cases, I have conducted extensive social history investigations, prepared social history reports, conducted psycho-social assessments, and assisted attorneys in preparing for the penalty phase. I have also testified as a penalty-phase witness in some trials. I have worked on capital cases in Alaska, Colorado, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Texas, Vermont, Virginia, Washington, West Virginia, Wyoming, the U.S. Virgin Islands, and Korea.

7. I have conducted extensive training of attorneys, mitigation specialists, mental health professionals, and investigators regarding development and presentation of mitigation, and preparation for the penalty phase in capital cases.    This training has included presentations at the American Bar Association Annual Meeting, the Annual Conference of the NLADA, the annual training seminar on the death penalty sponsored by the NLADA (at which I have served as an instructor every year since 1993), the annual capital punishment seminar sponsored by the NAACP Legal Defense and Educational Fund, capital punishment trainings sponsored by the National Association of Criminal Defense Lawyers (NACDL), the annual conference of the National Association of Sentencing Advocates, and the annual military death penalty training conducted at the Naval Justice School.

8. I have also addressed the annual death penalty seminar of the Illinois Appellate Public Defender Office on two occasions. I have been a training consultant for the Illinois Capital Resource Center, providing sixteen hours of training to mitigation staff in both 1990 and 1991, and led similar training for the Missouri State Public Defender in 1991. I was a consultant to the NLADA Mitigation Specialists Training Project and Mitigation Affidavit Project in 1990-91. In October, 1991, I was a faculty member for a two-day program titled "Mitigation Specialists Training" co-sponsored by the NLADA, the Missouri Capital Punishment Resource Center, and the Missouri Chapter of the National Association of Social Workers. I planned this program and prepared the materials which were distributed to those attending.

DECLARATION OF JILL MILLER -- 2

9. I was on the faculty of the Indiana death penalty seminar in 1993. I trained staff of the Defender Association of Philadelphia in 1993 on penalty phase preparation, and did mitigation training for the Nebraska Commission on Public Advocacy and the New Mexico State Public Defender Office in 1997. In 1998, I was on the faculty of death penalty training programs sponsored by the National Association of Criminal Defense Lawyers (NACDL) in Phoenix, Arizona; the Tennessee Association of Criminal Defense Lawyers in Nashville, Tennessee; and the Idaho Federal Public Defender.

10. I conducted training and case consultation with social workers, mitigation specialists, and attorneys at the Office of the Public Defender in Miami, Florida, and the Jefferson County Public Defender in Louisville, Kentucky in the fall of 1998. I was on the faculty of death penalty training programs for the NACDL in Boise, Idaho, and the Florida Public Defenders Association in 1999.

11. As a member of the Board of Directors and Defender Council of the NLADA, I participated in developing and approving the "Standards for the Appointment and Performance of Counsel in Death Penalty Cases," adopted by the NLADA in 1987, and later adopted as guidelines by the American Bar Association, as well as the "Performance Guidelines for Criminal Defense Representation" adopted and published in 1995. I am currently participating in updating and revising the American Bar Association's "Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases."

12. In 2000, I received the "Life in the Balance" Achievement Award, presented annually by the National Legal Aid & Defender Association to recognize outstanding contributions to the representation of defendants facing the death penalty. In 1999, I was recognized by the National Association of Sentencing Advocates for exemplary dedication in the advancement of sentencing advocacy.

13. I was first contacted by counsel representing Orlando Hall, a death-sentenced federal prisoner, in March 2000. His attorneys contacted me, in part, because of my extensive experience in federal capital prosecutions since the reintroduction of the federal death penalty in the late 1980's and early 1990's. Counsel advised me that the social history investigation in this case had been truncated by the mitigation investigator's late entry into the case. Counsel originally asked me to review information and estimate how much time would be necessary to complete an appropriate mitigation

DECLARATION OF JILL MILLER -- 3

investigation in Orlando's case, and what tasks such an investigation would include. As I normally do in post-conviction matters, I reviewed a number of documents from the trial record, analyzed the penalty phase presentation in this case, and advised counsel of the deficiencies I noted in the record, as well as the investigation that I believed needed to be performed at this stage of the proceedings. These findings are reflected in my declaration of April 22, 2000 (Exhibit A hereto).

## THE ROLE OF THE MITIGATION SPECIALIST AND THE NATURE AND SCOPE OF THE SOCIAL HISTORY INVESTIGATION REQUIRED IN A CAPITAL CASE

14. The role of the mitigation specialist in a capital murder case is to assist defense counsel by conducting a thorough social history investigation and psycho-social assessment; identifying factors in the client's background or circumstances that require expert evaluations; assisting in locating appropriate experts; providing background materials and information to experts to enable them to perform competent and reliable evaluations; consulting with the attorney(s) regarding the development of the theory of the case and case strategy, thereby assuring coordination of the strategy for the guilt-innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; and working with the client and his or her family while the case is pending. The mitigation specialist may be a witness in the penalty phase hearing, and may offer testimony regarding the results of the social history investigation and assessment.

15. The mitigation specialist must be retained and begin work on the case at the inception of the case or as soon afterward as possible. This is because the results of the social history investigation are necessary to enable defense counsel to make informed decisions regarding such matters as competency to proceed, the need for expert evaluations, medical treatment or other services while the case is pending, motion practice, and plea negotiations. It is vital that the mitigation specialist conduct sufficient social history investigation early in the process to assist counsel in determining the need for other expert assessments, including what type of assessments are indicated.

16. A minimum of six months to a year is generally necessary to adequately prepare for a capital murder trial, including the penalty phase. Factors affecting the length of time and number of hours necessary to prepare include, but are not limited to, the nature and complexity of the case; the age of the client; the prior history of the client including such things as

DECLARATION OF JILL MILLER -- 4

113

prior criminal history, prior incarcerations, history of significant physical or mental health problems, military history, lengthy employment history, or frequent changes in residence and schools; the extent of records and documentation that exist, and difficulties in locating and obtaining records; the number of collateral interviews that must be conducted; the existence of special conditions, factors or issues that must be researched and considered; the need to address victim impact evidence; conditions of confinement; the time necessary to obtain, schedule, and complete expert assessments; the extent of travel involved to investigate and interview the client and collateral sources; other professional commitments of the mitigation specialist; and specific jurisdictional procedures or practices. Cases in which a number of these factors exist will often require at least one year, and sometimes more, to prepare. Post-conviction cases often require a greater length of time to prepare, due to difficulties in locating records and witnesses, as well as the need to review the trial record.

17. A properly conducted social history investigation is also time-consuming because it inevitably involves eliciting personal information from the client and others, particularly information of a private and sensitive nature. The person conducting the investigation must have the training, knowledge, and skills to detect the presence of significant factors such as: neurological impairments; cognitive disabilities; physical, sexual, or psychological abuse; substance abuse; mental disorders; and other factors which influence the development of the client's personality and behavior. Equally important, factors such as denial, repression, shame, and a sense of privacy all inhibit the ability to fully disclose critically important information. Where present, these factors increase the amount of time necessary to complete the investigation, since the mitigation specialist cannot obtain such sensitive information without building a relationship of genuine trust with the persons who are providing information. Building such a relationship takes time; for example, where a source is also a victim of trauma, it may be necessary to conduct repeated interviews of the source, or even involve a consulting or treating expert to assist the source, in order that information about traumatic experiences may be obtained without overwhelming or retraumatizing the subject. These time demands cannot be artificially compressed to meet an external schedule. Consequently, it is essential that the investigation be undertaken as early as possible in the history of the case.

18. An adequate social history investigation is also time-consuming because it requires the mitigation specialist to gather and review many documentary records including but not limited to: charging documents, investigation reports relating to the offense; news media accounts of the offense; the

DECLARATION OF JILL MILLER -- 5

114

coroner's report or autopsy report; FBI, state, and local criminal history reports on the client; jail booking records; police reports and court files related to the client's prior arrests and convictions, as well as juvenile adjudications; medical records of all kinds; school records of all kinds; employment records of all kinds; social service agency records of all kinds; military records of all kinds; adult education records of all kinds; prior jail and prison records of all kinds; prior probation and/or parole records of all kinds; treatment records of all kinds; and jail records for the current incarceration.    In addition, similar records must be obtained where appropriate for other significant persons in the client's life, including parents, siblings, grandparents, and so on.

19. In addition to gathering these documents, the mitigation specialist must also interview the client to obtain detailed and specific social history information, and to learn the identities of collateral sources of information. This information cannot be obtained in a few visits; numerous interviews are generally required to cover all necessary areas. Information that should be obtained from the client regarding childhood should include, but not be limited to: information regarding his or her birth (including any knowledge the client may have concerning the mother's pregnancy, the circumstances of the birth, any complications of delivery or birth trauma); early developmental history (including the age at which the client learned to walk and talk, and was toilet trained); makeup of the family unit (including background information on birth parents and other significant relatives, including date and place of birth, educational attainment, health history, date of marriage, ages at time of marriage, etc.), age and sex of siblings, prior marriages and other children of parents; early health of the client, including whether the client suffered any serious accidents, illnesses, or injuries; residential history of the family, including where they lived, for what periods of time, and under what conditions; employment history of parents; educational history, including activities in which the client participated, favorite subjects, and names of teachers that the client remembers; religious training, practices, and beliefs; discipline in the home, including the form of discipline, how administered, how often, by whom, and for what; family relationships, including the nature and quality of the client's relationship with each parent, siblings, and relatives or other significant persons, and the relationship between the parents; friends and leisure activities; other significant relationships; community activities, including such things as sports, scouting, music, and so on; jobs held as a youth, including lawn work, newspaper delivery, babysitting or other odd jobs; any significant childhood experiences, including such things as death or serious injury or illness of a family member or other significant person, divorce of parents, abandonment by parent; family violence; parental

115

alcohol or drug use; abuse of the client, including physical, sexual, or emotional abuse; and exposure to violence in the community; history of any alcohol or drug use; history of running away; and juvenile record. In addition, the client should be interviewed concerning how he or she perceived him/herself as a child, in terms of personality, behavior, feelings, responses to different events in life, and relationships with others.

