ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 18 2002

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

ORLANDO CORDIA HALL,
*Defendant.*

CIVIL ACTION NO. 4:00-CV-422-Y
(Criminal No. 4:94-CR-121-Y)

---

# EXHIBITS (Vol. 2)
# (31-50)
## TO SECOND AMENDED MOTION OF ORLANDO CORDIA HALL
## TO VACATE CONVICTION AND SENTENCE AND
## FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND
## RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

---

Robert C. Owen
Texas Bar No. 15371950
Owen & Rountree, L.L.P.
510 South Congress Avenue
Suite 308
Austin, Texas 78704
(512) 320-0334

Marcia A. Widder
Louisiana Bar No. 23367
636 Baronne Street
New Orleans, Louisiana 70113
(504) 529-5955

1071

# Exhibit 31

Excerpts from trial testimony of Larry D. Nichols from
United States v. Miller & Reliford, No. CR3:94-343-G (N.D. Tex.)

264



NORTHER' DIS'

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS APR 2 4 1995

N.    ER. Y CLERK

DALLAS DIVISION

UNITED STATES OF AMERICA            (        NUMBER CR3-94-343-G
                                    (
                                    (
VERSUS                              (
                                    (
VERNON ANTHONY MILLER and           (
ERIC JEROME RELIFORD,               (        April 10, 1995


VOLUME 1
TESTIMONY OF MR. LARRY NICHOLS
BEFORE THE HONORABLE A. JOE FISH, and a jury

A P P E A R A N C E S:

For the Government:        MR. LARRY JARRETT
                           Assistant United States Attorney
                           UNITED STATES DEPARTMENT OF JUSTICE
                           NORTHERN DISTRICT OF TEXAS

                           U.S. Courthouse
                           1100 Commerce Street
                           Dallas, Texas 75242
                                214/767-0951

For the Defendant Reliford:
                           MR. THOMAS PAPPAS
                           Burleson, Pate & Gibson
                           2414 N. Akard
                           Suite 700
                           Dallas, Texas 75201

                                214/871-4500
For the Defendant Miller:
                           MS. JILL BINDLER
                           Assistant Federal Public Defender
                           Northern District of Texas
                           525 Griffin, Suite 629
                           Dallas, Texas 75202
                                214/729-2746

Court Reporter:            Cassidi L. Casey, CSR No. 1703
                           1100 Commerce Street, Rm 15D6L

                           Dallas, Texas 75242
                                214/767-0774

/94

P R O C E E D I N G S:

(Witness sworn)

PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. JARRETT:

Q  Sir, would you please state your full name for the record?

A  Larry D. Nichols.

Q  Spell your last name for the reporter?

A  N-i-c-h-o-l-s.

Q  Mr. Nichols, you were a defendant in this case, were you not?

A  Yes.

Q  And please tell the jury how old you are?

A  21 years of age.

Q  And your date of birth?

A  4-23-73.

Q  Would you please tell the jury whether you have a criminal history?

A  Yes, I do have a criminal history.

Q  What does that history consist of?

A  I was arrested once in Atkins, Texas.

Q  For what?

A  Possession of a gun.

Q  Any other arrests or convictions?

A  No, sir.

@WITNESS — DIRECT — @                                    4

Q   Now, sir, do you know the defendants in this case?

A   Yes.

Q   What are their names?

A   Vernon Anthony Miller and Eric Reliford.

Q   Please point to Eric Reliford?

A   Indicates.

Q   An describe an article of clothing?

A   Light blue suit.  Gray tie.

Q   And please point to Vernon Miller?

A   Indicates.

Q   Please describe his clothing?

A   White shirt and gray tie.

        MR. JARRETT:  Will the record reflect the witness identified the defendants?

        THE COURT:  The record will so reflect.

BY MR. JARRETT:

Q   How did you know the defendants?

A   I met them through my work.

Q   How did you meet?

A   Mr. Reliford came by to see my sister on occasion but she never was at home.

Q   Where was Mr. Reliford living when you first met him?

A   He was living at the country club apartment from my understanding and Mr. Miller was staying with his mother.

Q   And where are we talking about, Shreveport Louisiana?

A   Yes, sir.

Q   So both individuals are residents of Shreveport?

A   Yes, sir.

Q   Now, as clearly as you can, would you tell us the month in which you met the two individuals?

A   Well, I met Eric I think it was in March sometime.  Now, Mr. Miller, I got acquainted with him in January.

Q   Where were you working at that time?

A   I wasn't working anywhere.

Q   Did you ever get a job and you were working between the time that you met Mr. Reliford and the time that you met Mr. Miller and the time that you were arrested?

A   The job, it wasn't a real job.  You know just like a part time job just doing delivery sales and things like that.

Q   What about the defendants here?  Mr. Reliford, was he working when you met him?

A   I think so.  From my understanding he started to work --.

        MS. BINDLER:  I object to him testifying from his understanding unless he has actual knowledge.

        THE COURT:  Sustained.

BY MR. JARRETT:

Q   Do you know whether or not Mr. Reliford was working?

A   No, I don't.

Q   Do you know whether or not he got a job?

A   Yes, he later got a job at Champion Ford.

268

@WITNESS – DIRECT – @                                    6

Q   And what's Champion Ford?

A   Auto sales in Shreveport, Louisiana.

Q   How is it that you know he got a job at Champion Ford?

A   In the course of getting acquainted I went out several times to his job.

Q   And why did you go out there?

A   I went out there on occasion to get a loan of a car from Mr. Reliford.

Q   Now, do you know whether or not Mr. Miller was working at that time?

A   Mr. Miller was working at an he would which I can could and started working on February 14th or something like that

Q   All right.  Do you know whether or not he got another job after that?

A   No, he didn't.

Q   So how were you living?

A   Criminal money and drug money, things like that.

Q   Would you please tell the Court what type of criminal money you are talking about?

A   From drug proceeds.

Q   So does that mean that you were selling dope?

A   Yes, it does.

Q   Who were you selling dope with?

A   Me and Mr. Miller.

Q   Now, when you first met Mr. Miller and Mr. Reliford, how

much time did the three of you spend together?

A   Well, at first when we met up like every Sunday Mr

Reliford had a party at his house and I stayed over there on several nights like Mr. Miller.  And on occasion I went to clubs and things like that.

Q   So how much time did you spend?

A   Well, like a week or whatever.

Q   Would anyone talk about criminal records?  Either Mr. Miller or Mr. Reliford and you, would you talk about criminal records?

A   Yes, we would.

        MR. PAPPAS:  Your Honor, I object to this line of questioning for two reasons.  Number 1 it's hearsay.  Number 2 it violates rule 402 as to its relevancy versus whether or not it's probative and number 3, it also violates rule 404. Character evidence is not admissible to prove background.

        THE COURT:  I'll overrule the objection.  You may continue your answer.

BY MR. JARRETT:

Q   So who mentioned criminal conduct?

A   All three of us.

Q   What did Mr. Reliford say?

A   Well, that's when --.

        MR. PAPPAS:  Again, your Honor, I reurge my objection to what Mr. Reliford said with regard to criminal

270

@WITNESS – DIRECT – @                                    8

conduct is a violation of rules 402, 403 and 404.

THE COURT:  Overruled.  You may answer?

A  It was things about robbery and things like that.

BY MR. JARRETT:

Q  Okay.  Did he talk about his criminal conduct, his criminal history.

MR. PAPPAS:  Your Honor, I object to this question.  It's one thing if they talked about planning crimes.  Another thing if they are going to try to bring in unrelated matters that have no bearing on the allegations in the indictment or conspiracy.

THE COURT:  Sustained.

MR. PAPPAS:  Ask the jury be instructed to disregard the question.

THE COURT:  All right.  Ladies and Gentlemen the fact that a question is answered is of no moment and should not be considered by you.  I think I told you earlier and if not I will certainly tell you later in the case the only evidence comes from the witness and not the questions that are asked unless by their answer they somehow or affirm or incorporate the question.

Next question, Mr. Jarrett.

MR. JARRETT:  Thank you, your Honor.

BY MR. JARRETT:

Q  Mr. Nichols, did Mr. Reliford as you testified discuss how

CASSIDI L. CASEY CSR (214) 767-0774

271

@WITNESS – DIRECT – @                                9

to commit robberies?

A  Yes, he did.

Q  Now, did he indicate to you where he had learned that from?

A  Yes, he did.

        MR. PAPPAS:  Your Honor, I object to this particular question.  It's outside the scope of the allegations contained in the conspiracy count as well as the other counts.  It violates rule 404 and rule 403 and rule 402.

        THE COURT:  Overruled.  You may answer?

A  Yes, he obtained information from prison which he served five years.

BY MR. JARRETT:

Q  Now, was there ever a decision made between the three of you to commit robberies?

A  Yes, there was.

Q  How was that decision made?

A  The decision was made I think the later part of June.

Q  Who was in on this decision?

A  All three of us.

Q  And what did you guys decide to rob?

A  We decided to rob a fast food restaurant in Shreveport.

Q  Do you know how old Mr. Miller is?

A  Yes.

@WITNESS - DIRECT - @                                        10

Q   How old is he?

A   He's now 21 years of age.   At the time he was twenty.

Q   So you are the same age?

A   I was born in 1973.   He will be twenty-two in December.

Q   So you are both 21?

A   Yes.

Q   And do you know how old Mr. Reliford is?

A   From my understanding he's twenty-five.

        MR. PAPPAS:   Your Honor, I object unless he has
actual knowledge of Mr. Reliford's age.

        THE COURT:   Sustained.

        MR. PAPPAS:   Ask the jury be instructed to
disregard the witness' answer.

        THE COURT:   The jury is instructed to disregard the
witness' last answer.

BY MR. JARRETT:

Q   Do you know how old Mr. Reliford is?

A   No.

Q   Now, did either one of you own a gun?

A   Well, I owned a gun back in July.

Q   Where did you get your gun?

A   I purchased it from Shreveport sports in Shreveport
Louisiana.

Q   And what was the caliber of this gun?

A   It was a nine millimeter.

CASSIDI L. CASEY CSR (214) 767-0774

273

Q   Did either Mr. Reliford or Mr. Miller own a gun?

A   Mr. Reliford --

MR. PAPPAS:  Your Honor, I object.  If he's testifying from actual knowledge I withdraw the objection. But every time he says to my understanding I believe he's testifying from some matters outside his knowledge.

THE COURT:  All right.  Sustained without some further foundation for the witness' answer.

BY MR. JARRETT:

Q   Sir, did Mr. Reliford ever possess a weapon?

A   Yes, he did.

Q   What weapon depose?

A   A thirty-eight.

Q   And any other weapons?

A   A tech twenty-two also.

Q   And any other weapons?

A   A shotgun.

Q   And when did you first commit a robbery?

A   June 29, 1994.

Q   How many robberies did you commit in that one night?

A   Three in one night.

Q   I would like to talk only about tack could bell, Captain D's, Kentucky fried chicken and pioneer bank.  Whether did you commit the robberies on those three locations?

MR. PAPPAS:  Your Honor, I object to this line of

@WITNESS – DIRECT – @                                    12

questioning.    It is highly prejudicial.    It is not probative of the events in question.    It violates rule 404.    It's an

attempt backdoor to introduce some uncharged character evidence.    It's outside the scope of the particular counts involved.    It goes to our motions filed with the court concerning the unnecessary allegations in the manner and means paragraph and we would urge that the court deny the

admission.

THE COURT:    Overruled.    You may continue your answer.

BY MR. JARRETT:

Q    Please answer that question?

A    I don't remember what you said.    Can you repeat it again. please.

Q    What robberies did you commit on June 29?

A    Captain D's on Mansfield road and Kentucky Fried Chicken on Hearn Avenue.

Q    Let me ask you this.    There was a subsequent occasion when you robbed Taco Bell; is that right?

A    Yes, there was.

Q    And specifically the Taco Bell on Pines Road?

A    Yes.

Q    And when did you rob that Taco Bell?

A    It happened on June 29.

Q    Now, when did you decide to rob pioneer bank?

CASSIDI L. CASEY CSR (214) 767-0774

275

@WITNESS - DIRECT - @                                    13

A   Pioneer bank I decided to rob it three weeks later. That's when Mr. Reliford came up with a plan that he obtained through prison to rob a bank --

MR. PAPPAS:   Your Honor, I object to the question as calling for I am permissible character evidence and in addition I am going to object to the answer as being outside the scope of the question.

THE COURT:   Well, I'll sustain the latter objection and overrule the former.

MR. PAPPAS:   And ask the jury be instructed to disregard the answer.

THE COURT:   All right.  The jury is so instructed Next question.

MR. JARRETT:   Thank you, sir.

BY MR. JARRETT:

Q   Concerning the Taco Bell and the Captain D's and the Kentucky Fried Chicken?

A   Yes.

Q   Which one of those establishments were robbed first?

A   Captain D's was robbed first.

Q   Who went alone on that particular one?

A   The first robbery it was participated in Mr. Miller and Mr. Reliford.

Q   What happened there?

A   That's when Mr. Reliford had entered Captain D's on

CASSIDI L. CASEY CSR (214) 767-0774

276

@WITNESS – DIRECT – @

Mansfield road and robbed it.

Q Was he wearing anything to disguise his features?

A Yes, he was wearing a mask.

Q Was a weapon used?

A Yes, it was.

Q And what type of weapon was used?

A A.38.

Q Was any other weapon used?

A No, it wasn't.

Q Do you recall how much money was received?

A No, I don't recall.

Q Do you know whether or not you received any money?

A Yes, I do.

Q How much money did you get?

A Approximately five hundred dollars.

Q How much money did Mr. Miller get?

A I can't remember.

Q Did Mr. Miller get any money?

A Yes, did he.

Q How much money did Mr. Reliford get?

A It was split among the three of us.

Q So sir, tell me, what vehicle did you drive on that occasion?

A A 1981 is sue sue that was owned by Mr. Miller.

Q Now, where did you split the money?

@WITNESS - DIRECT - @                                           15

A   At Mr. Reliford's house.

Q   Later on that evening?

A   Yes.

Q   Was there a decision played to rob another place?

A   Yes, there was.

Q   Who made that decision?

A   Mr. Reliford did.

Q   What facility or what fast food restaurant was going to be robbed this time?

