Q   Or more, correct?

A   Yes.

Q   Let's focus on the September 29th robbery.  Is it your testimony that Mr. Miller was the master mind of the except 29th robbery?

A   Yes.

Q   So you never master minded anything?

A   No.

Q   You were just sort of an innocent dupe or victim of these two manipulative criminals, is that your testimony?

A   Well, no, everybody participated as one.

Q   But you didn't have any original thoughts.  You just did what they advised you to do?

A   Well, everybody had things to say things like that.

Q   You testified Mr. Reliford was the master mind of the first two robberies, the first two bank robberies?

A   Correct.

Q   And Mr. Miller was the master mind of third bank robbery?

A   Yes.

Q   Did you master mind any of this?

A   No, I didn't.

Q   Now, in regards to the third robbery, what gun was used in that robbery?

A   Okay, what robbery?

Q   Mesquite Credit Union?

383

A   On September 29.

Q   September 29?

A   A Taurus 380.

Q   A Taurus 380, is that correct?

A   Yes.

Q   And whose gun was that?

A   Mine.

Q   And when did you get that gun?

A   Purchased it I think August the 28th.

Q   So you purchase it two days after you drove back from Dallas on the date of the Provident Bank robbery, is that correct?

A   Correct.

Q   And you purchased it with money from the Provident Bank robbery, is that correct?

A   Correct.

Q   And where did you purchase that gun from?

A   At a pawn shop on hole wood boulevard.  I can't recall.  I think national jewelry an loan or something.

Q   Was Mr. Miller with you when you purchased that gun?

A   Yes, he was.

Q   Mr. Reliford wasn't with you when you purchased that gun?

A   No, he wasn't.

Q   Was Mr. Miller the one that master minded the purchasing of that gun?

H1                            @WITNESS – CROSS – @                            81

A   No.   I purchased it on my own.

Q   And the reason for purchasing it I believe you said was for protection?

A   Correct.

Q   And did you carry it for protection up until the time it was decided to be used in a bank robbery at Mesquite Credit Union?

A   Yes.

Q   And who carried it?

A   I did.   And Mr. Miller carried it also.

Q   I may be unclear.   Who carried it most of time.   I assume you didn't both carry it at the same time.

A   Well, at the time I had a Ruger nine millimeter which I carried and Mr. Miller carried the Taurus.

Q   But you bought it, right?

A   Yes.

Q   Tell us about the Ruger nine millimeter.   When did you get that gun?

A   It was purchased on September 25.   I purchased it a week before the Provident Bank robbery.

Q   A week before the Provident Bank robbery.

A   Yes.   You had to go through a five day waiting period and I purchased it on a Friday or a Saturday.

Q   And you were able to actually obtain that gun before the Provident Bank robbery?

CASSIDI L. CASEY CSR (214) 767-0774

A  It was obtained afterwards.

Q  You went to buy the before but you didn't pick it up until after the robbery?

A  Yes, you had to wait five days for it.

Q  What gun, if any, if you know P was used in the prove dent robbery?

A  From my not guilty the tech 22.

Q  Have you ever owned a tech 22?

A  No, I haven't.

Q  You made some reference on Monday to a tech 22 being purchased in Shreveport?

A  Yes.

Q  Were you present when that tech 22 was purchased?

A  Yes, I was.

Q  And where was that tech 22 purchased?

A  At the Expo Hall in Shreveport.

Q  From the gun show?

A  Yes.

Q  Was Mr. Miller present when that gun was purchased?

A  Yes, he was.

Q  Was Mr. Jesse Anderson present what that gun was purchased?

A  No, he wasn't.

Q  Was Mr. Rick I Anderson present when that gun was purchased?

386

H1                                          @WITNESS - CROSS - @                                          83

A    No, he wasn't.

Q    Who purchased the gun?

A    Mr. Miller did.

Q    I'm sorry, sir.  I thought I asked you if Mr. Miller did
and you said no?

A    You asked if he was present.

Q    He purchased the gun but he wasn't present?

A    You asked was he present and I said yes.

Q    Who bought the gun?

A    Mr. Miller did.

Q    Who was there when the gun was bought?

A    Mr. Miller and I.

Q    Mr. Reliford wasn't anywhere around?

A    No, he wasn't.

Q    But it was his master minded idea that suggested you buy
that gun and use it in this robbery, Mr. Miller's?

A    No, it wasn't.

Q    Whose was it?

A    Well, it was purchased for protection.

Q    So you had one gun that was purchased for protection
immediately prior to a bank robbery that was used in the bank
robbery, correct?

A    The Taurus 380, yes.

Q    And you had another gun that was purchased for protection
that was also used to a bank robbery, is that correct?

387

A   No, it wasn't used in a bank robbery.

Q   What gun was used in the Provident Bank robbery?

A   A tech 22.

Q   Again, I may be unclear.  Were you present when that gun was purchased?

A   Yes, I was.

Q   And who purchased that gun?

A   Mr. Miller.

Q   And why was that gun purchased if you know?

A   Mike I say it was purchased for protection.

Q   And so in fact a second gun, the gun, the tech 22 that was used in the Provident Bank robbery was purchased by Mr. Miller in your presence?

A   Yes.

Q   For the purpose of protection?

A   Correct.

Q   Again, I may be unclear on this.  So the two of you all bought a gun at a gun show in Shreveport immediately or sometime prior to the commission of the Provident Bank robbery on August 26th?

A   Correct.

Q   And Mr. Reliford didn't have anything to do with the purchase of that gun?

A   I know he didn't.

Q   And the reason that gun was purchased is for protection,

correct?

A   Correct.

Q   And that gun was used to rob a bank here in Dallas, correct?

A   Correct.

Q   Provident Bank, correct?

A   Correct.

Q   And then another gun was purchased by you after the Provident Bank robbery but before the second Mesquite Credit Union robbery on September 29th, is that correct?

A   That's right.

Q   And you and Mr. Miller were present when that gun was bought, is that correct?

A   A Ruger nine millimeter when I went to pick it up all three of us was present.

Q   The Ruger nine millimeter wasn't used in the September 29 bank robbery?

A   No, it wasn't.

Q   I'm referring to the Taurus 380.  You and Mr. Miller were present when that gun was bought?

A   Correct.

Q   And Mr. Reliford wasn't around, correct?

A   Correct.

Q   And that gun was bought after you robbed Provident Bank or after Provident Bank was robbed with a gun that was

previously bought for protection, right?

A   Yes.

Q   And that Ruger three eighty was also bought for protection, right?

A   Correct.

Q   And the three eighty Taurus was also bought for purposes of protection, correct?

A   Yes.

Q   And Mr. Reliford wasn't around when that was bought?

A   Yes.

Q   And that three eighty Taurus that was bought for protection was also used to rob a bank, correct?

A   Yes.

Q   And it's your testimony that Mr. Reliford's master minding of the Provident Bank robbery didn't extend to getting you all to purchase that gun for protection; is that right?

A   May I clarify the question?  Clarify that for me.

Q   You have testified sir, have you not, that Mr. Reliford master minded this Provident Bank robbery?

A   Yes.

Q   And Mr. Miller master minded the second Mesquite Credit Union robbery?

A   Yes.

Q   And I believe you testified and I wanted to give you a chance to make it clear, you testified that Mr. Reliford

didn't have anything to do with the purchasing of the tech 22 that was used in the August 26th Provident Bank robbery?

A   Correct.

Q   So when you say that he master minded that bank robbery, that master minding didn't include the protection of the gun for protection that was use to do rob a bank, is that correct?

A   Correct.

Q   And in fairness he didn't have anything to do with the September 29th bank robbery?

A   No, he didn't.

Q   And you used the three eighty or you had it in your possession, is that correct?

A   Like I say I carried a nine millimeter and Mr. Miller carried a three eighty.

Q   What did Mr. Miller do with the tech 22?

A   I cannot recall what he did with it.

Q   Was it dumped in the Chevron dump sister after the August 26th robbery?

A   No.  It wasn't.

Q   But he still had it, is that correct?

A   It was carried back to Mr. Miller's apartment.

Q   And your testimony is I guess -- do you know if it was left there or did Mr. Miller carry it around with him?

A   No I don't know.

Q   You don't know what happened to it?

A   No, I don't.

Q   Now, sir, in regards to the fast food robberies that you claim were committed on the night of June 29th?

A   Yes, sir.

Q   You remember those?

A   Yes.

Q   Taco Bell, Kentucky Fried Chicken and long John silver's?

A   Captain D's.

Q   A seafood place?

A   Yes, sir.

Q   Now, is it your testimony, sir, that you were all over at Mr. Reliford's immediately prior to the commission of those robberies?

A   Yes, we were.

Q   And somebody decided they were going to go out an rob those three places; is that right?

A    It was a joint decision among the three of us.

Q   Certainly that wasn't any master minding decision on the part of Mr. Reliford was it?

A   Well, I can't really say.

Q   Well, do you remember who suggested it or whose idea it was?

A   Well, Mr. Reliford's.

Q   But it certainly wasn't your idea, was it?

A   No.

Q   And the first place that was robbed was which place?

A   Captain D's on Mansfield road.

Q   And about what time was that robbed?

A   Four fifteen.

Q   An who was present when that place was robbed?

A   Me and Mr. Miller and Mr. Reliford.

Q   Which one of the three of you went into that place?

A   Mr. Reliford.

Q   So you and Mr. Miller were out in the car?

A   That's correct.

Q   And then from there you went back to Mr. Reliford's apartment, is that correct?

A   Correct.

Q   And then about how long did that robbery take?

A   Are you taking about from the time he left the car and came back?

Q   Yes.

A   About three to five minutes.

Q   Was anybody wearing a mask?

A   A stocking cap which was supposed to be used.

Q   Stocking caps which was supposed to be used?

A   Yes, part after stocking that was cut off.

Q   You mean like a nylon stocking like you see in the moves?

A   Yes.

393

Q   And was that your idea or Mr. Miller's idea?

A   About what?  To wear a stocking?  Mr. Reliford came up with that.

THE COURT:  Mr. Pappas, we need to take a moment.

MR. PAPPAS:  All right.  Your Honor, may we approach?

THE COURT:  Yes, sir.

MR. PAPPAS:  For the purposes of my cross I know your standing order said we would break at eleven.

THE COURT:  I'm sorry.  I didn't the question.

MR. PAPPAS:  I'm trying to plan the rest of cross. I wanted to know if you wanted to cut it off now.

THE COURT:  Well, ordinarily it would be ate minutes from now.  But I'm not sure of the status of juror now.

MS. BINDLER:  She's crying, judge.

THE COURT:  Let me see counsel at the bench again please.

I have just been informed that this jury has just thrown up and is very nauseous.  I think maybe we should go ahead and take our lunch recess now and see how she feels at the end of lunch hour.  If she's no better I may let her go. Ladies and Gentlemen, I understand one of your number is experiencing some discomfort right now so I think it would probably be wise for us to take our luncheon recess

at this point and hope that she can begin feeling better during that luncheon recess. We'll be in recess for lunch

until one o'clock. Please continue to observe the instructions I have given you regarding your conduct while we're apart.

(Recess)

THE COURT: Mr. Nichols, you may step down. Thank you.

Counsel, at the pretrial conference last week I believe everybody who gave me any input into the question of the length of trial concurred in an estimate of four days. In about an hour we will have used a day and a half out of the four days that you have estimated and will still not have

finished with our second witness out of the thirty some odd Mr. Jarrett estimated to me the government had. I don't know how many the defense has but from what Mr. Pappas said this morning apparently his client at least expects to call some witnesses. I hope I am not being simply an alarmist but I'm

concerned about the pace the case is proceeding an wondering if we need to start working longer hours.

MR. JARRETT: From the government's perspective, your Honor, the witness on the stand now and our following witnesses will certainly be the longest witness that we will

THE COURT: I think this witness is going to be the

rest of day the way we're going now so we'll be halfway

through and still have only heard two witnesses. Am I wrong about that? Maybe the cross examination is going to go a lot

faster than I think it is but so far it doesn't seem to be.

MR. JARRETT: It was our anticipation that Mr. Nichols would find up around one or one thirty, that was if I finished at eleven o'clock. I don't know what the defenses length of cross examination will be. However, we do have

several witnesses that are from Shreveport, Louisana that must testify today or we run into conflicts in Shreveport. An we can certainly take them out of order. I guess my question to be to the defense certainly they started their cross examination but if they could give us an estimate as to the length of time their cross examination is going to take I

would be in a better position to give the court as estimate as to how fast we will move.

MR. PAPPAS: In fairness to the Court and Mr. Jarrett I can say I'm sequential about a third of way through. I have touched on our matters in my cross. I think

it would be fair to say I'm a third or halfway through. I concur with Mr. Jarrett this witness and one other are really the focus of the examination of my case. We are trying to in fact -- we met yesterday, the public defender and I met yesterday to see if we could agree on stipulating to some of Mr. Jarrett's exhibits and we can and we'll be happy to meet

with him. As far as my witnesses go, I have the three alibi

396

witnesses that we referred to and then possibly one witness, impeachment witness. So I think I share Mr. Jarrett's belief

that this witness -- he is taking the longest but obviously he's the key witness to the case and I will try to be more specific and hurry along in my cross as the court may recognize some of the difficulties in dealing with the witness' answers. But I have gone over some things that come

later in my cross. As far as the other witnesses I don't have a lot of cross on the witnesses Mr. Jarrett intends to offer.

MR. JARRETT: May I be heard?

THE COURT: Yes. But one of things I would like to hear is if you can draw this down to a bottom line. Are you

still on line to finish the case in four days. That's what I'm interested in.

