Q   And you think all of this is going to be helpful to you so you can get up on your feet an help yourself?

A   Right.

Q   And you are offering to get a lawyer for Vernon Miller?

A   Yes.

Q   And you are wanting his help so you can get out of jail because there is no need for both of you to go to jail, is there?

A   That's correct.

Q   And you wanted to be the one who didn't have to stay in jail, didn't you?

A   Well, it wasn't that.  Like I said we always said if one go to jail the other one should be out.

Q   And by that, you are the one whose asking him to help you get out of jail?

A   Yes.

            THE COURT:  Ms. Bindler, let's take our midafternoon recess at this time.

            Ladies and Gentlemen, we'll be in recess until 3:20.

            (Recess)

            THE COURT:  Go ahead, Ms. Bindler.

            MS. BINDLER:  Your Honor, may I approach the witness?  I have several exhibits to give him.

            THE COURT:  Yes, ma'am.

504

RECROSS-EXAMINATION

BY MS. BINDLER:

Q   Mr. Nichols, I am going to hand you what's been marked as Government's Exhibit 57.  Do you recognize this receipt?

A   Yes.

Q   And what receipt is this for?

A   The purchase of camcorder.

Q   And is that the camcorder we have talked about here today?

A   Yes.

Q   And the one you bought?

A   Yes.

Q   And I am going to show you what's been previously marked as Government's Exhibit 56.  This is a copy of receipts, do you recognize this?

A   Yes.

Q   And what is this for?

A   Struts to go on a 1991 Accura Integra.

Q   And is it in your name?

A   Yes.

Q   And I show you Government's Exhibit 58, do you this recognize?

A   Receipt.

Q   And whose name is it in?

A   Mine.

Q   And what is it for?

505

A  To purchase a stereo system and car alarm.

Q  And what car is that?

A  1991 Accura Integra.

Q  I show you Government's Exhibit 59.  Do you recognize this?

A  Yes.

Q  And what is this receipt for?

A  Gold to go on a car, around the plates.

Q  And what car?

A  A Lincoln.

Q  And what name?

A  Mine.

Q  And I show you Government's Exhibit 59 A and what name is it in?

A  Mine.

Q  And I show you what's previously been marked as Government's Exhibit 62.  Do you recognize this receipt?

A  Yes.

Q  And whose name is the receipt in?

A  Mine.

Q  And what name is that?

A  Larry Evans.

Q  And what is this receipt for?

A  A gun.

Q  I show you what's been marked as Government's Exhibit 70.

506

Do you recognize this?

A   Yes.

Q   What is this?

A   The title of 1987 Mustang.

Q   And what is the second sheet of paper represent?

A   The same thing.

Q   And that was the Mustang that you bought?

A   Yes, it is.

          MS. BINDLER:  At this time I move admission of
Government's Exhibit 70, 62, 59, 59, 58, 56 and 57.

          THE COURT:  Any objection?

          MR. JARRETT:  No, sir.

          MR. PAPPAS:  Your Honor, if I may I don't believe
those are being offered against my client.  I'm not sure I'm
entitled to a limiting instruction if they are offered by
codefendant's counsel but I would ask for one.

          THE COURT:  Well, I don't think so either.  I don't
think you are entitled to that since this is not government's
evidence even though it is so designated by the markings.

          I will admit in evidence Government's Exhibit 56,
57, 58, 59 A, 59, 62 and 70.

BY MS. BINDLER:

Q   And those receipts show purchases made by you for either
your Accura or your Mustang?

A   That's correct.

507

Q   When Mr. Pappas asking you about putting a gun to Mr. Reliford's head you explained to the jury you never have?

A   That's correct.

Q   Have you ever put a gun to anyone's head?

A   Not that I recall.

Q   Can you take a moment an think back in your 21 years and see if you ever remember putting a gun to anybody's head?

A   I'm not sure if I put it to his head.  But I did pull a gun on someone before.

Q   Who was that?

A   Gather.  I can't recall his last name.

Q   Why did you put a gun towards him but not his head?

A   He came to my house about five thirty in the morning asking me about a gun that was stolen.

Q   So this was at your house?

A   Well, it was at my sister's apartment.

Q   And it's your testimony that you didn't take Mr. Miller under your wing?

A   No, I didn't.

Q   That you've never told anybody other than your lawyer and the government about your involvement in any of these robberies?

A   That's correct.

Q   Specifically you have never told anybody about your involvement in the robberies in the Shreveport, correct?

508

A   I didn't understand the question.

Q   You have never told anybody that you were involved in the robberies in Shreveport?

A   I cannot recall that.

Q   You don't recall ever telling anyone that?

A   No.

Q   If you had told someone do you think you would remember it?

A   No.

Q   You don't think you would remember it?

A   No.

Q   Do you remember talking with anyone at Mansfield about Country Pimp?

A   I didn't call him by Country Pimp.  I called him by Jesse Anderson.

Q   You never referred to him as Country Pimp?

A   No, I haven't.

Q   Did you ever tell anyone at Mansfield about how you and Jesse Anderson brought back kilos of cocaine from Florida to sell?

A   No.

Q   You didn't?

A   No.

Q   It's not true or you didn't tell them that?

A   It's not true.

Q  Going back briefly to the last letter you wrote to Mr.
Miller which is the November 15th letter again you say tear
this letter in half an throw the pieces away?

A  Yes.

Q  And trust and believe in you because you won't mislead
him?

A  Yes.

Q  And again you tell him that you guys need to stick
together?

A  Yes.

Q  And you are asking him to do things for you and you'll see
that he's all right?

A  Yes.

Q  You make sure you got a hired lawyer instead of an
appointed lawyer?

A  That's correct.

Q  And again, it's your testimony that you never controlled
Mr. Miller?

A  That's correct.

Q  Never made him do anything?

A  No.

Q  Never hit him?

A  We played at fighting or something.  But just hit him
ordinary.

Q  So the only time you have ever struck Mr. Miller is when

510

you are play fighting?

A   Yes.

Q   Didn't hit him because he didn't do what you told him to?

A   No.

Q   Didn't hit him because he didn't do something the way you wanted it done?

A   No.

Q   Never did anything like that?

A   No.

Q   So it's your testimony when he was asleep you never put hot saws in his mouth?

A   That was a game that me and Mr. Miller and Mr. Reliford did.  The first person to fall asleep dotted it put in their mouth.

Q   Was it also a game you played with Mr. Miller that you would take your private parts out an hit Mr. Miller with them?

A   That's not true.

Q   That's not true?

A   No.

Q   Than a if Mr. Miller wasn't doing something you wanted you wouldn't put your fingers inside your rear end and smear it on Mr. Miller's face?

A   No.

Q   And that's not something you would do?

A    No.

Q    Because you don't try to control Mr. Miller?

A    No.

Q    And the last line in your letter to Mr. Miller is I have nothing but love for you?

A    Yes.

        THE COURT:    Mr. Jarrett, do you have further questions for Mr. Nichols?

        MR. JARRETT:    Yes, your Honor.    Approximately five questions.

                        REDIRECT EXAMINATION

BY MR. JARRETT:

Q    Mr. Nichols, why are you continually turned this way?

A    To face the jury.

Q    And you indicated you have pled guilty, sir?

A    Yes.

Q    And the fact that you pled guilty, does that change the truth?

A    No, it doesn't.

Q    Jesse Anderson, Country Pimp?

A    Yes.

Q    Where is he?

A    He's dead now.

Q    So you don't have any reason --- so you could blame everything on a dead man, couldn't you?

512

@WITNESS – REDIRECT – @                         209

A   No, sir, I wouldn't do that.

Q   But you didn't do that?

A   No.

Q   And how did you get the jet skis to Florida?

A   In the pick-up truck.

Q   What pick-up truck are we talking about?

A   The one that was stolen from Champion Ford in Shreveport.

Q   Now, did you receive any letters from Mr. Miller?

A   Yes, I did.

Q   And what did you do with those letters?

A   Passed them over to my attorney.

        MR. JARRETT:   May I approach the witness, your Honor?

        THE COURT:   Yes, sir.

BY MR. JARRETT:

Q   Would you look at this, please?

A   Yes.

        MR. JARRETT:   Your Honor, this would be marked as Government's Exhibit 94.  A copy has been provided to the defense attorneys and I will show them again.

        THE COURT:   All right.

        MR. JARRETT:   At this time, your Honor, I will -- strike that.

BY MR. JARRETT:

Q   How is it that you recognize this letter?

CASSIDI L. CASEY CSR (214) 767-0774

513

@WITNESS – REDIRECT – @                                    210

A   It was passed to me by a guard at Mansfield.

Q   And what did you do with the letter?

A   Gave it to my attorney.

Q   Do you recognize the handwriting?

A   Yes, I do.

Q   Whose is it?

A   Mr. Miller's.

Q   Can you give us an idea when you received the letter?

A   I can't recall.  I received several letters while at Mansfield.

        MR. JARRETT:  At this time I offer in evidence Government's Exhibit 94.

        THE COURT:  Any objection?

        MS. BINDLER:  No, your Honor.

        THE COURT:  Government's Exhibit 94 is admitted.

        MR. JARRETT:  Approach the witness, your Honor?

        THE COURT:  Yes, sir.

BY MR. JARRETT:

Q   When Mr. Miller says that they wanted me to try to testify against you possibly Eric, what was he talking about?

A   He stated that --.

        MS. BINDLER:  Objection, your Honor, he doesn't know what was in my client's mind when he wrote this.  It's speculation.

        THE COURT:  I'll sustain the objection to the

514

question as phrased.

BY MR. JARRETT:

Q   What did you take that to mean?

A   That the FBI had offered Mr. Miller a plea agreement in order to testify against me.

Q   And when he said without either of us they have nothing, just circumstantial evidence, what did you take at that to mean?

A   That if I I didn't testify against him.

Q   You know I won't say nothing because I have gone it in the past.  I'm asking you not to say anything here.  What did you take that though mean?

A   Well, once again he asked me not to testify.

MR. JARRETT:  Pass the witness.

THE COURT:  Mr. Pappas, do you have questions for the witness?

MR. PAPPAS:  Very few, your Honor.

RECROSS-EXAMINATION

BY MR. PAPPAS:

Q   You were asked by Mr. Jarrett why you were faced the way you were faced and you said it's to face the jury?

A   Yes.

Q   Who gave you that advice?

A   No one.

Q   You just came up with that on your own?

A    Yes.

Q    And you were asked on the other cross about Mr. Anthony Beau and it's your testimony now that he is a gang member?

A    Anthony Beau?  Yes, he's a gang member.

Q    And he's a gang member of what gang?

A    The rolling sixties.

Q    That's the Crypts?

A    Yes.

Q    And you testified on cross that you have a green at that time too on your chest, is that correct?

A    Yes, that's correct.

        MR. PAPPAS:  Your Honor, at this time I have requested permission -- I have checked with Mr. Jarrett and he has no objection -- to allow this gentlemen to step down and show his at that time too to the Ladies and Gentlemen of the Jury.

BY MR. PAPPAS:

Q    Would you do that, sir?

A    Yes, sir.

Q    And sir, you had made some testimony earlier about you were being beat by Mr. Reliford, is that correct?

A    No.

Q    Did you have a beeper during the summer of 1994?

A    Yes.  I thought you said beat like in beat up on.

Q    A beeper?

A    Yes.

Q    What was that beeper number?

A    I cannot recall now, sir.

Q    Do you know a James Williams or Kevin Harris?

MR. JARRETT:  Your Honor, this is beyond the scope of cross examination.  Strike that.  Beyond the scope of redirect examination.

THE COURT:  Sustained.

BY MR. PAPPAS:

Q    You were asked on the other cross about this stolen carrying bag?

A    A stolen carrying bag was mentioned.

Q    The green canvas bag that you put the money in that I guess you took from Mesquite Credit Union?

A    Are you talking about the one that Mr. Miller carried?

Q    Yes.

A    No.  It wasn't stolen.  It was bought in Florida.

Q    By you and Mr. Miller?

A    Yes.

Q    And that bag was left left in the storage recently place that you had leased in your name?

A    Yes.

Q    And that's where it was recovered by the authorities?

A    Yes, that's correct.

Q    Now, you have never had any contact with Mr. Reliford in

@WITNESS — RECROSS — @                    214

the Mansfield jail, is that correct?

A   No.

MR. PAPPAS:   Pass the witness, your Honor.

THE COURT:   Anything further, Ms. Bindler?

MS. BINDLER:   Briefly, your Honor.

RECROSS-EXAMINATION

BY MS. BINDLER:

Q   This letter at that Mr. Jarrett just handed you, Government's Exhibit 94?

A   Yes.

Q   This is a letter that my client wrote you at Mansfield?

A   Yes.

Q   And you gave it to your lawyer?

A   Yes.

Q   And it was your testimony earlier that you were wanting my client to write an affidavit for you about the Mansfield credit union Number 2 robbery?

A   Yes, that's right.

Q   And you would have given that to your lawyer?

A   Yes, ma'am, that's correct.