20. Information that should be obtained from the client regarding the client's adult years, and experiences as an adult, should include the foregoing topics (where relevant), as well as, without limitation: residential history; employment history, including name of businesses or persons for whom the client worked, dates of employment, description of job and duties, pay, performance on the job, names of persons familiar with his or her work, reasons for leaving the job, and any significant job experiences; adult education; military history; health; significant relationships, including marriages, children, and the nature and quality of these relationships; exposure to violence in the community, including experiences of traumatic loss, being the subject of violent assault, and witnessing violence; sexual development, practices and relationships; names of friends; leisure activities; legal history, including arrests, convictions, circumstances surrounding prior legal involvement; experiences in prison or on parole or probation, and experiences with the police. In addition, the client should be interviewed regarding how he or she perceived of him/herself as an adult, in terms of personality, behavior, and feelings, and how they perceived their relationships with others.

21. Along with obtaining all relevant documents and spending long hours interviewing the client, the mitigation specialist must conduct collateral interviews with family members and others to supplement and corroborate the information obtained from the client. Persons who should be interviewed include, but are not limited to, the following: parents, siblings, spouses or significant others; children; other relatives such as grandparents, aunts, uncles, cousins; childhood and adult friends and neighbors; school personnel, including teachers, principals, counselors, social workers, psychologists, or coaches; ministers or other church personnel; employers, job supervisors and co-workers; social service and court personnel; physicians or medical personnel who have treated the client; jail or correctional institution staff; law enforcement personnel; mental health professionals who have assessed the client at any time in the past or for purposes of the present proceeding, or who have provided treatment to the client.

DECLARATION OF JILL MILLER -- 7

116

22. The mitigation specialist must maintain an ongoing consultation with defense counsel, to keep them informed of the results of the investigation, and to consult on the implications of the results for case strategy. Information obtained can affect considerations regarding competency to proceed or mental responsibility for the offense, plea negotiations, the manner in which the defense team relates to the client; decisions regarding jury selection; whether or not the client should testify, at either phase of trial; decisions regarding the need for expert evaluations, and selection of witnesses for the trial including penalty phase. The mitigation specialist should generally prepare a comprehensive social history report containing the information obtained in the investigation. This report is to be used by defense counsel in developing case strategy and determining who should be called as witnesses; and may be provided to experts performing evaluations so that they have adequate background information to conduct a competent evaluation.

23. Because all these steps are both necessary and time-consuming, the social history investigation must be initiated at the earliest possible time in the trial process for its results to be usefully employed to the client's maximum benefit.

## SOURCES OF INFORMATION RELIED UPON

24. I rely on the following sources of information for the assertions of fact and expressions of professional opinion contained in this Declaration. First, I have reviewed the following documents relevant to this case: medical records of Betty Hall; special education and high school records of Demetrius Hall; special education records of Te'Aushia Whiddon; special education records of Eric Hampton; military records of Scotty Hall; school records of Orlando Hall; medical records of Orlando Hall; social security earnings records for Orlando Hall; records concerning the divorce of A.J. and Geraldine Hall; statistical data on unemployment in El Dorado, Arkansas, in 1990, and nationwide in 1990 for black men ages 16-19; portions of the pleadings in *United States v. Hall*, including the indictment, the Government's notice of intent to seek the death penalty, defense counsel's requested penalty phase instructions regarding mitigating circumstances, defense counsel's motion for continuance and two *ex parte* motions for funds for mitigation investigation; portions of the trial transcript, including the guilt-phase closing argument by the Government, the charge of the Court, all punishment phase testimony, the jury's punishment verdict (including findings as to aggravating and mitigating factors), and the post-trial offer of proof regarding proposed defense witness Lisa Clayton, M.D.; a summary of the remainder of the guilt-phase

DECLARATION OF JILL MILLER -- 8

testimony; the opinion of the United States Court of Appeals for the Fifth Circuit affirming Orlando Hall's conviction and death sentence on direct appeal; declarations and draft declarations  from Rev. D.L. Hegler, Jerry and Gracie Ross, Cassandra Ross, Betty Hall, Charles Chastain, Michael Tigar, Cleo Jamerson, Emmanuel Porchia, Jerline Hill, Betty Roberson, Veda Smith, Keith Hill, Tracy Hall, Scotty Hall, Pam Palmer, Stacey Dineen, A.J. Hall, and Eric Hampton; time records for defense investigator Danny LaRue; a letter and poem from Orlando Hall to his daughter Te'Aushia; letters from Orlando Hall to his brother Demetrius Hall and a portion of a letter from Orlando Hall to his sister Cassandra Ross, all written while he was incarcerated pretrial; two memoranda from Tena Francis to trial counsel (9/23/95 "Investigative Plan" and 11/9/95 "Investigator's Final Summary"); portions of Tena Francis' file on the case, including memoranda of witness interviews; Arkansas DOC, parole, and probation records of Orlando Hall; juvenile records of Orlando Hall; records regarding Orlando Hall's other offenses (both adjudicated and unadjudicated); the report of the autopsy performed on the victim, Lisa Rene; records of Orlando Hall's pretrial incarceration at Mansfield Jail; memoranda of witness interviews conducted by Tena Francis; arrest records of A.J. Hall from El Dorado Police Department; Orlando Hall's proposed statement in allocution; memoranda regarding witness interviews conducted by Orlando's current counsel, including interviews of Cassandra Ross, Rev. D.L. Hegler, Jerry and Gracie Ross, Orlando Hall, Pam Palmer, Betty Hall, Scotty Hall, and A.J. Hall; the victim impact documents (statements, etc.), disclosed by the Government in the course of pretrial discovery; statements by Orlando Hall  (10/5/94; 10/5/94 (FBI-302); 9/30/94 (FBI-302)).

25. In addition, I have personally interviewed the following persons, several of them in depth and more than once: Orlando Hall, Betty Hall, A.J. Hall, Cassandra Ross, Pam Palmer, Scotty Hall, Tracy Hall, Cynthia Hampton Braggs, Eric Hampton, Jamie Whiddon Garrett, Veda Smith, Robbie Charles, Luella Crow, and Latonya Anders.

### REVIEW AND CRITIQUE OF THE PENALTY PHASE PREPARATION AND PRESENTATION IN MR. HALL'S CASE

26. As a result of my professional experience and training, I am familiar with the generally accepted standards of performance in the criminal defense community for attorneys and mitigation specialists in capital cases, as those standards of performance have emerged and evolved since the mid-1970's. I base this statement on my familiarity with three primary sources: court decisions, written standards for performance (such as those developed by

DECLARATION OF JILL MILLER -- 9

118

the NLADA and the American Bar Association, as well as comparable organizations at the state level), and training programs and training materials from specialized attorney and mitigation specialist trainings conducted around the country since at least the early 1980's. It should be noted that, even prior to that period, there existed an extensive body of caselaw, standards, and training materials regarding sentencing in non-capital cases that provided substantive guidance for counsel.

27. The consensus reflected by those materials is that defense counsel in a capital case must undertake "the most extensive background investigation imaginable," in the words of one representative publication, including "look[ing] at every aspect of [the] client's life from birth to the present," and "talk[ing] to everyone . . . who has ever had any contact with [him]." By no later than 1985, the unanimous view of qualified capital defense attorneys across the nation was that the likely success of the penalty phase depended on conducting the most extensive pretrial social history investigation possible. The use of mitigation specialists -- social workers and other mental health professionals with special expertise in the areas of social history investigation – to accomplish this task was well-established by the mid-1980's.

28. Based on my education and professional experience and training, as well as my personal familiarity with the foregoing facts concerning the emergence of mitigation specialists and the recognition of their central role in capital defense from the late 1970's to the present, and my extensive experience training attorneys with respect to these matters, I can state with confidence that, in 1994-1995, the standard of practice for defending death penalty cases obliged counsel to make sure that a complete and thorough social history investigation, including but not limited to the investigative tasks described in the preceding paragraphs, was completed in a timely manner. In 1994-1995, the standard of practice also required counsel to obtain the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task.

29. In sum, in 1994-1995 it was well-established that counsel in a capital case was responsible for knowing the nature and scope of the investigation necessary to produce a reliable and appropriately detailed and corroborated social history and to identify other potential mitigating evidence; for seeking appropriate resources in a timely manner to carry out such an investigation, for monitoring and directing the investigation as it proceeded, and for preparing and presenting the available mitigating evidence in a manner calculated to maximize the benefit to the defendant. Measured by this standard, the investigation, preparation and presentation of penalty

DECLARATION OF JILL MILLER -- 10

phase evidence in Orlando's case was inadequate and deficient in many respects.

30. Orlando's attorneys failed to request and obtain the services of a mitigation specialist early enough in the case to enable her to conduct a thorough and competent social history investigation. Nor did the attorneys conduct the necessary investigation themselves. It should be noted that counsel were not qualified by education and training to conduct much of the investigation called for by the facts of Orlando's case. Investigating a family background marked by violence requires the involvement of a person with the training, knowledge, and skills necessary to elicit information about traumatic experiences without overwhelming or retraumatizing the subject. Untrained interviewers, even those sensitive to the delicate nature of the inquiry, are highly likely to expose trauma victims to psychological and physical harm by forcing the subject to confront deeply personal and painful memories without simultaneously providing methods with which to cope with the surge of emotions such memories bring forth. In addition, a person with such training, knowledge, and skills will likely be able to elicit more probative information concerning traumatic events than could an individual lacking that expertise.

31. Because counsel did not secure the services of a mitigation specialist until mid-September, 1995, recommendations for, and completion of, indicated expert assessments could not be accomplished in time to be put to use at the penalty phase. Given the evidence in this case, in light of the standard of practice for investigating and developing mitigating evidence in 1994-1995, Orlando's attorneys should have obtained the assistance of at least two experts: a neuropsychologist (as urged to counsel by Tena Francis, their mitigation investigator) and some person with expertise in trauma, including the significance of chronic trauma, exposure to violence in the home and community, and traumatic loss. To explain the full range of influences on Orlando's behavior and to place his other criminal activity in context, counsel should also have located a witness to explain the factors that drew young black men in El Dorado in the mid-1990's into the drug economy. Such a witness could very likely have been found in the community itself.

32. Because counsel waited until the eve of jury selection to secure the services of a mitigation specialist, she did not have time to complete a thorough social history investigation. It appears that counsel directed her to use some of her time investigating Orlando's co-defendants (e.g., their other criminal conduct and their reputations). This work could and should have been delegated to counsel's other investigator, to free up the mitigation

DECLARATION OF JILL MILLER -- 11

120

specialist to work exclusively on developing Orlando's social history. In any event, six weeks -- the time between mid-September, when counsel first got their mitigation investigator on the case, and the start of the penalty phase on November 1 -- was simply not enough time to complete a minimally adequate social history investigation in this case, even if counsel's mitigation specialist could have devoted her time exclusively to that goal. In addition, as noted above, by the time the investigation was underway it was too late to achieve many of the purposes for conducting such an investigation in the first place -- to inform motion practice, to identify other appropriate experts, to inform jury selection, and so on.