A   The next fast food was Kentucky fried chicken or Hearn Avenue.

Q   Who participated in that robbery?

A   Mr. Reliford and Mr. Miller.

Q   And what happened there?  Do you know?

A   That's when Mr. Reliford went in and I drove the get away car.

Q   Please put your hand down an speak into the Mike and speak slowly?

A   Yes, sir.

Q   How much money was taken from this place?

A   I can't remember.  It was once again the money was split between the three of us.

Q   Why didn't you go?

A   I stayed at home.  Mr. Reliford had asked just two people in the car.

278

@WITNESS - DIRECT - @

Q   Do you know whether or not a weapon was used?

A   Yes, it was.

Q   What weapon was used?

A   A.38 special.

Q   Now, tell me when was the last fast food place hit?

A   The next was Taco Bell on punch road.

Q   When was that hit?

A   Between eleven an twelve the same night.

Q   Do you know whether or not a disguise was used on that particular occasion?

A   Yes, it was.

Q   What type of disguise?

A   A stocking.

Q   Who went in?

A   Mr. Reliford Mr. Miller drove.

Q   Where were you?

A   I was at home at country club apartments.

Q   How much money was got?

A   I don't remember.

Q   Did you get some money?

A   Yes.

Q   How much did you get?  Do you know?

A   After everything was over I wound up with about eleven hundred dollars.

Q   From the three robberies, your take was eleven hundred

@WITNESS - DIRECT - @

dollars?

A   Yes.

Q   And can you tell the jury whether or not a weapon was used on that particular occasion?

A   Yes, it was.

Q   Was it the same weapon used in all three robberies. Taco Bell, Captain D's and Kentucky Fried Chicken?

A   Yes, it was.

Q   What were you doing with the money?

A   I spent it.  Hotel room and clothing and things of that sort.

Q   Now, was there any force or coercion?  You weren't there during two of those robberies, is that correct?

A   That's correct.

Q   Why did Mr. Miller go?

A   Mr. Miller --

    MS. BINDLER:  Objection, your Honor, he has no idea what was in Mr. Miller's mind.  Speculation.

    THE COURT:  Sustained.

BY MR. JARRETT:

Q   Mr. Miller went?

A   Yes, he did.

Q   Was there any discussion about who would go an who would not go?

A   Earlier in the day, yes, there was.

@WITNESS – DIRECT – @

Q   What discussion was that?

A   Well ―.

MS. BINDLER:  Objection, your Honor.  This is hearsay.

THE COURT:  Overrule.  You may answer?

A   There was plans about who was going to go in and who was going to be the driver of get away car.

BY MR. JARRETT:

Q   Did Mr. Miller object?

A   No, he didn't.

Q   Was there ever a decision made to go onto other things?

A   Yes, there was.

Q   And when this decision made?

A   It was made later on the following week by Mr. Reliford and the next thing was pioneer bank.

Q   Well, Mr. Reliford didn't make the whole decision, did he?

A   Well, no, it was a joint decision among me and Mr. Miller and Mr. Reliford.

Q   Now, why was this decision made to go into pioneer bank?

A   Well, the money which was coming in from the fast food restaurant wasn't enough.  So that's when we turned to bank robbery.

Q   Who selected the bank, pioneer bank?

A   Mr. Reliford did.

Q   Now, when did you attempt to rob pioneer?

@WITNESS — DIRECT — @

A   I cannot recall what day it was.

Q   Do you remember what month it was?

A   Yes, it was in July.

Q   Who was along on this trip?

A   Mr. Reliford and Mr. Miller.

Q   What type of vehicle was used at that time?

A   From my understanding it was a burgundy sedan.

Q   Was a weapon supposed to be used?

A   Yes, it was.

        MR. PAPPAS:   Your Honor, I am going to object.   I'm not clear whether or not he's testifying that he was there and saw things or will he just understands it and I think until they clarify it he's basing his information upon hearsay.

        THE COURT:   Mr. Nichols, you said earlier in one of your answers concerning the car that was used or to be used that it was your understanding that it was burgundy.  Did you actually see the car or were you told about the car

        THE WITNESS:   Well, I saw it on the news.  I didn't actually see the car for myself.

        THE COURT:   Sustain the objection.

        MR. PAPPAS:   Your Honor, we would ask the jury be instructed to disregard those answers he has given.

        THE COURT:   So instructed.

BY MR. JARRETT:

CASSIDI L. CASEY CSR (214) 767-0774

282

@WITNESS – DIRECT – @                                                    2

Q  Concerning the information that you know or received about the pioneer bank robbery, how did you get this information?

A  Well, it was planned three days prior to that.  Me and Mr Miller and Mr. Reliford drove around Shreveport area and I scoped out several banks and Mr. Reliford at that time chose pioneer bank on line avenue.

Q  Was there any discussion between you and Reliford an Miller following the robbery of pioneer bank?

A  Yes.

Q  I'm sorry?

A  Yes, there was.

Q  Now, the discussion between you, Reliford and Miller. what did that consist of?

A  Well, after that plans had went wrong and once again.

Q  How did you know the plans went wrong?

A  They instructed me about the die that had exploded on the money pack.

Q  So how much money was taken at that time?  Do you know?

A  I have no idea.

Q  Did they tell you that some money had been taken?

A  They said some had been taken but a dye pack had exploded on it.

Q  Did they tell you whether or not a weapon was used or not used?

A  Yes, they told me a weapon used.

@WITNESS - DIRECT - @

Q   What type of weapon?

A   A twelve gauge shotgun.

Q   And who provided the weapon?

A   Mr. Reliford provided the weapon.

Q   Was there any discussion concerning what vehicle was driven on that occasion?

A   No.

Q   Now, do you know whether or not Mr. Reliford decided that you guy were going to hit another bank?

A   Yes.

        MR. PAPPAS:   Your Honor, I am going to object. That calls for speculation on the part of this witness.

        THE COURT:   All right.  Sustained.

BY MR. JARRETT:

Q   So no money was ultimately split up between the three of you from pioneer bank?

A   Right.

Q   What happened after that?

A   It was planned to go to Florida and rob a bank down there but the plans was unsuccessful and I later came back, came to Dallas, Texas.

Q   Now, what did you go to Dallas, Texas for?

A   To rob a bank.

Q   And why Dallas?

A   Well, Mr. Reliford had -- he stayed here before.  And he

CASSIDI L. CASEY CSR (214) 767-0774

284

@WITNESS – DIRECT – @

wanted to come up here an rob a bank up here.

Q   When are we talking about?

A   Talking about the first part of August.

Q   How did you get here?

A   In a green pick-up truck.

Q   Where did you get the vehicle from?

A   From Mr. Reliford.

Q   How did Mr. Reliford get the vehicle?

A   From Champion --

          MR. PAPPAS:   Your Honor, I object unless he has actual knowledge.

          THE COURT:   All right.   Sustained.

BY MR. JARRETT:

Q   Do you know or were you told by Mr. Reliford how he got the vehicle?

A   Yes, I know how he got the vehicle.

Q   How did he get the vehicle?

A   From Champion Ford in Louisiana.

Q   How did he do it?

A   He set it out front and I picked it up, me and Mr. Miller.

Q   So are you telling the jury that you stole this vehicle?

A   Yes, it was.

Q   Where did you take this vehicle once you had it?

A   Well, I drove it around Shreveport and things like that. We also -- me and Mr. Miller took a trip to Florida in the

@WITNESS – DIRECT – @

green pick up also.

Q  Now, you indicated that you drove from Shreveport to Dallas in this stolen vehicle?

A  Yes, we did.

Q  And Mr. Reliford was in there?

A  Yes, he was.

Q  What was the purpose again for driving to Dallas?

A  To rob a bank.

Q  Did you ever decide on a bank?

A  There was several.

Q  Give us a list of the ones that were chosen?

A  Provident Bank on Preston Road, Mesquite Credit Union an several more.

Q  Why were those particular banks chosen?

A  Well, Mr. Reliford said a compact bank, you know, small, things like that.

Q  Now, when exactly did you rob the first bank in Dallas?

A  On August the 16th.

Q  August the 16th or August the 17th.

        MR. PAPPAS:  Your Honor, I am going to object to the leading nature of the question.

        THE COURT:  Overruled.  You may answer.

A  I think it was August the 16th or 17th.  I cannot recall what date it was for sure.

BY MR. JARRETT:

CASSIDI L. CASEY CSR (214) 767-0774

286

@WITNESS - DIRECT - @

Q   What were you doing the day before?

A   Me and Mr. Miller went to Melvin Woods to get our Mustang and after we got there that's when we came to an understanding that we wanted to buy an Accura that there was also.  Accura Integra.

Q   What did you discuss with Mr. Woods concerning the Accura?

A   Well, you know at first I discussed about the Mustang and then later me and Mr. Miller came to a conclusion about buying the Accura and I suggested to him I would be back the next day to purchase that particular Accura Integra.

MR. JARRETT:  May I have a moment, your Honor?

THE COURT:  Yes, sir.

BY MR. JARRETT:

Q   Now, why did you go there to discuss with Mr. Woods concerning the Accura or the Mustang?

A   Well, we went to purchase a car.  I went and test drove it and the following day is when we went back and bought it.

Q   Now, once you bought this truck -- strike that.  On the 17th of August of 1994, do you know where you were?

A   Yes, in Dallas, Texas.

Q   When did you go to Mesquite Credit Union?

A   Me and Mr. Miller went to Mesquite Credit Union about 1:30 or two.

Q   Why did you go there?

A   To rob it.

CASSIDI L. CASEY CSR (214) 767-0774

287

@WITNESS – DIRECT – @

25

Q   And who went in?

A   Mr. Miller went in.

Q   Where were you?

A   I was parked on the side.  It was a dome know's.  I was parked --

MR. JARRETT:  Your Honor, for demonstrative purposes I have a blow up of a map with the Court's permission.

THE COURT:  All right, sir.  Counsel for the defendants seen that?

MR. JARRETT:  I believe so, your Honor.  I can show it to them now.

MR. PAPPAS:  I have no objection.

MS. BINDLER:  I have no objection but I have not seen it.

MR. JARRETT:  With the Court's permission.

THE COURT:  Yes, sir.

MS. BINDLER:  Your Honor, if we could move around so that we can see the exhibit.

THE COURT:  Yes, sir.

Mr. Nichols, while you are away from the microphone please remember to keep your voice up so that everyone can hear your testimony.

BY MR. JARRETT:

Q   Sir, would you please step forward.  Now, this is a blow

up of the area where you robbed the Mesquite Credit Union, is that correct?

A   Yes.

Q   Would you please point out the Mesquite Credit Union?

A   Right here.

Q   Right here?

A   Yes.

Q   An what is this facility right here?

A   Tommy Lube.

Q   And what's right over here that I'm pointing to?

A   A Dominoe's pizza.

Q   And would you tell the jury where you were parked?

A   Parked right here.  On the other side of the brick wall.

Q   Now, where did you let Mr. Miller out of the bank?

A   Right there.  And he proceeded to walk up the street.

Q   Now, how long was Mr. Miller out of the vehicle?

A   Approximately between forty-five minutes.

Q   Would you please tell the jury what the plan was?

A   The plan was to go in and rob the credit union an enter through the alley way right here past the Dominoe's pizza where I was waiting in the alley in the pick up.

Q   Did Mr. Miller get back in the vehicle?

A   Yes, he did.

Q   Do you know actually whether or not he robbed the credit union?

@WITNESS – DIRECT – @                                    2

A   Yes, he did.

Q   And could you tell us whether or not a weapon was used?

A   Yes, it was.

Q   What type of weapon was used?

A   Tech 22.

Q   Where did you get this tech 22 from?

A   Purchased in Shreveport Louisiana.

        MR. JARRETT:  Approach the witness, your Honor?

        THE COURT:  Yes, sir.

BY MR. JARRETT:

Q   There has been testimony concerning a truck?

A   Yes.

Q   Would you please look at Government's Exhibits 35 A, B, C, D and E and tell the Court whether or not you recognize these exhibits?

A   Yes, I do recognize this truck.

Q   Please look at all of them.

A   Indicates.

Q   Do you recognize them?

A   That was the truck used in the robbery.

Q   Is this the same truck that was stolen?

A   Yes, it was.

Q   Driven across state lines?

A   Yes.

        MR. JARRETT:  Sir, we would offer in evidence 35 A

@WITNESS – DIRECT – @                                    28

through E.

THE COURT:  Have counsel for the defendants seen these?

MS. BINDLER:  Yes, your Honor, we have.  No objection from the defendant Miller.

MR. PAPPAS:  No objection.

THE COURT:  Government's Exhibits 35 A, B, C, D and E are admitted.

BY MR. JARRETT:

Q  Now, sir, you indicated that Mr. Miller returned eventually?

A  Yes, he did.

Q  What did he was with him?

A  A bag of money and a gun.

Q  And what happened to this bag of money?

A  Me and Mr. Miller proceeded back to the days inn on highway 80 and after we got back to the hotel we counted the money up.  We took approximately seventy-one hundred dollars and took it to Mr. Melvin Woods.

Q  Why did you do that?

A  To purchase the 1981 Accura Integra.

Q  How did you pay for it?

A  From the proceeds of the Mesquite Credit Union.

Q  So did you pay cash?

A  Yes, I did.

@WITNESS – DIRECT – @                                    29

Q   What did you do after that?

A   After we purchased the car from Mr. Melvin Woods, we later went to stay at a hotel the next day because eventually at closing time Mr. Woods wasn't able to hand me over the title. So he suggested I come back the next morning.

        MR. JARRETT:   Approach the witness, your Honor?

        THE COURT:   Yes, sir.

BY MR. JARRETT:

Q   Please look at Government's Exhibit 82 and tell the Court whether or not you recognize that document?

A   Yes, I do.

Q   What does that purport to be?

A   This is a receipt for the 1981 Accura.

Q   Is there a date on that document?

A   Yes, there is.

Q   What is that date?

A   August 17th.

Q   Is that the date you purchased the vehicle?

A   Yes, it is.

Q   Would you please look at Government's Exhibits 36 A, B, C and D and tell the jury whether or not you recognize that?

A   Yes, this is the car that was purchased with the bank money.

Q   Did you say this was the car that was purchased with the bank money?