MR. JARRETT: Your Honor, I honestly believe since the bulk of our witnesses are custodial witnesses, fact witnesses the defense based upon the defenses they have

outlined will not have significant cross examination. That being the case I believe my case will end tomorrow evening or Friday afternoon. We should be finished with our case by midday Friday.

THE COURT: All right. That's what I needed to know.

MR. PAPPAS: Your Honor, if I may I'm sure the

court is aware of this. Friday is starting pass over and good Friday. I don't know how the court intends to deal with that. I don't have any definite plans yet. It's not a federal holiday. This is not the only case on my docket as I'm sure you appreciate of the I was hoping four days meant we would have the case to the jury by Friday afternoon but it does not sound like that if you have very many witnesses to call based on what Mr. Jarrett has said unless the case moves faster than he is estimating but I do have some other matters that I need to attend to next week. So I will simply have to wait and see how the case is going before I decide whether we can take any time Friday for those religious holidays. We'll be in recess for lunch until one o'clock.

(Jury in)

THE COURT: Good afternoon, Ladies and Gentlemen. Let's see. Ms. Gregory? Which of you was the lady who was feeling in disposed

THE WITNESS: I was.

THE COURT: If you feel any other problems as you did this morning just hang in and we'll let you go.

I believe when we recessed Mr. Nichols was still testifying. May we have him come back, please? Mr. Nichols, during the luncheon recess I was informed by Mr. Moreno, our court security officer, that several members of the jury had indicated to him that they are having trouble

398

H1                          @WITNESS - CROSS - @                          95

understanding you.  So I am going to ask that you try to always speak slowly and distinctly and directly into that

microphone and I will also ask any members of jury if you are having trouble understanding him to raise your hand so we can have him repeat his answer before we lose the answer so you cannot understand what I is.

Are you ready to proceed, Mr. Pappas?

MR. PAPPAS:  I am, your Honor.

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. PAPPAS:

Q   Mr. Nichols, with we took the break, we were talking about the three fast food robberies, is that correct?

A   That's correct.

Q   Your testimony is you were in the car onto of them but you didn't do the three one?

A   No, sir.

Q   Your testimony is you left from Mr. Reliford's house to commit the first -- the three of you left to commit the first fast food robbery, is that correct?

A   Correct.

Q   That would have been June 29, 1994?

A   Yes, sir.

Q   And what time did you leave from Mr. Reliford's house?

A    Just before ten o'clock.

Q    And the first place that was robbed was what?

A    Captain D's on Mansfield road.

Q    And you stayed in the car, is that correct?

A    Yes, I was the driver.

Q    You were the driver?

A    Yes, sir.

Q    And whose car were you driving?

A    Mr. Miller's car.

Q    What kind of car was that?

A    An Isuzu Stylus.

Q    I'm sorry.  I didn't understand that.

A    An Isuzu Stylus.

Q    And Mr. Miller and Mr. Reliford got on?

A    No.  Only Mr. Reliford got out.

Q    And you and Mr. Miller drove around the block until Mr. Reliford came back?

A    We parked directly behind K. and B. on Mansfield road.

Q    And I guess a stocking was taken, is that correct?

A    Yes, sir.

Q    Did Mr. Reliford put that on in the car or did you see him put it on?

A    No, I didn't see him put it on.

Q    Was he sitting in the front sit, back seat?

A    Front seat.

Q   An Miller was in the back seat?

A   Yes.

Q   And you were driving Miller's car?

A   Yes, sir.

Q   Did you actually see him go into the Captain D's?

A   No, sir, I didn't.  He came back to the car what?  Five minutes later?

A   Yes, sir.

Q   And did you actually see him carrying the weapon?

A   When he left the car, yes, sir.

Q   What was it?

A   A.38.

Q   And then you all after that robbery you all drove back to Mr. Reliford's place, is that correct?

A   Correct.

Q   And you stayed there?

A   Yes.

Q   Did they leave the money with you?

A   Yes, sir.

Q   With you?

A   Yes, sir.

Q   And then the two of them left, is that correct?

A   Yes, they did.

Q   They came back after the second robbery?

A   Yes, sir, they did.

Q   Where is Mr. Reliford's apartment in relationship to the Captain D's on -- what street was Captain D's on?

A   Mansfield road.

Q   Mansfield road?

A   Yes, sir.

Q   Where is Eric's apartment -- Mr. Reliford's apartment in relationship to where the Captain D's was?

A   Approximately how far?

Q   Yes.  Either distance or time travel?

A   About fifteen to twenty minutes.

Q   Fifteen to twenty minutes away?

A   Yes, sir.

Q   So then they came back and dropped you off and they went out to do something else, is that correct?

A   Yes, they did.

Q   And they came back after doing whatever they did, is that correct?

A   Correct.

Q   And it's your testimony that they talked about in front of you robbing another fast food place?

A   Yes.

Q   Did Mr. Reliford talk about it or Mr. Miller talk about it?

A   It was a conversation among both of us.

Q   Both of us or all of us?

CASSIDI L. CASEY CSR (214) 767-0774

402

H1                              @WITNESS – CROSS – @                              99

A    All of us.

Q    And what fast food establishment was robbed that you claim you heard talking about?

A    Kentucky Fried Chicken an Taco Bell.

Q    Well, I thought they came back after they robbed the second one before they robbed the third?

A    Well, you asked me which ones they robbed.

Q    Well, we're fixed in time the first time after they came back after robbing?

A    Okay.

Q    Did they talk about robbing a fast food place?

A    Yes, they talked about robbing the Captain D's.

Q    You were with them when that happened?

A    Yes.

Q    And they drop you off?

A    Yes.

Q    And they leave?

A    Correct.

Q    And they come back?

A    Correct.

Q    What did they talk about when they came back that time?

A    About the establishment that had been robbed.

Q    And that was the KFC?

A    Yes.

Q    And did they say who had gone in?

402

A    Mr. Reliford.

Q    Mr. Reliford said he went inside and robbed the place?

A    No.  There was a conversation an I can't remember.  Mr. Reliford was the one that went in.  Mr. Miller said he was the one.

Q    Mr. Miller said he went in.

A    Yes.

Q    And Mr. Reliford didn't say he went inside?

A    No.

Q    And where in Shreveport is the KFC?

A    On Hearn Avenue.

Q    And how far is that from where Mr. Reliford's apartment is?

A    About fifteen minutes.

Q    About fifteen minutes?

A    Yes, thereabouts.

Q    And then after they came back from the KFC, they left again; is that right?

A    Correct, sir.

Q    And what time did they come back the final time?

A    The final time.  After the last robbery?

Q    Yes.

A    It was after twelve o'clock.

Q    And did one or the other of them describe what they had robbed?

A    Just the Taco Bell had been robbed.

Q    Which one said they robbed it?

A    Well, it was a conversation among all of us.

Q    Which one of these two gentlemen said that they robbed the Taco Bell?

A    Well, Mr. Reliford, he was the gun man --

Q    I didn't ask who was what.  I asked which one said what to you, sir.

MR. JARRETT:  Your Honor, at this time we object. The defense counsel should allow the witness to respond to the question.

THE COURT:  Well, I agree.  But I think the witness was not responding to the question asked.  Would you repeat the question, Mr. Pappas?

MR. PAPPAS:  Yes, sir.

BY MR. PAPPAS:

Q    Which one of gentlemen in that conversation described what happened?

A    Mr. Reliford, sir.

Q    What did Mr. Reliford say?

A    Well, he talked about how he went inside and he came out and then at that point that's when he came back to the apartment.

Q    Did Mr. Miller say anything?

A    No, he didn't, sir.

Q   And then the three of you split up the money evenly among you?

A   Yes, we did.

Q   So it was split equally even though you didn't are anything to do with the second robberies an even by your opinion a very limited dealing with the robbery?

A   Well, no, it was a conspiracy so we split the three robberies.

Q   So now you are saying it was a conspiracy?

A   Well, we talked about how to commit the robberies.

Q   Were you involved in the second two robberies?

A   No, I wasn't, sir.

Q   But you did receive proceeds from that?

A   Yes, sir.

Q   So you talked about the conspiracy justifying how you received these proceeds?

A   Yes, sir.

Q   Have you ever at any time subsequent to June 29 or June 30 1994 ever told anyone that you committed those three fast food robberies?

A   No, sir, I didn't.

Q   You have never bragged to anyone about it at any time either in the free world or while you were in jail, sir?

A   No, sir.

Q   And again at some point you were in the B tank in

406

Mansfield, is that correct?

A   That's correct.

Q   And you never talked to anyone in the B tank in Mansfield about committing these robberies?

A   No, sir.

Q   Never claimed you committed these robberies?

A   No, sir.

Q   In fact you told these gentlemen exactly what you told this jury today, is that correct?

A   Yes, sir.

Q   Now, were you involve in the Pioneer bank robbery -- Pioneer Bank in Shreveport?  July of 1994?

A   No, sir, I wasn't.

Q   You had nothing to do with that?

A   It was going to be the three of us but I didn't go.

Q   And the reason you didn't go is because you thought it was wrong?

A   Well, at that point I was kind of scared.  I never participated in a bank robbery and I never thought about doing anything like that.

Q   So you were scared to do bank robberies?

A   Yes.

Q   I guess you got over your fear, did you not, sir, to do the last three bank robberies?

A   I never actually went inside the bank so.

407

Q    And you also provided the guns for at least two of the last three bank robberies, didn't you?

A    No, sir, I didn't.  The only gun that was used was a Taurus 38 0 .

Q    What about this tech 22?

A    No.  It wasn't registered to me by any means or licensed.

Q    Didn't you say you had it in your possession?

A    No.

Q    You never had a tech 22 in your possession?

A    No, sir, never had a tech 22.

Q    It was just bought in your presence by Mr. Miller; is that right?

A    That's correct.

Q    Now when was the Pioneer bank robbery discussed in your presence?

A    The day before the bank robbery.

Q    Was it discussed the day before or July 17th or 18th?

A    Well, it was discussed two or three days prior to that.

Q    So that would be what?  July 15, 16th?

A    I cannot recall the exact day the bank was robbed.

Q    And it's your testimony that Mr. Reliford was the master mind of this Pioneer bank robbery?

A    Yes.

Q    And you were with Mr. Reliford and Mr. Miller immediately prior to committing the commission of that robbery?

408

A   We drove around town.

Q   And what did you drive around in?

A   A burgundy Oldsmobile.

Q   So you actually were in a burgundy Oldsmobile, correct?

A   During the time of us scoping it out.

Q   And there was a shotgun with you, is that correct?

A   There was a shotgun that was used in the Pioneer robbery.

Q   Was there a shotgun in the burgundy Oldsmobile?

A   No, sir, there wasn't.

Q   Do you have personal knowledge as to whether or not a shotgun was used in the Pioneer bank robbery?

A   Well, I didn't actually go inside the bank.  There was on the news about a shotgun being used.

Q   Did you see either of these gentlemen leave the burgundy Oldsmobile with a shotgun to go into the Pioneer Bank?

A   No, sir, I didn't.

Q   Did you see either of these yes with the shotgun the day of Pioneer bank robbery?

A   No, sir.

Q   Now, at some point -- do you own a shotgun?

A   Yes, sir, I do.

Q   Would you describe for the Ladies and Gentlemen what kind of shotgun you own?

A   Twelve gauge multiburg (phonetic) shotgun.

Q   And when did you buy that shotgun?

40a

A   Two days after the Mesquite Credit Union robbery.

Q   You didn't own a shotgun before that?

A   No, sir, I didn't.

Q   At some point, did you ever put that shotgun to Mr. Reliford's head?

A   No, sir, I didn't.

Q   Did anybody ever put a shotgun to Mr. Reliford's head?

A   No, sir, not to my knowledge

Q   And you believe this burgundy Oldsmobile was the actual vehicle use to do aid the commission of the Pioneer bank robbery, is that correct?

A   I have no knowledge about that, sir.

Q   But you drove it around an cased it?

A   Yes.

Q   And you saw the news after ward and the news described it as the get away car?

A   Well, they didn't say much about it, sir.

Q   At this time do either of these gentlemen know your uncle Roosevelt?

A   Yes, they did.

Q   Which one?

A   Both of them.

Q   Would you tell the Ladies and Gentlemen of the Jury who that red or burgundy Oldsmobile belonged to?

A   The one we was driving around?

410

Q    Yes.

A    Roosevelt Young.

Q    And were you the one that got it from Mr. young to drive around?

A    Two days prior, yes.

Q    So you are the connection to the vehicle that you believe was used in the robbery and the person that vehicle was obtained from, Roosevelt Young?

A    They said the vehicle that was used was similar to that about the it wasn't, sir.

Q    And you know it wasn't because of course the burgundy Oldsmobile was always in your possession and you commit that robbery?

A    Well, it wasn't always in my possession.

Q    How do you know it wasn't used?

A    The car was taken to the police station an checked for die and things of this sort and the sargeant of police department later said this wasn't the car which was used from the crime scene.

Q    This is a Shreveport sargeant, is that correct?

A    Yes, it is.

Q    But this uncle Roosevelt is the same uncle Roosevelt that got Mr. Miller's car from him to do his bond?

A    No.  I paid for Mr. Miller's bond to get out of jail and his car wasn't used for the bond.

411

Q  Well, you have heard some testimony or you may be aware and if you aren't tell me, that in fact Mr. Roosevelt or Roosevelt Young did in fact claim the car of Mr. Miller's, is that correct?

A  Well, after me and Mr. Miller left to go to Florida he did leave his car with Mr. young.

Q  Mr. young kept the car?

A  Yes, sir.