Q   And your lawyer gave this letter to Mr. Jarrett, didn't he?

A   Yes.

Q   And in this letter it says -- Vernon is telling you I won't say nothing because I have done it in the past?

518

A   Yes.

Q   And that's because you asked Mr. Miller to keep quiet and in the past he's done what you have told him and he's going to do it again, isn't he?

A   No, that's not what he was talking about.

        MS. BINDLER:   Thank you.

        THE COURT:   You may step down Mr. Nichols.   Thank you.   Who will be the government's next witness?

# C E R T I F I C A T I O N

I, Cassidi L. Casey, certify that during the proceedings of the foregoing-styled and -numbered cause, I was the official reporter and took in stenotypy such proceedings and have transcribed the same as shown by the above and foregoing pages 1 through 19 and that said

transcript is true and correct.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.


CASSIDI L. CASEY
UNITED STATES DISTRICT REPORTER
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
BOARD NUMBER 1703

Exhibit 32

Declaration of Charles May

521

## DECLARATION OF CHARLES MAY

Charles May, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Charles May and my date of birth is June 6, 1952.

2. During 1995, I was an inmate at the Mansfield Detention Center. I recall another inmate by the name of Orlando Hall who was being held there also. Orlando Hall and I were in the same tank for a couple of weeks.

3. Orlando was always very quiet and I never heard him talk about his case, to me or anyone else. Orlando was very suspicious of other inmates on the unit and did not trust anyone. During a card game, he once warned me about another inmate who was talking a lot and trying to get others to talk about their cases.

4. Based on my observations of Orlando, I do not believe that he would have ever talked with anyone about details of his case or any secret plans that he may have had. He never talked about having a plan to escape and I never heard anyone else say that Orlando had talked of such plans. Orlando never bragged about his involvement in his case nor did he say anything vulgar about the victim. I never saw Orlando with any weapon of any type while in the unit, and no one else in the unit ever told me that Orlando had any weapon whatsoever.

5. I was never interviewed by any of Orlando Hall's attorneys or any representative of Hall's attorneys prior to May, 2000. If I had been contacted in 1995, I would have told them the same information contained in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___M̄ay 10th 2000___ (date).

26221-07

CHARLES W. May

**CHARLES MAY**

522

Exhibit 33

Declaration of Javier Solis

523

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ORLANDO CORDIA HALL
        Plaintiff

        v.

UNITED STATES OF AMERICA
        Respondent

CIVIL ACTION NO.

DECLARATION OF    Javier Solis

I, Javier Solis, declare as follows:

1.    I am over 18 years of age.  All statements made herein are based upon my personal

knowledge, and I am competent to testify hereto:

I was incarcerated in Mansfield Detention center for 6 months. During in that time I was in the same holding tank for about 2 weeks with Orlando Hall.

During the 2 weeks I would see Orlando every day in the day room. Orlando never did talk about escaping or planning to abduct his layers, or a jail guard to escape. Orlando didn't talk much or brag about his case or brag about killing a girl. Orlando didn't talk about his case at all.

I was around Orlando during this time and based on the way he acted and the way that he talked. I believed that Orlando was sorry about what happened in his case that he felt bad about it.

I never did know about Orlando or anybody else to have a shank or any other weapon on the tank.

524

Also in Mansfield were two other inmates by the name of Hayward Alexander & Larry Nichols, I Often heard this 2 inmates talking about getting a 5dK or reduction on their sentences. This inmates had the reputation of trying to come up with information from other inmate. in order to testify against them for help with their cases, Other inmates warned me not to talk to them about my case.

I over heard Nichols brag about snithing on his co-defendents

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

4-10-00   2421 South Carrier Prkwy
Date and Place Grand Prairie
Tk. 75051

Name

525

Exhibit 34

Declaration of Charles Chastain

526



DEPARTMENT OF CRIMINAL JUSTICE

## DECLARATION OF CHARLES CHASTAIN

Charles Chastain, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Charles Chastain. I am over the age of eighteen years and otherwise competent to make this declaration.

2. I hold the Ph..D. in Government from Southern Illinois University and am a Professor of Criminal Justice at the University of Arkansas at Little Rock, having been here continuously since 1972. For sixteen of those years I was the Department Chair. I have served as President of the Southwest Association of Criminal Justice Educators of which I have been a member since its inception in 1978. I have also been a member of the Academy of Criminal Justice Sciences (a national organization) since 1975 and served a three-year term as a member of that organization's Executive Board as the representative for Texas, Oklahoma, Arkansas, New Mexico, Arizona, Colorado, and Utah. During the past twenty years I have made many presentations of research and served on academic discussion panels for ACJS and SWACJE. In January this year I completed a seven-year term on the Arkansas Post Prison Transfer Board (formerly Board of Pardons and Paroles), and in that capacity have reviewed the files of and interviewed thousands of inmates in the Arkansas Department of Correction. My area of expertise is in the Constitutional Law of Criminal Justice, but over the past few years I have leaned more toward parole and am now considering writing a book or monograph about the Arkansas parole system.

3. At the request of attorneys representing Orlando Hall, I have reviewed Hall's records from his incarceration as inmate number 99582 in the Arkansas Department of Corrections. Based on my experience with that agency and my familiarity with its practices and standards, I can express the following opinions with a high degree of confidence in their reliability.

4. The documents reflect that Hall was assigned as a "C-2 trusty." All inmates are classified as Class I, II, III, or IV. The higher the classification, the more good time the inmate earns. All Class I inmates get 30 days good time per month, but the degree of trust imposed in them varies somewhat. Hall's designation as a C-2 trusty indicates that he was a Class I (highest level) inmate and that he occupied a trusted status. C-1 trusties can actually leave the compound unescorted; C-2 trusties can leave the prison walls with a security person; C-3 trusties are Class I inmates but cannot leave the prison grounds. The records indicate that Hall reached the C-2 trusty level rather quickly, which strongly suggests

527

that the authorities viewed him as having a low propensity for violence and general misbehavior, and that Hall impressed them with his positive adjustment to confinement.

5. The documents also indicate that Hall, at the time he was originally considered for parole and when he actually made parole, had not committed a single disciplinary infraction during any period of incarceration. Disciplinaries are write-ups for misbehavior in the institution. Hall's record of zero disciplinaries is as good a record as an inmate could have. It is unusual for an inmate to complete his sentence without acquiring any disciplinaries whatsoever. Hall's record in this regard indicates that he has been an ideal inmate.

6. The documents reflect that Hall obtained release on parole under "Act 814." That Act provided for certain inmates to be discharged from custody into the community on work-release. The decision to parole Hall under Act 814 was strictly up to the Department of Correction; it is safe to say that the DOC did not grant 814 status to any inmate who had given any reason to be concerned about his behavior, nor to any inmate who had not used his time productively and positively while in the institution.

7. I was never interviewed by any of Orlando Hall's attorneys or any representative of Hall's attorneys prior to May, 2000. In my opinion, any person with comparable expertise in corrections in the State of Arkansas in 1995 could have attested to the same information contained in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on _____ (date).

_Charles Chastain_    5/10/00
CHARLES CHASTAIN

528

Exhibit 35

Excerpts from Mr. Hall's Arkansas DOC records

529

# Certificate of Achievement

This award of distinction is presented

To _____ ORLANDO HALL _____

For Superior Achievement & Excellence of

Performance in _____ SUBSTANCE ABUSE TREATMENT PROGRAM _____

This _29th_ day of _____ JANUARY _____, 19_93_

Signed _____

RECEIVED

JAN 2 9 1993

FILE CLERK
TUCKER UNIT

Rec'd
9-21-93/8
Minc'

TO:     INFIRMARY ADMINISTRATION

FROM:   CLASSIFICATION OFFICER

RE:     A.R. #386/MERITORIOUS GOOD TIME

DATE: 9-20-93

Effective March 1, 1991, an inmate may be awarded extra good time for appropriate use of sick call:  Appearances at sick call 12 times per year or less, excluding emergencies and/or infirmary ordered appointments.  Please check the appropriate box indicating this Inmate's use of sick call as specified previously and return to classification.

INMATE: O. Hall                    ADCH 99582

ELIGIBILITY DATES: 9-4-92        THROUGH 9-4-93

[X]     Zero to 4 appearances at sick call in one (1) year.

[ ]     5 to 8 appearances at sick call in one (1) year.

[ ]     9 to 12 appearances at sick call in one (1) year.

[ ]     13 or more appearances at sick call in one (1) year.

S Minchew  Med Rec Clerk
INFIRMARY ADMINISTRATOR

9-21-93
DATE

(TEPCSI:SICALL.826)

531
1013

STATE OF ARKANSAS
DEPARTMENT OF CORRECTION

Pine Bluff     UNIT

RECEIVED
OCT 6 1993

TO:     Director

FROM:   Warden   Dobbs

RE:     Inmate   Hall, O. _____ ADC# 99582

DATE:   9-24-93

Pursuant to the provisions of Act 273 of 1987 and Administrative Regulation 826, and in recognition of the requirements listed below, I do hereby concur with the recommendation of the Unit Classification Committee for:

Award of ___60___ days Meritorious Good Time

_____ OJT

Job:_____ from _____ to _____

XXX
_____ APPROPRIATE USE OF SICK CALL

Visits: __0 To 4__ from __9-92__ to __9-93__

_____ HEROIC ACT, _____ DAYS

Explain: _____

_____

_____ UNSOLICITED ACT, _____ DAYS

Explain: _____

_____

_____ OTHER

Explain: _____

_____

_____

_____ Warden     9-27-53
                                     Date

Director - APPROVE _____ Date  9/30/93

DENY _____ Date _____      532

1015

99582-A

INMATES'S NAME _Orlando___Hall_____    COUNTY _UNION_

BASED UPON THE ABOVE NAMED INMATE'S CONDUCT WHILE UNDER MY SUPERVISION,

I RECOMMEND (X) DO NOT RECOMMEND ( ) THE AWARD OF MERITORIOUS GOOD TIME

FOR THE PERIOD SERVED IN THE COUNTY JAIL AWAITING TRANSFER TO THE DEPARTMENT

OF CORRECTION. THE ABOVE * NAMED INMATE WAS INCARCERATED IN THE COUNTY JAIL

AWAITING TRANSFER TO THE DEPARTMENT OF CORRECTION FORM _sept 4, 1995_

19_____ TO ___9-4___ 19 _92_.

Ross
9-14-92
64

_____
SHERIFF,S SIGNATURE

I HEREBY CERTIFY THAT I AM AUTHORIZED TO MAKE THE ABOVE RECOMMENDATION AND

TO SIGN FOR THE SHERIFF.

_____
TRANSPORTING OFFICER

533

1014

## DEPARTMENT OF CORRECTION
## TUCKER UNIT
## TUCKER, ARKANSAS

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____ POSTED

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: Orlando Hall ADC#: 9982 BKS: 9-C DATE: 11-C-9

WORK ASSIGNMENT: VO-Tech PERSON YOU WISH TO CALL: LaTonya Andt

RELATIONSHIP: "Fiance" daughter mother. ADDRESS: 1622 E. Maple CITY: Texas

STATE: Midland "Texas" ZIP CODE: 29701 PHONE #: (915 570-1136

HOW DID YOU LEARN OF THE EMERGENCY: Visition and letter on 11-1-93

EXPLAIN NEED: Sir, My 9 month old daughter was admitt into the Hospital to have an operation done on her ear's. I need to speak with my Fiance her mother concerning my daughter Health. Thank u

INMATE SIGNATURE: Orlando Hall 91582

APPROVED: _____ DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: Call Complete 11-5-93 E. Bretton 10:10pm

## DEPARTMENT OF CORRECTION
## TUCKER UNIT
## TUCKER, ARKANSAS

DATE: _____

TO: _____ ADC#: _____ BKS: _____

FROM: _____

YOUR REQUEST FOR A TELEPHONE CALL DATED _____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____

_____

_____

_____

_____
APPROVING OFFICER

NOV 1 5 1993

FILE CLERK DATE
PINE BLUFF UNIT

534

1213

## DEPARTMENT OF CORRECTION
## PINE BLUFF WORK COMPLEX
## PINE BLUFF, ARKANSAS

POSTED

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: O. Hall 99582 _____ ADC#: 99582 BKS: 9C DATE: 11-15-93

WORK ASSIGNMENT: Vo-Tech _____ PERSON YOU WISH TO CALL: (Mother)

RELATIONSHIP: Mother _____ ADDRESS: 1503 Quitter CITY: El Dorado

STATE: Arkansas _____ ZIP CODE: 71730 PHONE #: (851) 862-3177

HOW DID YOU LEARN OF THE EMERGENCY: (Visitation) sister

EXPLAIN NEED: Hello, Sir, I recived some unFortunate news concerg. My Father Health. this past friday my Brother found him Lauing in the Bath Room from A serious stoke. my family ha came down from out of state and I will be gradeful if you will Allow me to speak with them & check on M.