33. Counsel's mitigation specialist lacked the qualifications to conduct a psycho-social assessment of Orlando or to explain the significance of the specific factors she uncovered to the jury, as she was not qualified to testify as an expert on these matters. Counsel had no other expert to explain the significance of Orlando's background of family violence and trauma or the consequences of those experiences for his development into, and behavior as, an adult.

34. As a result of improper interviewing techniques and counsel's failure to appreciate the long-term impact of trauma on potential witnesses from Orlando's family, counsel's penalty phase witnesses left demonstrably false and inaccurate impressions with the jury. For example, both Orlando's mother Betty Hall and his sister Cassandra Ross denied that the children in the family (as opposed to their mother) had been physically abused by Orlando's father A.J. Hall. Mrs. Hall also testified on cross-examination that Orlando had never lacked for supervision, guidance, or material support. Those impressions were grossly misleading and false, as set forth in greater detail below. These distortions resulted from failures in the methods of interviewing employed by counsel and failures in their handling generally of the family witnesses. Obtaining full, accurate, and detailed information is a function of how interviews are conducted, how critically important questions are worded, and how witnesses are worked with after information is obtained. The testimony at the penalty phase was factually unreliable and misleading because of defense counsel's failure to follow the standard of practice in developing and presenting such testimony.

35. Counsel's penalty phase presentation lacked a number of available elements which the standard of practice in 1994-1995 recognized as essential to an effective case for life, including but not limited to the following: In focusing on the co-defendants, counsel failed to tell Orlando's own story. They failed to combat the dehumanizing impact of the prosecution's case, or provide enough information about Orlando's life for the jury to

DECLARATION OF JILL MILLER -- 12

121

understand his development and behavior. At the time of Orlando's trial, it was understood among attorneys defending capital cases that an effective case in mitigation required that the jury hear at least some information about the defendant's positive acts and qualities. A great deal of such information was available about Orlando, including his having saved his nephew Syroid from drowning just months before the crime. Counsel failed to develop or present that evidence. Counsel failed to develop and present available evidence showing Orlando's successful adjustment to incarceration and his positive record as a prisoner (typically called "Skipper evidence," after *Skipper v. South Carolina*, 476 U.S. 1 (1986)). As a result of counsel's inaction, the jury had very little specific mitigating information about Orlando.

36. It appears that counsel did little to address the future dangerousness aggravator. In Orlando's case, where the only available non-death sentence was life without the possibility of release, counsel should have pointed out that his dangerousness had to be assessed in the context of a life sentence in federal prison. *Skipper* evidence is relevant to this inquiry. At least two law enforcement professionals who had actual contact with Orlando as an inmate in Arkansas (former Union County deputy Cleo Jamerson and former Department of Corrections officer Keith Hill) were available and willing to testify that Orlando was a model inmate who successfully adjusted to confinement and caused no trouble. Comparable testimony was available from those who had dealt with Orlando in Texas, such as psychiatrist Dr. Jim Womack of the Federal Medical Center, who similarly would have characterized Orlando as a "model detainee" who presented no problems to the correctional staff. The fact that both of Orlando's priors were drug offenses, the latter involving amounts of cocaine valued at $40 and $20 (for which he received a ten year sentence), was relevant evidence of his non-dangerousness in a prison setting, as was the fact that he pled guilty to both offenses. While this latter information was before the jury in the form of documents from Orlando's prior convictions, counsel should not have relied on the jury to pore over those documents and find the relevant information contained in them.

37. Although a need for neuropsychological testing was indicated by the information known about Orlando prior to trial, and counsel's investigator Tena Francis urged them to have such testing performed, such testing was never performed prior to trial. It is my understanding that post-conviction counsel have had such testing conducted and that the results reflect a strong likelihood that Orlando has mild neurocognitive abnormalities which affect his brain's executive functions. Had counsel developed this evidence, it could have supported an effective argument that Orlando's participation in

DECLARATION OF JILL MILLER -- 13

122

the events that led to Lisa Rene's death, and his failure to take actions to resist or stop that sequence of events, was influenced by his neurocognitive impairments, which undermined his judgment, problem-solving and decision-making ability.

38. Counsel submitted numerous mitigating factors to the court for inclusion in the penalty-phase jury charge which they had not presented evidence to support. Presumably, counsel should have been familiar with the Supreme Court's decision in *Delo v. Lashley*, 507 U.S. 272 (1993), under which a trial court need not instruct the jury on any mitigating factor concerning which the defendant has not presented any evidence.

39. Counsel failed to address the testimony of the two young women who testified that Orlando had sexual contact with each of them around the time of the crime. Presumably, the Government presented this evidence to portray Orlando as callous, remorseless, and unmoved by his participation in the crime. In addition, there was a substantial risk that this evidence might evoke from the jury offensive and highly prejudicial historical stereotypes about the uncontrollable sexual appetites of African-American men. A persuasive alternative explanation was available: Orlando's life experiences as the child of an alcoholic, abusive and womanizing father had a profound and destructive influence on his attitudes toward women and sex, and led him to engage in such conduct far more casually and with less emotional investment than a person raised with healthier attitudes. With one exception, Orlando's siblings, products of the same environment, have likewise had problems maintaining successful conventionally monogamous relationships. Simply put, given Orlando's background and upbringing, there is no reason to assume that his having engaged in sexual conduct with these women around the time of the crime reflects any lack of remorse for his involvement in the offense. Counsel's failure to develop a fully detailed psycho-social assessment of Orlando left them unable to defend against the damaging inferences urged by the Government.

SUMMARY AND OVERVIEW OF AVAILABLE INFORMATION
WHICH AN APPROPRIATE SOCIAL HISTORY INVESTIGATION
WOULD HAVE UNCOVERED

40. The social history investigation undertaken by post-conviction counsel, which could have been accomplished by trial counsel and their investigator had they pursued it in a timely manner, reveals extensive and important mitigating information about Orlando Hall which the jury that sentenced him to death never heard and which would both have humanized Orlando and given the jury a more sympathetic explanation for his conduct than the

DECLARATION OF JILL MILLER -- 14

123

Government presented. Among the facts that have been uncovered in the post-conviction investigation (which are all discussed in greater detail below) are the following:

- There is substantial evidence concerning the degree of violence in Orlando's home and its corrosive effect upon him and his family which was not adequately or even accurately brought out at his trial. Contrary to the image presented at trial, Orlando was himself a victim of serious physical abuse as a child at the hands of both of his parents. Moreover, he was a witness to much more extensive and traumatic abuse of his mother and his siblings than the trial testimony indicated. Orlando and his siblings all currently exhibit symptoms consistent with the trauma of being exposed to family violence from a young age.

- Orlando additionally was exposed to additional violence as a child and young adult, and experienced traumatic loss in the deaths of relatives and the violent deaths of friends.

- Orlando's mother Betty suffered from serious health problems and depression, which resulted in her being emotionally unavailable and dependent on medication – as well as gambling – as a way to escape the painful parts of her life.

- Orlando suffers from neurocognitive impairments, with accompanying learning disabilities, which undermine his judgment and reasoning ability, especially when he is under stress, and which deprived him of important protective mechanisms for coping with the chaos and debilitating effects of his upbringing.

- When Betty Hall eventually took her three youngest children, including Orlando, and left her abusive husband, she quickly abandoned Orlando and his younger brothers Tracy and Demetrius, leaving them to fend for themselves, with no parent in the home to supervise their behavior or to provide necessities, such as food, clothing or electricity.

- As a result of his abandonment by his mother and the responsibilities towards his younger brothers that this placed on him, as well as Orlando's cognitive deficits and the

DECLARATION OF JILL MILLER -- 15

124

limitations they placed on his employability, and the lack of meaningful economic opportunities for an African-American teenager in El Dorado, Orlando turned to selling drugs to help his family survive.

■    When Orlando was inevitably arrested and imprisoned for selling drugs, he was a compliant and non-violent prisoner who adjusted successfully to confinement and posed no threat to other inmates or correctional staff.

■    At the time this crime occurred, Orlando had expressed his desire to leave the drug trade and was making efforts to do so, and to leave Arkansas and obtain gainful employment.

■    Despite having suffered a traumatic upbringing, Orlando nevertheless has positive qualities which are acknowledged by everyone who has come into contact with him: he is generous and warm; loves his children deeply; cares for his family and feels responsible for taking care of them; and is even capable of acts of heroism, as when he leapt from a second-floor balcony to rescue his nephew Syroid from drowning in a motel swimming pool.

41. Orlando apparently suffers from an undiagnosed learning disability, which would have had significantly harmful psychological, social and emotional consequences (including effects on judgment and decision-making, particularly under stress). Orlando's frustration with school likely resulted from the difficulty he had learning -- especially as he moved into the higher grades, where limitations on his ability to process and comprehend information increasingly impeded him. His placement in remedial classes and his early withdrawal from school are both consistent with this inference. Orlando may also suffer from Attention Deficit Disorder (ADD) in addition to a learning disability; that condition would also be consistent with much of the information presently known about his own background and that of his family (both in his parents' generation, in his own generation, and in his children's). If so, his use of marijuana may, at least in part, be attributed to self-medication for ADD.

42. While the physical abuse of Orlando's mother Betty by his father A.J. was described, to some extent, in the penalty phase testimony of Betty Hall and Cassandra Ross, both those witnesses denied that the children in the family were "abused." This left the jury free to conclude that because the children themselves were not "abused," they suffered no negative effects from the

DECLARATION OF JILL MILLER -- 16

125

experience and thus that it could not mitigate or help explain Orlando's involvement in the crime. First, this characterization -- that the Hall children were not "abused" -- was incorrect. The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse. The children were whipped with switches and a belt, to the point that the beatings left welts on their skin. They were targeted for such punishment unpredictably, with the degree of punishment varying arbitrarily according to the temper of the parent imposing it. A.J. Hall has admitted that his abuse of alcohol led him on occasion to lose control and beat his children with unrestrained rage. A.J. and Betty's practice of "delaying" punishment, by letting the children knew they were going to be whipped but not telling them when the punishment would occur, exacerbated the children's feelings of helplessness and terror. Dreading such "delayed" punishment, Orlando often wet the bed, a physical response to terror which he could not control. When his parents whipped him for this involuntary action, it only worsened his fear and shame. When discipline produces physical injury, is unpredictable, is inflicted in response to behavior the child physically cannot control, and reflects the mood or condition of the person inflicting it rather than the severity of the child's misbehavior, then it constitutes abuse, not correction.