@WITNESS – DIRECT – @                                    30

A   Yes, it is.

    MR. JARRETT:   Government offers 82 and 36 A, B, C and D in evidence.

    THE COURT:   Any objection?

    MS. BINDLER:   No objection from defendant Miller.

    MR. PAPPAS:   No objection, your Honor.

    THE COURT:   Defendant's Exhibits 82 and 36 A, B, C and D are admitted.

BY MR. JARRETT:

Q   Whether did you go back to Shreveport?

A   The next day.

Q   How did you go back to Shreveport?

A   I drove the green pick up and Mr. Miller drove the Accura.

Q   And what did you do with the money?

A   I spent it on hotels and cloth and things like that.

Q   What was Mr. Reliford doing during this time?

A   From my understanding he was laid off from work.

Q   Why didn't he participate in this robbery?

A   Why didn't he?

Q   Why didn't he?

A   The day before the robbery happened he suggested about us getting a second car to be used as a get away car and at that point Mr. Reliford boarded a plane to come back to Shreveport Louisiana.

Q   How did he want to get this second car?

CASSIDI L. CASEY CSR (214) 767-0774

A   To car Jack it.

Q   Whether did you decide to come back to Dallas?

A   We decided to come back to Dallas on August the 26th.

Q   Why did you come back to Dallas on August 26th?

A   Rob a bank.

Q   Which bank did you decide to would be on in occasion?

A   Provident Bank on Preston Road.

Q   And who was supposed to participate in this robbery?

A   Me and Mr. Reliford.

Q   What was supposed happen on this occasion?

A   We was supposed to go in and get the money and come back an go to Shreveport Louisiana.

Q   I'm sorry I have to take you back.  Do you know whether or not there were any gloves used in any of the robberies?

A   From the Mesquite Credit Union from my understanding there was no gloves used.

Q   Were there supposed to be gloves used at this robbery?

A   Yes, there was.

Q   And who was supposed to use gloves?

A   Mr. Reliford and Mr. Miller.

Q   Why were they supposed to use gloves?

A   To disguise their fingerprints.

Q   Now, would you please tell the jury what the plan was on this occasion?

A   The plan was to go in and take from the cashier's money

belonging to prove dent bank.

Q  Now, how did you get from Shreveport to Dallas this time?

A  I drove the Accura Integra and Mr. Miller drove the green pick-up truck.

Q  Why did you need two investigation?

A  The green truck was supposed to be used for the get away truck.

Q  What do you mean by get away truck?

A  Well, it was going to be the truck to drive to the bank and the Accura is going to be the one, a change car, you know.

Q  So what happened before you went to the bank?

A  We stopped off -- I cannot recall what the exit was.  But we stopped off -- me and Mr. Miller and Mr. Reliford and washed the truck do you know of fingerprints and things like that.

Q  Who did the washing?

A  All three of us did.

          MR. JARRETT:  Approach the witness, your Honor?
          THE COURT:  Yes, sir.
BY MR. JARRETT:

Q  Please look at Government's Exhibit 68 and tell us whether or not you recognize that?

A  Yes, I do.

Q  And what does Government's Exhibit 68 purport to be?

@WITNESS – DIRECT – @                                    33

A    A title for the Accura Integra.

MR. JARRETT:   Offer Government's Exhibit 68 in evidence.

THE COURT:   Any objection?

MS. BINDLER:   No from the defendant Miller.

MR. PAPPAS:   No objection.

THE COURT:   Government's Exhibit 68 is admitted.

BY MR. JARRETT:

Q    Can you tell the jury what time of day or night did you arrive at Provident Bank?

A    Provident Bank, about three o'clock.

Q    What time did you leave Shreveport?

A    At eleven o'clock.

Q    How are you so certain about that?

A    It was between eleven and eleven thirty.

Q    Why do you know that?

A    Because I look at my watch at that time.

Q    How are you so certain you arrived here approximately two o'clock in the afternoon?

A    It was between two an two thirty.  I looked again at my watch.

Q    What time did you actually go into the bank?

A    I cannot recall when I went into the bank but it was between three o'clock an three thirty.

Q    What was your job during the robbery?

CASSIDI L. CASEY CSR (214) 767-0774

@WITNESS - DIRECT - @                                          34

A    My job was to stay in the Accura Integra an drive when they came out of the bank.

MR. JARRETT:  Again, your Honor, I have an exhibit for the demonstrative purposes.

THE COURT:  All right.

MR. JARRETT:  With the Court's permission.

THE COURT:  Yes, sir.

BY MR. JARRETT:

Q    Now, would you please point to where Provident Bank is located?

A    Right here.

Q    I notice that there is an arrow below the circle?

A    Yes.

Q    What does that denote?

A    That's the spot on which I was waiting at after they left the bank.

Q    Now, at any point before the robbery was actually committed did defendant Miller an Reliford approach your location indicated by the arrow?

A    Yes.

Q    Why did they go there?

A    To make sure I was in the right spot.

Q    Once they made that determination, did they leave?

A    Yes.

Q    What was the plan concerning the truck?

CASSIDI L. CASEY CSR (214) 767-0774

A    The plan was for them to enter and top the Provident Bank robbery and come back and ditch the truck in the apartment complex and come through the gate which is located in here and enter into the black Integra.

Q    So there was a gate right here where you were supposed to meet?

A    Yes, there is.

Q    Return to your seat.  Mr. Nichols, would you please tell the jury whether or not Mr. -- strike that.  Would you please tell the members of jury whether or not anyone approached you while you were sitting there waiting on the other two individuals to come back?

A    Yes, they did.

Q    Who approached you?

A    A hispanic male.

Q    What did he say to you?

A    I cannot recall exactly what he said.

Q    When did Reliford an Miller come back to the car?

A    He came back to the car approximately thirty-five minutes after they left.

Q    What happened after they returned to the car?

A    Mr. Reliford came first and then later came Mr. Miller.

Q    Do you know whether or not or did Mr. Reliford or Mr. Miller discuss whether or not gloves, masks and weapons were used?

A   Yes, it was.

Q   And which ones?

A   It was discussed earlier at the car wash it was discussed about that.

Q   What about when they came back?  Was it discussed?

A   Yes, it was.

Q   What was the nature of the discussion?

A   About the mask that was used and the gloves, latex gloves

Q   Now, throughout the course of this robbery, you were located in the car, would that be a fair statement?

A   Yes.

Q   And happened after they came back?

A   When they came back, they had a bag of money and which Mr Miller was carrying.

Q   How much money was taken?  Do you know?

A   Well, eighty-two thousand dollars.

Q   How do you know that?

A   I looked on the indictment.  That's how much they had.

Q   Was there a split in the money?

A   Yes, there was.

Q   How much money did Mr. Reliford get?

A   Thirty thousand.

Q   How much money did Mr. Miller get?

A   Thirty.

Q   An how much did you get?

@WITNESS – DIRECT – @                                              37

A  Ten thousand.

Q  Thirty, thirty and ten.  That's seventy.  What happened to

the other?

A  Mr. Miller, I later found out he had stolen -- it was a

package.

          MS. BINDLER:  Objection, your Honor, there isn't

any foundation for this.

          THE COURT:  All right.  Sustained.

BY MR. JARRETT:

Q  Well, how much money did Mr. Miller get from the bank

robbery?

A  Thirty thousand.

Q  In total?

A  Yes.

Q  Where did you go once you left the scene of this bank

robbery?

A  Chevron off of highway 80.

Q  Why did you go there?

A  To fill the car with gas.

Q  What happened while you were there?

A  I entered the Chevron and paid for the gas and that's when

I came back out and Mr. Reliford and Mr. Miller was still

inside the car.

Q  Was there any discussion between the three of you

concerning ditching any of the masks or property you had

CASSIDI L. CASEY CSR (214) 767-0774

300

@WITNESS – DIRECT – @                                                38

obtained as a result of this robbery?

A   Yes, there was.

Q   What discussion was that?

A   Mr. Miller he was going to throw his items -- which he wore inside the bank he was going to throw them in a dumpster at the station.

Q   Did he do that?

A   No, he didn't.

Q   Why didn't he do that?

A   Because Mr. Reliford instructed him not to.

Q   Where did you go after you left the bank, after you left the Chevron station?

A   Then we proceeded to head back to Shreveport Louisiana.

Q   And approximately what time did you get back to Shreveport?

A   Between the hours of seven thirty an eight.

Q   And where did you go?

A   To the country club apartments where Mr. Reliford lived.

Q   Now, you have indicated -- strike that.  Where were you, Miller and Reliford living during the course of these robberies?

A   Well, Mr. Reliford had an apartment and me and Mr. Miller was staying in and out of hotels.

Q   And how were you paying for the hotels?

A   From the proceeds of the robberies.

CASSIDI L. CASEY CSR (214) 767-0774

@WITNESS – DIRECT – @                                    39

MR. JARRETT:  May I approach, your Honor?

THE COURT:  Yes, sir.

BY MR. JARRETT:

Q  Sir, I'd like to show you what's been marked as Government's Exhibit 16.  Do you recognize that?

A  Yes, I do.

Q  And what is Government's Exhibit 16 A?

A  I wrote this in Residents Inn in Shreveport, Louisiana.

Q  What about Government's Exhibit 16 B?

A  Same Residents Inn.

Q  And 16 C?

A  Embassy Suites in Shreveport, Louisiana.

Q  And 16 C?

A  Residents Inn in Shreveport.

Q  And 16 E?

A  Holiday Inn Shreveport.

Q  16 F?

A  Holiday Inn Shreveport.

Q  16 G?

A  Holiday Inn also.

Q  16 H?

A  La Quinta Inn in Houston, Texas.

Q  16 I?

A  La Quinta Inn in Houston, Texas.

Q  An 16 J?

CASSIDI L. CASEY CSR (214) 767-0774

302

@WITNESS - DIRECT - @                                    40

A    Holiday Inn in Shreveport Louisiana.

Q    Now, can you tell us whose name appears on those exhibits?

A    Mr. Miller and Mr. Nichols, myself.

Q    And how did you use to pay for your stays at all of these hotels?

A    Cash.

Q    Where did you get the cash from, sir?

A    From the proceeds of robbery.

            MR. JARRETT:   Your Honor, we would offer Government's Exhibits 16 A through 16 J.

            THE COURT:   Any objection?

            MS. BINDLER:   Mr. Jarrett and I have discussed earlier that there might be some hearsay on 16 A.  16 A has some material at the top of the second page that we wanted redacted.  If they have redacted we have no objection.

            MR. JARRETT:   Your Honor, that information has not been redacted.  I would ask that 16 A be admitted into evidence on the condition that the document is redacted before publishing to the jury.

            THE COURT:   All right.  Is that satisfactory, Ms Bindler.

            MS. BINDLER:   Yes, your Honor.

            THE COURT:   Mr. Pappas?

            MR. PAPPAS:   Your Honor, I'm not sure of the relevance of these documents as to my client.  I don't know

303

@WITNESS – DIRECT – @                                                41

whether there is some claim that he was at these motel rooms. If that's the case there may be some relevance.  I withdraw

the objections.  They only the proceeds that were spent from about by Mr. Nichols and by Mr. Miller of some of the robberies, two of which my client does not stand charged with, then we would ask that they not be admitted or if they are going to be admitted that we at least have a limited

instruction as to their use vis-a-vis Mr. Miller and not Mr. Reliford.

THE COURT:  Mr. Jarrett, is the government seek to go admit these documents against Mr. Reliford?

MR. JARRETT:  No, your Honor.

THE COURT:  All right.  I will admit Government's

Exhibits 16 A through J against Mr. Miller only and will admit Government's Exhibit 16 A only on condition that Page 2 there of be redacted before publication to the jury.

MS. BINDLER:  Your Honor, it's Pages 2 and 3.

THE COURT:  Pages 2 an 3.  I'm sorry.  Mr. Jarrett,

I think it's time for us to recess today.

C E R T I F I C A T I O N

I, Cassidi L. Casey, certify that during the proceedings of the foregoing-styled and -numbered cause, I was the official reporter and took in stenotypy such proceedings and have transcribed the same as shown by the above and foregoing pages 1 through 19 and that said transcript is true and correct.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

CASSIDI L. CASEY
UNITED STATES DISTRICT REPORTER
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
BOARD NUMBER 1703

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

APR 2 4 1995

NANCY DOHERTY, CLERK

by_____
Deputy

DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ( NUMBER CR3-94-343-G |
| ( | |
| ( | |
| VERSUS ( | |
| ( | |
| VERNON ANTHONY MILLER and ( | |
| ERIC JEROME RELIFORD, ( April 12, 1995 | |

TESTIMONY OF MR. LARRY NICHOLS
BEFORE THE HONORABLE A. JOE FISH, and a jury

A P P E A R A N C E S:

For the Government:      MR. LARRY JARRETT
                         Assistant United States Attorney
                         UNITED STATES DEPARTMENT OF JUSTICE
                         NORTHERN DISTRICT OF TEXAS
                         U.S. Courthouse

                         1100 Commerce Street
                         Dallas, Texas 75242
                              214/767-0951

For the Defendant Reliford:
                         MR. THOMAS PAPPAS
                         Burleson, Pate & Gibson
                         2414 N. Akard
                         Suite 700
                         Dallas, Texas 75201
                              214/871-4500

For the Defendant Miller:
                         MS. JILL BINDLER
                         Assistant Federal Public Defender
                         Northern District of Texas
                         525 Griffin, Suite 629
                         Dallas, Texas 75202
                              214/729-2746

Court Reporter:          Cassidi L. Casey, CSR No. 1703
                         1100 Commerce Street, Rm 15D6L
                         Dallas, Texas 75242

                              214/767-0774

CASSIDI L. CASEY CSR (214) 767-0774

PROCEEDINGS:

THE COURT:  Good morning, Ladies and Gentlemen.  I believe when we recessed last Monday Mr. Nichols was still testifying.  May we have him come back?

MR. JARRETT:  Yes, sir.  Your Honor, approach the witness?

THE COURT:  Yes, sir.

(Witness sworn)

PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. JARRETT:

Q  Mr. Nichols, I would like you to look at Defendant's Exhibits 1 an 2 and ask you if you recognize those documents?

A  Yes, sir,.