Q  That's the same Mr. young that loaned you the burgundy Oldsmobile that you claimed wasn't involved if the robbery?

A  Yes, sir.

Q  But it was the one you drove around immediately prior to the robbery casing the joint, correct?

A  Yes, it was.

Q  Now, you have referred to when you and Mr. Miller went to Florida?

A  Yes.

Q  When did you and Mr. Miller go to Florida?

A  I cannot recall the exact date.

Q  Well, let's just try to fix it in time.  Was it before or after the Pioneer bank robbery?

A  It was after as I recall.

Q  Was it before or after the Mesquite Credit Union robbery?

A  Well, just before.  We went twice to Florida also.

Q  And the time you are describing that you went down there

412

with Mr. Miller, was that the time you took the jet skis down there with you or was that a different time?

A   That was the first time.

Q   Would you tell the Ladies and Gentlemen what jet skis we're referring to?

A   The jet skis which was sold to a person in Florida.

Q   Where did you get the jet skis?

A   Two of them was stolen.  One of which me and Mr. Miller stole together and one was stolen by two occupants of his apartment.

Q   And so as I understand it the reason you go to Florida with Mr. Miller is to sell some stolen items?

A   Yes, sir.

Q   And those stolen items include items that you and Mr. Miller stole together, right?

A   Yes.

Q   And items you and someone else stole together, right?

A   Yes.

Q   And who stole them with you?

A   A guy name James.

Q   Who?

A   Tyson.

Q   Is this the same James Tyson that works at Champion Ford?

A   No.

Q   Different James Tyson?

A   I just know one James Tyson, sir.

Q   So the two of you all went down to Florida to sell these stolen items that you got, correct?

A   Correct.

Q   An while you were down there, you also bought some masks, isn't that correct?

A   Somewhat?

Q   Some masks?

A   No, sir.

Q   Was that the second trip?

A   The masks was purchased in Shreveport, both sets of them.

Q   So the masks were never purchased in Florida, is that correct?

A   Corrected.

Q   Now, how long were you down in Florida?

A   I cannot recall.

Q   Was it one day, a week?

A   About a week.

Q   And while you were down there, did you have an opportunity to see Mr. Anderson?

A   There was a purpose for going down there to see Mr. Anderson also.

Q   The purpose was to go down –– in addition to selling these stolen items, the purpose was to see Jesse Anderson?

A   Correct.

Q   And Jesse Anderson lived in Florida, is that correct?

A   Yes.

Q   And now, you had been involved in a fair amount of criminal activity with Jesse Anderson, correct?

A   Not me myself.  But I was tied into it.

Q   In fact, you had been involved in some drug dealings or at least as you say tied into some drug dealings that Mr. Anderson had done, is that correct.

MR. JARRETT:  Your Honor, at this time we object. Realize.  We don't see where the defense counsel is going.

THE COURT:  What is the relevance of this, Mr. Pappas.

MR. PAPPAS:  Well, your Honor, we are again attempting to establish and keeping in mind that we will also with this witness establish that he had repeated contacts with Mr. Anderson.  We believe we will have a witness that is going to say it was Mr. Anderson with Mr. Nichols and Mr. Miller when the three bank robberies were committed and we're trying to show prior criminal activity by this gentlemen and Mr. Anderson.

THE COURT:  I'll permit you to do that in summary form if we can do that.  But I don't want to get too far afield from this case as far as criminal activity is concerned.

MR. PAPPAS:  Yes, sir.

415

BY MR. PAPPAS:

Q  Briefly, sir.  Your contacts with Mr. Anderson in regard to the criminal conduct you were linked to him or tied to him with?

A  It was only on one occasion.

Q  What was that?

A  Mr. Anderson was a drug dealer in the Shreveport area and he came back to Shreveport and one day while I was working him an Kevin Jones came to pick me up an at that time we headed to go to Florida.  At that point earlier in the day Mr. Anderson had fooled somebody in a fake drug deal and the three of us went to Florida.

Q  Were you involved in that in any way?

A  I didn't have any ties to it but I did spend the money and I have spent the money with him.

Q  And the fake drug deal you are referring to is the brown letter case that was full of flower around beat up wall board?

A  No, sir.  That was between Mr. Anderson -- I don't know how it happened or whatever.  Like I say they came to pick me up from work.

Q  And you weren't present when that happened?

A  No, sir, I wasn't.

Q  When was that by the way?

A  Just happened in December.

416

Q   So this happened before you ever met Mr. Reliford, is that correct?

A   Correct, sir.

Q   And it happened before you ever met Mr. Miller; is that right?

A   Correct.

Q   And you went to Florida in July to see Mr. Anderson as well as to sell the stuff you had stolen, is that correct?

A   Right.

Q   And what was the purpose of seeing Mr. Anderson at that time?

A   Just go an hang out with him, just visit with him.

Q   Did you spend a lot of time hanging out with the Mr. Anderson during that summer a fall of 1984?

A   Well, you know we had a room in Florida and we went on the beach several times, me and Mr. Anderson and his boss which place he worked at and we went to the clubs and that was it.

Q   But you didn't see him in Shreveport much after that, is that correct?

A   Excuse me.

Q   Did you see him in Shreveport at all after that?

A   Yes.

Q   And did you spend anymore time in Shreveport with him after that?

A   Yes, we did.

Q  Did you spend any time with him in Shreveport immediately before or after any of bank robberies?

A  Not immediately after.

Q  What about immediately before?

A  No, sir.

Q  Now, Mr. Anderson has another -- you were about to say a big drug dealer, is he a big time guy?

A  He was.

Q  In fact he had another nickname besides Country Pimp?

A  No.

Q  The nickname main, does that ring a bell with you?

A  That was a nickname his mother called.  It wasn't a nickname.  His nickname is Country Pimp.

Q  And when you all went to Florida, you and Mr. Miller, did you all take some guns with you?

A  On the first trip?

Q  Yes?

A  No, we didn't.  It was me, Mr. Anderson and Mr. Jones.

Q  I thought Mr. Miller was with you?

A  No.  On my first trip me and Mr. Anderson went.

Q  Was the first trip the one where you guys sold the stolen jet skis?

A  Me and Mr. Anderson or Mr. Miller.

Q  Did you sell stolen jet skis on more than one occasion?

A  No.

CASSIDI L. CASEY CSR (214) 767-0774

48

H1                                @WITNESS - CROSS - @                        115

Q  Who was with you when you sold them?

A  Mr. Anderson.

Q  So Mr. Miller wasn't around?

A  Mr. Anderson was there but Mr. Jones was at the time in the United States Army.

Q  I guess I'm confused.  When was the first time you went to Florida?

A  The first time I ever went to Florida was me and Mr. Anderson and a friend.

Q  What was that friend's name?

A  Tie reason.  I can't remember his last name.

Q  What was tie reason's last name?

A  I don't remember.

Q  And when was that?

A  August.

Q  1993.  So you were running with this big time drug dealer at least six months before you met Mr. Reliford and Mr. Miller?

A  Yes.

Q  Did you do any drugs with him?

A  I drove Mr. Anderson too far -- he got away from me --

        MR. JARRETT:  Again, your Honor, we object on relevance and also 403.

        THE COURT:  Overruled.

BY MR. PAPPAS:

419

Q  You may answer, sir?

A  Mr. Anderson and I -- I mean tie reason.  We went to Florida -- Mr. Anderson got shot approximately two weeks before that and his friend had died.

Q  Excuse me.  I was asking about the drugs you did with Mr. Anderson?

A  Selling?

Q  Doing drugs, ingesting?

A  We don't smoke.  Mr. Anderson don't do drugs.

Q  He didn't do drugs?

A  No.

Q  He's just a big time drug dealer?

A  Yes, sir.

Q  Did you do drugs with him?

A  Me and tie reason smoked drugs.

Q  What kind of drugs?

A  Marijuana.

Q  Did you do any cocaine or crack cocaine?

A  No.

Q  Now, the second time you went to Florida with Mr. Miller?

A  No.  The second time was Mr. Anderson and Mr. Jones.

Q  When was that?  December?

A  Yes, sir.

Q  What was the purpose of that trip?

A  To take Mr. Anderson back to Florida.

420

Q  Did you do any drugs in that trip?

A  Me and Mr. Jones -- me and Mr. Anderson did not participate in using drugs.

Q  Did you engage in any criminal activity on that trip?

A  That's the trip that Mr. Anderson had conned a guy out of fake drugs.

Q  And again you weren't really involved with that.  You were riding?

A  I was at work at that time.

Q  But you were riding with them subsequently?

A  After they did it, yes, we all were.

Q  And who was the master mind of that criminal operation?

A  Mr. Anderson was.

Q  So if you've got this straight you have never been a master mind of any criminal activity?

A  No, sir.

Q  And even the jet skis you stole?

A  It was me and James and a guy named gather had did that a while back and Mr. Miller decided to get one, too.  The same night we left to go to Florida.

Q  Now, sir, you and Mr. Miller were involved in a number of theft by hot checks the summer of 1994, correct?

A  Hot checks?

Q  Yes.

A  Yes.

421

H1 @WITNESS – CROSS – @ 118

Q   Would you tell the Ladies and Gentlemen about that?

A   Mr. Miller had several check books.  Me and Mr. Miller and his girlfriend an her sister and another young lady came to Dallas back in April to go to six flags.  We stayed from the Friday until the Monday.  Sunday we all went to the mall and that's when Mr. Miller wrote the checks that previously that Saturday night he gave the checkbook to Ms. Angel Thompson but she came back an later stated that the checks couldn't be cashed because they needed him present.  So the next morning the five of us went to the mall an went shopping.

Q   And when you were cutting this deal and you were supposed to tell these government representatives about all of your criminal activity I suppose you told them about that also, correct?

A   Yes, sir, I did.

Q   And that criminal conduct is included in your plea agreement.  They are not going to prosecute you for that, are they?

A   No, sir.

Q   Now, at some point did you and Mr. Reliford have a falling out?

A   No, sir, it was Mr. Miller and Mr. Reliford.

Q   Okay.  When was that?

A   After the first Mesquite robbery.

Q   So if you would when after the first Mesquite robbery?

422

A  I can't recall how many days afterwards it was.

Q  But before the second robbery, is that correct?

A  Yes, it was.

Q  What?  A day or two or a week or to before the second robbery?

A  About a week before.

Q  Okay.  The first robbery, would you agree occurred on August 17th?

A  I can't recall.  But it sounded like the right day.

Q  The second robbery occurred on August 26th?

A  Yes.

Q  So it would have been about in the middle of that two week period between those?

A  Yes, sir.

Q  And in regards to the first robbery, when did you all, the robbery of the Mesquite Credit Union, when did you and Mr. Reliford and Mr. Miller leave the Shreveport area to come to Dallas?

A  We left the Friday before the Mesquite robbery.

Q  When was the Mesquite robbery, on a Friday?

A  It was on a Wednesday.

Q  A Wednesday.  Where did you stay?

A  First two nights we stayed at William Young's house.

Q  Who is William Young?

A  Roosevelt Young's brother.

HJ                      @WITNESS – CROSS – @                      120

Q   And you were staying there because you knew Mr. young?

A   We got there later that night and they took us to a party so we stayed over.

Q   The point is you were the one that knew William Young?

A   Yes, I did.  And Mr. Miller also knew him.

Q   And Mr. Miller.  But not Mr. Reliford?

A   No, sir.

Q   Did Mr. young know you robbed that Mesquite Credit Union bank?

A   No, sir.

Q   So the first two nights you stayed there and then where did you stay?

A   Days inn.

Q   Okay.

A   I can't recall the location it was.

Q   Now, at some point during all of this sequence of events, Mr. Reliford left, is that correct?

A   He left a day prior to the credit union robbery.

Q   And the reason he left is because there was a disagreement by your testimony —

A   Yes, sir.

Q   There was a disagreement over how that robbery was supposed to take place, is that correct?

A   There was a disagreement about him getting a car by means of car Jacking.

Q  Your testimony is he was going to be a big bad guy and car Jack a car and you didn't think that was right and --?

A  I wasn't going to car Jack.

Q  You weren't going to be involved in criminal activity?

A  I was involved in criminal activity but I didn't want to take part in car Jacking.

Q  So you were barely involved in that bank robbery?

A  No, sir, I wasn't.

Q  The point is you didn't do a car Jacking?

A  No, sir.

Q  Mr. Reliford left because there was a fight and you did the right thing and refused to do a more violate act?

A  Mr. Reliford disagreed and he later dropped off at DFW.

Q  Did Mr. Miller drop him off or did you drop him off?

A  All three of us were in the truck.

Q  Do you know whether or not he had a ticket before he was dropped off?

A  I have no idea.

Q  Were you present with Mr. Reliford most if not all of the time those days prior to him being dropped off at the airport?

A  Well, Mr. Reliford had a female companion.  Two which he knew.  And on several occasions he would leave the hotel an go with them.

Q  So he wasn't around you all a significant part of the

425

time, correct?

A   Well, half the time he was.

Q   He left and didn't have anything to do with the robbery on the 17th, correct?

A   Correct.

Q   And how much money did you all get out of that robbery?

A   I think twelve thousand dollars.

Q   And you and Mr. Miller divided the twelve thousand dollars evenly, isn't that correct?

A   No.  It wasn't divided.  A car was bought out of it and I think Mr. Miller give his mother about fifteen hundred dollars of that.

Q   But the point is you didn't give Mr. Reliford any of that money?

A   When we got back to Shreveport, Mr. Reliford was out of a job an needed money to pay bills.

Q   How much money did you give Mr. Reliford?

A   I can't remember.

Q   A hundred dollars, thousand dollars.

Q   ?