INMATE SIGNATURE: O. Hall N. 99582

APPROVED: _____ DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: Call incomplete 11-15-93 RL

Call complete 11-25-93 E. Bratten 10:30

## DEPARTMENT OF CORRECTION
## PINE BLUFF WORK COMPLEX
## PINE BLUFF ARKANSAS

RECEIVED

NOV 2 9 1993

DATE: _____

TO: _____ ADC#: _____ BKS: _____

FILE CLERK
PINE BLUFF UNIT

FROM: _____

YOUR REQUEST FOR A TELEPHONE CALL DATED _____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____

_____

_____

535

_____ APPROVING OFFICER        DATE

1212

DEPARTMENT OF CORRECTION
INTER-OFFICE COMMUNICATION

TO: O. HALL #99582                        DATE: 7-6-93

FROM: Mr. L. C. Evans, Classification Officer    RE: WORK RELEASE APPLICATION

I am in receipt of your application for Work Release. Your application was reviewed by the Unit Classification Committee on _____7-1-93_____. You meet the requirement necessary to participate in the program.

Your name will be placed on a list along with other applicants for possible screening by a Work Release Representative in the future.

cc: Inmate's File
    File

1137



DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

DEC 1 1995

POSTED

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____

FILE CLERK
PINE BLUFF UNIT

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____ DEC 2  1995

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: Orlando Hall  ADC#: 49582 BKS: 9-C DATE: 12

WORK ASSIGNMENT: Vo-tech  PERSON YOU WISH TO CALL: Betty Hall

RELATIONSHIP: Mother  ADDRESS: 1503 Nautter CITY: ELDorado

STATE: ARKansas  ZIP CODE: 71730  PHONE #: (501) 862-3177

HOW DID YOU LEARN OF THE EMERGENCY: Father Vistion

EXPLAIN NEED: Sir my mother is very ill, She may need a blood transplant. Well I gaive you a letter concerning the matter. Thanks you!

INMATE SIGNATURE: _____

APPROVED: _____  DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: Call Complete 12-20-93 10:50am.

E. Brite

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

DATE: _____

TO: _____

ADC#: _____ BKS: _____

FROM: _____

YOUR REQUEST FOR A TELEPHONE CALL DATED_____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____

_____

_____

APPROVING OFFICER

DATE

ACI-7264

117.

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____

_____

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: O. HALL                        ADC#: 99582 BKS: 9C DATE: 8-30-93

WORK ASSIGNMENT: Vo-Tech    PERSON YOU WISH TO CALL: Betty Hall

RELATIONSHIP: mother    ADDRESS: 1503 Qurter    CITY: EL Dorado

STATE: Arks    ZIP CODE: 71730    PHONE #: (501) 862-3177

HOW DID YOU LEARN OF THE EMERGENCY: caption Death in family

EXPLAIN NEED: _____

_____

_____

INMATE SIGNATURE: ORLANDO HALL

APPROVED: Cpt. [signature]    DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: Call made and completed

8-30-93 - IMTaylor

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

DATE: _____

TO: _____ ADC#:_____ BKS:_____

FROM:_____

YOUR REQUEST FOR A TELEPHONE CALL DATED_____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____

_____

_____

538

_____        _____
APPROVING OFFICER                          DATE

1185

TELEPHONE REQUEST SLIP
DEPARTMENT OF CORRECTION
Pine Bluff Unit

(1)   AN ACTUAL EMERGENCY MUST EXIST AT HOME.
(2)   AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST.
(3)   INMATES FILL OUT TOP PART OF FORM ONLY.
(NOTE: GIVING FALSE INFORMATION WILL RESULT IN DISCIPLINARY ACTION)

NAME: _Orlando Hall_ ADC#: _99582_ BKS: _9-C_ CLASS: _1-C_

WORK ASSIGNMENT: _Vo-Tech_ PERSON YOU WISH TO CALL: _Betty Hall_

RELATIONSHIP: _Mother_ ADDRESS: _____ CITY: _El Dorado_

STATE: _AR_ ZIP CODE: _____ PHONE#: (    ) _962-317_

HOW DID YOU LEARN OF THE EMERGENCY: _____

EXPLAIN NEED: _____ Aunt died - (not getting to go
to funeral) - letting him speak w/ family_

INMATE SIGNATURE: _____ DATE: _8-31-93_

APPROVED: _____ DISAPPROVED: _(for 9-3-93)_

COMMENTS BY P.B.X. OPERATOR: _Call complete 9-3-93_

532

1184

Orlando Hall #99582
mother had stroke in
April. Passed out this a.m.
being test at Union
Medical. Eldorado.
Can he call home
tonight about 8:00pm.
to get test results +
see how she's doing?

Pam - (sister) called.
9/13/93

**IMPORTANT MESSAGE**

FOR Warden

DATE 10-11-93    TIME 2:05 P.M.

WHILE YOU WERE AWAY

M Ron Smith

OF Attorney

PHONE No. 534-3721

| TELEPHONED | ✗ | PLEASE CALL | ✗ |
|---|---|---|---|
| CALLED TO SEE YOU | | WILL CALL AGAIN | |
| WANTS TO SEE YOU | | RUSH | |
| RETURNED YOUR CALL | | | |

MESSAGE Hall, O. # 99582

App for 814

SIGNED ms.

540

1183

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

POSTED

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: _O. Hall_ ADC#: _14582_ BKS: _9C_ DATE: _9-20-93_

WORK ASSIGNMENT: _VO-Tech_ PERSON YOU WISH TO CALL: _Lindsey) Bett Hall._

RELATIONSHIP: _mother_ ADDRESS: _1503 N Quarter_ CITY: _El Dorado_

STATE: _ARK_ ZIP CODE: _71730_ PHONE #: _(501) 862-3777_

HOW DID YOU LEARN OF THE EMERGENCY: _My Sister called last monday._

EXPLAIN NEED: _Sir I would be very grateful if you would Allow Me_
_To call my mother. She is very sick, Every since my aunt Deed she (1_
(1 week _have been in And out The hospital. I'm very worried about her having Another._
_Please Allow me to call her This._

INMATE SIGNATURE: _Orlando Hall_

APPROVED: _(signature)_ DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: _____

_Call Incomplete - No answer - 9-30-93 - E Bratton 9:10 pm_

_Call Complett 10-2-93_
_Dozier 10:20 pm_

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

DATE: _____
OCT 8 1993
ADC#: _____ BKS: _____
REC'D _____
MAIL _____ _____

TO: _____

FROM: _____

YOUR REQUEST FOR A TELEPHONE CALL DATED _____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____
_____
_____

54)

_____        _____
APPROVING OFFICER              DATE

1182

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

POSTED

RECEIVED
OCT 1 5 1993
FILE CLERK
PINE BLUFF UNIT

(1) AN ACTUAL EMERGENCY MUST EXIST AT HOME: _____

(2) AN ACTUAL NEED FOR IMMEDIATE INFORMATION MUST EXIST: _____

(NOTE: GIVING FALSE INFORMATION FOR REQUEST WILL RESULT IN DISCIPLINARY ACTION)

NAME: Orlando Hall    ADC#: 9958    BKS: 9-c    DATE: 10-1-93

WORK ASSIGNMENT: Vo-tech    PERSON YOU WISH TO CALL: Betty Hall

RELATIONSHIP: mother    ADDRESS: 1507 Navarro    CITY: El Dorado

STATE: AR    ZIP CODE: 71730    PHONE #: (501) 862-3177

HOW DID YOU LEARN OF THE EMERGENCY: by a visit

EXPLAIN NEED: Sir: My father had a stroke this past week and had to be admitted. in the hospital Sir it is inspired That I know his condition. not to Long a go my mother had a stoke also.

INMATE SIGNATURE: Orlando Hall

APPROVED: _____ DISAPPROVED: _____

COMMENTS BY P.B.X. OPERATOR: Hall made his call I have no way of knowing who he call except from the above information

/Call Complete

DEPARTMENT OF CORRECTION
PINE BLUFF WORK COMPLEX
PINE BLUFF, ARKANSAS

B. _____
953-p
10/14/93

DATE: _____

TO: _____    ADC#: _____ BKS: _____

FROM: _____

YOUR REQUEST FOR A TELEPHONE CALL DATED _____ HAS BEEN APPROVED - DISAPPROVED

FOR THE FOLLOWING REASONS: _____

_____

_____

APPROVING OFFICER    DATE

542    1181

ARKANSAS DEPARTMENT OF EDUCATION
TESTS OF GENERAL EDUCATIONAL DEVELOPMENT
EXAMINEE'S SCORE REPORT

NAME OF EXAMINEE ....................... HALL SR, ORLANDO C
SOCIAL SECURITY NUMBER .............. 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
DATE OF BIRTH .......................... 24-APR-1971
TEST SCORING DATE ..................... 20-DEC-1993
GED TEST CENTER CODE .............. 352

| | TEST FORM | STANDARD SCORE | PERCENTILE RANK |
|---|---|---|---|
| TEST 1: THE WRITING SKILLS TEST ........................ | AF | 44 | 26 |
| TEST 2: THE SOCIAL STUDIES TEST........................ | AF | 49 | 45 |
| TEST 3: THE SCIENCE TEST .............................. | AF | 53 | 62 |
| TEST 4: INTERPRETING LITERATURE AND THE ARTS ..... | AF | 50 | 50 |
| TEST 5: THE MATHEMATICS TEST ........................ | AF | 20 | 1 |
| TOTAL SCORE ................................... | | 216 | |
| AVERAGE STANDARD SCORE ................... | | 43.2 | |

A MINIMUM STANDARD SCORE OF 40 ON EACH OF THE FIVE TESTS, AND AN
AVERAGE STANDARD SCORE OF 45, IS THE REQUIRED PASSING SCORE
PASSED _____ FAILED __X__

NOTE:
    THE SCORES ON THIS REPORT ARE THE HIGHEST SCORES ACHIEVED
    BY EXAMINEE AND NOT NECESSARILY THE MOST RECENT OR RETEST SCORES
    IF RETEST SCORES ARE LOWER THAN SCORES PREVIOUSLY ACHIEVED THE
    RETEST SCORES ARE NOT REPORTED

STATE ADMINISTRATOR OF G.E.D.
TESTING PROGRAM
LITTLE ROCK, ARKANSAS 72201

543    1170

Exhibit 36

Declaration of Cleo Jamerson

544

## DECLARATION OF CLEO JAMERSON

Cleo Jamerson, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Cleo Jamerson. I live at 1308 Rock Island in El Dorado, Arkansas.

2. I am an officer with the El Dorado Police Department, presently assigned as resident police officer at Rogers Middle School. I was previously employed as a deputy sheriff with the Union County Sheriff's Department, located here in El Dorado.

3. During my service as a deputy sheriff, I had contact on several occasions with Orlando Hall. I placed Mr. Hall under arrest on at least one occasion, and I was on duty at the jail where he was housed for a period of time. I also transported him on at least one occasion from El Dorado to the state prison in Pine Bluff.

4. In my dealings with Mr. Hall, he never gave me any problems as a prisoner or a detainee. When I arrested him, he did not attempt to flee or evade me. He did not resist arrest. He did not express anger or hostility toward me. He took no violent actions.

5. When Mr. Hall was in jail, he was what I would call a good inmate. He kept to himself and did not incite conflict with other inmates. He did not lead other inmates into trouble by encouraging them to break the rules. In the jail, we periodically conducted searches for contraband and weapons, to maintain the security of the facility. Mr. Hall was never found to be in possession of contraband, such as drugs. He was never found to be in possession of any weapon. I do not recall him ever being placed on "lock down" or losing privileges as a result of misbehavior. He was never involved in any plan or attempt to escape from custody. If all our inmates had behaved like Mr. Hall, we would have had an orderly and peaceful jail at all times.

545

6. In my capacity as deputy sheriff, I was authorized to approve the amount of "good behavior" time which an inmate was entitled to claim against his state sentence for having behaved himself in the county jail before being transferred to state custody. If an inmate acted violently or broke the rules while in the county jail, they would not receive such credit. On one occasion in 1992, I signed such a document for Orlando Hall, indicating that he was entitled to meritorious good time credit as a result of having conducted himself in a positive manner while he was in the county jail. A true and correct copy of that document is attached to this statement as Appendix A. The signature on that document is mine.

7. In my own observations of Mr. Hall, I never knew him to commit any act of violence either in jail or when he was in my immediate custody.

8. Prior to April, 2000, when Mr. Hall's current attorneys visited Rogers Middle School, I was never contacted by anyone, before or after Orlando Hall's trial, concerning the matters set out in this statement. If I had been asked, I would have told them the same things I have stated here. If I had been called as a witness to testify to the facts contained in this statement at Orlando Hall's trial, I would have been willing to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 18, 2002_ (date).

CLEO JAMERSON

546

APPENDIX A
Orlando Hall good-time credit from Union County Jail (1992)

547

99582-A

INMATES'S NAME _Orlando Half_                                    COUNTY  UNION

BASED UPON THE ABOVE NAMED INMATE'S CONDUCT WHILE UNDER MY SUPERVISION,

I RECOMMEND (X) DO NOT RECOMMEND (  ) THE AWARD OF MERITORIOUS GOOD TIME

FOR THE PERIOD SERVED IN THE COUNTY JAIL AWAITING TRANSFER TO THE DEPARTMENT

OF CORRECTION. THE ABOVE * NAMED INMATE WAS INCARCERATED IN THE COUNTY JAIL

AWAITING TRANSFER TO THE DEPARTMENT OF CORRECTION FORM _Sept 4, 1992_

19_____        TO _____9-4_____  19 _92_.