43. Because such treatment was all the Hall children knew, they understandably saw it as normal punishment, not "abuse." As Scotty Hall has put it, the children simply thought that was how black families were. The tendency to regard one's own childhood experience as "normal" is understandable, and is demonstrably familiar to professionals who work regularly with victims of family violence. It means, however, that the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." Instead, one must inquire about the specific methods of discipline employed within the family, and the circumstances surrounding discipline. Counsel's examination of these witnesses reflects a failure to grasp this basic principle of social history investigation and witness preparation in a capital sentencing hearing.

44. At the same time, the true extent and severity of the physical beatings visited on Betty Hall, the unpredictability of A.J. Hall's outbursts toward her, and the far-reaching consequences for Betty's own physical and mental health and that of her children, were not communicated by the testimony actually presented at Orlando's penalty phase. A.J. Hall's abuse of Betty caused her to require medical attention at times and resulted in the police coming to intervene on several occasions, although A.J. apparently was charged only once. Interviews with Betty and the Hall children confirm that A.J.'s violence against Betty reached startling extremes -- he scarred

DECLARATION OF JILL MILLER -- 17

126

her face, he beat her eyes until the skin around them permanently darkened, he shoved her through a plate glass window, he climbed onto the hood of their car and beat at the windshield with his fists, he pummeled her until the police were called. The violence, though a constant feature of their life together, flared unexpectedly. Betty feared for her life, and yet compulsively attempted to placate A.J. to avoid further beatings. As a result of the stress and trauma, she sank into depression, which she attempted to remedy with prescription medications and a desperate fondness for gambling. As a consequence of all these factors, as her children grew older Betty was less and less emotionally available to them, and unable to give them appropriate care, supervision, and support.

45. It is highly significant that the Hall children regularly saw A.J. brutalizing Betty. The destructive effects of repeatedly witnessing physical violence can be as severe as the effects of being subjected to it. Chronic exposure to violence and trauma can have profound effects on a child's development. It undermines his sense of safety and security, and his ability to grow into an emotionally healthy adult. Parents cannot be viewed as providing safety for the child when they are also the inflictors of violence. A child, especially a son, who witnesses the abuse of his mother develops feelings of guilt, helplessness, powerless, and low self-esteem. To develop into an emotionally healthy adult, a child's basic physical and emotional needs must be met. Among these needs are predictability, stability, positive modeling, and opportunities to develop a positive sense of self. If that child is frequently exposed to his father's violent battery of his mother, the child will lack the safety, predictability, and consistency which are vital to healthy emotional development.

46. Traumatic events in Orlando's life include his having witnessed the violent abuse of his mother and having been the target of abusive physical discipline by both parents, both on a chronic basis. In addition, Orlando suffered the traumatic loss of his grandmother and aunt, who had served as sources of positive regard and emotional reinforcement. His grandmother died when he was young, at a time when the loss would have had greater traumatic impact. Orlando was also directly exposed to other traumatic deaths/losses. For example, he saw his father's first cousin, Harry J., burned to death inside his truck -- at "Anybody's Club," the rundown nightclub located immediately behind the Hall family home and run by Orlando's uncle, T.J. He was present when his friend Eric Steele was shot twelve times. Another friend, Corey Brown, was robbed and shot in the head near the Hall home after having stayed overnight with the Halls, and died from his injuries. Two other friends died of drug overdoses. In addition, Orlando's involvement in the illegal drug business for an

DECLARATION OF JILL MILLER -- 18

127

extended period was itself traumatic; Orlando's brother Tracy recalls that he and Orlando both lived in anxiety and fear as a result of seeing friends come to violent ends and knowing that they could be the target of violence; both thought they could die at any time. Their perception that El Dorado was a lethally violent place is consistent with newspaper accounts which state that major crimes in the city increased significantly from 1986 to 1993 (one police official indicated that the crime rate "quadrupled" in that interval).

47. Such traumatic losses affect a child's sense of security, safety and stability, as well as his sense of the future. Chronic trauma, especially that which begins at an early age and involves multiple types of trauma, can lead to feelings of hopelessness and futurelessness. All the male children in the Hall family have experienced these intense feelings of futurelessness. Children or adolescents who experience or witness violence/trauma can suffer from a variety of mental health symptoms, which can include depression and Post Traumatic Stress Disorder (PTSD) or trauma syndrome. Chronic exposure to violence can affect cognition, undermining learning, memory and school performance. Orlando's school records and his performance on recent tests of his academic ability reflect distinct problems consistent with chronic exposure to violence in the home. Chronic trauma also affects personality development and behavior, and can lead to decreased impulse control. The extent of the effects of chronic trauma is a function of the types of trauma, number of traumas, extent of exposure, and such factors as age, sex, cognitive competence, availability of support services, and the presence of other risk factors or protective factors (explained below). The impact of trauma on a child is compounded by an environment of poverty, family disruption, and community disintegration. While both A.J. and Betty Hall were employed full-time, their wages were not high and they had a house full of children to feed. In addition, it appears that A.J. Hall did not always contribute his earnings to supporting the household. The resulting economic pressure on the family, especially in the context of the persistent violence between the parents and the physical abuse visited on the children by the parents, is consistent with other evidence suggesting that the impact of the trauma on the Hall children was substantial.

48. Certain risk factors, if present, enhance the likelihood that a child who experiences trauma will suffer damaging mental health consequences. A number of such risk factors are present in Orlando's background, including severe marital distress, overcrowding in the home due to large family size (Orlando and his three brothers and two sisters shared two bedrooms in the family's small, three-bedroom home), and maternal psychiatric disorder

128

(his mother Betty's depression). A.J. Hall's alcoholism aggravated the risk factor of marital distress by introducing unpredictable violence into the home. In addition, low cognitive functioning and brain impairment (such as Orlando exhibits) enhance the likelihood of adverse effects.

49. Moreover, the timing and number of traumatic events in a person's childhood may dramatically impact the injurious effects of trauma on a child's intellectual and behavioral development. The age and development of the child has a significant effect on the debilitating effects of trauma. A child who, like Orlando, experiences his first trauma before age eleven is three times more likely to develop psychiatric symptoms than one who first suffers trauma at a later age, when an individual's coping mechanisms are more fully developed. Research indicates that as the number of risk factors or stressors in the child's life increases, performance on IQ tests deteriorates. According to one leading researcher, the extent of the effect on the child of chronic trauma or exposure to violence is a function of the types of trauma, the number of traumas, and the extent of exposure. There is a "dose-response" relationship – in other words, each added trauma has a multiplier effect so that the impact of successive traumas is far greater than the sum of each part. The accumulation of the risks and stressors in a child's life enhances the likelihood of adverse effects on the child.

50. The presence of protective or ameliorating factors can decrease the likelihood that destructive mental health consequences will result from chronic trauma. Unfortunately, few such factors existed in Orlando's case. Protective factors can include cognitive competence (Orlando's intelligence is in the low average range and his academic ability, even as an adult, is well below the norm); experiences that promote the child's positive sense of self (Orlando's environment provided few such opportunities); community support and encouragement (these were not available), and role models for active and constructive coping strategies (his parents did not provide such models). Orlando did have a stable emotional relationship with his mother, as well as positive early relationships with his grandmother and aunt. After the death of his grandmother, however, and due to his mother's increasing physical and emotional unavailability, Orlando did not have the continuous level of emotional support which would have helped him deal constructively with the experience of trauma. Resources were also markedly absent outside the family, other than, to some extent, Rev. Hegler. The experience of Orlando's sister Cassandra Ross provides a significant contrast. From an early age, Ms. Ross found refuge in the family of her boyfriend Jerry Ross, whom she later married and with whom she has had a stable and emotionally healthy long-term relationship. Ms. Ross' relationship with Jerry, in fact, dates back to her

DECLARATION OF JILL MILLER -- 20

129

childhood -- he was her elementary school sweetheart. Ms. Ross acknowledges the role of the Ross family in providing her with emotional and material resources, and it is plain that Jerry's parents provided positive models in a way that her own parents did not. At the same time, Ms. Ross's cognitive ability led to successes in school which Orlando lacked; her cognitive ability itself, and the positive regard it brought her in the school setting, were protective factors which reduced the impact of family trauma on Ms. Ross. Even so, it would be a mistake to assume that Ms. Ross has not suffered, and does not continue to suffer, from the trauma that characterized the Hall household.

51. Understanding the nature of risk factors and protective factors, and directing the social history investigation toward identifying them, is essential to explaining for a lay jury how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may appear to overcome it. Research indicates, for example, that boys and girls react differently to the experience of witnessing trauma as children; as a result, a girl who grows up watching her mother daily assaulted by her father may suffer somewhat less psycho-social damage than a boy raised in the same environment and witnessing the same traumatic violence. Every child in a family suffers different consequences from the experience of trauma, even when all experience it at the same time. The extent to which each child in Orlando Hall's family, in growing to adulthood, experienced or avoided criminality, substance abuse, relationship problems, or the like, and the severity of those experiences, depends on the unique combination of protective factors and risk factors affecting him or her during childhood. In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.

52. Betty Hall exhibits many symptoms of PTSD and could probably be diagnosed as suffering from it. All the children in this family exhibit multiple symptoms of trauma syndrome. While trauma syndrome is less pervasively disabling than "full-blown" PTSD, the presence of this extensive symptomatology nevertheless reflects and corroborates the traumatic experiences that Orlando and his siblings endured.

53. Trauma symptoms fall into three categories, and a subject must exhibit symptoms in all three areas before a diagnosis of PTSD may be made. The first category of symptoms is *re-experiencing*. Re-experiencing occurs through nightmares, flashbacks, or memories triggered by certain events,

DECLARATION OF JILL MILLER -- 21

130

words or experiences that are linked to the traumatic event. The person has recurrent or intrusive distressing recollections of the events, and acts or feels as if she is experiencing the trauma all over again. In response to these recollections, the person experiences intense feelings of distress such as terror or helplessness.    Betty Hall and several of the Hall children reported suffering nightmares about their traumatic childhood experiences after being encouraged to talk about them.