Q  And how is it that you recognize those documents?

A  It's my handwriting which I wrote to Mr. Miller.

Q  And when did you write those documents to Mr. Miller?

A  During the time I was incarcerated at Mansfield.

Q  Where was Mr. Miller at the time you were incarcerated?

A  At CD C. in Shreveport Louisiana.

MR. JARRETT:  At this point I would offer in evidence Defendant's Exhibits 1 and 2.

MS. BINDLER:  No objection.

MR. PAPPAS:  I believe those are the exhibits we offered earlier.  Is that correct?

307

@WITNESS – DIRECT – @                                    4

MR. JARRETT:  That's correct.

MR. PAPPAS:  We have no objection.

THE COURT:  All right.  Defendant's Exhibits 1 and 2 are admitted.

BY MR. JARRETT:

Q  Mr. Nichols, I would like for you to look at Defendant's Exhibits 1 and I would like for you to go about halfway down the page to where you say, "man, I have just been thinking if this wouldn't have occurred, that we would probably have been dead within a year.  What were you telling Mr. Miller?

A  About the money which we had and the fancy things which we had.

Q  What were you saying we were living fast?

A  We were staying at motels and traveling, always on the go and things like that.

Q  What about the women?

A  Well, yes, had plenty of those.

Q  What about the drugs?

A  Yes, we had drugs.

Q  What were you telling him when you said I have given my life to Christ and I'm asking you to please do the same?

A  I asked him to turn over all of his problems to God, give it to God.

Q  I noticed in several letters you said that you love him.  Why did you tell him that?

A  Well, you know, me and him have came kind of close in the eight month period.

Q  On the second page at the top of that same exhibit you say whenever we won I just want to thank God and looks back at this being a blessing in disguise.  What was the blessing in disguise?

A  Well, you know I had several friends that got killed.  I have a brother-in-law that died recently in the last three-week period over drugs and money so I was telling him it's not good that we're in jail but it's a blessing because with we could be dead somewhere.

Q  Now, following that you say I'm not happy being in jail but this is lesson from the maker.  What were you talking about there?

A  I said it wasn't -- okay, yeah.  I said that you know once again to give thanks that I'm still alive today and not dead.

Q  Following that you indicate that they need to be looking for the head man, Eric?

A  Yes.

Q  Eric who?

A  Eric Reliford.

Q  Why did you say they need to be looking for Eric?

A  I feel if it wasn't for Mr. Reliford that I wouldn't be in this type of perdicament that I'm in now.

Q  Following all of this you say you don't know nothing an

never did nothing.  Why did you tell him that?

A  I wanted to express to him that you know I never robbed anything.  I participated in knowing about it.  But I never myself robbed anything.

Q  You told him, don't talk to know one about your case.  Now, I want to put this behind me and move on with my life.  Why did you tell him not to talk to anybody?

A  There was things that I was hearing from like the guys at Mansfield told me to tell him don't tell anything and I was just writing him out of -- you know other things guys was telling me.

Q  What did you mean when you said this is a turning point in your life?

A  Well, since this happened, I became close to God and also close to my family and my loved ones.

Q  You indicate that you have been talking to his mother as well and that she was doing well?

A  Yes.

Q  But she wasn't doing so we will.  When did you talk to his mother.  Excuse me?

A  Several times when she came to Mansfield.

Q  So his mother would talk to you?

A  Yes.

Q  Did you have any problems with his mother?

A  No.  She accepted my phone calls every time I called.

310

Q  And how many times did you talk to his mother.

MR. PAPPAS:  Excuse me, your Honor.  I'll make an

objection.  I'm not sure when you they say his mother who

they are talking about.

THE COURT:  All right.  Sustained.

BY MR. JARRETT:

Q  Did you an Sandra Holloway speak?

A  Yes.

Q  How many times?

A  Several times.

Q  Would you call?

A  Yes.

Q  Would you she accept your calls?  These are long distance

calls?

A  Yes.

Q  Would she accept your calls?

A  Yes.

Q  On the last page you indicate I also want you to get you a

Bible and read and get the full understanding and have faith.

What were you talking about there?

A  Well, I listed three Bible versus which he wanted him to

read every night before ego to bed and every morning.

Q  Now, at the bottom of that page, you say you don't know

nothing.  You never did nothing.  Mr. Reliford is the big

guy.  Focus on telling about his wrong and not yours.  What

were you telling Mr. Miller at that point?

A  Well, once again I was telling him to focus on not me because I'm not the main guy in this case.  I was just telling him you know to tell any wrongdoings.

Q  Now P one could interpret I guess, that you were trying to control Mr. Miller at this point.  How would you answer that question?

A  I know it's not true.

Q  Have you ever tried to control Mr. Miller?

A  No, I haven't.

Q  Now, please look at Defendant's Exhibit 2.  At the beginning of Defendant's Exhibit 2, you say that you are waiting to see how many years they are going to give me for nothing.  What are you talking about there?

A  Well, you hearing from the guys that said you know if I didn't rob anything don't worry about anything.  I was just talking through my head but it wasn't about anything.

Q  So were you saying you didn't actually go into any establishment to rob and that's the reason you say that you did nothing?  That what you are talking about?

A  Correct.

Q  Further down you say he seems like -- it seems like since I have been here I have gotten close to God and also to my family and star let.  What are you talking about there?

A  Once again I was telling him you know about what had

312

happened. My family have came close together and also I have came close to God and to my if he answer say.

Q And then you say something strange. But there isn't anything to tell. I have been working on my job, why I am going to go and rob a bank. You been on an off of your job also. What were you talking about there?

A Well, I was just telling him that I had a need to rob a bank.

Q But you weren't working on a job?

A I know I wasn't.

Q So what were you trying to do, concoct a story so you could be consisted tent with what he was going to say?

A Once again, I was going by things that guys in there told me. Steps to go by.

Q So you knew that Miller could hurt you and you knew that you could hurt Miller. Would that be a fair statement?

A Yes.

Q And so you were trying to get both of you singing from the same sheet of music, is that what you are saying?

A Sort of.

Q You indicate at the bottom of the page but they have no evidence on those cases which that are pending on me not?

A Yes.

Q They had accused me of three bank robberies but you know what the real deal is. What are you talking about there?

313

@WITNESS – DIRECT – @                                    10

A  Well, I was saying about the evidence part.  Every time that Mr. Miller would go into a fast food restaurant he was always have gloves.  So he was saying it like that.

Q  Now, at the top of the second page you indicate take responsibility for your role and don't be a snitch?

A  Yes.

Q  Seems like you are the snitch now, doesn't it?

A  Yes.

Q  So why did you tell Miller to take responsibility for his role and not to be a snitch.  Excuse me?

A  I was telling him to take responsibility for the part he played.

Q  Do you remember when you pled guilty in this case?

A  Yes, I did.

Q  What day was it?

A  I can't remember the exact day.

Q  What month was it?

A  March.

Q  And you wrote this letter that's indicated by Defendant's Exhibit 2 on November 15th?

A  That's correct.

Q  Would it be a fair statement to say that you had made your decision at this point when you wrote this letter to plead guilty?

A  Yes, that's true.

CASSIDI L. CASEY CSR (214) 767-0774

314

Q  Further down the page you indicate and God did this for a reason and a good reason it is.  What's the reason that you

believe that God brought you where you are today?

A  Like I said, I had several friends that passed whatever from the time that I have been at Mansfield and I was just saying that it's a blessing in disguise that I'm here and not dead somewhere.

Q  Now, you are telling Mr. Miller further down the page that you are not looking at life or nothing close to that and you also say to let the other person know I'm wanting to know will you be willing to sign a written affidavit stating that I didn't have anything to do with the September 29th, 1994 robbery.  Why did you tell Mr. Miller that?

A  I wanted him -- once again I was going by hearsay inside the jail cells at Mansfield.

Q  You also had spoken to your lawyer, hadn't you?

A  Yes, I had.

Q  And would it be a fair statement to say that your lawyer had visited the government and seen the evidence we had.

        MR. PAPPAS:  Your Honor, I object to the leading nature of this question.

        THE COURT:  Sustained.

BY MR. JARRETT:


Q  What evidence did your lawyer tell you we had against you.

315

@WITNESS - DIRECT - @                                          12

MR. PAPPAS:  I object to the question.  It calls for a hearsay response.

THE COURT:  Overruled.  You may answer.

A  From the standpoint I think Mr. Miller was going to testify against me and also have clothing which was found also.

BY MR. JARRETT:

Q  What about fingerprints?

A  Yes and fingerprints on the money wrap percent also.

Q  Now, you indicate down there that you want him to write this affidavit?

A  Yes.

Q  The fingerprints on the money wrappers and the clothing?

A  Yes.

Q  Do you remember what bank robbery that was seized from?

A  From the September 29th robbery.

Q  An do you recall whether or not your fingerprints were on those money wrappers?

A  Yes, they were.

Q  And whose other fingerprints were on those money wrappers?

A  Mr. Miller's.

Q  And then you say down here that the reason you wanted him to write this affidavit that it would be helpful to you so that you can get on your feet and get Miller a lawyer somehow.  Don't talk to know one until you get here.

316

Remember we always said that both of us don't need to be locked up. What are you talking about there?

A Well, we had said -- we was joking around an once said if we both get locked up it wouldn't be any need, just for one of us to get locked up and the other one help the other one as much as possible to get out.

Q So only one of you would ultimately be locked up?

A That's correct.

Q Remember to always throw these notes away. Trust and listen to me. I won't mislead you and you know that. What are you talking about there, Mr. Nichols?

A What page?

Q I'm on the same page, almost at the bottom. Remember to always throw -- I think that's what you were saying. Throw these notes away, tear them in half, trust an listen to me and I won't mislead you and you know that. What are you talking about there?

A Once again I had guys in my cell that was telling me to write him to tell him about the evidence they had and everything. It was just guys you know who was filling my head up with things.

Q You indicate on the next page at the top of page they really don't have nothing on us?

A Yes.

Q Now, you subsequently found out a little bit different,

@WITNESS - DIRECT - @                                                        14

would that be a fair statement?

A   Yes.

Q   Do you know what typo -- strike that.  But then you say
you know and I know that those masks that were bought as a
prank to play in Florida.  What are you talking about?  What
masks?

A   The masks the FBI seized on the September 29th robbery.

Q   Were you trying to get your stories together on that also?

A   Yes.

Q   I have never owned a truck a day in my life.  I want to go
home just like you.

Q   What truck are we talking about here?

A   The green pick-up truck, the Ford pick-up truck.

Q   Why was that important enough for you to talk about?

A   Well, I mentioned that to my lawyer.

Q   They who?

A   The agents.  The FBI agents had mentioned to the lawyer
about the pick-up truck.

Q   That a pick-up truck had been involve in the robberies?

A   Yes.

Q   And next you say as soon as you get this write me back.
Keep this between you and I.  Have to stay strong because we
have God on our side?

A   Yes.

Q   What are you talking about there?

CASSIDI L. CASEY CSR (214) 767-0774

A   Well, just telling him to write me back as soon as possible.   Mr. Miller had written a letter back to me corresponding to the October 24th letter had I wrote to him.

Q   Then on the last page you indicate about the middle of the page, you say we are facing about ten years and have to do about eight or seven years.   Where did you get that from?

A   From guys in the tank, telling me things like that.

Q   Well, tell the members of the jury what you are looking at?

A   Twenty-five to life.

Q   Twenty-five what?

A   Years to life.

Q   Tell the members of jury whether or not you can get probation off that twenty-five years?

A   No, I cannot.

Q   If asked, if they will about anything you can to put Eric under the gun.   If it wasn't for Eric, we won't be in the trouble that we are in now.

        Tell the jury what you meant by that?

A   Well, once again, I feel that you know if I hadn't met Mr. Reliford I wouldn't be here now.

Q   And why do you see that?

A   Well, I never once thought about in my life robbing anything.

Q   Then you say if there is anything that you can think that

319

@WITNESS – DIRECT – @                                      16

he told us that he did, put it all in the letter.  Did you tell Mr. Miller to lie here, sir?

A  No, I didn't.

Q  You told him to think of what Reliford had told you?

A  Yes.

MR. JARRETT:  Approach the witness?

THE COURT:  Yes, sir.

BY MR. JARRETT:

Q  Let me retrieve those two exhibits.  Now, sir, if you know, would you please tell the members of jury what Mr. Miller did with the money that he received as a result of these robberies?

A  Spent money on hotels and also giving his mother.

MS. BINDLER:  We object.  This is nonresponsive.  He asked what Mr. Miller did with the money, not what he did.

THE COURT:  Sustained.  Would you repeat the question, Mr. Jarrett.

BY MR. JARRETT:

Q  Would you please tell the jury what Mr. Miller did with the money, if you know, that he received from these robberies?

A  He sent it on clothing, hotels, parties and also about giving his mother some money also.

Q  If you know, how many times did he give his mother some money?

CASSIDI L. CASEY CSR (214) 767-0774

320

@WITNESS – DIRECT – @

A    Two or three times.

Q    If you know, how much money did he give his mother?

A    On the last occasion she was given eight thousand.  First occasion I think it was two and a half and I can't recall --

Q    Two and a half dollars?

A    No.  Two and a half thousand.

Q    Now, what size show do you wear?

A    Twelve.

Q    What size shirt do you wear?

A    Extra large.

Q    When you buy clothes, is that the size you get?

A    Yes.

Q    What size show did Mr. Miller wear?

A    Nine and a half.

Q    What size shirt does Mr. Miller wear?

A    Large or medium.

        MR. JARRETT:  Approach the witness?

        THE COURT:  Yes, sir.

BY MR. JARRETT:

Q    Sir, I'd like to show you what's been marked as Government's Exhibit 6 and ask you whether or not you can identify these articles of clothing and look at the size of that article, please.  What is it?

A    A size large.

Q    That one?

@WITNESS – DIRECT – @                                    18

A   Size large.

Q   This one?

A   Extra large, large.

Q   This one?

A   Large, extra large, extra large, extra large, extra large, 2 X.

Q   And do you recognize these items of clothing?

A   Yes.

Q   What are they?

A   Clothing that I bought with the proceeds from the bank robberies.

Q   We who bought?

A   Me and Mr. Miller.

Q   Where were these items of clothing seized from?  Do you recall?