A   It was about a hundred dollars.

Q   So out of this bank robbery you didn't split the money with him?

A   No.

Q   So he didn't participate and he didn't get any money?

426

A   Well, he was just given a hundred dollars because he said he needed bills to pay.

Q   But he wasn't given a hundred dollars because he was the master mind of that robbery.

A   Correct.

Q   In fact, he withdraw and abandon and didn't have anything to do with that robbery, did he?

A   Correct, sir.

Q   And the gun that was used that robbery was the tech 22, is that correct?

A   Correct, sir.

Q   And that wasn't Mr. Reliford's gun?

A   Correct.

Q   Were any masks purchased in anticipation of committing that robbery?

A   I can't recall, sir.

Q   You don't remember?

A   I just can't recall.

Q   When were the masks purchased that were used in the August 26th robbery?

A   I cannot recall what date it was used.  I think those masks -- they were purchased before, yes, they were.

Q   By you or by Mr. Miller?

A   It was me, Mr. Miller and Mr. Reliford.

Q   And where was those purchased?

427

A    At Fun Shop on Mansfield road.

Q    Now, the shotgun that you purchased, what was done with that?

A    It was taken to Mr. Reliford's house.

Q    When was it left at Mr. Reliford's house?

A    I cannot recall that date.

Q    Was it before or after the August 26th robbery?

A    It was after.

Q    Was it before or -- I guess it was before the September 29th robbery.

A    Correct.

Q    How much after the August 26th robbery was it?

A    I cannot recall, sir.

Q    You are aware, are you not, that in fact Jesse Anderson had a shotgun?

A    From my understanding he had one in Florida.

Q    Is that the one he pawned in Florida?

A    Yes, it was.

Q    Were you with him when he pawned that shotgun in Vero (phonetic) beach?

A    No.

Q    Mr. Reliford wasn't with him?

A    No, sir, he wasn't.

Q    Now, sir, I want to go through an identify as nearly as possible what guns you owned or came in contact with during

428

H1                          @WITNESS — CROSS — @                          125

the period from when you first met Jesse Anderson to the period you were apprehended on September 30?

A   I had a forty-four caliber Beretta.  A nine millimeter Ruger and a Taurus 380 and a twelve gauge Marberg and a Glock seventeen.

Q   What's the Glock seventeen?

A   A nine millimeter.

Q   Is that a rapid fire or semi-automatic pistol?

A   Yes, it is.

Q   Did you ever purchase any guns for any other individuals?

A   No, sir, I didn't.

Q   Do you know a fellow named Anthony Beau?

A   Yes, I do.

Q   Did you ever purchase a gun for Anthony Beau?

A   No, sir, I didn't.

Q   Let's go first.  When did you purchase the forty-four caliber Beretta?

A   I had bought it from one of Jesse Anderson's friends.

Q   Which friend?

A   I cannot recall the name.

Q   And when did you buy that gun?

A   Back in the summer of 1993.

Q   The summer of 1993?

A   Yes.

Q   That was before you ever started doing any criminal

activity, is that correct?

A  Yes.

MR. JARRETT:  Objection, your Honor, certainly that's outside the term of the indictment.

THE COURT:  Overruled.

BY MR. PAPPAS:

Q  You may answer, sir?

A  I tried selling drugs before also.

Q  And how much money did you get for the forty-four caliber Beretta?

A  I can't remember.

Q  And did you sell that at the request or insistence of Mr. Anderson?

A  No.

Q  And the Glock 17, whether did you purchase that?

A  It wasn't purchased.  It was from a guy named hospitalization.

Q  He just gave it to you?

A  No.  It was in exchange for drugs.

Q  Exchange for drugs?

A  Yes.

Q  So you gave him drugs and he gave you a Glock?

A  Yes, sir.

Q  And when did that happen?

A  I can't remember.  It was during the time frame that I

430

knew Mr. Miller.  I can't remember the month.

Q  Was it before or after the robberies you have described?

A  It was before.

Q  Didn't have anything to do with Mr. Reliford?

A  No, sir, it didn't.

Q  Now, sir, have you ever had any gang involvement or are you a member of a gang?

A  No, sir, I'm not.

Q  Would you tell the Ladies and Gentlemen of the Jury what the rolling sixties Crypts are?

A  It's a gang that's in Shreveport, Louisana.

Q  Is Mr. Anderson a member of that gang?

A  No, sir, he's not.

Q  And would you describe what the significance is of the tatoo that has a picture of a rat smoking a marijuana cigarette?

A  It was just a picture that Mr. Miller got.

Q  It's not a insignia for the rolling sixties Crypts?

A  No, sir.  It's just a picture.

Q  And Mr. Miller has that at that time too?

A  Yes.

Q  And you have the same at that time too?

A  Yes, sir.

Q  And when did you get that at that time too?

A  The same day me and Mr. Reliford and Mr. Miller and a

431

female companion and his cousin.

Q   When was that?

A   I can't remember.  It was before the Pioneer bank robbery.

Q   But after the three fast food robberies?

A   Yes.

Q   So basically the three of you guys who were running around together decided to get tatoos, is that correct?

A   Well, Mr. Reliford already had one.

Q   He had a at that time too of a rat smoking a marijuana cigarette?

A   No, sir.

Q   And so you and Mr. Miller decided to get your first?

A   I got mine and then later on Mr. Miller got his.

Q   Later on the same day?

A   Yes, sir.

Q   Now, sir, you have testified that you were in Houston immediately prior to the commission of the September 29 Mesquite Credit Union robbery, correct?

A   Correct.

Q   And you were in a hotel room down there with Mr. Miller, correct?

A   Yes.

Q   And is it your testimony that in fact Mr. Anderson was no where around that hotel room?

A   No, sir, he was in Shreveport, Louisana at that time.

Q  But you have testified that you did not see Mr. Anderson immediately after any of those robberies, is that correct?

A  The only robbery which Mr. Anderson -- well, he knew about was the last robbery which was committed on September 29th and I saw Mr. Anderson that morning after which was September 30 when I was arrested.

Q  So your testimony is you did see Mr. Anderson immediately after that robbery?

A  It was the next day.

Q  Where did you see him?

A  Me and a female companion went to pick him up at his mother's house.

Q  Let me digress just a little bit.  Immediately after you and Mr. Miller committed the first robbery in August, the Mesquite Credit Union, the one Mr. Reliford left and never went to, you went and bought a black Accura, is that correct?

A  Me and Mr. Miller bought it.

Q  Is that car in your name or his name?

A  It was in my name.

Q  Did you pay for the car?  Give him the money?

A  Yes, cash.

Q  And so you went and bought a black Accura, didn't you?

A  Yes.

Q  And the it would be fair to say you really liked that car?

A  Well, when I first went I looked at a black must strange

433

HI                          @WITNESS – CROSS – @                          130

and after we saw the Accura that's when we agreed to go back an buy the Accura the following day.

Q   That wasn't my question.  The question was you really liked the black Accura, didn't you?

A   Me and Mr. Miller both.

Q   Mr. Miller really liked it too?

A   Like I say it was between the two of us.

Q   So the two of are the only ones that drove it, corrects?

A   Yes.

Q   So nobody else drove it?

A   No, sir.

        MR. PAPPAS:  Your Honor, for purposes of the record I don't know that technically we have done what we need to do but we would agree to adopt the government's numbering system of their exhibits.  I have already attempted to offer some of their exhibits.  I am going to offer an exhibit that is on the government's exhibit list.

        THE COURT:  All right, sir.

        MR. PAPPAS:  Approach the witness?

        THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q   I am going to show you what's been marked as Government's Exhibit 61 and ask you without going into what that says ask you to describe what you did with the black Accura on September 30th?

CASSIDI L. CASEY CSR (214) 767-0774

434

A   It was taken to Brako Brako.

Q   And who took it to the Brako Brako?

A   I did.

Q   And who picked it up?

A   I did.

Q   And is this the actual copy of receipt you obtained from the Brako?

A   Yes.

Q   And it's an exact copy?  Isn't that an exact copy of the receipt they gave you?

A   Yes.

Q   Hasn't been altered in any way?

A   No, sir.

        MR. PAPPAS:  Your Honor, at this time we offer Government's Exhibits 61 in evidence.

        THE COURT:  Any objection?

        MR. JARRETT:  None, sir.

        THE COURT:  Government's Exhibit 61 is admitted.


BY MR. PAPPAS:

Q   Now, sir, at the top of this, it says name, Jesse Anderson?

A   Correct.

Q   Sir, didn't Jesse Anderson drive the car you said he never did drive?

435

A    I was outside talking to the female companion which had followed me and Mr. Anderson over there and he was inside.

He signed his name on the thing for to have the car did and at the bottom I signed my name because I'm the one that picked the car up.

Q    This is the car that you said you never let Jesse Anderson drive, correct?

A    I'm afraid so.

Q    Now, Mr. Reliford wasn't the only person you knew that worked at Champion Ford, is that correct?

A    I knew Mr. Reliford's friend.

Q    You didn't know anybody else?

A    No.  I knew a guy but he doesn't work at Champion Ford.

He works at round tree.

Q    Who is that?

A    James guy.

Q    Different?

A    Yes.

Q    And who is bruise Wilson?

A    A guy my sister knew.

Q    Wasn't he a salesman at Champion Ford?

A    I don't know.

Q    Didn't Kevin Jones also at some point work at Champion Ford?

A    I don't know.

436

Q   And you don't know whether or not James Tyson did?

A   From my knowledge he never did.

Q   You spent a lot of time with a fellow named Melvin, did you not?

A   Yes, sir.

Q   And what is Melvin's last name?

A   Howard.

Q   In fact when I asked you about criminal conduct you omitted some criminal conduct that was done with Melvin Howard?

A   No, sir.

Q   You weren't involved with a drive by shooting with Melvin Howard?

A   No, sir.

Q   You weren't the driver while Mr. Melvin Howard was the shooter on Hearn Road?

A   No, sir, I wasn't.

Q   Now, sir, how would you describe your relationship with Mr. Anderson, with Country Pimp?

A   A friend, someone who dated my sister and someone who have known since the sixth grade.

Q   Would you say you are close friends?

A   Yes, sir.

Q   Would you say you were ever afraid of him?

A   No, sir, I wasn't.

Q  Now, sir, you have referred to and were questioned about two letters that you wrote to Vernon Miller, is that correct?

A  Yes.

Q  And in fact we read from them.  Mr. Jarrett read from them an went over them at length this morning, correct?

A  That's correct.

Q  We'll start with the first.  The reason you wrote the letter dated October 24th was what?

A  I just wrote it to Mr. Miller.

Q  Well, you talked about your strong religious beliefs, is that correct?

A  That's correct.

Q  And the fact you were glad this was all over because you would have gotten killed if it wasn't behind you, correct?

A  That's correct.

Q  And when you wrote the letter, the point is you were lucky you were caught.  You thanked the good Lord you were caught because you were headed for your death?

A  That's correct.

Q  And when you wrote the letter you had no intention of ever being involved in any criminal activity again, is that correct?

A  Clarify that.

Q  When you wrote the letter your state of mind was such that because of your strong religious beliefs and the fact that

you were saved you had no intention of being involved in any criminal activity, correct?

A   No, sir.

Q   And in fact on the first line of the letter doesn't it say I'm down here kicking it and laying back and thinking about the good old days that have to be put on hold for a moment?

A   Correct.

Q   When you said that they had to be put on hold for a moment, sir, I guess you meant that they had to be put on hold forever, not for a moment, is that your statement?

A   No, sir.

Q   So when you said they had to be put on hold for a moment, you meant until you got back out of jail and could commit more criminal activity?

A   No, sir.

Q   What did you mean when you said had to be put on hold for a moment?

A   That I was probably going to have to serve some time in prison.

Q   Maybe just a time if you were lucky?

A   I had no idea of how long I was going to serve in prison.

Q   You didn't say your criminal activity had to be stopped, did you. You said put on hold. What did you mean by that?

A   I said the good old days had to be put on hold. I didn't say anything about criminal activity.

Q   I guess when you are talking about the good old days you are not talking about fast women or drugs or any of that activity?

A   I was talking about fast women but drugs no.

Q   And you are not talking about criminal activity?

A   No.

Q   In fact you have detailed some but you spent a fair amount of time with a number of people that were involved in criminal activity, is that correct?

A   No, sir.  I can't recall how many.

Q   Okay.  Well, you have referred to the gentlemen you went to Florida with and to Mr. Anderson, is that correct?

A   Well, Kevin Jones, he wasn't involved in any type of criminal activity, sir.

Q   So just Mr. Anderson; is that right?

A   Well, I had ties with like I say Melvin Howard which he was involved in criminal activity.

Q   You mean that happened while you were present?

A   Selling drugs, that's it.

Q   But nobody else, is that correct?

A   That's correct.

Q   So when you put in the letter I told Angel to tell you to hook up with my boys down there, my boys down there -- down there is referring to the jail cell or the jail facility in which Mr. Miller was present?

440

A    That's correct.

Q    So in fact you knew some people that were in a jail cell with Mr. Miller, is that correct?

A    Yes.

Q    One of those was named Anthony Beau?

A    Yes, sir.

Q    Is this the same Anthony Beau you never sold a gun too; is that right?

A    I think so.

Q    And Blue and Little Red?

A    Yes.

Q    And who is Blue?

A    A buy I met while being in Shreveport county jail.

Q    And little red?

A    The same also.

Q    What are their real names?

A    I have no idea.  I just know them by blue an red.

Q    But not Anthony Beau.  You knew him before jail, didn't you, sir?

A    Yes, sir.