Ross
9-14-92
64

32 days MGT

SHERIFF,S SIGNATURE

I HEREBY CERTIFY THAT I AM AUTHORIZED TO MAKE THE ABOVE RECOMMENDATION AND

TO SIGN FOR THE SHERIFF.

TRANSPORTING OFFICER

548

1014

Exhibit 37

Declaration of Keith Hill



## DECLARATION OF KEITH HILL

Keith Hill, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.  My name is Keith Hill. I am over eighteen years of age and have personal knowledge of the matters set forth below. I reside in Little Rock, Arkansas.

2.  I work as a security officer for the State Hospital. Prior to my service at the State Hospital, I was a correctional officer for fourteen years for the State of Arkansas. After graduating from the law enforcement academy, I began work at the Tucker Unit of the DOC. Over the course of my career, I was also assigned to the Pine Bluff Work Complex, the Diagnostic Unit, and the Wrightsville prison. I was promoted to corporal in 1992 and held the rank of sergeant at the time I left the DOC to move to the State Hospital.

3.  I know Orlando Hall, or "Lan," although I have not had contact with him in quite a few years. I know him because we both grew up in El Dorado, Arkansas, which is a fairly small town. I am about five years older than Lan, so we were not in school together. I was in high school with his older sister Pam, although we were not in the same class.

4.  Mostly, I got to know Lan because he and his brothers would come over to our neighborhood regularly to play basketball. People came from all over town to play, especially on Sunday afternoons. The games were held at what was then the Watson school on Center Street. Lots of people from our community would gather to watch the games. Lan and his brothers were from the "Douglas" neighborhood; my friends and I lived in the "Fairview" or "New Addition" neighborhood. Lan was a regular participant in these basketball games.

5.  Based on my familiarity with Lan during those years, I would describe him as mellow and easygoing. He definitely did not seem violent and I do not recall any occasion on which I saw or heard about Lan doing anything violent, like fighting or having a weapon. Lan never had any reason to fight, because he got along well with people. People appreciated his good personality and he had a lot of charm.

6.  After I left El Dorado and began to work as a corrections officer, I would hear from time to time, when I visited El Dorado, that Lan was beginning to get into trouble with the law. I know a lot of people his age who got in trouble selling drugs, and that was what I was hearing about Lan.

7.  Later, I was assigned to transportation duty, which involved transporting inmates from one location to another for court appearances, transfers, medical care, and so on. While I was assigned to transportation, I was in and out of the Pine Bluff facility regularly. It was at Pine Bluff that I ran into Lan a number of times. Whenever I took an inmate to or from a facility, I would usually have an opportunity to visit with officers there, or even with inmates. Whenever I saw Lan in prison, I would talk to him to see how he was



doing. Since he was from El Dorado, and had always seemed like basically a good kid, I was interested in how he was doing. I also heard from the officers there how he was behaving himself, so I had a good sense of what was going on.

8. Lan did very well in prison. Of course, when he first came in, he had to settle down, like any other inmate. When a person first comes into the prison system, other inmates will "test" them to see if they are weak or can be manipulated. If the new inmate stands up for himself, that situation resolves itself and usually there isn't any trouble after that. After just a short time, Orlando was what I would call a "role model inmate." His classification improved steadily, which is an indication that he was not having any serious disciplinary problems. An inmate who gets into trouble and has to be put "in the hole" will be set back in his classification and will not advance in the way that Lan did. I never heard from Lan or anyone else that he had any major disciplinary cases for infractions such as possessing contraband or weapons, or acting out violently. Everything I saw and heard indicated that Lan had made a very successful adjustment to confinement.

9. I have been advised that at Lan's trial, a prisoner testified that Lan had been making weapons in jail and intended to take a hostage in an escape attempt. In my opinion as an experienced correctional officer, Lan's record and behavior are entirely inconsistent with such an allegation. Nothing about Lan's successful prior record as an inmate suggests that he would do such a thing. In addition, my experience as a correctional officer makes me deeply skeptical of such testimony, because I know that certain inmates routinely invent stories about other inmates in order to help themselves.

10. I was never contacted by any of Lan's attorneys or any representative of his attorneys prior to February, 2001. If I had been contacted in 1995, I would have told them the same information contained in this declaration and would have been willing to testify to these facts if called as a witness.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 13, 2002_ (date).

_Keith Hill_
KEITH HILL

551

Exhibit 38

Declaration of Stacey Dineen

552

### DECLARATION OF STACEY DINEEN

Stacey Dineen, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Stacey Dineen. I am over the age of eighteen and otherwise competent to testify to the facts set forth below. I have personal knowledge of the facts contained in this statement.

2. I am an attorney in Atlanta, Georgia. In the spring semester of 2001, as a student at the University of Texas School of Law, I worked on Orlando Hall's case under the supervision of Robert C. Owen, co-director of the Capital Punishment Clinic.

3. At Mr. Owen's request, I telephoned Dr. Jim Womack at the Federal Medical Center in Fort Worth, Texas. Mr. Owen had asked me to interview Dr. Womack about his recollections of Mr. Hall in 1995, while Mr. Hall was incarcerated at that facility.

4. When I first spoke with Dr. Womack, he indicated that he would need to contact the Bureau of Prisons' central office and request a download of Mr. Hall's file so that he could review it. It was my understanding in my second conversation with Dr. Womack that he was basing his statements in that conversation on the information in Mr. Hall's file.

5. Dr. Womack indicated that Mr. Hall had been housed in the Administrative Detention Center. He said that inmates could be placed in that facility for any number of reasons, including as punishment, for purposes of investigation, by choice, etc. Dr. Womack stated that he had seen Mr. Hall while acting as a psychiatric counselor for the jail, evaluating prisoners' mental status during "rounds." He typically visited inmates about once per month on these "rounds."



6. During these visits, Dr. Womack would inquire into any concerns or complaints the inmates had. The visits were conducted according to a standard template that required Dr. Womack to assess the inmates' behavior. Part of the analysis including reaching an opinion as to whether the inmate posed a threat to himself or to others. Dr. Womack stressed that these assessments were "situationally specific," and did not reflect a recommendation for the inmate's future placement. It was an analysis of the imminent status of the inmate, not a prediction of future dangerousness.

7. Dr. Womack stated that he had eight contacts with Mr. Hall. He characterized Mr. Hall as calm, unproblematic, relaxed, and well-adjusted. He noted that Mr. Hall was often reading, slept well, and smiled easily. Dr. Womack found nothing unusual about Mr. Hall's presentation; he was well-groomed and his room was kept neat. He then stated that he would "go so far as to say" that Mr. Hall was a "model detainee." He acknowledged that Mr. Hall was a "high profile" inmate who had "many people checking on him," but stated that Mr. Hall was probably unaware that so many people were observing his behavior. Dr. Womack said that he foresaw no difficulty in managing Mr. Hall and that Mr. Hall posed no problems to the prison staff. Dr. Womack emphasized that although his contacts with Mr. Hall were brief, that in no way meant they were cursory.

8. Dr. Womack initially stated that he would be willing to sign a statement reflecting what he had told me about his recollections of Mr. Hall. However, when I later attempted to follow up with him, he stated in a subsequent conversation that he would have to speak to the Legal Department before he could make any formal statement confirming the matters we had discussed. I offered to contact the Legal Department myself or to have

554

Mr. Owen do so, but Dr. Womack indicated that he would rather do so himself. I gave

him my telephone number and Mr. Owen's, and asked that he please call me back as

soon as he got any information from the Legal Department. Dr. Womack did not attempt

to contact me after that and I have not spoken with him since that time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2002 (date).


STACEY DINEEN

Exhibit 39

FBI-302 re: Alonzo Airy, dated 10/30/95

556

FD-302 (Rev. 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/30/95

ALONZO AIRY, black male, date of birth, July 19, 1958, inmate, SEAGOVILLE FEDERAL CORRECTIONAL INSTITUTE (SFCI), Inmate Number 26612077, was advised of the identities of Special Agent (SA) PAUL SHANNON of the FEDERAL BUREAU OF INVESTIGATION (FBI), and United States Attorney (USA) PAUL MACALUSO, Prosecutor, Northern District of Texas (NDT), Dallas, Texas, and that the interview concerned ORLANDO HALL. AIRY was interviewed at the SFCI, Seagoville, Texas. On October 30, 1995, AIRY provided the following information:

AIRY advised that he had been in a tank with ORLANDO HALL at the MANSFIELD CORRECTIONAL CENTER (MCC), Mansfield, Texas, while he was awaiting sentencing on his case, a Convicted Felon in Possession of a Firearm case, filed by agents with BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS (ATF). AIRY advised he is currently serving a sentence of 37 months in the federal penitentiary after having pled guilty and been sentenced in that case.

AIRY advised that in the time he was in Mansfield in the tank with ORLANDO HALL, he frequently spoke with HALL, and eventually became friends with him and another inmate known to him as NICHOLS. He stated that HALL frequently talked about the case against him. AIRY stated that HALL, AIRY, and NICHOLS frequently stayed up late at night in the tank and talked about HALL's case.

AIRY described HALL as a remorseless and extremely cold individual. He stated that HALL's mindset could be described as a gangster attitude. He stated that HALL saw nothing wrong with going out and "getting" someone if that person takes your money. AIRY stated in fact that HALL believed it was absolutely necessary to go after someone who ripped you off.

AIRY stated that HALL believed all of his troubles could be blamed on the brothers, whom he said ripped him off for $5,000. HALL stated to AIRY that the $5,000 taken in the drug

MW 02800

Investigation on  10/30/95  at  Seagoville, Texas  File  7A-DL-70351

by  SA PAUL SHANNON/cm    Date dictated  10/30/95

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

7A-DL-70351

Continuation of FD-302 of ALONZO AIRY _____ , On ___10/30/95___ , Page __2__

ripoff belonged to HALL. HALL stated to AIRY that he had been pretty big in the drug business, and then had gotten knocked down by an arrest and a stretch in the state penitentiary. HALL stated to AIRY he was just out of the penitentiary and he was going to use the money to come up in the drug business.

AIRY stated that HALL indicated that the other individuals involved in the kidnapping and subsequent murders were his followers, and HALL repeatedly indicated that he was the big man in the operation.

HALL stated to AIRY that he would like to kill the brothers of the girl he had killed. HALL stated to AIRY that he had "killed the bitch" and that if he had to do it again, he would "kill her again." HALL expressed no remorse whatsoever for the killing. AIRY stated that he even asked HALL if HALL felt badly and that HALL again said that he would kill her again.

HALL also stated to AIRY that he had had sex with the girl. AIRY stated that HALL used the following language in describing these sexual relations:

He "fucked the bitch" and "the bitch sucked dick."

AIRY stated that HALL also indicated to him that he wished to kill a member of his gang known as BECKLEY. HALL stated to AIRY that BECKLEY was a "snitch." HALL stated further that if he had known that BECKLEY was going to snitch on him that he would have killed BECKLEY at the gravesite along with the girl.

HALL stated to AIRY that his only remorse about the whole case was that he had drawn his 19-year old brother into it. HALL stated that he got his brother into the case by calling him a sissy about not wanting to participate in going after the people who had ripped HALL off. AIRY stated that otherwise HALL showed no remorse and again indicated that he believed HALL to be extremely "cold." AIRY stated that HALL had a girlfriend whom he used to talk to frequently on the phone when he was at MCC. AIRY stated he believed HALL had a baby by the girlfriend. AIRY stated to AIRY that he believed the girlfriend must be working with the Feds because she would keep him on the phone for long periods of time and never cut him off. HALL then stated to AIRY

558

MW 02001

PD-302a (Rev. 11-15-83)

7A-DL-70351

Continuation of FD-302 of ALONZO AIRY , On 10/20/95 , Page 3

they wanted to kill his present girlfriend and referred to her as a "bitch."

AIRY stated that he also heard HALL talk generally about escape plans. HALL indicated to AIRY that he was mad at his attorney, and that his attorney didn't come around to talk to him often enough. HALL spoke about abducting the attorney or a jail guard to make an escape. HALL also talked about killing the attorney.

AIRY stated he observed HALL in the possession of a "shank", a crude knife made from a pen. He stated HALL had access to at least one other object that could have been a weapon. AIRY stated it was a piece of steel that inmates have been using to chip a hole in a cinder block wall which would allow a view into a cell which contained females. AIRY indicated that the hole in the wall was in ORLANDO HALL's cell.

AIRY stated that NICHOLS was present during most of his conversations with HALL. NICHOLS also had conversations with ORLANDO HALL when AIRY wasn't present. AIRY stated that whenever the topic of escape would come up, AIRY would leave the group. AIRY stated he believed that even talking about escape in a federal facility could lead to conspiracy charges and he felt like he didn't even want to try.