54. The second category of symptoms is *persistent avoidance of stimuli associated with the trauma and general numbing of feelings*. These symptoms include the person's efforts to avoid thoughts, feelings, conversations, or activities associated with the trauma; inability to recall an important aspect of the trauma; feelings of detachment or estrangement from others; restricted range of affect (emotional expression); and a foreshortened sense of the future. Persons who experience these symptoms often manifest depression and turn to alcohol or drug use as a means of emotional escape.    Orlando and each of his brothers exhibit the foreshortened sense of the future characteristic of this symptom group. All of the Hall children also report that they actively resist thinking or talking about the experiences of trauma in their family background.    Orlando's brother Scotty and his sister Pam both appear to have suffered from depression and to have sought solace in alcohol or drugs, although Scotty's reliance on such substances has been much more pronounced and long-term in its destructive impact on his life.    Orlando himself has used marijuana as a strategy to avoid thinking about or focusing on the painful experiences he endured as a child.

55. The third category of trauma symptoms is *persistent symptoms of increased arousal*. These symptoms may appear as, for example, difficulty falling or staying asleep; irritability or outbursts of anger; difficulty in concentrating; hypervigilance; and exaggerated startle response. Persons exhibiting these symptoms often say that, when in a room, they have to sit facing the door, with their back to the wall. They jump when they hear a loud noise. They are always looking over their shoulder, or scanning the horizon when out in public. All of the Hall children manifest one or more of these arousal symptoms.

56. Betty Hall exhibited, in her relationship to Orlando's father A.J., symptoms of co-dependency as it related to A.J.'s alcoholism.    She tolerated his alcoholic and abusive behavior by working long hours to provide financial support for her family while A.J. "drank up" his own earnings or hid them (Orlando's brother Scotty reports that A.J. kept money in an out-of-town bank to which Betty apparently had no access). Betty also invested a great

131

deal of time and energy in monitoring A.J.'s moods and behavior, hoping to avoid provoking him into outbursts of physical violence toward her. Along with her work schedule and her own escapist activity (gambling), this constant focus on A.J. made her both unavailable to her children and unable to protect them. Often, people who grew up in an alcoholic and violent home say that it felt like "walking on eggshells." Several of the Hall children used precisely this phrase to describe their emotional response to their home environment.

57. All of the Hall children exhibit characteristics of adult children of alcoholics. Children of alcoholics are prone to a range of psychological problems, including learning disabilities, attention deficit disorder, depression, and anxiety. When alcohol abuse is combined with violence, as in the Hall home, the children grow up in an atmosphere of chaos, inconsistency, unpredictability, and fear. They can develop an inability to trust, an extreme need to control, excessive sense of responsibility, and denial or repression of feelings. This can lead to low self-esteem, depression, isolation, guilt, and difficulty establishing and maintaining satisfying and healthy relationships. These children have a need to please others; they seek approval and affirmation. They can be either overly dependent (a consequence of having had normal needs for dependency and nurturance go unmet) or prematurely adult (as a result of having been forced to surrender childhood to take on adult roles in family). Adult children of alcoholics can be immature and impulsive, and often have poor problem-solving skills. They exhibit an increased incidence of alcohol and/or drug abuse, and often marry or get involved with someone who abuses.

58. Among the roles which children in alcoholic families may assume are: the "responsible one"/parent figure, the placator or mediator, and the scapegoat. Orlando's sister Cassandra presents a classic example of a person with an extreme need for order and control in her life. His sister Pam, and indeed Orlando himself, went through periods of being prematurely adult and responsible -- Pam as a result of their parents' work schedule, and Orlando as a result of having been abandoned by their mother after she finally left A.J. Several of the children have abused alcohol and drugs. Several exhibit difficulty establishing and maintaining relationships of trust and intimacy. Sometimes, children in alcoholic families will act out to draw attention to themselves, disrupting the family but providing a distraction from the issue of alcoholism. At other times, they will try not to draw attention to themselves, and to simply "fade into the woodwork", especially if the alcoholic parent is also abusive. These children do poorly in school, abuse alcohol or drugs, and act out in other unacceptable ways.

DECLARATION OF JILL MILLER -- 23

132

59. Orlando's entry into the drug economy can best be understood as a function of several different influences acting upon him at once. One primary factor was that few economic opportunities existed for legitimate work in El Dorado in 1989; even five years later, when the national economy was booming, a deputy prosecuting attorney for a regional drug task force described the area as "economically depressed." Moreover, most positions available to young African-American men in 1989 were in menial labor or service sector jobs paying at most minimum wage. Significantly, Orlando attempted to hold such jobs for a time, working as a shelf stocker at the "Sav-Mor" grocery store and at the giant Con Agra chicken processing operation in El Dorado before abandoning those efforts at making ends meet through the legitimate economy. A second factor making it difficult for young African-American men to obtain stable, long-term employment work at a reasonable wage was (and is) racial discrimination in employment, as well as in economic development in El Dorado generally. Community leaders such as Rev. Hegler attest to the persistent and pervasive influence of racial discrimination in limiting the economic opportunities available to young African-American men in south central Arkansas. A third factor operating as a barrier to Orlando's finding appropriate employment was his lack of skills, in combination with his poor academic achievement and cognitive impairment, all of which made finding legitimate work far more difficult.

60. In addition, the very pervasiveness of the drug trade in poor black neighborhoods like El Dorado's "Thunderzone" -- described in a 1994 news article as "the hub of a thriving drug trade" in southern Arkansas -- creates a destructive cycle in which youngsters like Orlando grow up knowing they can make money easily. This perception is encouraged by the local big suppliers, who for their part view young black men as expendable resources, who can be swiftly replaced if they are jailed or killed. Deficiencies in the educational system in El Dorado, which longtime observers such as Rev. Hegler attribute in part to the legacy of racial discrimination, as well as the comparable history of employment discrimination stretching back for generations, would contribute to the problem.

61. As a result of his history of trauma, Orlando lacked the feelings of self-worth which develop in a child raised in a normally supportive and nurturing environment. This deficit of emotional well-being, too, apparently contributes to the attractiveness of selling drugs. Where young African-American men cannot see legitimate avenues for achieving success, they nevertheless need to possess outward symbols of success,

DECLARATION OF JILL MILLER -- 24

133

because such symbols (*e.g.*, cars, clothing, and the like) function to confirm that the person who possesses them is important and deserves respect. Those who don't have access to such symbolic possessions feel unworthy and alienated. By satisfying his need for respect, the money he earned selling drugs likely provided Orlando benefits that were as much emotional and psychological as material.

62. Another recognized consequence of the experience of trauma is a sense of futurelessness - the sense that there is no point in creating plans or expectations of satisfaction because trauma has shown that at any moment they could be destroyed. At the time Orlando became involved in the drug trade, precisely such a sense of futurelessness dominated his perceptions of his own life chances. Research indicates that young men raised in similar circumstances, seeing high rates of lethal violence and incarceration in their communities, do not expect to live long or remain on the streets. This lack of a belief in one's own future tends to undermine any motive to work toward long-term goals, financial or otherwise. Young black men like Orlando who see no future for themselves are believed to be especially vulnerable to the lure of easy money in the illegal drug economy, and unable to transcend their own immediate circumstances to appreciate the potential long-term disadvantages of such behavior.

63. Perhaps most important, family members agree that Orlando's original involvement in drug dealing was motivated by his desire to take care of his family, rather than by greed. Abandoned along with his two younger brothers when his mother left his father and took up with another man, Orlando faced an urgent need for money to survive -- to pay for food, clothing, and the electric bill. This immediate and uniquely personal motivation, in addition to the social and psychological factors described above, helps explain why Orlando gave up on the limited opportunities available in the legitimate economy to a young, uneducated African-American man in El Dorado and moved instead into the drug trade.

64. For all these reasons, a strong argument could have been made that the lure of easy money in the drug trade was more than Orlando -- frustrated with his inability to learn, limited by his academic and cognitive deficits, feeling responsible for his brothers and his own children, earning minimum wages in menial jobs, hungry for respect and self-esteem, and burdened by a sense of futurelessness -- could resist. Such circumstances would have helped the jury understand how Orlando was drawn into the drug business.

65. A great deal of powerful ethnographic research supports the view that the lure of the illegal drug economy is less about greed for money than about

DECLARATION OF JILL MILLER -- 25

134

the search for self-worth, the desire for dignity, and the hunger for respect. In 1994-1995, there was extensive information of this type available to provide a lay jury with this perspective on why Orlando ended up selling drugs rather than gainfully employed at a legitimate job. Further, it was understood in the capital defense community that it was essential to present such a perspective so that jurors would understand that economic, social, and political factors -- rather than simply greed -- contributed to the involvement of young black men like Orlando in the drug trade. This explanation would take on even greater mitigating force in Orlando's case because additional factors unique to his family circumstances -- *i.e.,* his sudden responsibility for providing for his younger brothers when they were abandoned by their mother -- acted in combination with these larger forces.

66. Several people corroborate that at the time of this crime (the kidnapping and murder of Lisa Rene), Orlando wanted to get out of the drug business and was taking steps to do so. His sister Cassandra, for example, reports that Orlando seemed increasingly anxious to relocate from Arkansas to Texas. His then-girlfriend LaTonya Anders likewise indicated that he planned to leave Arkansas. His brother Demetrius indicates that Orlando told him repeatedly that he wanted for them both to stop dealing drugs as soon as they had enough money to launch a legitimate business. This information would also have helped the jury place Orlando's involvement in the drug trade into proper perspective -- not as his ambition, but as an activity into which circumstances and the lack of other opportunities had propelled him, and from which he hoped to escape.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _June 12, 2002_ (date).

_____
JILL MILLER

DECLARATION OF JILL MILLER -- 26

135

APPENDIX A

136

DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Jill Miller. I am a forensic social worker in private practice in Madison, Wisconsin. I have been in private practice since January, 1984. I received my Bachelor's of Science degree, with a major in Social Work, from the University of Wisconsin-Madison in 1967. I received my Master's of Science – Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Independent Clinical Social Worker, State of Wisconsin License Number 1662.

2. I am a member of the National Association of Forensic Social Work, the National Association of Sentencing Advocates, the National Legal Aid and Defender Association (NLADA), and the American Academy of Experts in Traumatic Stress. I am certified as a diplomate in forensic traumatology by the American Academy of Experts in Traumatic Stress.

3. I have testified in capital cases more than twenty times, qualified as an expert in the field of forensic social work.