A   From the Holiday Inn in Shreveport.

Q   Which you had rented?

A   Yes.

Q   What is that?

A   Size nine and a half.

Q   Nine and a half what?

A   NIKE, size eleven and a half air maximum.

Q   How much did those cost?

A   Twenty-five dollars.

Q   What about this?

@WITNESS – DIRECT – @                                      19

A   Seventy-four eighty-nine.

Q   What size are these?

A   Eleven and a half -- size eleven.

Q   What size are those?

A   Size eleven and a half.

Q   These?

A   Size nine.

Q   And these?

A   Size nine.

Q   And these?

A   Size nine and a half.

Q   An do you recognize those tennis shows?

A   Yes.

Q   Who tennis shows are these?

A   Me and Mr. Miller's.

Q   And where were they seized from?

A   From the back of the 1991 Accura.

Q   Back of the 1991 Accura Integra?

A   Yes.

Q   And how did you get these tennis shows?

A   Through the proceeds of a bank robbery.

        MR. JARRETT:  Your Honor, at this time we offer in
evidence Government's Exhibit 6 to include the items shown
the defendant as well as the tennis shows.

        THE COURT:  Any objection?

CASSIDI L. CASEY CSR (214) 767-0774

32.3

@WITNESS – DIRECT – @                          20

MS. BINDLER:  No objection.

MR. PAPPAS:  I have no objection to them being admitted but I would ask for a limited instruction that they not be admitted for any purposes against Mr. Reliford.

MR. JARRETT:  We do not object to that.

THE COURT:  All right.  The jury is instructed that they should not consider Government's Exhibit 6 against Mr. Reliford.  But those exhibits are admitted against Mr. Miller.

.

BY MR. JARRETT:

Q  Again, let me show you some items, sir.  Government's Exhibit 5.  Would you please look at Government's Exhibit 5?  And tell the members of the jury what Government's Exhibit 5 is?

A  A season camcorder.

Q  And where did that come from?

A  Cambeau Electronics in Shreveport, Louisiana.

Q  And who purchased that?

A  I did.

Q  And why did you purchase that?

A  I just had money to spend so I purchased it.

Q  Speak up now?

A  When I had money to spend is when I purchased it.

Q  And what about Government's Exhibit 3 A?

324

@WITNESS - DIRECT - @                                  21

A   Yes, I recognize it.

Q   And what is that?

A   A football cap.

Q   And what about Government's Exhibit 3 B?

A   Notre Dame jersy.

Q   Where did those items come from?

A   From bank proceeds.

Q   Bank proceeds?

A   Yes.

Q   A bank robbery?

A   Yes.

Q   Who is the owner of these items?

A   Mr. Miller.

Q   And do you know whether or not these items were used in any of the robberies?

A   Yes, the hat.

Q   Or a hat similar to that?

A   Yes.

          MR. JARRETT:   At this point, your Honor, I would offer in evidence Government's Exhibit E 5, 3 A and 3 B.

          THE COURT:   Against both defendants?

          MR. JARRETT:   Against defendant Miller, your Honor.

          THE COURT:   Any objection?

          MS. BINDLER:   No objection.

@WITNESS - DIRECT - @                                    22

THE COURT:  Government's Exhibit 5, E 5, 3 A and 3 B are admitted against Mr. Miller.

MR. PAPPAS:  Your Honor, again, we would request a limiting instruction.

THE COURT:  All right.  The jury is instructed not to consider these exhibits against Mr. Reliford.

BY MR. JARRETT:

Q  Do you recognize E 4?

A  Yes.

Q  What does that appear to be?

A  A gun.

Q  And where did this exhibit come from?

A  I'm not sure who bought that.

Q  Whose weapon is that?

A  It belonged to me.

Q  And when did you buy that weapon?

A  When?

Q  Yes?

A  Back in August.

Q  And why did you buy it?

A  For protection.

Q  And was that weapon ever used in any of the bank robberies?

A  Yes.

Q  Which one?

326

A   September 29.

Q   The last one?

A   Yes.

Q   And who was involved in that bank robbery?

A   Me and Mr. Miller.

MR. JARRETT:   Offer Government's Exhibit E 44 in evidence as to defendant Miller.

MS. BINDLER:   No objection, your Honor.

THE COURT:   Government's Exhibit 44 is admitted against Mr. Miller and the jury instructed not to consider it against Mr. Reliford.

BY MR. JARRETT:

Q   Now, what about drugs?   Did you buy any drugs with the money that you robbed for?

A   Yes.

Q   What drugs did you buy?

A   Marijuana.

Q   And what did you do with that marijuana?

A   Sold it and also used it.

Q   Who used it and who sold it?

A   Me and Mr. Miller.

Q   And could you give us a time frame?   The first robbery or the last robbery or between -- when did you use the drugs.

MR. PAPPAS:   Your Honor, I believe it's appropriate

327

@WITNESS - DIRECT - @                                24

to ask for a limiting instruction as to his testimony about the buying of selling an using of drugs with Mr. Miller and

ask that testimony be limited strictly to Mr. Miller and not Mr. Reliford.

THE COURT:  Does this testimony have any relevance to Mr. Reliford?

MR. JARRETT:  No, your Honor.

THE COURT:  All right.  The jury shall not consider this testimony concerning the purchase of marijuana or use of marijuana against Mr. Reliford.

BY MR. JARRETT:

Q   When did you buy these drugs?

A   After every robbery.

Q   And let's talk about the last robbery for a second. Strike that.  Would any of the money that you obtained from these robberies be used or given to any friends, girlfriends or any other person?

A   Yes, it would.

Q   Would Mr. Miller give any money to girlfriends or any other person?

A   Yes, he would.

Q   Who would he give his money to?

A   Ms. Angel Thompson.

Q   How much money, if you know, did he give Ms. Thompson?

A   Between ten an twenty thousand.

328

Q   Say that again for the jury?

A   Between ten an twenty thousand.

Q   How do you know this?

A   Well, after the robberies had occurred sometimes we put the money together and.  After the prove dent robbery Mr. Miller and I went to Florida and after we got to Florida we had found out that some money had been taken.  But I later found out that Mr. Miller, he gave Angel Thompson money.

MR. PAPPAS:  Your Honor, we would ask the court to give a limiting instruction as to this testimony in regards to Mr. Reliford.

THE COURT:  When you say this testimony, I mean we can do this every other question but it's going to prolong the trial well into next week.  It seems to me better for the jury just to understand that unless they hear Mr. Reliford's name mentioned that the testimony has no relevance to the charges against him.

MR. PAPPAS:  We have no objection to the Court giving that instruction, and we would limit ourselves accordingly.

THE COURT:  All right.  Ladies and Gentlemen, I think that probably should be our rule of thumb then.  Unless the witness mentions Mr. Reliford specifically in connection with a particular act or transaction that you should not consider that testimony against Mr. Reliford unless you hear

@WITNESS – DIRECT – @                                    26

from me to the contrary.

MR. JARRETT:  May I proceed, your Honor?

THE COURT:  Yes, go ahead, Mr. Jarrett.

BY MR. JARRETT:

Q  Now, Mr. Nichols, did you force Mr. Miller to participate in these robberies?

A  No, I didn't.

Q  Why did he participate, if you know?

A  He did it on his own will.

Q  Why did he do it?

MS. BINDLER:  Objection, your Honor, he doesn't know what was in Mr. Miller's mind.

THE COURT:  Sustained unless the witness –– unless some foundation is established for the witness to give an answer.

BY MR. JARRETT:

Q  Did Mr. Miller an yourself ever discuss why he was participating in the robberies?

A  Yes.

Q  Why did Mr. Miller say he was participating in those robberies?

A  For financial reasons of his mother and also to satisfy Ms. Thompson.

Q  Now, do you know whether or not Mr. Miller –– did Mr. Miller and yourself ever discuss whether or not Mr. Reliford

CASSIDI L. CASEY CSR (214) 767-0774

330

was the organize er or the main person out of the three of you?

A   Yes.

Q   And what would you say?

A   I would say that Mr. Reliford would be the master mind of everything.

Q   And why would you say that?

A   Well, the fact that he was obtained information from inside the prison systems when he was incarcerated.

          MR. PAPPAS:   Your Honor, I am going to object to that answer as being nonresponsive, as being prejudicial, as being not relevant to any of the inquiries that form the basis of this indictment.   I would ask the court to strike that testimony and instruct the jury to disregard.

          THE COURT:   I think the answer is responsive.   The question is why would you say that.   He gave a reason. Overruled.

BY MR. JARRETT:

Q   And when we were into testimony on Monday, we were talking about the Provident Bank robbery and you just ditched the clothing?

A   Yes.

Q   And where did you go once you had ditched the clothing?

A   We went to Shreveport, Louisiana.

Q   Where did you go once you got to Shreveport?

@WITNESS – DIRECT – @                                              28

A    To Mr. Reliford's residence.

Q    Would you please tell the jury approximately what time you arrived at Mr. Reliford's residence?

A    Between seven thirty an eight.

Q    And tell the jury where that residence is located?

A    Country club apartments.

Q    Was a gun used that robbery, the Provident Bank robbery?

A    Yes.

Q    And if so, how many?

A    One gun was used.

Q    Now, where did you go -- where did you go after you arrived at Mr. Reliford's apartment?

A    Three of us proceeded to a mall.

Q    Where were you staying at that time?

A    In and out of hotels.

Q    What did you do at the mall?

A    Well, all they have us went and just you know spent money on clothing an shows and things of this sort.

Q    The stuff that we just showed the jury?

A    Correct.

Q    Now, we're talking about the 26th of August, is that correct?

A    The Provident Bank robbery happened on August 26th.

Q    Now, what hotel were you staying in?

A    The Ramada Inn on something drive.

CASSIDI L. CASEY CSR (214) 767-0774

332

Q   Did Mr. Reliford ever visit you at the Ramada Inn?

A   Yes, he did.

Q   When did he visit you?

A   The following day.

Q   What day was that?

A   On a Saturday.

Q   Why did he visit you?

A   Mr. Reliford had also had --.

MR. PAPPAS:   Your Honor, I am going to object to the question unless he has some specific knowledge.  I think it calls for some speculation on his part about what Mr. Reliford may or may not have been motivated to do.

THE COURT:   Sustained.

BY MR. JARRETT:

Q   What was the purpose of Mr. Reliford's visit.

MR. PAPPAS:   Your Honor, I am going to object. That's basically the same question just reworded.  Calls for him to speculate on why Mr. Reliford may have done something.

THE COURT:   Yes, I think we need some foundation as to the witness' answer before I can allow him to answer that question.

BY MR. JARRETT:

Q   All right, sir.  Approximately what time of day or night did Mr. Reliford get there?

A   The next day between the hours of eleven an twelve.

Q    What did you talk about when Mr. Reliford was there?

A    Well, Mr. Reliford had also had a room at the Ramada Inn

---.

MR. PAPPAS:    Your Honor, I am going to object.    I think he was asked what they talked about and now he's attempting to go into some state of mind testimony.

THE COURT:    Sustained.

MR. PAPPAS:    Ask the jury be instructed to disregard his answer.

THE COURT:    Okay.    The jury is instructed to disregard the witness' last answer.    Would you repeat your question, Mr. Jarrett?

BY MR. JARRETT:

Q    What did you and Mr. Reliford talk about?

A    Well, you know about him purchasing a car.

Q    What type of car did Mr. Reliford want to purchase?

A    Either a BMW or a Jaguar.

Q    How did Mr. Reliford, -- if you know, how was Mr. Reliford going to pay for this Jaguar or BMW.

MR. PAPPAS:    Your Honor, I am going to object to the question as asked and to the answer.    I think it may be admissible if they are claiming that Mr. Reliford said something but with this witness he with don't know what he claims he knows and what he claims he heard.

THE COURT:    Mr. Jarrett, this is taking too long.

334

Try to be carefully in your question an ask him whether Mr. Reliford said something.

BY MR. JARRETT:

Q   Do you know what Mr. Reliford did with his part of proceeds from the 26th of August robbery.

MR. PAPPAS:  Your Honor, again, I hate to be contention I couldn't say.  He's the same objection.  He's asking what he knows instead of what he was told.

THE COURT:  This is a yes or no question.  He asked him if he knew what Mr. Reliford did with his portion of the proceeds.  The answer is yes or no.  I will permit that. Overruled.

A   Yes.

BY MR. JARRETT:

Q   How?

A   Mr. Reliford had --.

MS. BINDLER:  Your Honor, I object.  It's not responsive to the question.  He asked what he knew.  Until we know how he knew --

THE COURT:  Sustained.

MR. PAPPAS:  Ask for a jury instruction.

THE COURT:  So instructed.  But you need not make that request again, Mr. a Pappas.

MR. PAPPAS:  Yes, sir.

BY MR. JARRETT:

335

Q   How do you know Mr. Reliford purchased a BMW?

A   From a young lady Mr. Reliford was seeing.

Q   Do you know whether or not Mr. Reliford bought a BMW?

A   Yes.

            MR. PAPPAS:  I object.  That calls for his answer
-- especially based upon his last question calls for an


answer based upon hearsay and is leading as well, your Honor.

            THE COURT:  I'll permit the answer.  He answered
yes.  I'll overrule the objection to that.  Next question,
please.

BY MR. JARRETT:

Q   Now, had there been any conversations between you and Mr.

Reliford concerning this BMW?

A   Yes, there was.

Q   What was the substance of that conversation between you

and Mr. Reliford?

A   Mr. Reliford had asked if I would take him to a your Honor

car lot which is in Shreveport to purchase the BMW.

Q   Did you do that?

A   No, I didn't.

Q   Why didn't you do that?

A   Well, the next morning I was tired.  He paged me several

times but I never did go over to his house.

Q   Did you ever see Mr. Reliford in the BMW?

336

A   Yes, I did.

Q   Would I be a fair statement to say that Mr. Reliford was mad or angry with Mr. Miller?

A   Yes, he was.

Q   Why, if you know.

MR. PAPPAS:   Your Honor, I am going to object unless they lay some foundation as to the basis.

THE COURT:   Sustained.  How do you know that

THE WITNESS:   Excuse me?

BY MR. JARRETT:

Q   How do you know that?