Q    Now, it's your testimony, is it not, sir that the letter was written solely to assure Mr. Miller; is that right?

A    Yes.

Q    And in fact, did you at any point refer to his daughter?

A    Daughter?

4441

HI                            @WITNESS – CROSS – @                            138

Q  Mr. Miller's?

A  Mr. Miller doesn't have a daughter, sir.

Q  What do you mean when you say I would make it a point to look at your little daughter?

A  That's Angel's little daughter.

Q  His girlfriend?

A  Yes.

Q  And you are going to look after Angel's daughter?

A  That's right.

Q  And you are doing it out of the goodness of your heart and not any threat of retribution?

A  Well, once I had contact with Mr. Miller inside the jail at Shreveport and we said if I got out I would take care of the baby for him.

Q  And again you are doing that out of the goodness of your heart and not a veiled threat?

A  Well, I said that I would.

Q  In fact you were saying the same thing about his family. Look after his family?

A  That's correct.

Q  You are telling him he's not supposed to say anything, no nothing and he didn't do anything?

A  That's right.

Q  And at least part of letter was to at least put it all off on Mr. Reliford?

CASSIDI L. CASEY CSR (214) 767-0774

442

A    No, sir, not exactly.

Q    That's what you tried to do in the letter, isn't it?

A    No, it isn't.

Q    You say Mr. Reliford is the big guy.  Focus on telling them about his wrong and not yours?

A    I guess I did.

Q    You did say that, didn't you?

A    Yes, sir.

Q    And the reason is you were trying to get out of from under this by putting it on Mr. Reliford?

A    Like I said at this point I felt like Mr. Reliford was the cause of me being here.

Q    So basically you didn't do anything wrong.  It was all Mr. Reliford?

A    Well, I involved myself in criminal activity, robbing a bank.

Q    So the first --.

        MR. JARRETT:  Your Honor, again we would object. We will like for the witness to answer the question fully.

        MR. PAPPAS:  I think he did, your Honor.

        THE COURT:  I thought so, too.  Overruled.

BY MR. PAPPAS:

Q    So the first bank, the Mesquite Credit Union, from your own testimony Mr. Reliford played no part, he made you do that?

4473

A   No, sir, he didn't.

Q   And the third bank, September 29, you didn't see Mr. Reliford for three weeks before September 29?

A   No, sir, I didn't.

Q   And the third bank that was robbed on September 29, is it your testimony Mr. Reliford made you do all of that?

A   No, sir.

Q   You are basically a good guy and he got you started down the bad path?

A   Well, not only that I never thought about doing anything like that.  Bank robberies.

Q   And in fact when you wrote that letter on October 24th, you added a page.  You signed off with this Bible scripture reference in here and you added a couple of pages later or after you signed off?

A   I don't remember, sir.  I don't have a copy of it.

        MR. PAPPAS:  Approach the witness?

        THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q   I'll show you my copy and ask you to take a look at it?

A   Okay.

Q   Please refresh your memory to your satisfaction, sir, before I question you from that document.  Have you done that?

A   Yes, sir.

Q    And sir I ask you again.   In fact you felt so strongly about this letter you added a page to it, didn't you?

A    That's correct.

Q    And on that page you told him to put it all over Mr. Reliford, didn't you?

A    Yes, sir.

Q    And you said if asked tell them about anything you can to put Eric under the gun, is that correct?

A    Yes.

Q    If it wasn't for Eric we won't be here, correct?

A    That's correct.

Q    In fact, try to remember anything he told you about so that we can snitch him off.   Wasn't that the thrust of what you said?

A    Yes, sir.

Q    If there is anything that you can think that he told us that he did, put it all in the letter, is that correct?

A    Correct.

Q    Now, you are referring to a particular letter here; is that right?

A     Yes, sir.

Q    Okay.   That letter was a letter that you had told Mr. Miller to write if he ever got in trouble?

A    Could you rephrase that.

Q    Well, I don't see any reference to quote the letter

anywhere else in your October 24th document. What letter are you referring to?

A  I don't understand what you are saying.

MR. PAPPAS:  Approach the witness again, your Honor?

THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q  Sir, I am going to show you my copy and ask you where it says if there is anything that you can think where he told us, put it all in the letter. When you say the letter in that document what are you referring to?

A  Mr. Miller was corresponding with me, writing me a letter back.

Q  What were you going to do with that letter when you got it from Mr. Miller?

A  Not really.

Q  You were going to turn it over to the authorities to use against Mr. Miller and Mr. Reliford, weren't you?

A  No, sir.

Q  And Mr. Miller did write a letter, didn't he?

A  Yes, sir.

Q  And in that letter he did exactly what you instructed him to do?

A  No, sir. He talked about the FBI had come in to talk to him about a bank robbery and he played crazy. He said he

CASSIDI L. CASEY CSR (214) 767-0774

446

didn't know what was going on.

Q  So he didn't write a letter that involved or referred to Mr. Reliford?

A  I cannot recall, sir.

Q  Oh.  That quote put it all over Mr. Reliford.  You don't recall?

A  No, sir.

Q  In fact, even though you told him to put it all over Mr. Reliford, the reality is Mr. Reliford even by your testimony didn't have anything to do with two of the three bank robberies that's why we're here in Dallas, isn't that correct?

A  Correct.

Q  In fact, sir, you had an opportunity to look at the indictment, the second indictment that you were charged with that includes Mr. Reliford, haven't you?

A  Yes, sir.

Q  An even by your testimony some aspects of that are inaccurate or untrue, correct?

A  Yes, sir.

Q  Sir, isn't it true that between August 17th, 1994 and September 29, 1994, you and Mr. Miller and by your testimony I suppose Mr. Reliford went back and forth from Shreveport to Dallas a number of times?

A  I can't recall but two occasions.

Q   Okay.  And would it be fair to say where it says between August 29, 1994 and September 29, 1994 while in Dallas

defendants Eric Gerome Reliford and Mr. Miller and Larry Nichols committed armed robberies using firearms?

A   No, sir, it's not.

Q   Sir, where it says on or about September 29th, 1994 defendants Vernon Anthony Miller, Larry Donnell Nichols and

Eric Gerome Reliford returned to Shreveport, Louisana, that's not true is it?

A   No, sir, it's not.

Q   And sir, by your testimony in the overt acts page where it says between on or about June 29th, 1994 and July 19th, 1994, defendants Vernon Anthony Miller, Larry Donnell Nichols and

Eric Gerome Reliford aided and abetted by each other while using and carrying a firearm robbed a Taco Bell on Pines Road.  A Kentucky Fried Chicken on Hearn Road, a Captain D's on Mansfield Street and Pioneer Bank on Line Avenue.  That's not true?

A   What was robbed on June 29.  I can't recall the Pioneer robbery.

Q   But the point is you told us you weren't involved in some of those robberies but this says you were?

A   Correct, sir.

Q   Which is true?  Were you involved in some of those robberies or weren't you?

448

A    Like I said it was a conspiracy.

Q    What is your understanding of what is conspiracy is.

MR. JARRETT:  Objection as irrelevant.  The law is to be given by the court.

THE COURT:  I agree with that, that the law will be begin by the court but I think since the witness used the term we're entitled to know what he means by that term.

Overruled?

A    A conspiracy is when two or more people agree to commit a crime, sir.

BY MR. PAPPAS:

Q    You didn't agree to commit the Pioneer bank robbery, isn't that your testimony?

A    I said it wasn't a joint plan but I did not participate.

Q    You said you didn't want anything to do with it because you had never been involved in a bank robbery up to that point?

A    Yes, sir.

Q    But this says you were involved with the Pioneer bank robbery?

A    That's what it says on the paper, sir.

Q    And where it says on or about August 17th, 1994, defendants Vernon nonAnthony Miller, Larry Donnell Nichols and Eric Gerome Reliford drove the stolen truck from Shreveport, Louisana to Dallas, Texas, that's not true, is

it?

A  No, sir.

Q  And in fact your testimony is you are claiming you are in another car entirely?

A  No, sir, that's another incident I told you about.

Q  Okay.  So the three of you were in the pick up when you drove to Dallas for the August 17th robbery, is that fair?

A  Yes, sir.

Q  And I guess your testimony is you just didn't drive there on August 17th?

A  Yes, sir.

Q  And where it says on or about except 29, 1994, defendants Vernon Anthony Miller and Larry Donnell Nichols an Gerome Reliford aided and abetted by each other robbed the Mesquite Credit Union of thirty-six thousand seven hundred one dollars.  That's not true either?

A  No, sir.

Q  In fact Mr. Reliford was no where around?

A  Correct.

Q  And where it says on or about except 29, 1994, defendants drove from Dallas, Texas back to Shreveport, Louisiana, that's not true either, is it?

A  No, sir, it's not.

        Insert names after defendants.

450

Q  Again, it's your testimony in regards to count 2 that Mr. Reliford had left and abandon and not had anything to do with the robbery that occurred on August 17th, is that correct?

A  Could you repeat the question.

Q  I'll try to reword it a little better, sir.  It's your testimony, is it not that Mr. Reliford left and abandoned your efforts to rob the Mesquite Credit Union on August 17th?

A  Yes, sir.

Q  He didn't have anything to do with it?

A  No, sir.

Q  Didn't get any money except you loaned him a hundred dollars for something?

A  That's correct.

Q  And the gun that was used that robbery, he didn't have anything to do with that, did he?

A  No, sir.

Q  Now, sir, how was the money that was taken on August 26, how was that divided?

A  Three ways.  Thirty thirty ten.

Q  You got thirty?

A  No, sir.

Q  You only got ten?

A  Yes, sir.

Q  Mr. Reliford got thirty and Mr. Miller got thirty, is that

451

H1                          @WITNESS – CROSS – @                          148

your testimony?

A   Yes, sir.

Q   And where did the rest of money go?

A   I later found out that Mr. Miller had stolen some money out of the bag when we got to Shreveport and hid it.

Q   So your claim is he got even more than that?

A   Yes, sir.

Q   The fact is you got money from Mr. Miller frequently, didn't you?

A   Well, I had my own money so.

Q   Is that a yes or no?

A   No, sir.

Q   Didn't you all play dominoes for money?

A   I can't recall.  No, sir.

Q   Never did?

A   No, sir.

Q   And of the thirty-six thousand that was obtained on September 29, Mr. Reliford received none of that, is that correct?

A   That's correct, sir.

        MR. PAPPAS:  If may have just a moment, your Honor.

        THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q   And sir, finally, you wrote a letter to Mr. Miller on October 24th.  We have gone over that at some length.  You

452

HI                         @WITNESS – CROSS – @                         149

done know whether he wrote anything as a result of your efforts to have him do that.  But you also wrote him another letter on November 15th, didn't you?

A  Yes, I did.

Q  And in that letter you attempt to rational lies and explain that you weren't really going to go an rob a bank because you had a job, is that correct?

A  That's correct.

Q  And in fact would it be fair to say this is the first time in all of this that you heard the word master mind used?

A  Repeat that.

Q  Would it be fair to say right around this period of time is the first time in all of these events described that you heard the word master mind used?

A  I can't recall.

Q  You don't recall that the FBI was trying to say you were the master mind?

A  Well, what I obtained from information from a prisoner at Mansfield that Mr. Miller was trying to say I was the master mind.

Q  So when you say in your letter they were trying to say that I was the master mind?

A  Yes.

Q  They want for us to go against each other and to bring us more about it.  You are saying the they you are referring to

453

isn't the FBI, its your fellow cell mates?

A    No.    It was the FBI.

Q    So it was the FBI that said hay either you or the master mind or Miller is?

A    Well, they never came to me and said that.

Q    They never came to you and said at that?

A    No, sir, I didn't speak to the FBI for a while.

   MR. PAPPAS:    Approach the witness, your Honor?

   THE COURT:    Yes, sir.

BY MR. PAPPAS:

Q    I'll show you my copy of the letter and show you where it says they were trying to say I was the master mind.    They want for us to go against each other and to bring out more about us?

A    Yes, sir.

Q    And who does the they refer to?

A    The FBI.

Q    And then you go on to say but there isn't anything to tell?

A    Yes.

Q    But that's not true, was it?

A    There was something to tell.

Q    So you were lying when you said that in your letter, sir?

A    Yes.

Q    And you said I have been working on my job.    Why am I

454

going to go an rob a bank?

A  I don't understand.

Q  Well, you are trying to create the appearance here that you didn't have anything to do with any bank robberies and that's not true, is it?

A  No, sir.

Q  In fact, you talked about going to the law library, didn't you?

A  Correct.

Q  I'm sorry?

A  Correct.

Q  Did you go to the law library?

A  Yes.

Q  So you actually did some research about how to get out of this jam you were in, correct?

A  Well, I went but I had other inmates telling me about things like that.

Q  So in addition to going to the law library, you also got advice from your fellow inmates, correct?

A  That's correct.

Q  And you got that before you wrote this letter and the October 24th letter, correct?

A  I don't remember.

Q  Possibly before the October 24th letter?

A  I can't recall.

CASSIDI L. CASEY CSR (214) 767-0774

455

Q   Did you get the idea of putting it off on someone else at Miller's expense from the law library or someone else?

A   My friends told me to take responsibility for my role I played.

Q   So your friends in jail told you to tell the truth and it would work out?

A   They said take responsibility for the role you played in it and don't worry about anybody else.

Q   And in fact that's what you advised Mr. Miller?

A   Yes, sir.

Q   And you advised him to tell the truth and it would all work out?

A   I told him to take responsibility for the role which he played.

Q   You told him to be honest.  You didn't tell him to lie about anything?

A   I can't recall.

Q   Did you tell him to lie or not?

A   I cannot recall that.