AIRY stated that he believed NICHOLS would lie if he felt it would help himself, but AIRY further stated that if NICHOLS' statements reflected the same information as AIRY's statements of what HALL told him, then he believed NICHOLS would be telling the truth.

On repeated occasions throughout the interview, AIRY was given a chance to provide any information on NICHOLS which might indicate that NICHOLS was a liar. AIRY stated that he could provide no such information. AIRY was also given repeated opportunity to provide information in a positive light on ORLANDO HALL, for instance any examples of any remorse whatsoever on HALL's part. AIRY stated he could provide no positive information.

At this point the interview was terminated.

559

MW 02002

Exhibit 40

Affidavit of Alonzo Airy

560

STATE OF TEXAS

DALLAS COUNTY

AFFIDAVIT OF ALONZO AIRY

BEFORE ME, the undersigned authority, on this day personally appeared ALONZO AIRY, who after being duly sworn stated:

1. My name is Alonzo Airy. I was born July 19, 1958. ~~I am presently in custody at the Federal Correctional Institute (FCI) in Seagoville, Texas.~~ Released 3-3-200 LIVING AT 2756 ANN ARBOR DALLAS, TX

2. In 1995, I was incarcerated at the Mansfield Correctional Center while I waited to be sentenced on my case.

3. While I was incarcerated at Mansfield, I spent about two months incarcerated in a tank with an inmate named Orlando Hall. I spoke to Orlando Hall from time to time. In my conversations with Orlando Hall, he never stated that he had any plan to attempt an escape from custody. Orlando Hall never discussed any escape plan with me or in my presence. Orlando Hall never even made any sort of comments about wanting to escape. I never saw Orlando Hall with any homemade shank or any sort of weapon. I believe that if Orlando Hall had been planning an escape, I would have known about it because I spent a lot of time talking to him.

4. Although Orlando Hall did not discuss an escape plan with me, another inmate, Larry Nichols, urged me to claim that Orlando Hall had done so. Nichols often talked about his own hopes of getting favorable treatment from the prosecution in his case by cooperating against other defendants. Nichols asked me to go along with his story that Orlando Hall had been planning an escape, but I refused to go along with Nichols' plan to invent false information against Orlando Hall. On one occasion, I overheard Nichols and another inmate (not Orlando Hall) discussing the possibility of having a visitor attempt to smuggle a gun to an inmate for purposes of an escape.

5. I recall being interviewed by a woman who worked for Orlando Hall's lawyers. I told her the same things I am saying in this affidavit.

6. At some point after I was interviewed by the woman who worked for Orlando Hall's lawyers, I was interviewed by agents of the prosecution concerning my conversations with Orlando Hall and Larry Nichols. That interview took place at Seagoville FCI.

7. I did not tell the federal agents that Orlando Hall was remorseless or an extremely cold individual. I did not say that Hall saw nothing wrong with going out and getting someone if that person took his money. I did not say that Hall believed it was

561

absolutely necessary to go after someone who had ripped you off. The reason I did not tell the agents these things is because Hall never said any of those things to me.

8. I did not tell the federal agents that Hall told me that the other people involved in the kidnapping and subsequent murders were his followers. The reason I did not tell the agents this is because Hall never said it to me.

9. I did not tell the federal agents that Hall told me he wanted to kill the brothers of the victim in his case. I did not tell the federal agents that Hall told me he had "killed the bitch" or that if he had it to do over, he would "kill her again." I did not tell the federal agents that Hall expressed no remorse. The reason I did not tell the agents these things is because Hall never said any of them to me. The truth was that I never heard Orlando Hall brag about the crime or make light of it in any way. Based on the way Orlando Hall discussed the crime, it was my impression that he was truly sorry for what happened to the victim. In my opinion, it was eating him up inside.

10. I did not tell the federal agents that Hall told me he had sex with the victim in his case. I did not tell the federal agents that Hall told me that the victim had "sucked dick" or that he had "fucked the bitch." The reason I did not tell the agents these things is that Hall never said either of them to me.

11. I did not tell the federal agents that Hall told me he wanted to kill a member of his gang named Beckley. I did not tell the federal agents that Hall told me that Beckley was a "snitch" or that if he had known Beckley were going to "snitch," he would have killed Beckley at the gravesite along with the victim. The reason I did not tell the agents these things is because Hall never said any of them to me.

12. I did not tell the federal agents that Hall told me about escape plans. I did not tell the federal agents that Hall talked about abducting his attorney or a jail guard to make an escape. I did not tell the agents that Hall talked about killing his attorney. The reason I did not tell the agents these things is because Hall never said any of them to me.

13. I did tell the federal agents that I believed Larry Nichols would lie if he felt it would help himself.

14. During the time that Nichols, Hall, and I were in the same tank, almost every inmate discussed his desire for a 5K1 motion. Nichols was one of the main people talking about trying to get a 5K1 motion in his case. Nichols was being coached by a white inmate and I overheard them discussing how Nichols could obtain a 5K1 motion. They talked about how easy it was to get the Government to believe information as long as it looked real. Nichols specifically said to me that he thought Orlando Hall's case would be a sure-fire way to obtain a 5K1 motion, since it was so important to the U.S. Attorney.

15. While we were in jail together, I heard Nichols brag on many occasions about how he was able to manipulate his co-defendant, Vernon Miller, into committing the bank

562

robberies they were both charged with. Nichols also stated to me that he intended to attempt to obtain a 5K1 motion by telling the Government that Miller's mother and girlfriend had received some of the money stolen in the robberies Nichols and Miller committed. I believed Nichols was following through on his plan to obtain a 5K1 motion, because he was taken out of his cell several times to speak to Government representatives.

16. I was not asked by the federal agents to provide any information that could have put Orlando Hall in a positive light.

17. If I had been asked by the federal agents to provide any such information, I would have told them, as I told the woman working for Orlando Hall's lawyers in my earlier conversation with her, that I believed Orlando Hall was truly sorry for what he had done and that I believed it was eating him up inside. He even talked a lot about committing suicide.

18. I was never asked by the federal agents who interviewed me to review their notes or any written statement based on their interview with me. I did not sign anything. I was not given a copy of any report produced by the agents concerning their inteview with me in October, 1995.

19. I was never shown a copy of the federal agents' report of their interview with me in October, 1995. I was never asked by Orlando Hall's attorneys whether the statements in the federal agents' report were true.

I have read the foregoing affidavit. The contents of this affidavit are, to the best of my knowledge, true and correct, and I so state under the pains and penalties of perjury.

ALONZO AIRY

Subscribed and sworn before me
On this ___ day of _April_____, 2000.

Notary Public, State of Texas
My Commission Expires:_____

J. NEIL HARTLEY
NOTARY PUBLIC STATE OF TEXAS
Commission Expires:
JANUARY 29, 2002

Exhibit 41

Declaration of Michael M. Gelbort, Ph.D.

563

## DECLARATION OF MICHAEL M. GELBORT, PH.D.

Michael M. Gelbort, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.     I am a psychologist, licensed to practice in Illinois (#071-004000), Indiana (#20040461), and Texas (#3237, inactive). I am also a Diplomate in Forensic Neuropsychology of he American Board of Psychological Specialties (identification number 7666). I maintain a private practice specializing in clinical psychology and neuropsychology. A copy of my current *curriculum vitae* is attached to this Declaration as Exhibit A and is incorporated here by reference for all purposes.

2.     I received my B.A. degree with honors, with a double major in psychology and general sciences, from Grinnell College in Grinnell, Iowa, in 1977. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology from Texas Tech University in 1984. From 1984 to 1985, I held a post-doctoral fellowship in Neuropsychology and Medical Psychology at the Rehabilitation Institute of Chicago, and a faculty appointment at Northwestern University Medical School.   From 1985 to 1989, my primary employment was as Chief Psychologist and Director of Neuropsychology at the Institute for Rehabilitation and Research at the Medical Center in Houston, Texas. While in Houston, I was also a Clinical Assistant Professor at the Baylor College of Medicine.

3.     I am a member of the American Psychological Association, the International Neuropsychological Society, and the American Congress of Rehabilitation Medicine.

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 1

564

4.      At the request of counsel for Orlando Hall, I conducted a comprehensive neuropsychological assessment of Mr. Hall at the United States Penitentiary in Terre Haute, Indiana, on April 13, 2001. The evaluation of Mr. Hall comprised approximately 5 hours of testing and assessment.

5.      The purpose of the present examination was to determine whether Mr. Hall has neuropsychological dysfunction and to specify the severity and nature of any such impairment. Clinical neuropsychological testing assesses the behavioral expression of an individual's brain function. Appropriately interpreted, neuropsychological assessment is a fundamental part of a reliable and comprehensive clinical evaluation of brain integrity and functioning.

6.      Based on my interview and examination of Mr. Hall, and my review of his history, I have formed opinions regarding his neuropsychological condition, including the nature, extent and duration of his impairments, which I hold to a reasonable degree of certainty based on the standards of my profession. This declaration summarizes those opinions.

7.      Mr. Hall has a history replete with "marker variables," historical symptoms and signs which are highly correlated with neuropsychological impairment and, most often, neurological impairment or nervous system damage. These symptoms, when described by patients, family members, or discovered by health care professionals, clinically give rise to (or "trigger") further evaluation to better understand the extent and nature of the deficits so as to document and understand the pathology, as well as to permit doctors to appropriately treat the condition and reverse or rectify the damage as best as they are able. Most patients do respond to intervention and their behavior is

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 2

565

brought closer to the norm. Unfortunately for everyone, this did not occur in Mr. Hall's case prior to late 1994, as it is reasonably likely that had Mr. Hall been so diagnosed and treated before that time, he would not have become involved in the situation which has brought him into contact with the criminal justice system, or might have been able to resist the pressure to participate in the tragedy that ultimately occurred.

8.    In evaluating Mr. Hall, I employed a series of formal, standardized evaluation techniques which were available and clinically warranted at the time of his original trial in 1995, and which remain in widespread use today as well-accepted tools used by mental health professionals to assess neuropsychological impairment.

9.    In his performance, Mr. Hall shows indications of neuropsychological impairments. On formal testing, Mr. Hall produced results that placed him at approximately the fortieth percentile in terms of verbal intellect and at approximately the twelfth percentile on non-verbal abilities, a disparity which is consistent with other measures showing impaired brain functioning. Mr. Hall's visual information processing abilities were impaired in most instances and tests of higher cognitive abilities involving frontal lobe functions were also impaired for anything but the most basic tasks. Measures of learning and memory, functions which are extremely sensitive to brain and cognitive dysfunction, were variable, ranging from performance in the mildly impaired or borderline range through abilities that were superior. These scores are significant. The low scores on some of the tests directly reflect neuropsychological impairment. In addition, the fact that Mr. Hall's scores vary significantly reveals an asymmetry in his brain functioning that does not appear in a normal brain.

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 3

566

10.    Overall, my formal comprehensive neuropsychological evaluation of Mr. Hall found data indicative of neuropsychological impairment most affecting the non-dominant cerebral hemisphere, with dysfunction likely being more anterior (*i.e.*, in the front of the brain) than posterior. This area of the brain includes those centers within the brain which are responsible for abstract reasoning, judgment, the ability to understand "if -- then" relationships or to plan adaptive and socially acceptable/adaptive behavior, and to anticipate the consequences of ones' actions. These aspects of neurocognitive functioning are sometimes called "executive functions" because they play a supervisory role -- monitoring, initiating, inhibiting, and shifting of behaviors and cognitive sets.

11.    These are the brain centers and abilities needed to exercise judgment, to plan independently and successfully, and which allow individuals to autonomously make and implement decisions which are goal-directed, appropriate, and conform to societal expectations. In the academic setting, these kinds of deficits show up as problems in learning; in the real-world setting of adult interaction, they manifest themselves as pervasively maladaptive behavior. It should be understood that Mr. Hall is not so damaged that he is unable to "fit in" or behave in some semblance of a normal manner. Rather, he is significantly *less* capable, due to his deficits and damage, than a *normal* individual would be to make sensible plans or anticipate the consequences of his conduct, abilities which enable most people to conform their behavior to acceptable social norms. Again, his inabilities in this regard result from his cerebral dysfunction.

12.    These deficits, based on test data and review of the historical information, were present at the time of Mr. Hall's crime and were treatable then as they are treatable now. Both

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 4

56 7

medical intervention designed to stabilize Mr. Hall's nervous system functioning, as well as control of his environment to reduce stimulation and choices he must make, are methods used every day in treatment facilities and elsewhere to help patients with these impairments function more adaptively.

13.    Mr. Hall's impairments would have had a significant affect on his capacity to recognize the potential outcomes of the activities in which he became involved. People with deficits like Mr. Hall's often learn through a "hands-on" approach where they must experience a mistake before they can learn from it. This is to say that they have more difficulty anticipating consequences and further trouble generalizing from one situation or event to others. Such persons clearly benefit from, and respond to, supervision. Again, it is unfortunate that in this case it appears that the available "supervision" may have come from more predatory and ill-intentioned people. Mr. Hall, as a result of his cognitive impairments and prior life experiences, was easily (mis-)led and possessed limited abilities -- again, as contrasted with normal, non brain-impaired individuals -- to choose other behaviors or resist those with whom he was interacting, especially when doing so under stress.