4. I have practiced as a social worker in legal settings for nearly thirty years. I was on the faculty of the University of Wisconsin-Madison School of Social Work from 1973 until 1985. My work in agency settings, as well as private practice, has primarily involved the preparation of sentencing reports in criminal cases, and the preparation of dispositional plans and reports in juvenile cases, as well as some work in mental health and family matters. Since 1986, my work has primarily involved preparation for the penalty phase of capital trials, review of the penalty phase of capital trials, and preparation for post-conviction proceedings in capital cases.

5. Since 1986, I have worked on more than seventy-five capital murder cases, in which I have conducted extensive social history investigations, prepared social history reports, conducted psycho-social assessments, and assisted the attorneys in preparing for the penalty phase of trials and for post-conviction proceedings, including federal habeas corpus proceedings. These cases have been at the trial and post-conviction stages, and in federal courts and military proceedings as well as state courts. I have worked on capital cases in Illinois, Missouri, Indiana, Texas, Ohio, Wyoming, Virginia, Louisiana, Alaska, Kentucky, Florida, Oklahoma, Michigan, Kansas, Rhode Island, New Jersey,

Montana, Pennsylvania, Vermont, Colorado, New York, West Virginia, the U.S. Virgin Islands, and Korea.

6. I have conducted extensive training of attorneys, mitigation specialists, mental health professionals, and investigators regarding development and presentation of mitigation, and preparation for the penalty phase in capital cases. This training has included presentations at the American Bar Association Annual Meeting, the Annual Conference of the NLADA, the annual training seminar on the death penalty sponsored by the NLADA, the annual capital punishment seminar sponsored by the NAACP Legal Defense and Educational Fund, and the annual conference of the National Association of Sentencing Advocates.

7. I have also addressed the annual death penalty seminar of the Illinois Appellate Public Defender Office on two occasions. I have been a training consultant for the Illinois Capital Resource Center, providing sixteen hours of training to mitigation staff in both 1990 and 1991, and led similar training for the Missouri State Public Defender in 1991. I was a consultant to the NLADA Mitigation Specialists Training Project and Mitigation Affidavit Project in 1990-91. In October, 1991, I was a faculty member for a two-day program titled "Mitigation Specialists Training" co-sponsored by the NLADA, the Missouri Capital Punishment Resource Center, and the Missouri Chapter of the National Association of Social Workers. I planned this program and prepared the materials which were distributed to those attending.

8. I was on the faculty of the Indiana death penalty seminar in 1993. I trained staff of the Defender Association of Philadelphia in 1993 on penalty phase preparation, and did mitigation training for the Nebraska Commission on Public Advocacy and the New Mexico State Public Defender Office in 1997. In 1998, I was on the faculty of death penalty training programs sponsored by the National Association of Criminal Defense Lawyers (NACDL) in Phoenix, Arizona; the Tennessee Association of Criminal Defense Lawyers in Nashville, Tennessee; and the Idaho Federal Public Defender.

9. I conducted training and case consultation with social workers, mitigation specialists, and attorneys at the Office of the Public Defender in Miami, Florida, and the Jefferson County Public Defender in Louisville, Kentucky in the fall of 1998. I was on the faculty of death penalty training programs for the NACDL in Boise, Idaho, and the Florida Public Defenders Association in 1999.

10. As a member of the Board of Directors and Defender Council of the NLADA, I participated in developing and approving the "Standards for the Appointment and Performance of Counsel in Death Penalty Cases," adopted by the NLADA in 1987, and later adopted as guidelines by the American Bar

DECLARATION OF JILL MILLER -- 2

138

Association, as well as the "Performance Guidelines for Criminal Defense Representation" adopted and published in 1995.

11. As a result of my professional experience and training, I am familiar with the generally accepted standards of performance in the criminal defense community for attorneys and mitigation specialists in capital cases, as those standards of performance have emerged and evolved since the mid-1970's. I base this statement on my familiarity with three primary sources: court decisions, written standards for performance (such as those developed by the NLADA and the American Bar Association, as well as comparable organizations at the state level), and training programs and training materials from specialized attorney and mitigation specialist trainings conducted around the country since at least the early 1980's. It should be noted that, even prior to that period, there existed an extensive body of caselaw, standards, and training materials regarding sentencing in non-capital cases that provided substantive guidance for counsel.

12. The consensus reflected by those materials is that defense counsel in a capital case must undertake "the most extensive background investigation imaginable," in the words of one representative publication, including "look[ing] at every aspect of [the] client's life from birth to the present," and "talk[ing] to everyone . . . who has ever had any contact with [him]." By no later than 1985, the unanimous view of qualified capital defense attorneys across the nation was that the likely success of the penalty phase depended on conducting the most extensive pretrial social history investigation possible. The use of mitigation specialists -- social workers and other mental health professionals with special expertise in the areas of social history investigation – to accomplish this task was well-established by the mid-80's.

13. Based on my education and professional experience and training, as well as my personal familiarity with the foregoing facts concerning the emergence of mitigation specialists and the recognition of their central role in capital defense from the late 1970's to the present, I can state with confidence that, in 1994-1995, the standard of practice for defending death penalty cases obliged counsel to make sure that a complete and thorough social history investigation, including but not limited to the investigative tasks described in the following paragraphs, was completed in a timely manner. In 1994-1995, the standard of practice also required counsel to obtain the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task.

14. The role of the mitigation specialist in a capital murder case is to assist defense counsel by conducting a thorough social history investigation and psycho-social assessment; identifying factors in the client's background or circumstances that require expert evaluations; assisting in locating appropriate experts; providing background materials and information to experts to enable

DECLARATION OF JILL MILLER -- 3

them to perform competent and reliable evaluations; consulting with the attorney(s) regarding the development of the theory of the case and case strategy, thereby assuring coordination of the strategy for the guilt-innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; and working with the client and his or her family while the case is pending. The mitigation specialist may be a witness in the penalty phase hearing, and may offer testimony regarding the results of the social history investigation and assessment.

15. I have been advised by counsel for Orlando Hall, a federal inmate under sentence of death, of the following facts concerning the chronology of events leading to his conviction and death sentence:

- that the murder of the victim, Lisa Rene, took place on September 26, 1994;
- that Mr. Hall surrendered to the authorities on September 30, 1994;
- that Mr. Hall was indicted by a federal grand jury on November 4, 1994;
- that the attorneys originally appointed in 1994 to represent Mr. Hall were subsequently replaced by other counsel, who were appointed on March 31, 1995;
- that Mr. Hall's original counsel did not seek funds for the purpose of obtaining the assistance of a mitigation specialist during the period of time they represented Mr. Hall;
- that Mr. Hall's subsequent counsel did not seek appointment of a mitigation specialist until approximately September, 1995, and that their mitigation specialist, Tena Francis, began work on the case on approximately September 15, 1995;
- that jury selection in the case began approximately two weeks later, on October 2, 1995, and continued until October 19;
- that the guilt-innocence phase of trial began October 24, 1995 and ended October 31, with the jury finding Mr. Hall guilty as charged;
- that the penalty phase began November 1, 1995 and lasted until November 3;
- that the jury returned a death sentence against Mr. Hall on November 6, 1995.

16. For the reasons explained more fully in the paragraphs which follow, it is my professional opinion, based on my education and professional experience and training, that no adequate social history investigation could have been completed on the schedule described in the foregoing paragraph. In my experience, the lack of an adequate social history investigation makes developing a comprehensive, coherent penalty phase defense impossible. It is also my professional opinion that any reasonably effective capital defense attorney would have been aware, in 1994-1995, that it was essential to

140

undertake the social history investigation at the earliest possible date after appointment on the case, rather than waiting until the last minute.

17. First, the mitigation specialist must be retained and begin work on the case at the inception of the case or as soon afterward as possible. This is because the results of the social history investigation are necessary to enable defense counsel to make informed decisions regarding such matters as competency to proceed, the need for expert evaluations, medical treatment or other services while the case is pending, motion practice, and plea negotiations. It is vital that the mitigation specialist conduct sufficient social history investigation early in the process to assist counsel in determining the need for other expert assessments, including what type of assessments are indicated.

18. The nature and extent of the investigation and assessment necessary to adequately prepare for a capital murder trial, including the penalty phase, generally requires a minimum of six months to a year. Factors affecting the length of time and number of hours necessary to prepare include, but are not limited to, the nature and complexity of the case; the age of the client; the prior history of the client including such things as prior criminal history, prior incarcerations, history of significant physical or mental health problems, military history, lengthy employment history, or frequent changes in residence and schools; the extent of records and documentation that exist, and difficulties in locating and obtaining records; the number of collateral interviews that must be conducted; the existence of special conditions, factors or issues that must be researched and considered; the need to address victim impact evidence; conditions of confinement; the time necessary to obtain, schedule, and complete expert assessments; the extent of travel involved to investigate and interview the client and collateral sources; other professional commitments of the mitigation specialist; and specific jurisdictional procedures or practices. Cases in which a number of these factors exist will often require at least one year, and sometimes more, to prepare.

19. A properly conducted social history investigation is also time-consuming because it inevitably involves eliciting personal information from the client and others, particularly information of a private and sensitive nature. The person conducting the investigation must have the training, knowledge, and skills to detect the presence of significant factors such as: neurological impairments; cognitive disabilities; physical, sexual, or psychological abuse; substance abuse; mental disorders; and other factors which influence the development of the client's personality and behavior. Equally important, factors such as denial, repression, shame, and a sense of privacy all inhibit the ability to fully disclose critically important information. Where present, these factors increase the amount of time necessary to complete the investigation, since the mitigation specialist cannot obtain such sensitive information without building a relationship of genuine trust with the persons who are providing information. Building such a relationship takes time; for example,

DECLARATION OF JILL MILLER -- 5

141

where a source is also a victim of trauma, it may be necessary to conduct repeated interviews of the source, or even involve a consulting or treating expert to assist the source, in order that information about traumatic experiences may be obtained without overwhelming or retraumatizing the subject. These time demands cannot be artificially compressed to meet an external schedule. Consequently, it is essential that the investigation be undertaken as early as possible in the history of the case.