A   Well, Mr. Miller and Mr. Reliford had a fight I think four days prior to the Provident Bank.

THE COURT:   Did you see the fight

THE WITNESS:   Yes, I did.

BY MR. JARRETT:

Q   And where was this fight again, please?

A   At the Ramada Inn on month house drive.

Q   What was the reason for the fight?

A   Well, Mr. Reliford.

MR. PAPPAS:   Your Honor, I am going to object unless they lay some foundation as to the basis of his knowledge.

THE COURT:   Sustained.

BY MR. JARRETT:

337

@WITNESS - DIRECT - @                              34

Q  Prior to this fight was there any discussion between the defendants?

A  Yes, there was.

Q  What was the substance of discussion between the defendants Reliford an Miller?

A  Well, they had been off and on arguing about several things.

Q  What were they arguing about?

A  Well, Mr. Reliford.

    MR. PAPPAS:  Your Honor, I am going to object unless they lay some foundation this was done in the presence of this witness.

    THE COURT:  Sustained.

    MR. JARRETT:  Thank you, your Honor.

BY MR. JARRETT:

Q  While this argument took place, where were you?

A  I was right there in front of them.

Q  If you heard the argument -- did you hear the argument?

A  Yes, I did.

Q  What was the substance of the argument?

A  Well, Mr. Reliford -- him and Mr. Miller had an argument in Florida from the periods that we was down there.  They had had a fight down there also.  Mr. Miller had got tired of Mr. Reliford patting him on the rear.

Q  During this prove dent robbery -- strike that.  Did there

CASSIDI L. CASEY CSR (214) 767-0774

338

ever come a time that you came back to Dallas to rob another
bank or credit union?

A   Yes, sir.

Q   Prior to doing that, was there ever an occasion for you to
rent a storage shed?

A   Yes, there was.

Q   And where was this storage shed?

A   In Bossier City Louisiana.

Q   And why did you rent this storage shed?

A   For the purchase of storing a Mustang which I purchased.

        MR. JARRETT:   Approach the witness, your Honor?

        THE COURT:   Yes, sir.

BY MR. JARRETT:

Q   Government's Exhibit 60, what does that appear to be?

A   The contract I took out for the storage unit.

Q   And does your signature appear anywhere on Government's
Exhibit 60?

A   Yes, it does.

Q   Where does it appear?

A   In the left hand corner.

        MR. JARRETT:   Offer Government's Exhibit 60 in
evidence.

        THE COURT:   Any objection?

        MS. BINDLER:   Is he offering this against Mr.
Miller?   I believe the contract was in his name.

@WITNESS – DIRECT – @                                          36

MR. JARRETT:  Yes, your Honor, I'm offering this exhibit against Defendant Miller.

MS. BINDLER:  No objection.

MR. PAPPAS:  But not Reliford?

MR. JARRETT:  Against Mr. Miller, sir.

THE COURT:  Government's Exhibit 60 is admitted against the defendant Miller.

BY MR. JARRETT:

Q   Now, what were you doing between August 29th and September the 29th, 1994?

A   Staying at a hotel room and traveling, going to Florida.

Q   How many rooms did you have?  One room or two?

A   We had two.

Q   Now, when you made this decision to rob another place, who made this decision?

A   Mr. Miller did.

Q   Did you join in the decision?

A   Yes.

Q   And why did the two of you decide to rob a third place?

A   Mr. Miller had a financial debt on which he had to pay on September 30th on his car.  And the credit union was calling an harassing his mother about it and his mother was fired up about his car.

Q   So when did you come to Dallas?

CASSIDI L. CASEY CSR (214) 767-0774

3540

@WITNESS – DIRECT – @                                37

A    I came to Dallas on September 29.

Q    What time did you leave Shreveport?

A    We was in Houston, Texas.

Q    And when did you leave Shreveport to go to Houston?

A    We left on a Sunday.

Q    Do you know what day that was?

A    No.

Q    Why did you go to Houston?

A    We went to Houston for the purpose of robbing a bank.

Q    Did you find one?

A    No, we didn't.

Q    Did you subsequently leave Houston to come to Dallas?

A    Yes, we did.

Q    When did you do that?

A    September 29th.

Q    What time did you leave Houston?

A    Between seven an seven thirty.

Q    What time did you arrive in Dallas?

A    About eleven -- well, it was between eleven an eleven thirty.

Q    And what were you driving on that occasion?

A    1991 Accura Integra.

Q    Is that the one you purchased for seventy-one hundred dollars cash?

A    Yes, it is.

CASSIDI L. CASEY CSR (214) 767-0774

@WITNESS - DIRECT - @                                38

Q   Where did you go?

A   We went to the Mesquite Credit Union.

Q   And why did you go there?

A   That was the institute that his mother had trouble.

Q   Why did he choose that.

        MS. BINDLER:   Objection.   This calls for
speculation.   He hasn't laid the foundation

        THE COURT:   Sustained.

BY MR. JARRETT:

Q   Did you discuss with Mr. Miller the location of the
institution that you were going to rob?

A   Yes, we did.

Q   Did you decide on a location?

A   Yes, we did.

Q   And what location was that?

A   Mesquite Credit Union on Gus Thomasson Road.

Q   And why did you decide on Mesquite Credit Union?

A   It was his idea.

Q   So you went back to the same place you hit before?

A   Yes.

Q   And what was the plan?

A   The plan was I was to be in the car and Mr. Miller was to
go inside the institution an rob it and come out.

Q   Were you ever supposed to go into Mesquite Credit Union?

A   Yes, I did go into Mesquite Credit Union.

342

Q   Why did you inside?

A   Mr. Miller told me to go inside and look around the joint and that's when I went inside.

Q   What did you go inside to do?

A   To scope the bank area.

Q   Why did you do that?

A   From directions from Mr. Miller.

Q   For what purpose?  Just to look around the bank?

A   No.  To see if there was a security guard and how many people was inside.

Q   What did you see when you went in there?

A   I saw three ladies.

Q   Did you say anything to anyone?

A   Yes, I did.

Q   What did you say?

A   I went to the counter an asked him how much would it be to open up a checking account.

Q   And what happened after that?

A   That was when I entered out of the bank and back into the Accura Integra.

Q   Where did you go from there?

A   At the time me and Mr. Miller went to Grandy's.

Q   And why did you go there?

A   Well, he had to use the restroom.  He went inside and used the restroom and that's when we proceeded to -- I can't

remember the office or whatever it was.  But it was like a grocery store or some type directly behind Grandy and at that

point me and Mr. Miller went behind Grandy an changed his cloth.

Q   What cloth did he change into?

A   The cloth to wear into the bank.

Q   And what did he take with him?

A   A green bag.

Q   And what else defendant?

A   A can of pepper mace.

Q   The green bag, was that what you showed us earlier?

A   Yes.

Q   Would you please look at Exhibit 46 and tell the members of the jury what that is?

A   It's a can of pepper mace.

Q   Exhibit 47, would you please tell the jury what those are?

A   A pair of gloves.

Q   Do you know whether or not Mr. Miller had a pair of gloves with him when he went into the Mesquite Credit Union?

A   Well, from my understanding Mr. Miller had entered out of the car with a pair of gloves.

Q   Would you please look at Exhibit 50  which exists of money wrappers and tell the members of the jury whether or not you have seen money wrappers similar to these before?

A   Yes.

344

@WITNESS - DIRECT - @                    41

Q    And where did you see money wrappers similar to these before?

A    At Chevron when I got into the car.

Q    Tell the members of the jury what Exhibit 48?

A    This is the cap Mr. Miller wore inside the bank.

Q    And Exhibit 49?

A    That's the trousers he wore.

Q    And tell the members of the jury what Exhibit 5 1 is?

A    It was a mask which we had.

Q    And what was the purpose -- what was this mask used for?

A    To disguise our facial figure.

Q    Now what happened to Government's Exhibit 5 1, 48, 49, 50 , 47 and 46?  What happened to these items?

A    They was left behind at a Chevron.

        MR. JARRETT:  At this time we offer in evidence Government's Exhibit 46, 47, 50 , 48, 5 1 and 49.

        THE COURT:  Against both defendants?

        MR. JARRETT:  As against defendant Miller.

        THE COURT:  Any objection?

        MS. BINDLER:  No, sir.

        THE COURT:  Government's Exhibits 46, 47, 48, 49, 50  and 5 1 are admitted against the defendant Miller.  The jury will not consider them against the defendant Reliford.


BY MR. JARRETT:

Q   Now, sir, taking you back a bit, back to the Provident Bank robbery?

A   Correct.

Q   Do you know whether or not a mask was used during that robbery?

A   Yes, it was.

Q   And who went in to the bank on that occasion?

A   Mr. Miller and Mr. Reliford.

MR. PAPPAS:  I am going to object unless he has personal knowledge.  I believe he testified on Monday that he didn't go into the bank on that robbery.  If that's true he doesn't have personal knowledge.

THE COURT:  Sustained.

BY MR. JARRETT:

Q   Was there any discussion as who was supposed to go into that bank?

A   Yes.

Q   And who was that discussion amongst?

A   Mr. Reliford and Mr. Miller and I.

Q   And what was the plan that was hatched by the three of you?

A   I was going to be the driver and Mr. Reliford and Mr. Miller was going to enter Provident Bank.

Q   The discussion also consist of the items to be carried and whether or not they were going to use a mask.

346

@WITNESS - DIRECT - @                                43

MR. PAPPAS:  I am going to object to the leading nature of this question.

THE COURT:  Sustained.

BY MR. JARRETT:

Q   Now, what discussion, if any, did you have with Mr. Miller and Mr. Reliford concerning the mask?

A   The mask was purchased to disguise our facial figure.

Q   Do you know subsequent to the robbery whether or not Mr. Miller and Mr. Reliford and yourself discussed whether or not a mask was used during that robbery?

A   Yes.

Q   And what was that discussion, sir?

A   Well, the discussion was that the mask was going to be used along with a gun.

MR. JARRETT:  At this time, sir, I will offer in Government's Exhibit 5 1 as to Reliford.

THE COURT:  You mean on the basis of this testimony that the mask was to be used according to the discussion between the three defendants?

MR. JARRETT:  And sir I would ask that it be conditional admitted at this point and subsequently tied into the Provident Bank robbery by other witnesses.

THE COURT:  I think it would be better to offer it at that time once we have had it tied in.  I'll overrule your request at this time.

CASSIDI L. CASEY CSR (214) 767-0774

@WITNESS – DIRECT – @                    44

MR. JARRETT:  Yes, your Honor.

BY MR. JARRETT:

Q   Now, once you finished with the Mesquite bank on September 29 where did you go?

A   We went to the Chevron.

Q   What happened at the Chevron station?

A   That's when we through the article of clothings which was used and money wrappers.

Q   Who handled the money wrappers?

A   Well, Mr. Miller took them off the money and I put them in the trash.

Q   And what happened to the money?

A   The money was placed into a green bag.

Q   And what did you do with your money?

A   `ll, it was combined together.

Q   Say that again, please?

A   I said the money was combined together.

Q   And what happened to all the money then?

A   Well, later we went back to Shreveport and purchased a hotel room for two nights at the Holiday Inn in Shreveport, Louisiana.

Q   Now, where did you subsequently place the money?

A   The money was placed in public storage in Shreveport, Louisiana.

CASSIDI L. CASEY CSR (214) 767-0774

348

Q    The public storage room you rented?

A    Yes.

Q    And why did you place it there?

A    Well, for safety.

Q    And when the money was found -- do you know whether or not the money was recovered?

A    Yes, it was.

Q    And where was it recovered from?

A    In public storage in Bossier City, Louisiana.

Q    Mr. Nichols P once again, have you entered into a plea agreement with the government?

A    Yes.

Q    And what are the terms that have plea agreement?

A    I have been charged with two gun charges.

Q    And what does that mean?

A    The maximum.

Q    What does that mean?

A    Given up to twenty-five years.

Q    And I notice there is also a provision in your plea agreement for what is known as a 5 K 1?

A    Yes.

        MR. PAPPAS:  Your Honor, I am going to object to him questioning from the actual language of the plea agreement unless he intends to offer the plea agreement.

        MS. BINDLER:  I join in that objection, your Honor.

@WITNESS – DIRECT – @                                46

THE COURT:   I'm not sure what the basis of objection.

MR. PAPPAS:   Well, your Honor.  The best evidence rule is he's telling the jury what the plea agreement says and we actually have the document that's signed by the various participants that actually says what it says.

THE COURT:   And you want it admitted in evidence?

MR. PAPPAS:   Yes, your Honor.

THE COURT:   Any objection.

MR. JARRETT:   Your Honor, they certainly may.  I don't have a copy of it at this point in time and I don't have it marked as an exhibit.

THE COURT:   Perhaps if you have one, Ms. Bindler you could make it available to Mr. Jarrett so he can mark it.

BY MR. JARRETT:

Q   Before I go into there plea agreement thoroughly, Mr. Nichols, I would like to ask you a couple of other questions concerning the Provident Bank robbery.  Did Mr. Reliford and Mr. Miller get back in the car at some point in time?

A   Yes, they did.

Q   What did they have with them?

A   The money bag and the gun.

Q   And what was in the money bag?

A   It was a garbage sack that contained the money from the

CASSIDI L. CASEY CSR (214) 767-0774

350

THE COURT:  I'm not sure what the basis of objection.

MR. PAPPAS:  Well, your Honor.  The best evidence rule is he's telling the jury what the plea agreement says and we actually have the document that's signed by the various participants that actually says what it says.

THE COURT:  And you want it admitted in evidence?

MR. PAPPAS:  Yes, your Honor.

THE COURT:  Any objection.

MR. JARRETT:  Your Honor, they certainly may.  I don't have a copy of it at this point in time and I don't have it marked as an exhibit.

THE COURT:  Perhaps if you have one, Ms. Bindler

you could make it available to Mr. Jarrett so he can mark it.

BY MR. JARRETT:

Q  Before I go into there plea agreement thoroughly, Mr. Nichols, I would like to ask you a couple of other questions concerning the Provident Bank robbery.  Did Mr. Reliford and Mr. Miller get back in the car at some point in time?

A  Yes, they did.

Q  What did they have with them?

A  The money bag and the gun.

Q  And what was in the money bag?