        MR. PAPPAS:  Approach the witness?

        THE COURT:  Yes, sir.

BY MR. PAPPAS:

Q   Well, where you said to him and I'll point you from my copy I'm willing to know would you be willing to sign a written affidavit stating I didn't have anything to do with

456

the September 29, 1994 robbery which I did.  Tell me was that a lie or not?

A   Yes, it was.

Q   And when you testified earlier that you were just telling Mr. Miller to tell the truth, in fact you were telling him to lie?

A   Well, I had guys in the prison system filling my head with all kind of deals.

Q   So your efforts to get him to lie to these federal agents wasn't your fault, it was the fellows in the jail cell?

A   I didn't ask Mr. Miller to sign.  I just asked him to sign an affidavit.

Q   What were you going to do with the affidavit?

A   I was going to give it to my lawyer.

Q   So you weren't going to lie.  You were going to give it to the lawyer, correct?

A   Well, I was going to give it to him because the guys told me it would be best if I got an affidavit.

Q   An affidavit that's a lie?

A   Well, if you want to call it that.

Q   An affidavit saying you didn't have anything to do with the September 29, 1994 robbery, is that anything other than a lie?

A   No, sir.

Q   In fact, you told Mr. Miller to destroy these notes, to

CASSIDI L. CASEY CSR (214) 767-0774

457

H1                                @WITNESS — CROSS — @                                154

tear them in half?

A  Yes, sir.

Q  And you promised him I won't mislead you and you know that.  Promised him?

A  Correct.

Q  So basically didn't you promise him if he would lie for you you would help him out in the end?

A  Yes, some what.

Q  And in fact that included lying about trying to put Reliford in the middle of all of this mess?

A  Well, I didn't include Mr. Reliford into it at all.  Mr. Miller spoke on behalf of putting Mr. Reliford in this.

Q  So in the October 24th letter when you tell Mr. Miller to put Mr. Reliford in it you are now saying you didn't write that letter?

A  I did write the letter but I did not tell him to tell Mr. Reliford I wasn't included in those two robberies me and Mr. Miller participated.

Q  So when you say in the October 24th letter if there is anything you can think of he said he did put it in the letter?

A  Yes, sir.

Q  And think about anything you can to put Eric under the gun and if it wasn't for Eric we won't be in the trouble we're in now?

458

A

Q   And when you say Mr. Reliford is the big guy, focus on telling his wrong and not yours?

A   Yes, sir.

Q   You weren't telling Mr. Miller to put it all over Mr. Reliford and put him in the middle of this mess?

A   No, sir, I wasn't.  I was talking about the time that Mr. Reliford was bragging about the robberies that he had committed.

Q   Okay.  You referenced also in this November 15th letter these masks that you say were purchased in Shreveport, correct?

A   Correct.

Q   When you say in the letter you know and I know that those masks that were bought was a prank to play in Florida?

A   Correct.

Q   Were the masks bought in Florida or not?

A   No, sir.

Q   So the masks were bought an taken to Florida, is that correct?

A   Yes, sir.

Q   And they were bought by you and Mr. Miller to take to Florida, is that correct?

A   Yes.

Q   And Mr. Reliford didn't have anything to do with the

Case 4:94-cr-00121-Y    Document 1071-1    Filed 09/18/02    Page 78 of 121    PageID 1404

masks, did he?

A   No, sir.

MR. PAPPAS:  Pass the witness, your Honor.

THE COURT:  Ms. Bindler, do you have questions for Mr. Nichols?

MS. BINDLER:  I do, your Honor, but I need some of the exhibits they introduced through Mr. Nichols this morning that have been packed up.

THE COURT:  Can you indicate specifically to Mr. Jarrett which ones you need?

MS. BINDLER:  Yes, sir.

CROSS-EXAMINATION


BY MS. BINDLER:

Q   Mr. Nichols, you have been represented by an attorney since right after you were arrested in this case, haven't you?

A   That's correct.

Q   And his name is Mr. Michael Todd?

A   Yes.

Q   And you hired Mr. Michael Todd to represent you in this case, didn't you?

A   Well, my family hired him.

Q   And when you met with Mr. Todd he went over the first indictment with you, didn't he?

460

H1                              @WITNESS – CROSS – @                              157

A  Yes.

Q  And you came to court and told Judge Fish I have been over the indictment with my attorney and I understand it?

A  Correct.

Q  And when you returned on the the second indictment you went over that indictment with Mr. Todd and you came to the courtroom and stood in front of Judge Fish and told Judge Fish you understood everything in that indictment?

A  Yes, ma'am.

Q  And that's because you had gone over it with Mr. Todd?

A  The superceding indictment?  I saw it the day I was brought here.

Q  And you went over it?

A  Back at Mansfield, yes.

Q  And you told Judge Fish, the same judge here, that you went over that superceding indictment and you understood what you were charged with in that indictment?

A  Yes, sir.

Q  And Mr. Todd being your attorney went over all the evidence with the government that they had against you in this case, didn't he?

A  Not really.  He just told me things they had to show me. Exhibits such as things as receipts and things like that.

Q  So he went over some of the evidence with you?

A  Correct.

461

Q   And eventually you came to a plea agreement with the government such as Government's Exhibit 93 that we have been over this morning, correct?

A   Yes.

Q   And when you were going over the superceding indictment with Mr. Todd being the good lawyer that he is, he explained to you not only what you were charged with but the penalities that as punishment you could face under this superceding indictment, didn't he?

A   We didn't really talk about the maximum amount of prison, how much I was looking at.

Q   He didn't tell you what you were looking at if you went to trial?

A   Not at that point he didn't.  He said if I went to trial if I become guilty all the charges would be stacked on top of each observe and all the charges in Louisiana would be stacked.

Q   Let's go over that so the jury understands what stacked means.

        You are charged in the first count which is the conspiracy count you talked about a little bit, right?

A   Yes.

Q   And that contains the three bank robberies here in Dallas?

A   Correct.

Q   And it contains bringing the pick-up truck across state

462

H1                              @WITNESS - CROSS - @                         159

lines?

A   Correct.

Q   And it contains the four robberies in Shreveport?

A   Correct.

Q   An let's talk about what each of those offenses are. Conspiracy as you explain is when people join together to commit criminal acts, correct?

A   Correct.

Q   And your understanding of law is you can get up to five years for a conspiracy count?

A   Yes.

Q   And that for bank robbery with a gun, just the bank robbery part, you can get up to twenty-five years for that bank robbery?

A   Yes.

Q   And that bringing a stolen truck across state lines can get you up to ten years?

A   I think he mentioned something to me.  But I don't think we went over the maximum term of prison.

Q   But you were the person named in this indictment, aren't you?

A   Yes, ma'am.

Q   You want to know what kind of punishment time you are looking at, don't you?

A   Well, he didn't really discuss it with me.  He discussed

CASSIDI L. CASEY CSR (214) 767-0774

463

it with my family.

Q  But you are the person named in the indictment?

A  Correct.

Q  You are the person who had to sign the plea agreement?

A  Correct.

Q  And you were the person that Judge Fish is going to sentence?

A  Correct.

Q  Let's talk about count 2 of the indictment?

A  Yes.

Q  That's the first time the Mesquite Credit Union was robbed, is that correct?

A  Correct.

Q  And that carries as we just discussed a possible twenty-five year sentence?

A  Yes, sir.

Q  An because a gun was used that because you are telling us a gun was used that, aren't you?

A  Yes.

Q  That can get you minimum five years?

A  That's my understanding.

Q  That's your understanding?

A  Yes, I was going by the guidelines.  I was going by the maximum term of imprisonment.

Q  But your understanding under count 3 is Judge Fish doesn't

have a choice.  He has to give you five years for that charge?

A  That's my understanding.

Q  And then count 4 is going to be the robbery of Provident Bank?

A  Correct.

Q  And because that's a bank robbery that's a possible twenty-five years?

A  Correct.

Q  And a gun was used that correct?

A  Yes, it was.

Q  When you said to the jury a few minutes about stacking time that means if you get five years for one gun count the next one count of five years doesn't run along it runs after you finish the first one.  That's what you mean by stacking?

A  That's my understanding.

Q  That's your understanding?

A  Yes.

Q  And you understand the law in the federal system the first gun count you get five years, correct?

A  My understanding is I thought the maximum I can get is five.  That's what they have to give you.  The maximum is five.

Q  But then the second time you got a gun charge on you, that's a twenty years count, correct?

465

A   Yes.

Q   And that's twenty years after you serve the first five years?

A   From my understanding.

Q   And that's what stacking means?

A   Yes.

Q   And a gun was used in the Provident Bank robbery?

A   Correct.

Q   And then we turn to count 6 which is the second time the Mesquite Credit Union was robbed, correct?

A   Yes.

Q   And you were just sitting outside in the car?

A   Yes.

Q   You were just a driver.  And because that's a bank robbery that carries up to twenty-five years?

A   Yes, that's correct.

Q   And a gun was used that bank robberies, correct?

A   Yes.

Q   And because this isn't the first gun count that's another one of these twenty year gun counts, isn't it?

A   Yes.

Q   And that runs after the first five years for the Mesquite Credit Union?

A   From what I understand.  I have no idea.

Q   Well, your plea agreement says you are looking at

466

twenty-five years, doesn't it?

A  Yes.

Q  And that's because it's two gun counts?

A  That's two counts.

Q  And the first gun count is worth five years?

A  Yes.

Q  And the second gun count is worth twenty years?

A  Yes.

Q  So count 7 which is the second time the Mesquite Credit Union was robbed with a gun, that's an additional twenty years you have been looking at?

A  Yes.

Q  And then count 8 which is the last count in this indictment having to do with the pick-up truck, that could give you up to ten years?

A  Yes.

Q  So that's what you were looking at just from this indictment?

A  Yes.

Q  And your plea agreement which you signed, correct?

A  Yes.

Q  It's signed by yourself?

A  Yes.

Q  And you signed it and your lawyer sign it?

A

467

Q   And Mr. Jarrett signed it because he's the government's representative?

A   Yes.

Q   And there is another name on here.  His name is Robert Gillespie and he's the Assistant United States Attorney from the district of Louisiana, isn't he?

A   That's my understanding.

Q   That's your understanding and it's your plea agreement?

A   Yes.

Q   And this plea agreement has a paragraph in here that tells you what the government is promising to do for you, doesn't it?

A   Yes, as I recall.

Q   The government's agreement.  There is also paragraphs in here that talks about what you agree to do for the government?

A   Correct.

Q   Part of your agreement to the government as Mr. Pappas went over with you was you have to cooperate with the government?

A   Correct.

Q   Another thing you have to do is you had to forfeit everything you got from the proceeds of the bank robberies?

A   Yes, ma'am.

Q   And one of those things that you have to give back is that

CASSIDI L. CASEY CSR (214) 767-0774

468

1991 Accura Integra that you bought?

A  Yes.

Q  For seventy-one hundred dollars cash?

A  Correct.

Q  Title is in your name?

A  Yes.

Q  It's your car?

A  Well, it would be among me and Mr. Miller.

Q  It was your name on the title, was it not?

A  Yes, it was.

Q  Mr. Miller's name wasn't on the title?

A  No, it wasn't.

Q  You also have to give back this video camera that came in evidence as Government's Exhibit 5 , don't you?

A  Yes.

Q  And that was bought by you?

A  Yes, ma'am.

Q  The receipt is in your name?

A  Yes, ma'am.

Q  You also had to give back all the cloth that we saw here this morning?

A  Correct.

Q  Those were cloth that you bought?

A  That was cloth that me and Mr. Miller bought.

Q  The majority of them you bought?

A   Me and Mr. Miller.

Q   Let's go over that.  I counted ten pieces of clothing?

A   Yes.

Q   And you said my client was a large?

A   Yes.

Q   I counted four charges?

A   I don't know.

Q   Are you going to trust me or you want me to pull those out?

A   Yes.

Q   And so the double X's would be yours?

A   Yes.

Q   And you have to give those back?

A   Yes.

Q   And you have to give back a 1987 Mustang?

A   Yes.

Q   And you bought that for seventeen hundred dollars cash?

A   Yes.

Q   And you bought that with proceeds from the bank robbery?

A   No.  From checks.  From stolen checks.

Q   And you have to give that back to the government because you got it illegally?

A   Yes.

Q   The title to the Ford Mustang is in your name?

A   Yes, ma'am, it is.

Q   And you also have to give back whatever money they found in the storage shed?

A   Correct.

Q   An again, that storage shed is in your name?

A   Yes, ma'am, it is.

Q   You signed the contract?

A   Yes, sir.

Q   Your mother's name is also on that contract?

A   Yes, I put it on there.

Q   So that she could get if there if she needed to?

A   Along with her and Mr. young and my father.

Q   Mr. Miller's name wasn't on the contract?

A   He knew the code and he also had a key.

Q   But his name isn't on the contract?

A   No.

Q   His name isn't on the contract where it says these are the people who can come in here?

A   Yes, I knew it wasn't on there.

Q   Mr. Reliford's name wasn't on the contract either?

A   No, it wasn't.

Q   In return, let's talk about what the government is going to do for you.  Your name is still on this indictment, isn't it?

A   From my understanding it is.

Q   They are not going to dismiss your name from those other

471

charges until after you got sentenced, right?

A   I have no idea.

Q   That's what it says in the plea agreement?

A   I have no idea.

Q   The other thing the government is promising you is that this agreement as we said was signed by the assistant United States Attorney of Louisiana, correct?

A   I guess so.

Q   So it's binding upon them, meaning they signed it and they are a party to it?

A   Yes.