14.    The validity of a neuropsychological evaluation depends on the effort that the individual puts forth during the evaluation. In the course of evaluating Mr. Hall, I assessed his level of effort using measures designed to identify lack of effort and malingering. The results were indicative of a valid, non-malingering profile and provide a high degree of confidence that other

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 5

568

15.    measures are likewise valid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ (date).

_____
Michael M. Gelbort

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 6

569

## DECLARATION OF MICHAEL M. GELBORT, PH.D.

Michael M. Gelbort, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.     I am a psychologist, licensed to practice in Illinois (#071-004000), Indiana (#20040461), and Texas (#3237, inactive). I am also a Diplomate in Forensic Neuropsychology of the American Board of Psychological Specialties (identification number 7666). I maintain a private practice specializing in clinical psychology and neuropsychology. A copy of my current *curriculum vitae* is attached to this Declaration as Exhibit A and is incorporated here by reference for all purposes.

2.     I received my B.A. degree with honors, with a double major in psychology and general sciences, from Grinnell College in Grinnell, Iowa, in 1977. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology from Texas Tech University in 1984. From 1984 to 1985, I held a post-doctoral fellowship in Neuropsychology and Medical Psychology at the Rehabilitation Institute of Chicago, and a faculty appointment at Northwestern University Medical School.  From 1985 to 1989, my primary employment was as Chief Psychologist and Director of Neuropsychology at the Institute for Rehabilitation and Research at the Medical Center in Houston, Texas. While in Houston, I was also a Clinical Assistant Professor at the Baylor College of Medicine.

3.     I am a member of the American Psychological Association, the International Neuropsychological Society, and the American Congress of Rehabilitation Medicine.

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 1

570

4.    At the request of counsel for Orlando Hall, I conducted a comprehensive neuropsychological assessment of Mr. Hall at the United States Penitentiary in Terre Haute, Indiana, on April 13, 2001.  The evaluation of Mr. Hall comprised approximately 5 hours of testing and assessment.

5.    The purpose of the present examination was to determine whether Mr. Hall has neuropsychological dysfunction and to specify the severity and nature of any such impairment.  Clinical neuropsychological testing assesses the behavioral expression of an individual's brain function.  Appropriately interpreted, neuropsychological assessment is a fundamental part of a reliable and comprehensive clinical evaluation of brain integrity and functioning.

6.    Based on my interview and examination of Mr. Hall, and my review of his history, I have formed opinions regarding his neuropsychological condition, including the nature, extent and duration of his impairments, which I hold to a reasonable degree of certainty based on the standards of my profession.  This declaration summarizes those opinions.

7.    Mr. Hall has a history replete with "marker variables," historical symptoms and signs which are highly correlated with neuropsychological impairment and, most often, neurological impairment or nervous system damage.  These symptoms, when described by patients, family members, or discovered by health care professionals, clinically give rise to (or "trigger") further evaluation to better understand the extent and nature of the deficits so as to document and understand the pathology, as well as to permit doctors to appropriately treat the condition and reverse or rectify the damage as best as they are able.  Most patients do respond to intervention and their behavior is

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 2

brought closer to the norm. Unfortunately for everyone, this did not occur in Mr. Hall's case prior to late 1994, as it is reasonably likely that had Mr. Hall been so diagnosed and treated before that time, he would not have become involved in the situation which has brought him into contact with the criminal justice system, or might have been able to resist the pressure to participate in the tragedy that ultimately occurred.

8.      In evaluating Mr. Hall, I employed a series of formal, standardized evaluation techniques which were available and clinically warranted at the time of his original trial in 1995, and which remain in widespread use today as well-accepted tools used by mental health professionals to assess neuropsychological impairment.

9.      In his performance, Mr. Hall shows indications of neuropsychological impairments. On formal testing, Mr. Hall produced results that placed him at approximately the fortieth percentile in terms of verbal intellect and at approximately the twelfth percentile on non-verbal abilities, a disparity which is consistent with other measures showing impaired brain functioning. Mr. Hall's visual information processing abilities were impaired in most instances and tests of higher cognitive abilities involving frontal lobe functions were also impaired for anything but the most basic tasks. Measures of learning and memory, functions which are extremely sensitive to brain and cognitive dysfunction, were variable, ranging from performance in the mildly impaired or borderline range through abilities that were superior. These scores are significant. The low scores on some of the tests directly reflect neuropsychological impairment. In addition, the fact that Mr. Hall's scores vary significantly reveals an asymmetry in his brain functioning that does not appear in a normal brain.

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 3

10.    Overall, my formal comprehensive neuropsychological evaluation of Mr. Hall found data indicative of neuropsychological impairment most affecting the non-dominant cerebral hemisphere, with dysfunction likely being more anterior (*i.e.*, in the front of the brain) than posterior. This area of the brain includes those centers within the brain which are responsible for abstract reasoning, judgment, the ability to understand "if – then" relationships or to plan adaptive and socially acceptable/adaptive behavior, and to anticipate the consequences of ones' actions. These aspects of neurocognitive functioning are sometimes called "executive functions" because they play a supervisory role – monitoring, initiating, inhibiting, and shifting of behaviors and cognitive sets.

11.    These are the brain centers and abilities needed to exercise judgment, to plan independently and successfully, and which allow individuals to autonomously make and implement decisions which are goal-directed, appropriate, and conform to societal expectations. In the academic setting, these kinds of deficits show up as problems in learning; in the real-world setting of adult interaction, they manifest themselves as pervasively maladaptive behavior. It should be understood that Mr. Hall is not so damaged that he is unable to "fit in" or behave in some semblance of a normal manner. Rather, he is significantly *less* capable, due to his deficits and damage, than a *normal* individual would be to make sensible plans or anticipate the consequences of his conduct, abilities which enable most people to conform their behavior to acceptable social norms. Again, his inabilities in this regard result from his cerebral dysfunction.

12.    These deficits, based on test data and review of the historical information, were present at the time of Mr. Hall's crime and were treatable then as they are treatable now. Both

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 4

Sent By: Michael M. Gelbort, Ph.D.;        815 741 5171;        Jun-12-02  5:00PM;        Page 7/8

medical intervention designed to stabilize Mr. Hall's nervous system functioning, as well as control of his environment to reduce stimulation and choices he must make, are methods used every day in treatment facilities and elsewhere to help patients with these impairments function more adaptively.

13.    Mr. Hall's impairments would have had a significant affect on his capacity to recognize the potential outcomes of the activities in which he became involved. People with deficits like Mr. Hall's often learn through a "hands-on" approach where they must experience a mistake before they can learn from it. This is to say that they have more difficulty anticipating consequences and further trouble generalizing from one situation or event to others. Such persons clearly benefit from, and respond to, supervision. Again, it is unfortunate that in this case it appears that the available "supervision" may have come from more predatory and ill-intentioned people. Mr. Hall, as a result of his cognitive impairments and prior life experiences, was easily (mis-)led and possessed limited abilities -- again, as contrasted with normal, non brain-impaired individuals -- to choose other behaviors or resist those with whom he was interacting, especially when doing so under stress.

14.    The validity of a neuropsychological evaluation depends on the effort that the individual puts forth during the evaluation. In the course of evaluating Mr. Hall, I assessed his level of effort using measures designed to identify lack of effort and malingering. The results were indicative of a valid, non-malingering profile and provide a high degree of confidence that other

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 5

574

Sent By: Michael M. Gelbort, Ph.D.;        815 741 5171;        Jun-12-02  5:01PM;        Page 8/8

15.     measures are likewise valid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___06/12/02___ (date).

Michael M. Gelbort

DECLARATION OF MICHAEL M. GELBORT, PH.D.
PAGE 6

575

Sent By: Michael M. Gelbort, Ph.D.;          815 741 5171;          Jun-12-02 10:08AM;          Page 2

# VITA

## MICHAEL MAYER GELBORT

Suite 1621
30 North Michigan Avenue
Chicago, Illinois 60602
312.321.9406

Suite 270
1051 Essington Road
Joliet, Illinois 60435
815.741.2221

Fax: 815.741.5171

### Education

Post-Doctoral Fellowship, Neuropsychology and Medical Psychology.
Rehabilitation Institute of Chicago, 1984-1985.

Ph.D., Clinical Psychology (APA approved program), August, 1984.
Department of Psychology, Texas Tech University, Lubbock, Texas.
Minor: Applied Human Neuropsychology

B.A., Double Major: Psychology and General Sciences, with Honors.
May, 1977. Grinnell College, Grinnell, Iowa.

### Clinical Experience

CLINICAL AND
NEUROPSYCHOLOGIST,
PRIVATE PRACTICE

Chicago Area, Illinois. 1989-present.

Neuropsychological and psychological evaluations of inpatients
and outpatients. Clinical consultations, evaluation, and
intervention. Services provided in physical rehabilitation and
psychiatric inpatient units, as well as in the office.

CONSULTANT

Cornerstone Services, 1994-present.

Provide psychological evaluations for residents from this facility
which services 250 mentally retarded individuals.

CHIEF PSYCHOLOGIST
DIRECTOR,
PSYCHOLOGICAL
SERVICES

The Institute for Rehabilitation and Research, 1985-1989.

Responsible for provision of psychological services as required by
patients in the Head Injury and stroke programs in particular, and
serving persons with spinal cord injuries, multiple sclerosis,
amputation, pain, and other disabled patients in general in a major
regional dedication rehabilitation hospital. Duties included both
neuropsychological and personality assessment, treatment
planning, treatment, and consultation to the Interdisciplinary

576

Treatment Team.  Patients served included both inpatients and outpatients in each phase of rehabilitation.  The position included hospital administrative duties including directing the Psychology Department, program development, and research involvement. The department had three Ph.D. level psychologists, two psychometrists, and support personnel.

**CLINICAL ASSISTANT PROFESSOR**

Baylor College of Medicine, Department of Rehabilitation, 1985-1989

**PRIVATE PRACTICE**

Houston, Texas.  1986-1989.

Evaluation and treatment of outpatients and inpatients in a private practice setting.  Patients most typically suffered from neurotic or characterological difficulties or had a physical disability.  The practice also involved consultation to rehabilitation units in acute care hospitals, as well as disability evaluations for a variety of referral sources.

**POST-DOCTORAL FELLOW IN MEDICAL PSYCHOLOGY**

Rehabilitation Institute of Chicago,  1984-1985.

Provision of psychotherapy and counseling to spinal cord injured, head injured, and amputee patients and their families in both inpatient and outpatient settings.  Member of an Interdisciplinary Team charged with coordination and provision of rehabilitative treatment.  Responsible for ordering and interpreting Neuropsychological assessment batteries.

**FACULTY APPOINTMENT: LECTURER STATUS**

Northwestern University Medical School;  Department of Psychiatry and Behavioral Sciences, 1984-1985.

Lectured and performed supervision of doctoral students in Northwestern University's Medical School program in Clinical Psychology.  Lectured Northwestern University medical students. Member of Admissions Committee group responsible for rating application materials of those applying for admission to the Doctoral Program in Clinical Psychology.

**NEUROPSYCHOLOGICAL CONSULTANT**

From the Department of Psychology to the Department of Medical-Surgical Neurology, Texas Tech University School of Medicine, 1982-1984

Administration and interpretation of neuropsychological screening and complete batteries as referred by two neurosurgeons and two

neurologists in a major regional teaching hospital. Techniques included both Halstead-Reitan and Lurian batteries, as well as an extensive number of other assessment measures. Patients were both inpatients and outpatients and ranged from one to ninety years of age. The test batteries were idiographically designed to answer questions regarding range and extent of dysfunction and rehabilitation placement.

NEUROPSYCHOLOGICAL CONSULTANT
Texas Rehabilitation Commission, Lubbock, Texas, 1983-1984.

Administration and interpretation of approximately forty-five Luria-Nebraska Neuropsychological Batteries and additional academic achievement tests to college age students being evaluated for the diagnosis of learning disability.

PSYCHOLOGY INTERN
Milwaukee County Mental Health Complex (APA approved program), Milwaukee, Wisconsin, 1981-1982.

Administration and interpretation of psychological test batteries on a wide spectrum patient population; provision of inpatient and outpatient psychotherapy to adults and children; performance of intake interviews and assessments; attendance at and presentation of seminars.

PSYCHOLOGIST
Developmental Disabilities Center, Texas Tech University, Lubbock, Texas, 1980-1981.

Assessment of developmental delays and psychological/ neuropsychological functioning of newborns to three-year-olds; input to a Multidisciplinary Team; Clinic Administrator and administrator/interpreter of psychological assessments for Screening Clinic for school-age children; coordinator of feedback and recommendations to parents; language learning disability evaluator.

STUDENT THERAPIST
Texas Tech University Psychology Clinic, Texas Tech University, Lubbock, Texas, 1977-1981.