20. An adequate social history investigation is also time-consuming because it requires the mitigation specialist to gather and review many documentary records including but not limited to: charging documents, investigation reports relating to the offense; news media accounts of the offense; the coroner's report or autopsy report; FBI, state, and local criminal history reports on the client; jail booking records; police reports and court files related to the client's prior arrests and convictions, as well as juvenile adjudications; medical records of all kinds; school records of all kinds; employment records of all kinds; social service agency records of all kinds; military records of all kinds; adult education records of all kinds; prior jail and prison records of all kinds; prior probation and/or parole records of all kinds; treatment records of all kinds; and jail records for the current incarceration. In addition, similar records must be obtained where appropriate for other significant persons in the client's life, including parents, siblings, grandparents, and so on.

21. In addition to gathering these documents, the mitigation specialist must also interview the client to obtain detailed and specific social history information, and to learn the identities of collateral sources of information. This information cannot be obtained in a few visits; numerous interviews are generally required to cover all necessary areas. Information that should be obtained from the client regarding childhood should include, but not be limited to: information regarding his or her birth (including any knowledge the client may have concerning the mother's pregnancy, the circumstances of the birth, any complications of delivery or birth trauma); early developmental history (including the age at which the client learned to walk and talk, and was toilet trained); makeup of the family unit (including background information on birth parents and other significant relatives, including date and place of birth, educational attainment, health history, date of marriage, ages at time of marriage, etc.), age and sex of siblings, prior marriages and other children of parents; early health of the client, including whether the client suffered any serious accidents, illnesses, or injuries; residential history of the family, including where they lived, for what periods of time, and under what conditions; employment history of parents; educational history, including activities in which the client participated, favorite subjects, and names of teachers that the client remembers; religious training, practices, and beliefs; discipline in the home, including the form of discipline, how administered, how often, by whom, and for what; family relationships, including the nature and quality of the client's relationship with each parent, siblings, and relatives

142

or other significant persons, and the relationship between the parents; friends and leisure activities; other significant relationships; community activities, including such things as sports, scouting, music, and so on; jobs held as a youth, including lawn work, newspaper delivery, babysitting or other odd jobs; any significant childhood experiences, including such things as death or serious injury or illness of a family member or other significant person, divorce of parents, abandonment by parent; family violence; parental alcohol or drug use; abuse of the client, including physical, sexual, or emotional abuse; and exposure to violence in the community; history of any alcohol or drug use; history of running away; and juvenile record. In addition, the client should be interviewed concerning how he or she perceived him/herself as a child, in terms of personality, behavior, feelings, responses to different events in life, and relationships with others.

22. Information that should be obtained from the client regarding the client's adult years, and experiences as an adult, should include the foregoing topics (where relevant), as well as, without limitation: residential history; employment history, including name of businesses or persons for whom the client worked, dates of employment, description of job and duties, pay, performance on the job, names of persons familiar with his or her work, reasons for leaving the job, and any significant job experiences; adult education; military history; health; significant relationships, including marriages, children, and the nature and quality of these relationships; exposure to violence in the community, including experiences of traumatic loss, being the subject of violent assault, and witnessing violence; sexual development, practices and relationships; names of friends; leisure activities; legal history, including arrests, convictions, circumstances surrounding prior legal involvement; experiences in prison or on parole or probation, and experiences with the police. In addition, the client should be interviewed regarding how he or she perceived of him/herself as an adult, in terms of personality, behavior, and feelings, and how they perceived their relationships with others.

23. Along with obtaining all relevant documents and spending long hours interviewing the client, the mitigation specialist must conduct collateral interviews with family members and others to supplement and corroborate the information obtained from the client. Persons who should be interviewed include, but are not limited to, the following: parents, siblings, spouses or significant others; children; other relatives such as grandparents, aunts, uncles, cousins; childhood and adult friends and neighbors; school personnel, including teachers, principals, counselors, social workers, psychologists, or coaches; ministers or other church personnel; employers, job supervisors and co-workers; social service and court personnel; physicians or medical personnel who have treated the client; jail or correctional institution staff; law enforcement personnel; mental health professionals who have assessed the client at any time in the past or for purposes of the present proceeding, or who have provided treatment to the client.

DECLARATION OF JILL MILLER — 7

143

24. The mitigation specialist must maintain an ongoing consultation with defense counsel, to keep them informed of the results of the investigation, and to consult on the implications of the results for case strategy. Information obtained can affect considerations regarding competency to proceed or mental responsibility for the offense, plea negotiations, the manner in which the defense team relates to the client; decisions regarding jury selection; whether or not the client should testify, at either phase of trial; decisions regarding the need for expert evaluations, and selection of witnesses for the trial including penalty phase. The mitigation specialist should generally prepare a comprehensive social history report containing the information obtained in the investigation. This report is to be used by defense counsel in developing case strategy and determining who should be called as witnesses; and may be provided to experts performing evaluations so that they have adequate background information to conduct a competent evaluation.

25. Because all these steps are both necessary and time-consuming, the social history investigation must be initiated at the earliest possible time in the trial process for its results to be usefully employed to the client's maximum benefit.

26. I have been advised that Mr. Hall was repeatedly exposed to trauma as a child, regularly witnessing violent assaults on his mother by his father. Chronic exposure to violence and trauma can have profound effects on the development of a child. It affects the child's sense of safety and security, and his ability to grow into an emotionally healthy adult. Parents cannot be viewed as providing safety for the child when they are also the inflictors of violence. A child, especially a son, who witnesses the abuse of his mother develops feelings of guilt, helplessness, powerless, and low self-esteem. To develop into an emotionally healthy adult, a child's basic physical and emotional needs must be met. Among these needs are predictability, stability, positive modeling, and opportunities to develop a positive sense of self. If that child is frequently exposed to his father's violent battery of his mother, the child will lack the safety, predictability, and consistency which are vital to healthy emotional development.

27. Children who experience or witness violence suffer a variety of mental health symptoms or trauma reactions as a result. Exposure impacts on the child's development and can negatively impact cognition, including learning, memory, and school performance. Research indicates that as the number of risk factors or stressors in the child's life increases, performance on IQ tests deteriorates. Chronic trauma also affects personality development and behavior, and can lead to decreased impulse control. According to one leading researcher, the extent of the effect on the child of chronic trauma or exposure to violence is a function of the types of trauma, number of traumas, and extent of exposure. The accumulation of risk factors has a multiplier

DECLARATION OF JILL MILLER -- 8

144

effect. There is a dose-response relationship. The age and development level of the child are also important. Children who experience their first trauma before age eleven are three times more likely to develop psychiatric symptoms than those who are older. It is the accumulation of risks and stressors that enhances the likelihood of adverse effects on the child. The context in which the child experiences the trauma is important as well. The impact of trauma on a child is compounded by an environment of poverty, family disruption, and community disintegration. Among the risk factors that enhance the likelihood of adverse effects, including psychiatric disorders, are: severe marital distress; low socio-economic status; large families with overcrowding; maternal mental illness, and paternal criminality.

28. There are some factors or conditions that enhance a child's resiliency and ability to cope with chronic trauma. Ameliorating factors include: cognitive competence; experiences of self-efficacy; positive early relationships; self-confidence and self-esteem; community support and encouragement; and role models for active coping strategies. Protective factors include: stable emotional relationship with at least one parent or significant other person; an open and supportive educational climate; parental modeling of behavior that encourages constructive coping; and social supports outside the family. When these protective factors are lacking or absent, children are more likely to be negatively impacted by chronic trauma.

29. Understanding the nature of risk factors and protective factors, and directing the social history investigation toward identifying them, is essential to explaining for a lay jury how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may suffer somewhat less. Research indicates, for example, that boys and girls react differently to the experience of witnessing trauma as children; as a result, a girl who grows up watching her mother daily assaulted by her father may suffer somewhat less psycho-social damage than a boy raised in the same environment and witnessing the same traumatic violence. Every child in a family suffers different consequences from the experience of trauma, even when all experience it at the same time. The extent to which each child, in growing to adulthood, experiences or avoids criminality, substance abuse, relationship problems, or the like, and the severity of those experiences, depends on the unique combination of protective factors and risk factors affecting him or her during childhood. In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.

30. I have been advised that Mr. Hall was raised in an economically depressed area of Arkansas and became involved in the illegal drug economy as an adolescent and remained involved in that economy, at least during certain

145

periods of time, as a young adult prior to his arrest in this case at age twenty-three. In 1994-1995, it was understood by reasonably competent capital defense attorneys that the involvement of young black men in the illegal drug economy, and their concomitant failure to pursue or maintain legitimate employment, could be explained by reference to a series of economic, social, and political factors. For example, a number of respected leaders in the African-American community believe that a lack of meaningful local employment at a decent wage is a key factor. In addition, the very pervasiveness of the drug trade in poor black neighborhoods creates a destructive cycle in which youngsters grow up knowing they can make money easily. This perception is encouraged by the local big suppliers, who for their part view young black men as expendable resources, who can be swiftly replaced if they are jailed or killed. Deficiencies in the educational system and legacies of employment discrimination, often stretching back for generations, contribute to the problem. Where young men cannot see legitimate avenues for achieving success, they nevertheless need to possess outward symbols of success. Such symbols (including cars, clothing, and the like) function as a confirmation that the person who possesses them is important and deserves respect – an attitude that otherwise may rarely be extended to young black men. In this country, many African-Americans equate self-worth with material possessions; those who don't have access to such means feel unworthy and alienated. Young black men are believed to be especially vulnerable to the lure of easy money in the illegal drug economy because they often see no future for themselves. Given high rates of lethal violence and incarceration in their communities, they don't expect to live long or remain on the streets, and therefore have less motive to work toward long-term goals, financial or otherwise. In short, a great deal of powerful ethnographic research supports the view that the lure of the illegal drug economy is less about greed for money than about the search for self-worth, the desire for dignity, and the hunger for respect. In 1994-1995, there was extensive information of this type available to provide a lay jury with this perspective on the reasons a young black man like Mr. Hall might have ended up selling drugs rather than working at the local poultry processing plant .

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___April 22, 2000___ (date).

_____Jill Miller_____
JILL MILLER

DECLARATION OF JILL MILLER -- 10

146

# APPENDIX B

147

## DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. § 746, makes the following declaration:

1. My name is Jill Miller. I am a forensic social worker in private practice in Madison, Wisconsin. I received my Bachelor's of Science degree, with a major in Social Work, from the University of Wisconsin-Madison in 1967 and my Master's of Science - Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Independent Clinical Social Worker, State of Wisconsin License Number 1662. I am board-certified as an expert in traumatic stress by the American Academy of Experts in Traumatic Stress. My credentials are set forth in full in a declaration I executed on April 22, 2000, which is attached as Exhibit 13 to the Motion of Orlando Cordia Hall to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.