A  It was a garbage sack that contained the money from the

@WITNESS — DIRECT — @                                      47

robbery.

Q   And how much money did it contain?

A   Eighty-two thousand dollars.

MR. JARRETT:  Your Honor, I will mark the plea agreement as Government's Exhibit E 93.

THE COURT:  I took there was no objection to that coming in evidence.

MR. PAPPAS:  None, your Honor.

THE COURT:  All right.  Government's Exhibit 93 will be admitted.

.

BY MR. JARRETT:

Q   Now, please look at Government's Exhibit E 93.  Do you recognize Government's Exhibit E 93?

A   Yes, I do.

Q   What is Government's Exhibit E 93?

A   It's the plea agreement I agreed to.

Q   What does it say concerning --.

MR. JARRETT:  At this time I offer in evidence Government's Exhibit E 93.

THE COURT:  It's already been admitted.

MR. JARRETT:  Thank you, your Honor.

BY MR. JARRETT:

Q   I'd like for you to tell us how much it says in mandatory time you will have to serve?

A   The maximum time will be twenty-five years.

Q   And I would like for you to tell the members of the jury with respect to how much money you have to pay back.  Please read it?

A   Restitution of a hundred thirty-two thousand hundred dollars and fourteen.

Q   That you would have to pay back?

A   Correct.

Q   I would also like for you to read the provision concerning what you have agreed to do?

A   I agree to cooperate with the government by giving truthful information or testimony concerning my participation.

        THE COURT:  Mr. Nichols, apparently some members of jury are having trouble hearing your testimony.  And we're all wasting our time unless we hear.  So please try to speak up and clearly into that microphone so that everyone can hear you

        THE WITNESS:  Yes, sir.

BY MR. JARRETT:

Q   The last page which is the supplement to your plea agreement says what?

A   (No response).

Q   Let's talk about in return for Nichols providing substantial assistance?

352

A   In return for Nichols providing substantial assistance as defined above the government shall provide the government with the option for downward departure.

Q   Does it say option for downward departure?

A   Yes.

Q   Pursuant to what?

A   Pursuant to USC 5 K 1.1.

Q   And?

A   United States Code section 35 5 3.

Q   And what does it say next?

A   Which may be the statutory minimum.

Q   And so what's the government's obligation in this particular case as you understand it?

A   None.

Q   What's your obligation as you understand it, Mr. Nichols?

A   Repeat the question.

Q   What is your obligation under the terms of plea agreement?

A   Just to cooperate with the government.

Q   Tell the truth?

A   Yes.

        MR. PAPPAS:  Your Honor, I am going to object to the leading nature of that question.

        THE COURT:  Overruled.

BY MR. JARRETT:

Q   What is your obligation, Mr. Nichols?

353

@WITNESS – DIRECT – @                                    50

A    To assist the government.

Q    And?

A    And to provide truthful information.

Q    Are there any guarantees anything will happen, Mr. Nichols?

A    No, sir.

          MR. JARRETT:  Approach, your Honor?

          THE COURT:  Yes, sir.

BY MR. JARRETT:

Q    Would you please look at Government's Exhibit 45 and tell the members of the jury what Government's Exhibit 45 is?

A    It's a green bag that was in public storage.

Q    Please speak up?

A    It was the green bag which was stored in public storage.

Q    Where was this green bag bought?

A    Florida at wall matter.

Q    And where was this green bag used?

A    Mesquite Credit Union robbery.

Q    Which Mesquite Credit Union robbery?

A    September 29.

Q    And it was carried by whom?

A    Mr. Miller.

Q    And when he came out of the Mesquite Credit Union, what did he was in this bag?

A    Money.

CASSIDI L. CASEY CSR (214) 767-0774

354

MR. JARRETT: We offer this in evidence at this time.

THE COURT: Against both defendants?

MR. JARRETT: No, against the defendant Miller.

THE COURT: Government's Exhibit 45 will be admitted against Mr. Miller and the jury will not consider it against Mr. Reliford.

MR. JARRETT: May I have a moment, your Honor?

THE COURT: Yes, sir.

MR. JARRETT: No further questions, your Honor. Pass the witness.

THE COURT: Cross examination, Ms. Bindler?

MR. PAPPAS: Your Honor, may we approach the bench.

THE COURT: Yes, sir.

MR. PAPPAS: Your Honor, for the purposes of the scope of my cross an Ms. Bindler's cross and for the purpose of time we would request the court allow me to proceed first with the cross examination.

THE COURT: All right. Ladies and Gentlemen, although I told you during jury selection I believe it was that ordinarily I would recognize the defendants in the order in which they are named in the indictment, in this instance it has been agreed that counsel for the defendant Reliford will question Mr. Nichols first. So we will hear next from

355

Mr. Pappas.

CROSS-EXAMINATION

BY MR. PAPPAS:

Q  Mr. Nichols, did I ask you any questions you don't understand or aren't specific enough for you to answer, please tell me and I'll try to rephrase the question.  All right?

A  Yes, sir.

Q  Now, in regards to this plea agreement, Government's Exhibit Number 93 that you entered into, when did you enter into this agreement if you remember?

A  I can't remember the exact date.

Q  Does February 17th sound right, sir?

A  Yes.

Q  Okay.  And in regards to this plea agreement, I believe it was also your testimony that as of the time that you wrote this letter marked as Defendant's Exhibit number 2 dated November 15, 1994, which expresses your deep religious conversion that at this time you intended to enter a plea of guilty; is that correct?

A  I don't understand the question, sir.

Q  Okay.  If you need to I'll be happy to show you the exhibit.  We have Defendant's Exhibit 2 dated November 15th which is your letter to Mr. Miller.  You wrote it from jail

356

to jail.  Do you remember that?

A  May I see is a copy of it?

Q  Sure.

MR. PAPPAS:  Approach the witness, your Honor?

THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q  Sir, do you remember writing that letter?

A  Yes, I do.

Q  And do you remember testifying earlier this morning that the time you wrote that letter you intended to plead guilty as of the writing of that letter?

A  Yes.

Q  And in fact you did plead guilty some six months later, is that correct?

A  Yes, I did.

Q  Four months later?

A  Yes.

Q  Now, at the time you were writing that letter you were facing a great deal of prison time both within the federal system an within the state system, is that correct?

A  From only the federal system.

Q  Okay.  So you haven't been charged in the state system?

A  No, I haven't.

Q  And it's your understanding that pursuant to this plea agreement that there is some unwritten promise that you are

357

not going to be charged in the state system, either in Louisiana or here in Texas?

A   Would you clarify the question, please?  Okay.  You said you weren't charged in the state system.  You understand that armed robbery and certain gun violations which you have already confessed your involvement in are also a violation of state laws.  You understand that?

A   Yes.

Q   But you told these people you weren't being charged with that?

A   Well, to my knowledge there wasn't any charges.

Q   I'm sorry?

A   From my knowledge there wasn't any charges.  I think the only charges that was held on me in Louisiana was a charge of possession of marijuana.

Q   The point is even though charges haven't been brought yet against you, you know at some point they could be, corrects?

A   That's correct.

Q   And it's your understanding by entering into this plea agreement you believe that they won't be, is that correct?

A   Yes.

Q   And in focusing only on the indictment and you were given a copy of the indictment or your attorney went over with you the original indictment in this case, didn't they?

A   Two indictments.

H1                          @WITNESS – CROSS – @                          55

Q    There was an original indictment and a subsequent indictment, is that correct?

A    Correct.

Q    And the original indictment, you went over that with your attorney, didn't you?

A    Yes.

Q    Mr. Todd, is that your attorney's name?

A    Yes.

Q    And in fact there was a detention hearing in October?

A    Yes.

Q    And you went over the original indictment at that time; is that right?

A    Yes.

Q    And so you have seen it?

A    Correct.

Q    And that indictment did not include Mr. Reliford.

A    No.

Q    And the subsequent indictment, do you remember when you went over that with your attorney?

A    I can't remember the month.

Q    Okay.  But it was some time well after you sent that letter on November 15th?

A    Yes.

Q    And the subsequent indictment did include Mr. Reliford, is that correct?

359

A   Yes.

Q   Now, is it your understanding that under either indictment your potential criminal exposure, the amount of time you could go to prison was up to sixty-five years?

A   Not to my knowledge.

Q   How long did you think you could go to prison unless you work out some other arrangements?

A   Well, there wasn't a time that was set.

Q   Well, did you discuss the possible maximum penalities with your attorney at the time you either read the first indictment or second indictment?

A   Well, from my understanding the first indictment it's twenty-five years he said.

Q   And the second indictment was substantially more?

A   Yes.

Q   And so did you think it was more than that, do you think it could have been forty-five?

A   I don't know.

Q   But it's your belief it was substantially more?

A   Yes.

Q   And it's your belief by entering into this plea agreement and cooperating and assisting the government that you have limited your exposure to twenty-five years, is that correct?

A   Well, from my standpoint it was still a twenty-five year deal even with the plea agreement.

Q   So you have limited your criminal exposure, the time you could spend in jail, the most you could spend as a result of your promise to assist the government is twenty-five years, is that correct, sir?

A   That's correct.

Q   And in fact if you will look -- if you need to I will show it to you.  You testified about the last page of this exhibit and you talk about it as being some kind of 5 K 1?

A   Yes.

Q   And that is your promise to assist the government, is it not?

A   Correct.

Q   And it's your understanding if you assist the government sufficiently you may go to prison for less than twenty-five years; is that right?

A   There wasn't a promise made like that.

        MR. PAPPAS:  Approach the witness, your Honor?

        THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q   I am going to ask you to either read to yourself or out loud if you would rather this paragraph that's on the last page of Government's Exhibit 93 starting with in return?

A   "in return for Nichols providing substantial assistance as defined above the government shall provide the court with an option for downward departure pursuant to USG 5 can 1 United

361

States Code 35 5 3 which may recommend a sentence below the statutory minimum.  ".

Q  And the statutory minimum is twenty-five years, is that correct?

A  Yes, that's correct.

Q  So if you satisfy the government, is it your understanding that they will recommend that your punishment be less than twenty-five years?

A  Well, like I say, there wasn't a promise made or anything like that.

Q  I understand there was no promise or guarantee.  My question to you is it's your understanding of this agreement that if you satisfy the government they are going to ask that you do punished for less than twenty-five years?

A  No.

Q  So why are you cooperating with the government?

A  I felt it was the right thing to do.

Q  So it's your understanding that there is no language in here or nothing in here that tends to make you believe that if you satisfy the government your penalty will be twenty-five years or arguably could be less than twenty-five years?

A  No.

Q  You are just doing this because it's the right thing?

A  Right.

362

Q   And that again is pursuant to the religious conversion you got did he tell you wrote Defendant's Exhibit 1 and 2.

MR. JARRETT:  Objection.  Argumentative.

THE COURT:  Overruled.  You may answer.

A   Say it again, sir.

BY MR. PAPPAS:

Q   Your testimony that you are doing the right thing is pursuant to this religious conversion that you testified about and that is referred to in Defendant's Exhibits 1 and 2, the letters you wrote to Mr. Miller?

A   Well, that wasn't just a religious conversion.  I have always been religious all of my life, sir.

Q   So you were religious at the time you were involved in all of the robberies, is that correct, sir?

A   Yes, sir.

Q   And you are religious at the time you bought these guns, is that correct?

A   Corrected.

Q   And you were religious at the time you were spending the money as the prosecutor said on fast women an living in hotels, correct?

A   That's correct.

Q   And the strength of your religious convictions at that time was at least equal not strength of your religious convictions as stated in Defendant's Exhibits 1 and 2?

363

A    I really can't say.

Q    Now, subsequent to the time that you entered into this plea agreement in February, you have met a great deal of time with people associated with the government's team, have you not?

A    Not that much, sir.

Q    Well, did you meet with them this morning?

A    Yes, sir.

Q    An who was present with them when you met with the government this morning?

A    Mr. Jarrett.

Q    Was Mr. Grovner there?

A    No, he wasn't.

Q    Was the other FBI agent there?

A    No, he wasn't.

Q    And how long did you meet with Mr. Jarrett this morning?

A    For briefly about a minute or so the.

Q    Just one minute?

A    Yes.

Q    And have you met with any members of the government's team or any members representing the government all last week or at any time last week?

A    Yes, I did.

Q    And which days did you meet with a member of the government's team?

CASSIDI L. CASEY CSR (214) 767-0774

364

HI                              @WITNESS - CROSS - @                          61

A   I believe it was on Thursday.

Q   And any other days?

A   Yes.  I think it was on Tuesday and Wednesday also.

Q   So you met with them Tuesday and Wednesday and Thursday, is that correct?

A   Yes.

Q   And who was -- did you meet with them on Monday?

A   I don't recall, sir.

Q   Possible?

A   Yes.

Q   Let's focus on the Tuesday meeting.  Where did you meet with these gentlemen on Tuesday?

A   At the courthouse, downstairs.

Q   And who was present first of all?  When did it commence, when did it start?

A   About nine.

Q   And how long were you at this courthouse either waiting to meet or meeting with those gentlemen on Tuesday?

A   I can't recall that.

Q   Was it a minute, an hour, six hours?

A   Well, from the time I came to the Court house which was about seven thirty or eight and that's when I proceeded to the attorney's office.

Q   And when did you leave the courthouse on Tuesday?

A   About five o'clock.

CASSIDI L. CASEY CSR (214) 767-0774

365

Q  So you were here all day, is that correct?

A  Correct.

Q  And now who did you meet with all day with the government's team.

MR. JARRETT:  Your Honor, may we approach?  I apologize for the interruption.

THE COURT:  All right.

MR. JARRETT:  Your Honor, obviously the witness is confused.  We had a hearing in here Tuesday at nine o'clock -- Tuesday afternoon and we had a hearing in here Wednesday morning.  For the purposes of this line of questioning I ask that we be very precise as to when the defendant actually was here because I think that the times an dates are incorrect.

MR. PAPPAS:  Your Honor, I'll try to be as precise as possible.  That may be a matter for redirect if they are not happy with how precise I'm being.  I'll attempt to be more precise to clear it up.  I think the gist of what I'm doing is obviously and the government's ability to clear it up is well within the scope of their redirect.

THE COURT:  All right.