Q   And what that means is they are not going to prosecute you federally in the federal court in Louisiana for the stuff named in the indictment here?

A   That's correct.

Q   And that's going to be Pioneer bank robbery, correct?

A   Correct.

Q   And that's a bank robbery?

A   Yes.

Q   So that's twenty-five years?

A   Yes.

Q   And there was a gun used that, wasn't there?

A   Yes.

Q   So that's a twenty year gun count that would be served after the five years for the Mesquite robbery, correct?

472

A   Yes.

Q   Twenty years for the prove dent robbery?

A   Yes, sir.

Q   An twenty years for the Mesquite robbery that was robbed the second time?

A   Yes.

Q   There was also three robberies of restaurants.  We've got the Captain D's, correct?

A   Yes.

Q   And there was a gun used there?

A   Yes.

Q   And so that's another twenty years?

A   Correct.

Q   We've got the Taco Bell?

A   Yes.

Q   And there was a gun used there?

A   Yes.

Q   And you got some of the money from it?

A   Yes.

Q   And that's another twenty years?

A   Yes.

Q   And we've got one with Kentucky Fried Chicken, correct?

A   Yes.

Q   And there was a gun used there?

A   That's correct.

473

Q   And that's another twenty years?

A   Yes.

Q   So that's forty years in Shreveport they are not going to prosecute you for because of agreement you signed with the United States Attorney's office?

A   Correct.

Q   Okay.  And the judge who was going to sentence you after you testified here, not today but further down the line it's going to be the same judge who's presiding here today and that's Judge Fish, isn't it?

A   Correct.

Q   Let's talk about the restaurant robberies in Shreveport?

A   Yes.

Q   Captain D's, the money was split three ways?

A   Yes, it was.

Q   Kentucky Fried Chicken, it was split three ways?

A   Yes.

Q   And the Taco Bell was split three ways?

A   Yes.

Q   And it's your testimony on the Kentucky Fried Chicken and Taco Bell you were just sitting at Mr. Reliford's home waiting for Mr. Reliford and Mr. Miller to come back?

A   Correct.

Q   And the Pioneer bank robbery, you testified a little bit about the burgundy car that's owned by Roosevelt Young,

474

correct?

A   Yes.

Q   And how is he related to you?

A   My aunt's boyfriend.

Q   And Roosevelt Young is the same individual who bailed Vernon Miller out of jail by paying thirteen hundred dollars to a bondsman?

A   It's my understanding, yes.

Q   And in return for that bond Mr. young took Mr. Miller's car you have been talking about, the Isuzu?

A   No.  He didn't take it.  Mr. Miller left it when we went to Florida.

Q   So Mr. Miller didn't pay him anything?

A   Well, I paid him some money an later that night I picked Mr. Miller up from the jail downtown.

Q   There was another time Mr. Miller got arrested because of you?

A   When.

Q   There was a time that he got arrested and you ran from the van he got arrested in?

A   Well, that's when the police pulled over.  His mother also.

Q   But when the police pulled over the van Mr. Miller was in you ran?

A   That's not true.

475

H1                        @WITNESS – CROSS – @                        172

Q  Talk about Florida.  The time that you went down there to sell the stolen jet skis, you sold them to the person that Jesse worked for?

A  Yes.

Q  And Jesse Anderson introduced you to the man?

A  Yes.

Q  And the man knew they are stolen?

A  One of them.

Q  Oh they were two jet skis and he knew one of them was stolen?

A  Correct.

Q  And when you sold the jet skis in Florida, you didn't give your really name, did you?

A  No, sir.

Q  You gave the name Larry Jones?

A  Yes.

Q  And your name hasn't always been Larry Nichols?

A  No.

Q  And it was at some time Larry Evans?

A  Yes.

Q  And that's why some of the hotel receipts have that name on it?

A  Yes.

Q  And some of the car receipts have that name?

A  What.

476

H1                          @WITNESS − CROSS − @                          173

Q   The receipts for the improvements to the 1991 Accura?

A   That's not what I recall.  As I recall they were all signed Larry Nichols.

Q   And have you ever bought guns in the name of Larry Evans?

A   Yes.

Q   And the hotel receipts, the majority of them were in your name?

A   I thought it was equal.  I'm not for sure.

Q   And the hotel receipts, there were two that were in Mr. Miller's name.  That was the best western and the Holiday Inn, correct?

A   Yes.

Q   And those were found, one of them in your Accura?

A   Yes.

Q   And the one from the Holiday Inn, Mr. Miller's name is found in your Mustang?

A   I guess.

Q   That's your understanding?

A   Yes.  It's my understanding.

Q   And when you picked out the hotels, you had the cash to pay for them, correct?

A   No, I didn't.  We both had the cash to pay for them.

Q   But the bag that the cash was normally kept in was a bag you bought?

A   Yes, I did purchase the bag.

CASSIDI L. CASEY CSR (214) 767-0774

Q   And the storage unit that is in your name by your own testimony is a storage units you rented to keep your proceeds

from these robberies?

A   No.   It was supposed to be for keeping the 1987 Mustang.

Q   Can which you bought from proceeds from illegally gotten gains?

A   Yes.

Q   And when they searched your storage unit they found the bag in there that you bought, correct?

A   The bag that was purchased in Florida, yes.

Q   That you purchased?

A   Yes.

Q   With your money?

A   It was money from the bank proceeds.

Q   Which bank?

A   From Provident Bank.

Q   Which you had nothing to do with?

A   Yes, I was the driver at Provident Bank.

Q   And also in your storage unit that you signed the contract for, they also found a lot of money from some of these bank robberies?

A   They found money belonging to the last Mesquite Credit Union robbery.

Q   Which would be the second time the Mesquite Credit Union was robbed?

H1                          @WITNESS – CROSS – @                          175

A   Yes.

Q   Found in your storage unit?

A   Yes.

Q   Other than the time that Roosevelt Young bonded out Vernon Miller, there was also a time when you helped Vernon Miller back in death to Roosevelt Young, didn't you?

A   No.

Q   At no time did you take Roosevelt Young's ATM card from him and withdraw cash?

A   He took me back in April.

Q   And that was during the trip to six flags?

A   Yes.

Q   And he withdrew a lot of money?

A   Approximately five hundreds dollars.

Q   And you told him it was Vernon?

A   No, I did not.  He didn't ask anything about that.

Q   Now, when you made Vernon go to Florida with you to take the two stolen jet skis down there, you knew that Vernon had a court appearance he needed to go to?

A   I did not.

Q   You and Vernon went to Florida then you knew he had a court appearance he needed to go to?

A   The night before Mr. young's --

        MS. BINDLER:  Objection, your Honor, he's not respond to go my question.

CASSIDI L. CASEY CSR (214) 767-0774

474

H.I                          @WITNESS - CROSS - @                         176

          THE COURT:  Sustained.  Ask the question again.

BY MS. BINDLER:

Q  When you and Mr. Miller left to go to Florida with the jet
skis, you knew that Vernon Miller had a court date that he
would myself if he went with you?

A  No, I didn't.

Q  You did not?

A  No, I didn't.

Q  Let's talk a little bit about the first time the Mesquite
Credit Union was robbed on August 17, 1994?

A  Yes.

Q  The cloth that Mr. Miller wore and those were cloth that
you told him to wear?

A  I didn't tell him what to wear.

Q  You didn't teach him how to put on the cloth over his own
cloth so they would be easier to discard after the robbery?

A  No, ma'am, I didn't.

Q  You didn't tell him to wear gloves so there would be no

fingerprints?

A  No, ma'am, I didn't.

Q  You didn't hand him the gun to be used?

A  In the first Mesquite robbery it was one of my guns.  The
tech 22.

Q  I thought the technical 22 was from the prove dent?

A  It was also used in the Mesquite.

CASSIDI L. CASEY CSR (214) 767-0774

480

Q   That gun was unloaded, wasn't it?

A   Yes.

Q   You sent Mr. Miller in to a bank to rob it unloaded?

A   I didn't send Mr. Miller in.

Q   He went in with an unloaded weapon?

A   Yes.

Q   And you knew it was unloaded?

A   Yes.

Q   And right after the Mesquite Credit Union was robbed, you spent seventy-one hundred dollars of the proceeds to buy an Accura in your name?

A   That's correct.

Q   And you made a down payment on a gun in your name?

A   Yes.

Q   And on the Provident Bank robbery, that was the tech 22?

A   Yes.

Q   And it's your testimony that a hispanic man talked to you while you were waiting outside in the car?

A   Correct.

Q   Mr. Miller had just walked away from that car when that individual walked up, didn't he?

A   I cannot recall.

Q   And can you tell me where Country Pimp was on the day that the Provident Bank was robbed?

A   From my understanding he was in Florida.

481

H1                          @WITNESS — CROSS — @                          178

Q   In Florida?

A   Yes.

Q   And where was Rick I Davis on that day?

A   I don't know anybody named Rick I Davis.

Q   Let's talk about the second time the Mesquite Credit Union was robbed.  Again you sent Mr. Miller in to rob that?

A   No, I didn't.

Q   And what gun was used?

A   The Taurus 380.

Q   And that's your gun?

A   Yes.

Q   That you bought in your name?

A   Yes.

Q   That you bought for protection?

A   Yes.

Q   An once again Mr. Miller carried an unloaded gun into a bank that you handed him before he went in?

A   I didn't hand it to him.  The gun was laying inside the Accura Integra.

Q   Your Accura Integra?

A   Yes.

Q   And the cloth that Mr. Miller wore on that day, those were cloth you picked out?

A   Those cloth were picked out that morning.  They were purchased in Florida.

482

H1                                    @WITNESS – CROSS – @                                    179

Q   And you told Mr. Miller what to wear in the bank that day?

A   No, I didn't tell Mr. Miller what to wear.

Q   You told him to put on a ball cap?

A   No, I didn't tell Mr. Miller what to do.

Q   Mr. Miller when he robbed the Mesquite Credit Union both times had on a ball cap and somewhat baggie clothes?

A   I can't recall.  The second occasion he had on blue Dickies and a long sleeve shirt.

Q   And a ball cap?

A   Yes.

Q   But in the Provident Bank we have people like in work suits, don't we?

A   From my understanding it was the same blue Dickies outfit which he had.

Q   It wasn't a jump suit looking outfit?

A   No, a blue surety and blue pants and something underneath there.

Q   So that would be different from a blue shirt an Dickies?

A   That was the September 29th robbery.

Q   But in the Provident Bank robbery we have masks according to your testimony?

A   That's correct.

Q   But in the Mesquite Credit Union Mr. Miller wore regular street type cloth and a ball cap?

A   Yes.

483

Q   And following the second Mesquite robbery, it's your testimony that you and Mr. Miller through everything out in the Chevron station dumpster?

A   Yes.

Q   And that your fingerprints it's your understanding are on some of the money wrappers?

A   Yes, they are.

Q   As are Mr. Miller's?

A   Yes.

Q   But you had told him to wear gloves so he wouldn't leave fingerprints?

A   I didn't tell Mr. Miller what to do.

Q   You weren't with him in the car before you sent him in to rob the bank?

A   I did not send Mr. Miller in to rob the bank.

Q   You told him to wear gloves because that way you don't leave fingerprints?

A   I didn't tell him that.

Q   It's your testimony that Mr. Miller gave his mother money on several occasions, is that correct?

A   Yes.

Q   And tell us about the first time you saw Mr. Miller give his mother money?

A   The first time was after the Mesquite Credit Union.

Q   What day with a that that he did this?

484

A   I can't recall the exact day.

Q   How long after that was it, a day or a week?

A   About two days.

Q   Two days?

A   About, yeah.

Q   And you drove Mr. Miller over to his mother's house?

A   No.

Q   How do you know?

A   Me and Mr. Miller and Angel all proceeded in her car over to Mr. Miller's mother's house.

Q   And when was the next time you saw Mr. Miller give his mother some money?

A   September 29.

Q   How much money was that?

A   Possibly eight thousand dollars cash.

Q   And that was from the Mesquite Credit Union robbery?

A   Yes.

Q   And that was to pay on the car that Roosevelt Young has?

A   Roosevelt Young didn't have the car.

Q   Do you know where that car is?

A   I don't know.

Q   But the eight thousand dollars was to make the payment on his Isuzu car.

A   Yes.

Q   And when you have gone to Mr. Miller's home, you hug his

CASSIDI L. CASEY CSR (214) 767-0774

485

mom.

A   As I recall.  I can't remember.

Q   Up until a couple of months ago you still were calling her collect from your jail cell?

A   I haven't called her but three four times from Mansfield from the period of October to November.

Q   You haven't called her since you signed the plea agreement, have you?

A   No, I haven't.

Q   And you do know Mr. Miller's girlfriend, Angel Thompson, don't you?

A   Yes, I do.

Q   And any time Mr. Miller wanted to see Ms. Thompson Mr. Miller had to have your permission?

A   No, sir, I did not.

Q   You didn't decide when he could see her?

A   No.  Mr. Miller is a man on his own.

Q   At any point in time you have never had any control over Mr. Miller?

A   No, I didn't.

Q   Let's back up a little bit.  You met Mr. Miller back around January of last year, correct?

A   That's correct.

Q   And that was after he had been asked to leave his family's home?

486

A   I don't know if he was asked to leave his family home or not.  I don't know.

Q   It was after he wasn't living with his parents?

A   Well, from the time I met Mr. Miller he was staying with some other people.  Up until February, I think around the 20th, he was staying with his mother.

Q   A short time after you met Mr. Miller is when he left his family's home?

A   Not a short time.  About a month and a half.

Q   And he came to live with you after he left his parents's home?

A   Living with me at my sister's house and also staying in motels.