Provision of outpatient psychotherapy, as well as performance of intellectual and personality assessments to adults and children.

RESIDENTIAL LIVING SUPERVISOR
Lubbock Regional MH/MR Center, Transitions II Halfway House, Lubbock, Texas, 1979-1981.

578

|  |  |
|---|---|
|  | Employed interpersonal interventions and behavioral modification programs to aid newly released prisoners and parolees to reintegrate into community living. Participated in administrative decision making and program development. |
| STUDENT THERAPIST SUPERVISOR | Texas Tech University Psychology Clinic, Texas Tech University, Lubbock, Texas, 1980-1981. |
|  | Provision of individual supervision to second year practicum students on their outpatient cases. This experience was supervised by a faculty psychologist. |
| PSYCHOLOGY EXTERNSHIP | V.A. Mental Hygiene Clinic, Lubbock, Texas, 1980-1981. |
|  | Provision of psychotherapy and psychological assessment to outpatient veterans. |

## Research

A Neuropsychological Investigation of Two Subtypes of Dyslexia in College Students. Doctoral dissertation completed June, 1984.

A Brief Lurian Evaluation for Hospital Use with Head Trauma Victims. Unpublished, performed in cooperation with J. Thomas Hutton, M.D.

The Rey Complex Figure Test: Does it Really Measure Visual Memory? Unpublished research.

Functional Electrical Stimulation in Multiple Sclerosis Patients with Chronic Foot Drop. Paper co-authored with E. Simon Sears, M.D., presented at the 11th Annual Meeting of the American Neuropsychological Association, October 6, 1986.

## Presentations

Psychological Issues and Rehabilitative Treatment of Patients with Amputations. Continuing Education Course, Rehabilitation Institute of Chicago, Illinois, 1984.

Incidence of Closed Head Injury in Spinal Cord Injured Patients. Spinal Cord Injury Conference, Chicago, Illinois, 1985.

Contracting with Patients and perspectives of the Rehabilitation Process; Continuing Education Courses, The Institute for Rehabilitation and Research, Houston, Texas, 1985, 1986, 1987, 1988.

Rehabilitation Options in Texas. Presented at the 1987 Texas Head Injury Foundation state meeting, Houston, Texas, 1987.

579

Professional Support Group;  Current Issues.  Presented at the 1988 Texas Head Injury Foundation state meeting, Austin, Texas, 1988.

Psychological Issues in Rehabilitation of Traumatically Injured Persons.  Presented at the First Annual Seminar on Rehabilitation for the Clergy, Houston, Texas, 1988.

Neuropsychological Characteristics of Death Row Inmates.

MMPI-2 Characteristics of Criminal Offenders.

## Professional Affiliations

American Psychological Association,
     Student Affiliate, 1977-1980,
     Associate Member, 1980-1984,
     Member, 1985-present.

International Neuropsychological Society,
     Member, 1986-present.

American Congress of Rehabilitation Medicine,
     Member, 1986-present.

American Association of Spinal Cord Injury Psychologists and Social Workers, 1987-present.

Member, State of Illinois Head and Spinal Cord Injury Advisory Council, 1990-present.
     Secretary of Council, 1996-1997.

National Surveyor, Commission on Accreditation of Rehabilitation Facilities, 1993-present.

Member of the Board of Directors, Illinois Head Injury Association, 1993.

Member of Professional Advisory Board, Brain Injury Association of Illinois, 1994-present.

Vice Chair, Brain Injury Association of Illinois, 1994-present.

## Certificate and Licensure

Licensed Clinical Psychologist, State of Illinois, #071-004000

Licensed Psychologist and Health Service Provider in Psychology, State of Indiana, #20040461

Certified and Licensed Psychologist, State of Texas, #3237

Certified, National Register of Health Service Providers in Psychology, #35237

580

Sent By: Michael M. Gelbort, Ph.D.;        815 741 5171;        Jun-12-02 10:10AM;        Page 7/7

Diplomate in Forensic Neuropsychology, American Board of Psychological Specialties,
Identification Number 7666

Exhibit 42

Sworn declaration of Cassandra Ross

582

## DECLARATION OF CASSANDRA ROSS

Cassandra Ross, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. I am one of Orlando Hall's sisters and reside in the Dallas/Ft. Worth metropolitan area. I attended Orlando's trial and closely followed the criminal proceedings against him.

2. I recall that shortly after the jury returned the death sentence against my brother, I saw a television newscast in which a female member of Orlando's jury informed a reporter that during the weekend break between the sentencing deliberations, she had celebrated her daughter's birthday. At the party, the juror put a candle on the birthday cake in honor of Lisa Rene's memory, and she and the guests said a prayer for Lisa Rene. I recall that the reporter was a woman with black hair and was wearing a coat, and the juror had shoulder-length, curly blond hair and was kind of heavy set. The jury sentenced my brother to death on the Monday following the weekend break.

3. I think that this news report was broadcast the evening after the verdict was returned. I do not remember what television news station broadcast the report, but I typically only watch the news on Channels 4, 5 and 8.

4. I informed Orlando's attorney, Michael Ware, about the news report that I saw. I am not aware that he did anything to follow up on this information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___07APR00___ (date).

_Cassandra Ross_

CASSANDRA ROSS

583

Exhibit 43

Note from Michael Ware's file

584

Ned Walker
504 522 0578
Office

504 948 0402
home

Kevin McNeely
502 227 2142

25 4-5 9 14

2550 Chicago / Victor Tilly 536-6087
Cassandra Ross / #
214/642-0523
Channel 4 or 5
on date sentencing
verdict / 6:00 o-
11:00

585

**Exhibit 44**

Copy of email dated Sunday, June 10, 2001

586



HomeHotmailWeb SearchShoppingMoneyCentralPeople & Chat Passport sign out

**Hotmail** *deathrowspeaks@hotmail.com*

Inbox    Compose    Address Book    Folders    Options                    Messenger    Calendar    Help

### Folder: Inbox

From:    JHolmes712@aol.com Save Address - Block Sender
To:       deathrowspeaks@hotmail.com Save Address
Subject: juror
Date:     Sun, 10 Jun 2001 19:50:19 EDT

Reply          Reply All          Forward          Delete          Previous          Next          Close

I was the jury foreman in the trial of Orlando Cordia Hall in November 1995.
When I was notified that I was chosen to serve, I had no idea that the
experience would haunt me forevermore.  Or that it would change my destiny,
even the way I view life.

I had no problem convicting Mr. Hall for his crimes, for the evidence against
him was overwhelming.  However, when the penalty phase of the trial began, I
struggled with sentencing Mr. Hall to death.  I was the final holdout.  The
tally was 11 for - and only me against.  I have two sons very close in age to
the defendant, and my heart went out to his mother.  But, the photos of the
victim and the horror that she suffered, and the fact that Mr. Hall attempted
to cover up his crime right up until he was caught, convinced me that there
was no remorse.  It was all about covering his own hide and saving himself.
Ultimately, I voted in favor of sentencing Mr. Hall to death.

In the years since, I have struggled with this decision.  If I had it to do
over again, would I do it differently?  I honestly don't know.  I know that
it would still be one of the hardest decisions I have ever made.  My
experience continues to trouble me, even after all this time.

I do know that a beautiful young girl is dead.  That her family will suffer
the pain and loss for the rest of their lives.  I will always remember the
pleas from her father to deliver justice and the sadness in her mother's eyes
will remain with me forever.  But I also remember the sadness in the eyes of
Orlando's mother.  And her loss will also forever be a part of me.

There are no winners when someone is sentenced to die.  Maybe I have answered
my own question here.  But it's too late.

Reply          Reply All          Forward          Delete          Previous          Next          Close

Move To  (Move to Selected Folder)

587

Inbox    Compose    Address Book    Folders    Options                    Messenger    Calendar    Help

Exhibit 45

June 11,2001 letter from "Jana Holcomb" to Mr. Hall

588



589

Orlando C Hall, Sr.                                     June 11, 2001
Reg. no. 26176-077
Federal Death Row Unit
P.O. Box 33
Terre Haute
Indiana 47808-0033

Dear Mr. Hall,

        I followed the events of your trial in Ft. Worth.  I was very surprised when I read
your inmate profile on the Death Row Speaks web site.  You are a very articulate writer
and seem very confident, although your present circumstances are grim.

        I am the mother of two sons close to your own age.  I am very curious to know
how such a person as you could end up on death row.  What choices have you made in
your life that led you down this path?

        I was present in the courtroom when your mother took the stand and pleaded for
the life of her son.  It was obvious to me that the experience was a difficult one for you to
endure.  Perhaps the most difficult of the entire trial.  Are you still in contact with your
Mother?  How is she holding up?  She seemed like a very nice lady with a sadly broken
heart.  I have extreme sympathy for her.  I know it must be very hard for you, knowing
how she suffers.

        Mr. Hall, please don't be offended by what I am about to write.  But I also met
Lisa Rene's mother in the hallway of the courthouse.  Also a very lovely lady with a
broken heart.  I feel that I must ask if you have considered the impact you and your friends
have had on her family as well.  After reading your profile, I already know that the answer
is yes.  You must feel remorse about what happened.

        I know you must have received many letters since posting your address on the
internet.  I am interested in hearing from you.  I want to learn more about you as an
individual, your views on the death penalty, family, children.  But I must be honest, I also
want to learn more about your life and the events that led you to death row.  Would you
consider writing to me?  If you do choose to correspond with me, I will share more about
myself and my own views if you are interested.

        Perhaps we could provide some insights to one another.  I will be awaiting a
response.

                                    Jana Holcomb

                                    Jana Holcomb
                                    5011 Osage Dr.
                                    Arlington, TX  76018

590

Exhibit 46

July 24,2001 letter from "Jana Holcomb" to Mr. Hall





Orlando C. Hall, Sr.
#24176-077
Federal Death Row Unit
P.O. Box 33
Terre Haute, IN 47808-0033

Jana Holcomb
5011 Osage Dr.
Arlington, TX 76018

592

July 24, 2001

Orlando C. Hall, Sr.
#26176-077
Federal Death Row Unit
P. O. Box 33
Terre Haute, IN  47808-0033

Dear Orlando,

I hope this letter finds you doing well.  I am writing from Texas and it's very hot here now.  I have a friend in prison in south Texas and they have no air conditioning, of course.  He describes how miserable it is in the summer.  I think that is cruel and inhumane.  I hope you are having cooler weather in Indiana.

I have been a regular visitor to the new website "Death Row Speaks" and I have read about you and David and Jeff and some of the others.  The journals written by David and Jeff are posted there and read by thousands of people every month.  They serve a good purpose by allowing so many people to see the daily life prisoners lead on death row.  Maybe if enough people read it, they will ban together to help abolish the death penalty.

Your profile is so well written, I was wondering if you keep a daily journal as well.  If you do, you should consider asking David if his friends would post it on their website.  It could go a long way in the fight against the death penalty.

Your profile indicated that some of the people in your life were unable to handle the stress of your situation.  I hope that doesn't mean your family has stopped communicating with you.  Family is so important, regardless of the circumstances you're in.  Do you have brothers and sisters?  I have a very large family, and we are constantly together.  I am so grateful to be close to them.  I think if I were ever in trouble they would be there for me.  But I guess you never know, do you?  You would have to be a strong person to hang in there.

Jeff and David both talk in their journals about the birds and critters they can see out of their cell windows.  But in the comments section of the website, people say those windows are very high and prisoners wouldn't be able to see out of them.  So what's the real story?  I hope you really do have a window.  One with a nice cool breeze and a view of the trees with squirrels and birds.

I would love to hear about your kids.  How many do you have?  Boys or girls?  Maybe some of each!  I hope they are able to write to you.  This has got to

593

be tough on them.  Hopefully, they have a really supportive Mom who encourages them to remember their Dad and lets you write to them as well.  Are you allowed any visitors there?  I have been to visit my friend in south Texas and there are always lots of little kids there.  But death row is probably a little different, I guess.

Your profile says you're an avid reader.  What kind if books do you like?  I love to read also.  I love mysteries mostly.  And I'm a sucker for a Sidney Sheldon romance once in a while.  John Grisham is one of my favorite authors as well as Nelson Demille.  Demille wrote The Gold Coast, one of my all time favorite books.  It's about a Mafia don who moves next door to this filthy rich lawyer and gets the lawyer to come to work for him, then he steals his wife.  Somehow, you end up really liking the Mafia guy, even though he's a criminal and all around bad dude.  I guess you had to be there!  Ha! Ha!  Are you allowed to receive books there from the outside?  What if they are shipped directly from a book store?

Is your case still under appeal?  What's happening there?  Are you happy with your lawyers?  I hope they are making progress for you.  How do you pay for your lawyers?  Maybe they are people who are passionate about the death penalty and they work for free.  I don't have a clue how all of that works.  I'm sure all these question must sound stupid.  But they're just from someone who is uninformed, but interested just the same.