2. As detailed in my prior declaration, a significant portion of my practice is devoted to preparing for the penalty phase of capital trials and review of the penalty phase of capital trials, as well as preparing for post-conviction proceedings in capital cases.

3. Robert C. Owen and Marcia A. Widder have consulted with me in connection with their representation of Orlando Hall with a view towards retaining me as an expert in the areas of traumatic stress and the prevailing professional standards at the time of Mr. Hall's trial for defense counsel's investigation, preparation and presentation of mitigating evidence.

148

4. It is my understanding that Mr. Hall was raised in an environment in which he and his siblings were exposed to repeated and brutal attacks by the children's father on their mother throughout the marriage and well into Mr. Hall's teenage years. Additionally, the children were subjected to severe beatings by their parents in the guise of punishment.

5. Mr. Owen and Ms. Widder have expressed concerns to me about their competency to conduct interviews of Mr. Hall's family members because of the sensitive and delicate nature of the questions they must ask about the family's violent history and the emotional impact their questions have had on the family members they have thus far interviewed on this subject — Betty Hall (Orlando's mother), Cassandra Ross (Orlando's sister) and Pamela Palmer (Orlando's half-sister).

6. I have reviewed the declarations of Betty Hall and Cassandra Ross. I have also spoken with Ms. Widder regarding the dynamics of her and Mr. Owen's interviews with family members. Their declarations and counsel's characterization of the interviews indicate that Mr. Hall's mother and sisters exhibit symptoms consistent with posttraumatic stress disorder or trauma syndrome. This is strongly indicated by Betty Hall's reports of sleep disturbances and raised blood pressure following her interviews, as well as apparent flashbacks or intrusive recollections she experienced during interviews. The avoidance and distancing strategies employed by Mr. Hall's sisters are a common behavioral response to the experience of trauma. My experience and training suggest it is likely that Mr. Hall and his brothers have suffered at least some negative impact from experiencing chronic trauma as well.

149

7.  In my opinion, it is necessary that an appropriately qualified person be appointed to assist counsel in the investigation of Mr. Hall's family background by conducting interviews with family members who have experienced trauma. The person conducting such interviews must have the training, knowledge, and skills necessary to elicit information about traumatic experiences without overwhelming or re-traumatizing the subject. Untrained interviewers, even those sensitive to the delicate nature of the inquiry, are highly likely to expose trauma victims to psychological and physical harm by forcing the subject to confront deeply personal and painful memories without simultaneously providing methods with which to cope with the surge of emotions these memories bring forth. In addition, a trained expert will likely be able to elicit more probative information concerning traumatic events than could an individual lacking the requisite expertise. By training, education, and experience, I am such an appropriately qualified person.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _May 22, 2000_ (date).

JILL MILLER

150

APPENDIX C

151

## DECLARATION OF JILL MILLER

Jill Miller, pursuant to the provisions of 28 U.S.C. § 746, makes the following declaration:

1. My name is Jill Miller. I am a forensic social worker in private practice in Madison, Wisconsin. I received my Bachelor's of Science degree, with a major in Social Work, from the University of Wisconsin-Madison in 1967 and my Master's of Science – Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Independent Clinical Social Worker, State of Wisconsin License Number 1652. I am board-certified as an expert in forensic traumatology by the American Academy of Experts in Traumatic Stress. My credentials are set forth in full in a declaration I executed on April 22, 2000, which is attached as Exhibit 13 to the Motion of Orlando Cordia Hall to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.

2. As detailed in my April 22, 2000 declaration, a significant portion of my practice is devoted to the preparation of the penalty phase of capital trials, review of the penalty phase of capital trials and preparation for post-conviction proceedings in capital cases.

3. Robert C. Owen and Marcia A. Widder consulted with me last spring in connection with their representation of Orlando Hall with a view towards my retention as an expert in the areas of traumatic stress and the prevailing professional standards for trial counsel's investigation, preparation and presentation of mitigating evidence for use in the penalty phase at the time of Mr. Hall's trial in the fall of 1995. In preparation for the filing of a motion seeking my appointment and funding for my work, we discussed the amount of time that would be required to review all relevant documentary evidence (e.g. Mr. Hall's medical, school and penitentiary records); to conduct thorough interviews of Mr. Hall, family members and others with personal knowledge of Mr. Hall's upbringing, including significant factors in his development; and to testify in this matter. At that time, I estimated that 300 hours of work would be necessary to perform these tasks. This total is 100-300 hours less than the amount of time I have typically spent preparing the penalty phase case at the trial level in other federal death penalty cases I have worked on. This lower figure is based on the fact that post-conviction counsel have already undertaken a fair amount of work, including collection of records and preliminary interviews, in investigating the mitigating evidence that was never presented at trial.

4. Despite the current lack of funding for my work in this matter, Mr. Owen and Ms. Widder requested that I review the documents collected thus far and meet with Mr. Hall during a trip to Terre Haute, Indiana, which I recently undertook in connection with an unrelated capital case. I have reviewed, inter alia, a substantial proportion of Mr. Hall's prison, jail, probation, juvenile, and parole records; his school records; relevant medical records (for Mr. Hall and other family members); relevant pleadings from the trial; the transcript of the testimony from the sentencing phase; time records for the investigators who worked with trial counsel; memoranda from those investigators to trial counsel; statements by the defendants; and numerous declarations by witnesses, as well as memoranda of various witness interviews by post-conviction counsel. I also met with Mr. Hall for approximately 4 1/2 to 5 hours at the Federal Penitentiary in Terre Haute, Indiana.

152

5. Based on the minimal work that I have performed thus far, it is apparent to me that a great deal of mitigating information was never explored or developed by trial counsel. Some avenues that need to be explored are set forth below. Much more remains to be investigated and developed.

▪ It is my understanding from my review of the court records in this case that no evidence was presented that Mr. Hall and his siblings suffered physical abuse at the hands of both their parents. Further, it is my understanding that the prosecutor in fact argued that whatever abuse might have been directed at Betty Hall, that abuse did not impact the children greatly because they were not the targets of their father's violence. This was not an accurate picture of the Hall family. Rather, the Hall children suffered brutal beatings, which they interpreted to be punishment, rather than "abuse." Indeed, Mr. Hall was a chronic bed-wetter until the age of ten, a classic symptom of abuse — he explained that this would happen while he lay awake in terror next to his brothers waiting for his father to come home and give him a beating. The beatings the children suffered were severe, leaving welts on their bodies. Further, witnessing abuse and violence can have psychological consequences for children. In my opinion, reasonably competent capital defense counsel should have been aware of this in 1995.

▪ Virtually no evidence of Mr. Hall's good qualities was presented at trial. For example, during my one interview with Mr. Hall, I learned that as a young man he had leaped off a second-story hotel balcony in order to jump into a swimming pool and rescue his drowning three-year-old nephew. Such information would have presented the sentencing jury with compelling evidence of positive attributes of Mr. Hall's character.

▪ It is my opinion that Mr. Hall should be given a battery of neuropsychological tests. I base this recommendation on Mr. Hall's history, from his earliest days in school, of significantly substandard performance both in the class room and on standardized tests; his score of 80 on the BETA test administered by the Arkansas penitentiary system; his mother's possible alcohol abuse while she was pregnant with him; possible head trauma (Mr. Hall has dents in his skull that he cannot explain); and behavioral patterns that indicate some brain dysfunction. I note that Tena Francis, the mitigation specialist appointed by the court two weeks before trial, likewise concluded that such tests were indicated and communicated that opinion to trial counsel. No tests were ever performed.

6. As I set forth in my declaration, dated May 22, 2000, which is attached as Exhibit A to the motion for my appointment, I believe that it is essential that members of Mr. Hall's family be interviewed by someone with experience and expertise in dealing with victims of traumatic experiences. I have reviewed the declarations of Betty Hall and Cassandra Ross and have spoken with Ms. Widder regarding the dynamics of counsel's interviews with family members. The declarations and counsel's characterization of the interviews indicate that Mr. Hall's mother and sisters exhibit symptoms consistent with post-traumatic stress disorder. This is strongly indicated by Betty Hall's reports of sleep disturbances and raised blood pressure following her interviews, as well as apparent flashbacks or intrusive recollections she experienced during interviews. The avoidance and distancing strategies employed by Mr. Hall's sisters, Cassandra and Pam, likewise are common behavioral responses to the experience of trauma. My experience and training suggest it is likely that Mr. Hall's brothers have suffered at least some negative impact from experiencing

153

chronic trauma as well.

7. In my opinion, it is necessary that an appropriately qualified person be appointed to assist counsel in the investigation of Mr. Hall's family background by conducting interviews with family members who have experienced trauma. The person conducting such interviews must have the training, knowledge, and skills necessary to elicit information about traumatic experiences without overwhelming or re-traumatizing the subject. Untrained interviewers, even those sensitive to the delicate nature of the inquiry, are highly likely to expose trauma victims to psychological harm by forcing the subject to confront deeply personal and painful memories without simultaneously providing methods with which to cope with the surge of emotions these memories bring forth. In addition, a trained expert will likely be able to elicit more probative information concerning traumatic events than could an individual lacking the requisite expertise. By training, education, and experience, I am such an appropriately qualified person.

8. Mr. Owen and Ms. Widder have requested that I re-evaluate how much time would be necessary to conduct a minimally adequate investigation of Mr. Hall's background. In the interests of economizing on the amount of time I personally spend on this case, I have concluded that counsel are capable of interviewing collateral witnesses (individuals who observed the dynamics of the Hall family from outside the home, as well as other collateral sources of social history information). I would ordinarily interview such witnesses myself, and I would prefer to interview these witnesses even in this case. Should these tasks be relegated to counsel, however, I believe that I can complete an adequate, bare-bones investigation of Mr. Hall's background in approximately 150 hours.[1] I would focus my efforts on investigating and developing the psychosocial consequences of trauma, potential learning problems, and other factors that contributed to his involvement in the drug economy. This figure does not include the amount of time that would be necessary to write a thorough social history report or to testify at an evidentiary hearing. It does include the approximately 35-40 hours that I have already spent in reviewing documents and interviewing Mr. Hall.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 13, 2000_ (date).

_Jill Miller_
JILL MILLER

---

[1] I estimate that I will require four days to interview witnesses located in El Dorado, Arkansas and surrounding areas, and two to three days interviewing witnesses residing in Texas.

# APPENDIX D

155