BY MR. PAPPAS:

Q  Tuesday you got here at what time?

A  Between seven an seven thirty.

Q  Now, let's digress just a little bit, sir.  You have been incarcerated since October, is that correct?

H1                         @WITNESS – CROSS – @                         63

A    Since September 30th.

Q    One day after the Mesquite –– the second Mesquite Credit

Union robbery?

A    Correct.

Q    And where have you been incarcerated at least as of the

last couple of months, would it be Mansfield?

A    Yes, it would.

Q    I may know but I'm not sure the Ladies and Gentlemen know

when we say Mansfield, what do you mean by that?

A    The Mansfield holding facility.

Q    It's at the City of Mansfield?

A    I have no idea about Texas.

Q    It's some place some distance away from this courthouse,

is that correct?

A    Yes.  It's about forty-five minutes or so.

Q    And you have referred to the boys in your tank at

Mansfield.  You were in the B tank at Mansfield, is that

correct?

A    I was in several tanks.

Q    Were you ever in the B tank at Mansfield?

A    Yes,

Q    And how long were you in the B tank?

A    I can't recall.

Q    And what tank are you in now?

A    E.

CASSIDI L. CASEY CSR (214) 767-0774

367

H1                          @WITNESS - CROSS - @                          64

Q  And you don't remember how long ago you were in the B tank?

A  No, I can't recall.

Q  So you arrived here after a forty-five minute drive from Mansfield you arrived here on Tuesday at seven thirty, is that correct?

A  That's correct.

Q  Now, you say you left here about what?  Five?

A  Yes.

Q  Now, that whole time that you were here, you weren't meeting with the government team, you were sitting around doing other things as well, is that correct?

A  Yes.

Q  Did you ever testify in any hearings on that Tuesday?

A  No.

Q  And who did you meet with on the government's team Tuesday morning?

A  Well, I met Mr. Jarrett.

Q  Were either of the FBI agents present?

A  Yes.

Q  Were both of them present?

A  At one point.

Q  Was your attorney present?

A  No.

Q  So it was just you and the government; is that right?

368

A    Yes.

Q    And would it be fair to say the purpose of that meeting was to go over your testimony that you were giving here today?

A    No it was just questions that were asked.

Q    Well, they were asking about what you were testifying to, weren't they?

A    They were just asking about the events that happened.

Q    They didn't want to know anything about unrelated to this matter or these events you testified to?

A    Would you clarify to that.

Q    They weren't asking about what kind of kid you were in grade school or anything related to this case were they?

A    No, they weren't.

Q    Okay.  And you came back on Wednesday, is that correct?

A    Yes.

Q    And what time -- tell the Ladies and Gentlemen what time you arrived on Wednesday?

A    I cannot recall.  It was before eight o'clock.

Q    Again, it was early in the morning; is that right?

A    Correct.

Q    And you didn't leave until late that afternoon?

A    Correct.

Q    And about five o'clock, five thirty?

A    Well, about six that night.

Q   A little later that night?

A   Yes.

Q   Did you testify or were you here to testify for any hearings that were held on that day?

A   Well, I was brought to court from my understanding for a hearing but I never did make it to a hearing.

Q   So you never actually testified on Wednesday?

A   Yes.

Q   But you did meet with members of government's team, is that correct?

A   I cannot recall that.  I spoke with I think Mr. Grovner. I'm not for sure.

Q   You were here all day and you may have spoken with Mr. Grovner.  This is last Wednesday and you are not sure, is that correct?

A   Correct.

Q   What about Thursday?  Did you come down here on Thursday of last week?

A   I cannot recall, sir.

Q   Well, you testified earlier that you did.  Are you not sure now that you did?

A   I said I came by several days last week but I don't know what days for sure.

Q   Were you here three days last week?

A   Yes.

310

Q   Could you have been here more than three days last week?

A   No.

Q   The third day whenever that was that you were here last week, did you also arrive early in the morning, eight?

A   Yes.

Q   And you also stayed all day?

A   .

Q   And didn't leave until five or five thirty or six?

A   Yes.

Q   And you also spoke with some or all of the members of government's team?

A   I spoke with Mr. Grovner.

Q   Mr. Grovner.  Okay.  And did you speak with any members of government's team over the weekend?

A   No.

Q   Did you speak with them on Monday?  First of all were you here on Monday?

A   Yes, I was.

Q   You actually testified Monday afternoon, is that correct?

A   Yes.

Q   Did they bring you over Monday morning?

A   Yes.

Q   And by they, we're referring to either the marshals or whoever is responsible for transporting you, is that correct?

A   Correct.

Q  Did you speak with any member of the government team prior to testifying in front of these Ladies and Gentlemen Monday afternoon?

A  Yes, I did.

Q  And which members of government team did you speak with?

A  Mr. Jarrett.

Q  Now, sir, part of your obligation under this plea agreement is to testify truthfully, is that correct?

A  Correct.

Q  And I want to give you the opportunity, sir, if there is anything you have testified about either Monday afternoon or so far today that may be inaccurate, I want you to tell me what it is and give you and opportunity to clear that up?

A  Okay.

Q  An you have been complete my accurate in everything you have testified Monday afternoon and here this morning, is that correct?

A  To the best of my knowledge.

Q  All right.  Now, sir, do you remember when you arrived at the Mansfield jail?

A  No, I do not.

Q  Was it before Christmas or after Christmas?

A  It was in October.

Q  In the month of October.  So these actual letters that were written, Defendant's Exhibit 1 and Defendant's Exhibit 2

372

were written from the Mansfield jail, is that correct?

A   Yes.

Q   And they were written after the time of your detention hearing, that is when you knew you weren't getting out on bail?

A   Yes.

Q   Let's go back further.  You testified you were arrested on September 30th, is that correct?

A   Yes.

Q   And where were you arrested?

A   At my mother's house.

Q   At your mother's house.  Was anyone else present with you when you were arrested?

A   Yes.

Q   And would you tell the Ladies and Gentlemen who was with you when you were arrested?

A   Jesse Anderson, my mother, my sister and her friend and my goddaughter.

Q   And tell the Ladies and Gentlemen what if any nickname Jesse Anderson has.

MR. JARRETT:  Objection.  Relevance?

THE COURT:  What is the relevance.

MR. PAPPAS:  We have witnesses that are going to testify that Jesse Anderson was the Country Pimp that was referred to by the witness yesterday afternoon and we have

373

witnesses that we believe are going to testify that Country Pimp is in fact heavily involved in all the robberies if not the actual committor of the robberies. I'm trying to establish a connection between this gentlemen and that person. We have physical documents also.

THE COURT: Overrule the objection.

A  Repeat the question.

BY MR. PAPPAS:

Q  Who's Country Pimp?

A  He's my brother-in-law.

Q  And what's his name?

A  Jesse Anderson.

Q  So Country Pimp an Jesse Anderson are the same person, correct?

A  Yes.

Q  And Jesse Anderson was with you when you were arrested?

A  Yes.

Q  Was Mr. Reliford with you?

A  I don't recall. They rushed me and Mr. Anderson out of the house and into the jail.

Q  Was Mr. Anderson arrested at the same time you were?

A  Yes.

Q  And did you become aware or learn whether or not Mr. Anderson was subsequently released?

A  He was released the next day.

Up there it's not Reliford, it's Anderson.

Q  Tell the Ladies and Gentlemen how you know Mr. Anderson?

A  I have known him since the sixth grade and he started dating my sister and we became close friends.

Q  Are you close friends?

A  Yes.

Q  Very close friends?

A  Yes.

Q  Was Mr. Anderson ever present at any of the events -- other than the arrest any of the events you described either this morning or Monday afternoon?

A  Are you referring to as a robbery?

Q  I'm referring to any events you described?

A  No, he wasn't present.

Q  Wasn't present at any of them?

A  No.  He wasn't.

Q  Now, at some point you were transferred from Caddo Parish in Louisiana to Mansfield jail here in the North Texas area, is that correct?

A  First I went to FCI in Texarkana and then to Mansfield.

Q  And by FCI you are referring to federal correction institution that is located in Texarkana, is that correct?

375

A   Correct.

Q   Now, sir, is it your understanding as part of your plea agreement that you come clean and tell the government any and all criminal acts in which you have been involved or may have witnessed?

A   Yes.

Q   And it's your testimony that you have done that?

A   Yes, I have.

        MR. PAPPAS:   May I approach the witness, your Honor?

        THE COURT:   Yes, sir.

BY MR. PAPPAS:

Q   Mr. Nichols, I am going to show you what's been marked as Government's Exhibit E 5 1 and ask you to describe what that is?

A   This is the mask in the form of precedent Clinton or Reagan.

Q   President Clinton or Reagan?

A   I cannot tell.

Q   Presidential mask?

A   Yes.

Q   And I was unclear from your testimony earlier.  Is it your testimony that is the mask at some point you discarded?  Is that correct?

A   Yes.

376

Q   And is it your belief or were you told or did you have some physical basis either because you heard or saw that this mask was used in one or more of the bank robberies here in Texas?

A   It was used in the Provident Bank robbery.

Q   First of all, do you know who was wearing that mask in the Provident Bank?

A   I cannot say who was wearing it but from my understanding Mr. Miller had one and Mr. Reliford had one also.

Q   When was that mask discarded?

A   This mask was discarded on September 29th.

Q   At the Chevron gas station?

A   Correct.

Q   And was that the first time you all had been to the Chevron gas station?

A   No.

Q   So you went to the Chevron gas station some other time, is that correct?

A   Yes.

Q   So when you testified on Monday that you discarded a number of items in the Chevron dump sister there on August 26th, that was a different time than the time you discarded all of those items on September 29th, is that correct?

        MR. JARRETT:   Objection.   Misstatement of evidence, your Honor.

H1                          @WITNESS – CROSS – @                        74

THE COURT:  Overruled.  You may answer.

A   No.  I said that the evidence which was found was discarded on September 29th.

BY MR. PAPPAS:

Q   So you never discarded any evidence in the Chevron dump sister on August 26th?

A   No, I didn't.

Q   So the mask was not discarded after the August 26th robbery at prove dent, is that correct?

A   Correct.

Q   Whose mask was that?

A   What do you mean?

Q   Pardon me?

A   I don't understand your question.

Q   Who did the mask belong to?

A   Well, it was two of them.

Q   Who did that mask belong to, sir?

A   Well, it was in the presence of me and Mr. Miller.

Q   It was in the presence of you and Mr. Miller?

A   Yes.

Q   And you had it from before the August 26th robbery, is that correct?

A   This right here was purchased after the August 26th robbery.

Q   So that's not the same mask that was used in the August

CASSIDI L. CASEY CSR (214) 767-0774

26th robbery?

A  No, it isn't.

Q  What happened to the mask that was used in the August 26th robbery?

A  They were discarded by Mr. Reliford.

Q  And that was discarded in the Chevron dump sister there on August 26?

A  No.

Q  When was it discarded?

A  The same night.

Q  Who was present when it was discarded?

A  Me and Mr. Miller and Mr. Reliford.

Q  What time was it when that mask was discarded?

A  I can't remember.

Q  Was it early or before midnight or after midnight had to be before midnight.

Q  Was it before you eight dinner?

A  I can't recall.

Q  What time did you get back to Shreveport from Dallas?

A  Around seven thirty.

Q  Was it immediately after you got back?

A  I cannot recall, sir.

Q  And this mask was purchased in Florida?

A  No.

Q  The other mask was purchased in Florida, is that what you

H1                          @WITNESS – CROSS – @                          76

were saying?

A  No, both sets of masks were purchased in Shreveport.

Q  Were they purchased by you or Mr. Miller?

A  The first mask was purchased by Mr. Reliford at a pawn shop.  Me, Mr. Miller and Mr. Reliford was present at that time.

Q  What pawn shop was that?

A  The if you know shop.

Q  Do you know the name of the if you know shop or is that the name?

A  That's the name.

Q  And who paid for the mask?

A  Mr. Reliford.

Q  You didn't pay for it?

A  No, I didn't.

Q  First of all when was that mask purchased?

A  I cannot recall.

Q  Was it purchased on the 26th, the day before the 26th?

A  It was purchased about two weeks before the 26th.

Q  And who kept it in their possession, if you know?

A  It was kept at Mr. Reliford's house.

Q  And on the 26th, you all went and I guess picked up Mr. Reliford and drove from Shreveport to Dallas, is that correct?

A  That's correct.

380

H1                          @WITNESS – CROSS – @                          77

Q   Okay.   And you were driving the pick-up truck; is that right?

A    I wasn't driving the pick-up truck.

Q   Who was driving the pick-up truck?

A   Mr. Miller was.

Q   The three of you were sitting in the pick-up truck; is that right?

A    No.   I was driving the Accura Integra.

Q   You were driving the Accura Integra?

A   Right.

Q   And Mr. Miller was driving the pick-up truck?

A   Correct.

Q   Was anybody reading in the Accura Integra with you?

A   No.

Q   Was anybody reading in the pick-up truck with Mr. Miller?

A   Yes, Mr. Reliford was.

Q   Did you meet them somewhere or did you follow them or how did the two vehicles get together before they left Shreveport?

A   We headed out.   Mr. Miller left first.   Something happened and we had to fill up the tire on the car and I stopped and Mr. Miller -- we later met Mr. Miller at Kelly's truck stop.

Q   You say we later met Mr. Miller at Kelly's struck stop.

A   Yes.

Q   Who is we?

A   Mr. Reliford an me.

Q   So he was riding in the Accura?

A   Only to the truck stop.

Q   But nobody else was with Mr. Miller; is that right?

A   No.

Q   Now, the mask that was used in the September 29th robbery, that's that mask?

A   I don't know.  It was one similar to that.  I can't really say if that's the exact one that was used.

Q   Okay.  Is it your belief that a mask was used in the September 29th robbery?

A   The plans were a mask was supposed to be used but I have no idea whether it was used.

Q   Who made the plans?

A   Mr. Miller.

Q   Now, I want to be clear.  Mr. Reliford even by your testimony had nothing to do with the September 29th robbery?

A   No, sir.

Q   Didn't discuss the planning?

A   No.

Q   Didn't master mind it?

A   No, he didn't.

Q   You didn't even see Mr. Reliford for some two weeks prior to September 29, is that correct?

A   Yes.