Q   But he was where you have been living?

A   I was staying with my sister so he stayed over some nights, yes.

Q   And you kind of took him under your wing?

A   No, I didn't.

Q   Never told him you would take him under your wing?

A   No, I didn't.

Q   You and Mr. Miller lived with your sister and you have also lived in hotels both here in Dallas and in Shreveport?

A   Yes.

Q   And in Houston?

A   Yes.

487

H1                        @WITNESS – CROSS – @                        184

Q   And you stayed with some of your friends when you were in
Florida?

A   Yes.

Q   And any time that Mr. Miller went back to visit his family
after he left the home, you were with him?

A   Not on every occasion I wasn't.

Q   You normally drove him over to the house in the Accura?

A   No.  He would drive himself over or he would have Ms.
Thompson come pick him up and take him over.

Q   How many times do you think you were in his family's home
after he moved out?

A   We went back several times to his stepfather's house and
after that his mother an father got a divorce and she went to
her apartment and we went over there several times.

Q   Several meaning three or more?

A   I can't recall.

Q   You know his sisters, don't you?

A   Yes.

Q   And their names are Christi and Kim?

A   Yes.

Q   And you have been around them before?

A   Yes.

Q   And you have been with his family?

A   Yes.

Q   And you were present the night that Mr. Miller gave his

488

mom the eight thousand dollars cash?

A   Yes.

Q   And you were trying to hurry him up because you had things you were blank to do that night?

A   I was planning ongoing to see a female and he stayed with Angel that night and I left.

Q   But you were trying to hurry him out of his mother's house because you had things you wanted to do?

A   Well, we both had a key.  We had a suite that night and I asked him for the keys and that's it.

Q   But you were trying to hurry him up because you both came in the same car that night?

A   We both came in the same car but Mr. Miller had somehow set it up to meet Ms. Thompson at his mother's house.

Q   And that's his girlfriend?

A   Yes.

Q   Defendant's Exhibits 1 and 2 which are the letters that Mr. Jarrett and Mr. Pappas have gone over with you, do you recall these letters?

A   Yes, I do.

Q   And the first letter you wrote October 24th, 1994, correct?

A   Yes.

Q   And that was about how long after you got arrested?

A   About twenty-five days.

Q  So you already had a lawyer?

A  Yes.

Q  And you had Mr. Todd?

A  Yes.

Q  And he is a pretty good lawyer, isn't he?

A  Yes.

Q  And he's giving you his best legal advice as to what you should do in this case?

A  Yes.

Q  And you were telling Mr. Miller in this first letter you wrote him when you were still in Shreveport to look up your friends down there and they would take care of him.  These are blue, red and these are gang members?

A  No.  Red is about seventy-five years old and blue is about forty-five and they are not in gangs or anything.

Q  How about Anthony Beau?

A  He was.

Q  Which gang was that?

A  The rolling sixties.

Q  Is that Crypts or blood?

A  Crypts.

Q  Let's talk a little more about the at that time too that Mr. Pappas went into.  The hat on the mouse, is blue, isn't it?

A  Mine is green.

H1        @WITNESS - CROSS - @      187

Q   And you got yours first?

A   Yes.

Q   And you picked it out?

A   Yes, I picked mine out first.

Q   And the same day you made Mr. Miller get the same at that time too?

A   No.  I did not make Mr. Miller.  He had his own option. Everybody got a at that time too.  After I got mine Mr. Miller suggested he get his but in a different color.

Q   Mr. Miller suggested he get his at that time too?

A   Yes.

Q   And you knew Mr. Miller for a month before he moved in with you or came to stay with you?

A   I knew him back in high school but I just got acquainted with him back in January.

Q   An throughout these letters you make a lot of references to finding God?

A   Yes.

Q   And you know that Mr. Miller went to church every Sunday with list family before he met you?

A   Not from my understanding.

Q   That's not your understanding?

A   No.

Q   It's your understanding he had never been arrested before he met you, isn't it?

H1 @WITNESS – CROSS – @ 188

A That's what he told me.

Q That what you know?

A Yes.

Q The agents haven't told you anything else?

A No.

Q And it's also your understanding he had never robbed a bank before he met you?

A No.

Q He had never done drugs?

A He had done drugs.

Q He told you that?

A Yes.

Q And never been arrested for dealing drugs?

A No.

Q Never been arrested for simple possession before then?

A Not to my understanding.

Q And it was your understanding that he was pretty close to his family before February?

A Yes, I guess.

Q That's your understanding, isn't it?

A Yes.

Q And throughout these letters you keep talking about how you were going to take care of Mr. Miller, don't you?

A Well, I said I was going to -- well, Angel's little daughter.

Q   And that's not Mr. Miller's natural child?

A   No, sir it's not.

Q   But you consider it your responsibility to take care of Mr. Miller's family?

A   I always said if I got in trouble look after my family and if he got in trouble I would look after his family.

Q   And in this first letter October 24 you say halfway down this is coming out from someone looking out for you because I have nothing but love for you baby boy?

A   I said I was going to look after his family for him, yes.

Q   And you were telling him you were going to look out for him?

A   Yes.

Q   And you also say in this same first letter like I told them he was the wrong people and by them you are talking about the police, the authorities?

A   Yes.

Q   And you said they need to be looking for Eric, he's the head man?

A   Correct.

Q   And Mr. Pappas has gone through a lot of that with you, hasn't he?

A   That's correct.

Q   And then you go on to say you don't know nothing and never did, don't talk to none about your case, right?

H1                              @WITNESS - CROSS - @                              190

A   Yes.

Q   And you are telling the jury that the jail house lawyers, your cell mates were telling you to tell him this?

A   Yes.

Q   And you had a lawyer at this point, didn't you?

A   Yes.

Q   And you were talking to your lawyer?

A   Yes.

Q   And you were following his legal advice?

A   Yes, sir.

Q   And you were listening to what he had to say?

A   Yes.

Q   And you knew Mr. Miller had been arrested for the same charges in the indictment that you had?

A   Yes.

Q   So he probably had a lawyer?

A   I didn't know.

Q   You didn't know if he had a lawyer?

A   No.

Q   But you had a lawyer?

A   Yes, I did.

Q   And you know that everyone is entitled to a lawyer?

A   Yes.

Q   And you went to an initial appearance when you first got arrested?

A    Yes.

Q    And they told you if you couldn't afford a lawyer one would be appointed for you?

A    Well, my family had me a lawyer so --

Q    You didn't have to go through that?

A    Right.

Q    But you understand here in America everybody has the right to a lawyer?

A    Right.

Q    And also in letter you talk about this being a turning point in your life and this is where you found God, right?

A    Yes.

Q    And you also talk about the fact that you are going to make it a point to look after Angel an her little daughter?

A    Right.

Q    And to look after Ms. Sandra, correct?

A    Yes.

Q    And that's Vernon's mom?

A    Yes.

Q    An Kim?

A    Correct.

Q    And that's Vernon's sister?

A    Yes.

Q    An she's younger than Vernon?

A    Yes.

Q  And also Chris?

A  Chris is older than Vernon.  I mean Chris is younger than Mr. Vernon.

Q  And Mr. Miller is only 21.  So they have to be younger?

A  Yes.

Q  And in fact one of them is still in high school?

A  Yes.

Q  And during the time that you were writing this letter, you were still calling Ms. Sandra?

A  Yes.

Q  Collect?

A  Yes.

Q  And she took the calls?

A  Yes.

Q  And when you went into her home, you tried to have polite manners?

A  Correct.

Q  And you gave her a hug?

A  As I recall.  I don't know if I gave her a hug or not.

Q  And you called her mom on occasion?

A  Yes.

Q  And you gave Vernon Bible verses to read?

A  Yes.

Q  Because you want him to find God?

A  Yes.

Q  In hopes that he's going to do the right thing on his case?

A  Well, I just gave him the Bible verses to read.

Q  And you say at the very closing of this first letter -- towards the end of letter, you don't know nothing, you never depend nothing, Mr. Reliford is the big guy.  Focus on telling his wrong and not yours?

A  That's correct.

Q  So you are trying to remind Mr. Miller in your words that Eric is the bad guy?

A  Yes.

Q  And it's your testimony you are not trying to tell Mr. Miller what to do?

A  No, I'm not.

Q  You are not telling him what to say?

A  No.

Q  You are not telling him to keep quiet?

A  No.

Q  The top of the last page of this letter at the bottom you are trying to tell him to tear up the letter?

A  Uh-huh.

Q  Because you don't want this around anymore?

A  Well, like I said I heard in guys to tear up the letter.

Q  You didn't think there was anything incriminating in the letter, did you?

A   Well, I just told him to tear it up.

Q   On the last page of this first letter, you say this place is like a country club?

A   Yes.

Q   And you are talking about Mansfield law enforcement center, a jail?

A   Yes, ma'am.

Q   Where you don't have any freedoms?

A   Well, it was better than the place where I was.

Q   So you considered it a country club?

A   Yes.

Q   Said you stayed up until four or five in the morning playing cards an dome knows?

A   Yes.

Q   But you are telling the jury you never played dome knows with Vernon Miller?

A   Yes, I had played with Vernon Miller but I never played for money.

Q   Never played for money.  Never racked up ten, twenty, thirty thousand dollars in debt against Mr. Miller?

A   No.

Q   And on Fridays you get to work the comedy jam and movies?

A   Yes.

Q   And you think Mr. Miller is going to be happy when he gets to Mansfield law enforcement center.

H1                    @WITNESS - CROSS -                    125

A   Well, I called Ms. Sandra several times and she told me he didn't like it down there and I told her about some of the things that Mansfield have.

Q   Trying to make it look better?

A   Yes.

Q   And you are trying to warn Mr. Miller about the good cop, bad cop thing that police play?

A   Yes.

Q   And again you are looking out for his interests?

A   Yes.

Q   An again you say don't talk to anyone, I mean no one because anything you say in court can hurt you?

A   Yes.

Q   And again you say we're facing ten years and have to do about seven or eight years?

A   Yes.

Q   And at this time you had a lawyer and a copy of the indictment?

A   Yes.

Q   So you knew good and well you were facing forty-five years on the gun charges alone at that point?

A   Well, at that point we thought that charge was going to run concurrent with each other.

Q   And you know better now?

A   Yes.

CASSIDI L. CASEY CSR (214) 767-0774

Q   And you told him if they ask you about anything put it all on Eric and you know that Eric had at least nothing to do with the two Mesquite Credit Union robberies?

A   That's correct.

Q   And again you blame Eric saying if it wasn't for Eric we won't be in the trouble we're in now?

A   That's correct.

Q   And that Eric was in the Mesquite Credit Union robberies?

A   That's correct.

Q   And you close this letter with I've got nothing but love for you babe.  And you are talking about your love for Vernon Miller?

A   Yes.

Q   And who by your testimony you had a great crime spree across this nation?

A   Excuse me.

Q   Withdraw the question.  The second letter you still had Mr. Todd representing you?

A   Yes.

Q   And it was written about fifteen days later?

A   I don't know.

Q   November 15th.

A   I guess.

Q   You guess so?

A   Yes.

Q  And about the first paragraph you let Vernon know you have talked to his mom?

A  Yes.

Q  And that's Sandra Holloway?

A  Yes.

Q  And you are pleased to hear that Vernon never told her about any of this?

A  Yes.

Q  Which means he was keeping his mouth shut?

A  I talked to Ms. Holloway and she told me what was going on because Mr. Miller wasn't telling her anything.

Q  So you were glad to hear that he wasn't telling his mother about anything that had gone on?

A  No.  Because she was worrying real bad about what was going on.

Q  And you talk again about getting close to God?

A  Yes.

Q  And close to your family?

A  Yes.

Q  An close to star let?

A  Yes.

Q  And how you asked star let to Mary you?

A  Yes.

Q  And you tell Mr. Miller that there isn't anything to tell about this case?

501

H1                          @WITNESS – CROSS – @                          198

A   Correct.

Q   And you were on this witness stand Monday afternoon?

A   Yes, I was.

Q   For about two or three hours?

A   I can't recall how long it was.

Q   And you have been on the witness stand since about nine o'clock this morning, haven't you?

A   That's correct.

Q   Got an awful lot to tell, don't you?

A   I guess so.

Q   And as Mr. Pappas went over, you been working on your job?

A   Yes.

Q   You were in jail at that time, weren't you?

A   At what time.

Q   At the time you wrote this letter, Defendant's Exhibit 2?

A   Yes.

Q   You weren't working on your job?

A   I was telling him it appears that I was out, I was working on the job.

Q   And at the end of the first page of the second letter you say they have accused me of three bank robberies but you know what the real deal is, correct?

A   Yes, that's correct.

Q   And you are here to testify about the real deal?

A   Yes.

502

H1                          @WITNESS – CROSS   @                          199

Q   And on the second page you are telling Vernon to take responsibility for his role and don't be a snitch?

A   That's correct.

Q   And you are taking full responsibility for your role here today, aren't you?

A   Yes.

Q   And then as Mr. Pappas went over with you briefly that you asked Vernon to write an affidavit saying you had nothing to do with the second robbery from Mesquite Credit Union?

A   Yes, that's correct.

Q   So you were asking Vernon to lie for you?

A   Yes.

Q   To try and help yourself?

A   Yes.

Q   So that you could get less time so that you could maybe even get some of the charges dropped against you?

A   I --

Q   Because you didn't want the authorities to think you had anything to do with the second Mesquite Credit Union robbery?

A   Yes.

Q   That's why you wanted him to write the affidavit?

A   Yes.

Q   And you also say with what you and I know about Shreveport and you are talking about the restaurant robberies?

A   Yes.

503