Well, a little about myself.  I live in Arlington, Texas.  I own my own company and love being my own boss.  I have a little pomeranian dog named Shelby, which I adore.  I enjoy reading, playing on my computer, hanging out in the pool with my family and friends,  and I am totally addicted to the weekly TV show, Friends.

Orlando, I hope you've enjoyed my letter.  If you have some extra time on your hands (sorry, a little tasteless prison humor) I'd love to hear from you.  Who knows, maybe we can become real friends.  We'll never know unless we try.  I'm up for it if you are.

Jana Holcomb

5011 Osage Dr.
Arlington, TX  76018

594

Exhibit 47

August 3,2001 letter from "Jana Holcomb" to Mr. Hall

595



August 3, 2001

Dear Orlando,

I just wanted to drop you a line to let you know I received your letter on July 31st. So I guess mail delivery from there to here is about 3 days.

I want to write you a longer letter, but I have to go to work and then my step-children are coming for the weekend. So there may not be time until Monday. I have many things to tell you - and to ask you. But I want to put some thought into it when I have more time next week. Your letter was awesome! I really appreciate that you want to correspond with me.

Just to answer a few of your questions. White, happily married for 11 years, 42 years old. Two children, three step-children and three grandsons. I own a company that processes auto titles for car dealers. I've been in business 5 years and 3 months. And I voted for Gore. I hope my age doesn't put you off. I'm a very YOUNG 42!! HA!

I looked up the demographics of Arlington for you. You were absolutely right about the hispanic population. I've included a chart for you to show your friend.

Tell Paul Hammer that I read his July journal entries today. He made reference to his cell window, and said, rather defensively I thought, that some people must think he tells lies in his journal. Was he referring to my letter? If he was, apologize for me and explain that it's just questions from an uninformed but interested person.

One question for you this time. Do you get very much mail due to your posting on the website? Do any of the other guys? What about Bruce Webster? I haven't seen anything about him on Death Row Speaks. I guess that was more than one question, huh? Oh, well.

Take care and I promise to write again soon.

Joana

# Keeping Yourself Busy In Prison

Three convicts were on the way to prison. They were each allowed to take one item with them to help them occupy their time while incarcerated. On the bus, one turned to another and said, "So, what did you bring?"

The second convict pulled out a box of paints and stated that he intended to paint anything he could. He wanted to become the "Grandma Moses of Jail". Then he asked the first, "What did you bring?"

The first convict pulled out a deck of cards and grinned and said, "I brought cards. I can play poker, solitaire, gin, and any number of games."

The third convict was sitting quietly aside, grinning to himself. The other two took notice and asked, "Why are you so smug? What did you bring?"

The guy pulled out a box of tampons and smiled. He said, "I brought these."
The other two were puzzled and asked, "What can you do with those?"

He grinned and pointed to the box and said, "Well according to the box, I can go horseback riding, swimming, roller-skating...."

Orlando,
Thought you would enjoy this.
Hope "prison humor" doesn't offend you.
Jana

598



# Cats Diary

DAY 752 - My captors continue to taunt me with bizarre dangling objects. They dine lavishly on fresh meat, while I am forced to eat dry cereal. The only thing that keeps me going is the hope of escape, and the mild satisfaction get from ruining the occasional piece of furniture. Tomorrow I may eat another houseplant.

DAY 761 - Today my attempt to kill my captors by weaving around their feet while they were walking almost succeeded, must try this at the top of the stairs. In an attempt to disgust and repulse these vile oppressors, I once again induced myself to vomit on their favorite chair...must try this on their bed.

DAY 762 - Slept all day so that I could annoy my captors with sleep depriving, incessant pleas for food at ungodly hours of the night.

DAY 765 - Decapitated a mouse and brought them the headless body, in attempt to make them aware of what I am capable of, and to try to strike fear into their hearts. They only cooed and condescended about what a good little cat I was...Hmmm. Not working according to plan.

DAY 768 - I am finally aware of how sadistic they are. For no good reason I was chosen for the water torture. This time however it included a burning foamy chemical called "shampoo." What sick minds could invent such a liquid. My only consolation is the piece of thumb still stuck between my teeth.

DAY 771 - There was some sort of gathering of their accomplices. I was placed in solitary throughout the event. However, I could hear the noise and smell the foul odor of the glass tubes they call "beer." More importantly I overheard that my confinement was due to MY power of "allergies." Must learn what this is and how to use it to my advantage.

DAY 774 - I am convinced the other captives are flunkies and maybe snitches. The dog is routinely released and seems more than happy to return. He is obviously a half-wit. The Bird on the other hand has got to be an informant. He has mastered their frightful tongue. (something akin to mole speak) and speaks with them regularly. I am certain he reports my every move. Due to his current placement in the metal room his safety is assured. But I can wait, it is only a matter of time....



When I Am An Old Woman

When I am an old woman I shall wear purple
With a red hat which doesn't go and doesn't suit me.
And I shall spend my pension on brandy and summer gloves
And satin sandals and say I've no money for butter.



I shall sit down on the pavement when I'm tired
And gobble up samples in shops and press alarms bells
And run my stick along the public railings
And make up for the sobriety of my youth.
I shall go out in my slippers in the rain
And pick the flowers in other peoples gardens
And learn to spit.



I can wear terrible shirts and grow more fat
And eat three pounds of sausage at a go
Or only bread and pickle for a week
And hoard pens and pencils and beermats
And things in boxes.

But now I must have clothes that keep me dry
And pay my rent and not swear in the street
And set a good example for the children.
I will have friends to dinner and read the papers.
But maybe I ought to practise a little now?
So people who know me are not too shocked and surprised
When suddenly I am old and start to wear purple.

600

Exhibit 48

Email text (from foreperson of jury)

601

Page 1 of 1

**Ali Brauda**

**From:**    Jackie Holmes [jholmes245@attbi.com]
**Sent:**    Thursday, April 18, 2002 10:48 AM
**To:**      webmaster@deathrowspeaks.net
**Subject:** federal death row prisoner

Orlando Hall was profiled on your web site previously.  But now his profile is gone.  Do you know why?

Unfortunately, I was the jury foreman in this young man's trial and followed his journey quite closely.  I corresponded with him annonamously for awhile, but was overwhelmed by the emotions it evoked and could not continue.  I am still very interested in keeping up with him, but now there is no information about Mr. Hall on your web site.

I know that you must be inundated by requests, but anything you could tell me about Mr. Hall's current status would be appreciated.

Thank you for your efforts at maintaining such a useful source of information.

4/19/2002

Exhibit 49

Printout of internet address information for "Jackie Holmes" in Arlington, Texas

663



SEARCH the web    [          ]    Search

Yellow Pages ☆  White Pages  Classifieds    Shopping

Hot Air Fare Deals
Meet Mr Right HERE
Online Casinos
Save on Lodging

Find High School Alumni
Travel Deals!

## Public Records Search
1-800-US-SEARCH

First Name  Jackie        Last Name  Holmes

YOU ARE HERE >  Home > My InfoSpace > White Pages > Listings > Detail

# Detail

## Listing details for: J Holmes Arlington TX US

**Quick Search**    Email Search    Find a Business    Reverse Lookup

### TRY PUBLIC RECORDS!

### Promotions

- Home Loans
- Find Anyone!
- Criminal Recs $25/yr
- People Find $19.95
- Send Flowers!
- Online Class Reunion

**Jackie Holmes**
5011 Osage Dr
Arlington, TX 76018
+ Address Book
**Find out more about Jackie Holmes**
Find Jackie Holmes at Classmates.com!
Send Flowers to Jackie Holmes.

**817-467-1456**
update/remove

## Related Links



Save time and money on your car insurance.

Life begins at 30...
udate

## Map of Arlington, TX

**Navigate the map**
Click anywhere on the map to center on a point and use the arrows to move in any direction.



@2002 MapQuest.com, Inc.; @2002 Navigation Technologies

- Add Your Listing
- Low Fares to TX!
- Save on Cars
- $7 unlimited Internet
- Meet Mr Right HERE
- Save money, refinance now!
- Home Loans
- Criminal Records - $25/year
- Stock Quotes

**Other Services**
- Phone & Address Search
- Email Search
- Reverse Lookup
- Yellow Pages
- Classifieds
- Search the Web
- PageGreetings

604

Exhibit 50

Affidavit of Kevin McNally, dated 5-12-00

605

## AFFIDAVIT OF KEVIN McNALLY

COMMONWEALTH OF KENTUCKY )
) ss.
COUNTY OF FRANKLIN )

I, Kevin Michael McNally, being first duly sworn and cautioned according to law, do hereby state the following under oath, TO WIT:

1. I currently serve, along with David Bruck of South Carolina, and Richard Burr of Houston, Texas, as Federal Death Penalty Resource Counsel. This project assists court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. My responsibilities include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of adequate defense services to indigent capital defendants in such cases.[1] This effort includes the collection of data on the application of the federal death penalty, both as to prosecutions under 21 U.S.C. § 848(e) *et seq.*, and more as to prosecutions pursuant to the "Federal Death Penalty Act of 1994." Among the aspects of each federal death penalty prosecution about which the Project collects information is the race of the defendant.

2. In the course of our duties, the Project has collected the following information regarding all potential federal death penalty cases being prosecuted pursuant to 21 U.S.C. § 848(e) *et seq.* and the Violent Crime Control and Law Enforcement Act of 1994, Pub.L.No. 103-322, 108 Stat. 1796.

---

[1] The work of the Federal Death Penalty Resource Counsel Project is described in the report recently prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

606

3. Between August 17, 1927 and March 15, 1963, there were 34 executions. Of those 34, 28 were white, 2 were Indian, 3 were black and 1 was unknown. Only 6, or 18%, were non-white. [See attached graph].

4. Since 1988 there have been 199 defendants against whom the Attorney General has authorized the government to request the death penalty, 48 have been white, 38 Hispanic, 10 Asian/Indian and 103 African-American. 151 of the 199 or 76%, of the defendants approved for a capital prosecution by the Attorney General to date are members of minority groups. [See attached graph].

5. Sixteen of the twenty defendants now on federal death row under active death sentences, or 80%, are non-white. [See attached graph].

6. Forty-four of the 67 defendants who pled guilty after the Attorney General authorized a capital  prosecution, or 66%, are non-white. [See attached graph].

7. Twenty-one of the 24 defendants who had the notice of intent to seek the death penalty withdrawn, after their case was authorized for a capital prosecution, or 88%, are non-white. [See attached graph].

8. Twenty-five of the 33 defendants who received a sentence of less than death from a judge or jury, after their case was authorized for a capital prosecution, or 78%, are non-white.  [See attached graph].

9. Thirty-one of the 41 defendants pending trial for a capital case, or 76%, are non-white. [See attached graph].

2

FURTHER AFFIANT SAYETH NOT.

Kevin McNally
Affiant

COMMONWEALTH OF KENTUCKY   )
                                ) ss.

COUNTY OF FRANKLIN           )

Subscribed and sworn to before me, a notary public, on this 12th day of May, 2000.

Notary Public
State of Kentucky at Large

My commission expires 2/6/2001

g:\feddeath\race\race.aff

3

608

# RACE OF INMATES EXECUTED - 1927 - 1963



WHITE - 28
82%

BLACK - 3
9%

INDIAN - 2
6%

UNKNOWN -
1
3%

| | |
|---|---|
| ⊞ | INDIAN - 2 |
| ■ | UNKNOWN - 1 |
| ☐ | WHITE - 28 |
| ■ | BLACK - 3 |



# RACE OF FEDERAL CAPITAL DEFENDANTS AUTHORIZED FOR FEDERAL CAPITAL PROSECUTION

WHITE - 48
24%

BLACK - 103
52%

ASIAN/INDIAN - 10
5%

HISPANIC - 38
19%

ASIAN/INDIAN - 10
HISPANIC - 38
WHITE - 48
BLACK - 103

Case 4:94-cr-00121-Y   Document 1071-2   Filed 09/18/02   Page 128 of 132   PageID 1575

# RACE OF FEDERAL DEATH ROW INMATES



BLACK - 12
60%

WHITE - 4
20%

HISPANIC - 3
15%

ASIAN - 1
5%

☒ ASIAN - 1
■ HISPANIC - 3
☐ WHITE - 4
■ BLACK - 12



# RACE OF FEDERAL CAPITAL DEFENDANTS WHOSE NOTICE OF INTENT TO SEEK THE DEATH PENALTY WAS WITHDRAWN



16
66%

ASIAN - 1
HISPANIC - 3
WHITE - 3
16
INDIAN/NA - 1

INDIAN/NA - 1
4%

ASIAN - 1
4%

HISPANIC - 3
13%

WHITE - 3
13%



RACE OF FEDERAL CAPITAL DEFENDANTS WHO WERE SENTENCED TO LESS THAN DEATH AFTER JURY OR JUDGE VOTED AGAINST DEATH

BLACK - 18
55%

ASIAN - 2
HISPANIC - 4
WHITE - 8
BLACK - 18
INDIAN/NA - 1

INDIAN/NA - 1
3%

WHITE - 8
24%

HISPANIC - 4
12%

ASIAN - 2
6%