United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 5, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

4.94.CR. 1214 (θ)
(4-00CV 4224)

No. 04-70050

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ORLANDO CORDIA HALL

Defendant-Appellant

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN -5 2' 6

CLERK, U.S. DISTRICT COURT
By_____
Deputy

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before KING, SMITH, and STEWART, Circuit Judges.

KING, Circuit Judge:

Defendant-appellant Orlando Hall, a federal prisoner under a sentence of death, has applied for a certificate of appealability to challenge the district court's denial of his motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Hall previously sought, and was denied, a certificate of appealability from the district court. For the reasons discussed below, we DENY Hall's application for a certificate of appealability.

## I.  BACKGROUND

Orlando Cordia Hall ("Hall") ran a marijuana trafficking enterprise in Pine Bluff, Arkansas, along with Bruce Webster

("Webster") and Marvin Holloway ("Holloway").  Hall, Webster, and Holloway bought marijuana in the Dallas/Fort Worth area, assisted by Steven Beckley ("Beckley"), who lived in Irving, Texas.  Typically, Beckley drove the marijuana back to Arkansas, and Holloway stored the marijuana in his house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to Little Rock, Arkansas, and Hall then flew from Little Rock to Dallas in order to buy marijuana.  Beckley and Hall's brother, Demetrius Hall ("D. Hall") picked Hall up at the Dallas airport.  Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis ("Vitalis") and Neil Rene ("N. Rene"), at a car wash and gave them $4700 to procure marijuana.  Hall and Beckley returned to the car wash to pick up the marijuana, but Vitalis and N. Rene did not return.  Hall then spoke with Vitalis and N. Rene by telephone, and Vitalis and N. Rene told Hall that they had been robbed of both their car and the $4700 entrusted to them.

Hall and Beckley then gave Vitalis's and N. Rene's phone number to a friend who worked for the telephone company, and this friend told them that the number was associated with an address at the Polo Run Apartments in Arlington, Texas.  Hall, D. Hall, and Beckley began surveilling this address, and they saw Vitalis and N. Rene exit an apartment and approach the same car which they claimed had been stolen along with the $4700.  Based on this

2

surveillance, Hall and Beckley concluded that Vitalis and N. Rene had lied about the robbery and had kept the $4700 for themselves.

Hall called Holloway on September 24, 1994, and instructed him to drive Webster to the airport in Little Rock. Webster then flew from Little Rock to Dallas. That evening, Hall, D. Hall, Beckley, and Webster drove to the Polo Run Apartments in a car owned by Hall's sister Cassandra. Hall and Webster each carried handguns, D. Hall carried a souvenir baseball bat, and Beckley carried duct tape and a jug of gasoline.

When they arrived, Webster and D. Hall knocked on the front door of the apartment that Vitalis and N. Rene had left. Lisa Rene ("Rene"), N. Rene's sixteen-year-old sister, was alone in the apartment and refused them entry. When Webster and D. Hall began issuing threats, Rene called her sister and 911. Webster attempted to kick in the front door, but when that failed he and D. Hall circled around to the patio and broke into the apartment through a glass door. Webster then entered the apartment, tackled Rene, and dragged her back to Hall's sister's car. The group then drove away from the Polo Run Apartments and returned to Hall's sister's apartment, where Beckley's car was parked. There, they forced Rene into Beckley's car and then drove off in a group. During this second drive Hall raped Rene. Later, the group returned to Hall's sister's apartment, and from there Beckley, D. Hall, and Webster drove back to Pine Bluff along with

3

Rene.  Hall remained behind and flew back to Arkansas the next day.

Once Beckley, D. Hall, and Webster reached Pine Bluff, Holloway provided them with money, which they used to move into a motel room.  There, they tied Rene to a chair and raped her repeatedly.  On September 25, 1994, Hall and Holloway arrived at the motel room and took Rene into the bathroom for approximately twenty minutes.  When they emerged, Hall told Beckley, "She know too much," and then he left the motel with Holloway and Webster.

After leaving the motel, Hall and Webster went to Byrd Lake Park and dug a grave.  That evening, Hall, Webster, and Beckley took Rene to Byrd Lake Park, but they could not find the grave site in the dark, so they returned to the motel room.  Early the next morning, on September 26, 1994, Beckley and D. Hall moved Rene to another motel because they were concerned that a security guard at the first motel was becoming suspicious.

Later on the morning of the 26th, Webster, Hall, and Beckley again drove Rene to Byrd Lake Park, after covering her eyes with a mask, and they took her to the grave site, which they were able to locate in the daylight.  At the grave site, Hall placed a sheet over Rene's head and then hit her once in the head with a shovel.  Rene screamed and attempted to run away, but Beckley grabbed her and hit her twice in the head with the shovel. Beckley then handed the shovel to Hall, and Hall and Beckley took

turns beating her.  When they had finished, Webster gagged Rene, dragged her into the grave, covered her with gasoline, and covered her with dirt.  In its current brief before this court, the government reminds us that the medical report supported findings that Rene was alive but unconscious when she was buried by Webster, that she died from the effects of the multiple blunt force injuries she suffered during her beating, combined with asphyxia, and that she may have regained consciousness in the grave before her death.  After Rene was buried, the three men returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant was issued in Arlington for Hall, D. Hall, and Beckley for Rene's kidnapping, and D. Hall, Beckley, and Webster were arrested.  On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney.  Based on his attorney's advice, Hall did not give a statement at arrest, but he indicated that he would talk once he was transported to Texas.  On October 5, 1994, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in Rene's kidnapping and death.

The United States District Court for the Northern District of Texas issued a criminal complaint on October 26, 1994, charging Hall, D. Hall, Webster, and Beckley with kidnapping in violation of 18 U.S.C. § 1201(a)(1).  On November 4, 1994, a six-

count superseding indictment was returned, charging Hall, D. Hall, Webster, Beckley, and Holloway with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c), traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952, using a telephone to promote the unlawful activity of extortion in violation of 18 U.S.C. § 1952, traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952, and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).

The government filed notice of its intent to seek the death penalty against Hall on February 23, 1995. The district court severed Hall's trial from the trial of his codefendants on April 6, 1995, and his trial began on October 2, 1995. On October 31, 1995, the jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm during a crime of violence. After a separate hearing, the jury recommended, by unanimous vote, that Hall receive the death penalty.[1]

---

[1] Hall was sentenced to death for the kidnapping conviction, life imprisonment for the conspiracy conviction, and sixty months imprisonment for each of the remaining two

Hall appealed, and his conviction and sentence were affirmed by this court on August 21, 1998. <u>United States v. Hall</u>, 152 F.3d 381, 389-90 (5th Cir. 1998) [hereinafter <u>Hall</u>]. Hall filed a petition for rehearing with this court, which was denied on October 1, 1998. Hall then petitioned the Supreme Court for a writ of certiorari, which was denied on May 17, 1999. <u>United States v. Hall</u>, 526 U.S. 1117 (1999).

Hall filed his initial motion to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, in May 2000. In June 2000, the district court granted Hall's request to file a discovery motion. Hall filed an initial discovery motion in August 2000 and a supplemental discovery motion in May 2001. The district court denied both motions in April 2002. Hall then filed a second § 2255 motion to vacate in June 2002, and he filed an amended version of this motion to vacate in September 2002. In this second amended motion, Hall raised twelve claims for relief from his conviction and sentence.[2] <u>See</u> <u>Hall v. United</u>

---

convictions.

[2] The district court found that the twelve claims listed in Hall's motion raised nine issues, specifically whether:

    A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

    B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

States, No. 4:00-CV-422-Y, slip op. at 6, 2004 WL 1908242 (N.D.

Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.].

C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments (claims three through five).

D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall (claim eight).

G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand (claim nine).

H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I. Hall's rights under the Fifth And [sic] Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

Hall v. United States, No. 4:00-CV-422-Y, slip op. at 6-7, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.]. The district court also noted that Hall moved for "an evidentiary hearing before this Court on all of his claims." Id. at 7.

8

The government filed a response to this second amended motion to vacate in January 2003, and Hall replied in March 2003. On June 7, 2004, the district court conducted an evidentiary hearing limited to the extraneous influence on the jury issues raised by Hall's third, fourth, and fifth claims for relief, which were grouped together by the district court as issue C in the list reproduced in note 2 supra.  On August 24, 2004, the district court issued a comprehensive, careful memorandum opinion and order, denying all of the claims presented in Hall's § 2255 motion for relief.

Hall filed a notice of appeal from the district court's order denying his § 2255 motion on November 9, 2004, and he applied to the district court for a certificate of appealability ("COA") on that same date as well.  The district court denied Hall's COA application on December 6, 2004, citing Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000), and finding that Hall had failed to make a substantial showing of the denial of a federal constitutional right.  On July 18, 2005, Hall filed the present application for a COA with this court.

## II.  DISCUSSION

This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA.  28 U.S.C. § 2253(c)(1)(B).  To obtain a COA, an applicant such as Hall "must make a substantial

9

showing of the denial of a constitutional right." <u>United States v. Garza</u>, 165 F.3d 312, 314 (1999) (citing 28 U.S.C. § 2253(c)(2), and <u>United States v. Kimler</u>, 150 F.3d 429, 431 n.1 (5th Cir. 1998)).   An applicant such as Hall "need not establish that he will win on the merits[;]" rather, "he need only demonstrate that the questions he raises are debatable among reasonable jurists." <u>Garza</u>, 165 F.3d at 314 (citing <u>United States v. Rocha</u>, 109 F.3d 225, 227 n.2 (5th Cir. 1997)).   "In determining whether to grant a COA, our inquiry is limited to a threshold examination that 'requires an overview [of Hall's current claims] . . . and a general assessment of their merits.'" <u>Smith v. Dretke</u>, 422 F.3d 269, 273 (5th Cir. 2005) (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003)).   Because this matter involves a sentence of death, "any doubts as to whether a COA should be issued must be resolved" in Hall's favor. <u>Smith</u>, 422 F.3d at 273 (quoting <u>Hernandez</u>, 213 F.3d at 248) (internal alterations omitted).

Hall raises several distinct claims in his current application for a COA.   First, Hall believes that a COA should issue to determine whether the district court erred in denying five of the specific substantive claims in his § 2255 motion. Second, Hall claims a COA should issue to address whether the district court erred by limiting the June 7, 2004, evidentiary hearing solely to his extraneous influence upon the jury claims.

Third, Hall claims that a COA should issue to address whether the district court erred in denying all discovery.  Fourth, Hall claims that a COA should issue to determine whether the district court erred in denying him reasonable additional funds to develop further evidence.  Finally, Hall claims that this court should assign a new judge if it decides that a remand is necessary.  The government has provided substantive and direct responses to all of the claims discussed above.[3]

The remainder of this opinion will discuss the claims in Hall's application for a COA, and the government's substantive response to these claims, in greater detail.  Because both Hall and the government devote most of their attention to Hall's five general merits claims--particularly his ineffective assistance of

---

[3]  In responding to Hall's second amended § 2255 motion, the government also argued that Hall was "procedurally barred from raising all but his second and part of his third through fifth claims for relief because [the barred claims] were not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default."  Dist. Ct. Op. at 7-8.

The district court was not persuaded by the government's procedural objections.  Although it recognized that many of the claims "were not raised on direct appeal and are not based on new law or facts," the district court chose to address the claims "in the interests of justice" because "Hall . . . alleged that his appellate counsel was ineffective for not raising these claims."  Dist. Ct. Op. at 8.

In responding to Hall's current application for a COA, the government briefly observes (in a single footnote) that it "is not abandoning any of those procedural bars," and it argues that "[i]n the event this Court elects to grant COA on any issue, the government will rely on those procedural bars in its [subsequent] response."  Gov't Br. at 8 n.1.  Because these arguments have not been sufficiently briefed at this stage, we will not consider them at any greater length.

11

counsel claim--these will be addressed first, together with related procedural claims.

## A.    Hall's Substantive Claims

In his current application for a COA, Hall reiterates five of the substantive claims from his § 2255 motion: his ineffective assistance of counsel claim, his extraneous influence on the jury claim, his incomplete indictment claim, his prosecutorial misconduct claim, and his selective prosecution claim. Related to these five claims is his procedural claim that the district court erred in limiting the evidentiary hearing to the extraneous influence on the jury claim. Of the five substantive claims, the ineffective assistance of counsel claim is the most important to his current application; in his brief before this court, Hall acknowledges that the "centerpiece of this case is . . . [the] penalty-phase IAC [ineffective assistance of counsel] claim." Therefore, the ineffective assistance of counsel claim will be considered first, and the sentencing component of this claim will be considered most extensively.

### 1.    Hall's Ineffective Assistance of Counsel Claim

In the proceedings before the district court, Hall claimed that his trial counsel was constitutionally ineffective on twelve separate grounds, all of which are substantially reiterated in

12

his current application for a COA.[4]  After separately and

_____

[4]  More specifically, Hall contended that his trial counsel was constitutionally ineffective for:

1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses;

2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony;

3) failing to call available and known witnesses to testify at punishment;

4) failing to question government witnesses in order to present additional mitigating evidence;

5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase;

6) failing to re-interview a potential defense witness after he appeared to have altered his testimony;

7) failing to make a closing argument at the guilt phase of the trial;

8) failing to argue effectively that Hall should have been allowed to make a statement in allocution;

9) making uninformed and unreasonable decisions regarding their choice and use of witnesses;

10) failing to adequately argue their motions for continuance;

11) making an ineffective closing argument at the punishment phase; and

12) failing to conduct an adequate voir dire.

Dist. Ct. Op. at 16-17.  Although Hall has reordered, combined, and separated these twelve grounds in his current application for a COA, they are substantially the same as the grounds considered

13

extensively considering each of Hall's arguments, the district court concluded that Hall received "constitutionally effective assistance of counsel at his trial" because his attorneys "conducted reasonable investigations in all areas of the case . . . vigorously cross-examined government witnesses . . . ably argued all objections and points of law; and eloquently defended their client in their closing statements."  The government now argues that the "record demonstrates that the [district] court conducted an exhaustive review of each of Hall's claims, and properly denied relief.  No COA should issue because no court would resolve Hall's issues in a different manner."  Hall believes that each of his twelve grounds was sufficient to support his ineffective assistance of counsel claim, and in his current application for a COA, he argues that reasonable jurists could debate the district court's decision on each of these twelve grounds.

To establish ineffective assistance of counsel, Hall must satisfy a two-part test and show both that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance.  Strickland v. Washington, 466 U.S. 668, 687 (1984) (stating that an ineffective assistance of counsel claim has "two components" and requiring convicted defendants to show both that "counsel's performance was

_____

by the district court.

14

deficient" and "that the deficient performance prejudiced the defense").  We determine whether counsel's performance was deficient "by examining whether the challenged representation fell below an objective standard of reasonableness."  Cotton v. Cockrell, 343 F.3d 746, 752 (5th Cir. 2003) (citing Kitchens v. Johnson, 190 F.3d 698, 701 (5th Cir. 1999)).  Crucially, "a fair assessment" of counsel's challenged conduct requires reviewing courts to make "every effort . . . to eliminate the distorting effects of hindsight . . . and to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  When it has been shown that "'counsel made an adequate investigation,'" we have held that "'any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance.'"  Cotton, 343 F.3d at 752 (quoting Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002)).  Of course, even if Hall could establish that his counsel's performance was deficient, satisfying the first step of the Strickland test, he would also have to establish that the "'prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different[,]'" thereby rendering the trial "'fundamentally unfair or unreliable.'"  Cotton, 343 F.3d at 753 (quoting Ransom v. Johnson, 126 F.3d 716, 721 (5th Cir. 1997)).

15

But because, as will be discussed immediately below, no reasonable jurist could debate the district court's conclusion that Hall's counsel provided reasonable, vigorous, and thorough assistance at Hall's trial and sentencing, we need not address this second step of the Strickland test, and so we will not consider whether the errors Hall alleges could have prejudiced his defense.

### a.    Hall's Mitigation Arguments

The acknowledged "centerpiece" of Hall's current application for a COA is his argument that his trial counsel failed to present various mitigation evidence and arguments at Hall's sentencing because they failed to conduct an objectively reasonable investigation into Hall's family background.  We observed, when considering Hall's direct appeal, that

> [i]n support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members[5] . . . . Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed.

Hall, 152 F.3d at 413.  Hall now argues that his upbringing was somewhat more difficult than we recognized on direct appeal.

---

[5]    The two family members who testified at Hall's trial were Hall's mother and his sister Cassandra, whose car and apartment were used in Rene's abduction.  Both offered uncontroverted testimony that Hall's father beat Hall's mother throughout their marriage, until the marriage ended in divorce when Hall was fifteen.  See Hall, 152 F.3d at 413.

16

More specifically, Hall now argues that he was beaten with belts and switches by both of his parents, but particularly his father, as a form of discipline, and he argues that this discipline constituted abuse.  He also argues that his trial counsel failed to present evidence of this alleged abuse because they failed to adequately investigate his background before sentencing, and he concludes that his trial counsel's failure to present evidence of this abuse substantially prejudiced his defense at sentencing, constituting ineffective assistance of counsel.  In support of this argument, Hall submitted several highly detailed declarations from family members and assorted experts along with his second amended § 2255 motion.

Although we did not consider some of the allegations presented in these declarations during Hall's direct appeal, we did consider the significant evidence, presented by Hall's trial counsel to the jury, which demonstrated that Hall's upbringing was marked by violence.  As we stated in Hall's direct appeal, his trial counsel presented uncontroverted evidence that his mother was repeatedly beaten by his father throughout his childhood.[6]  See Hall, 152 F.3d at 413 (noting the

---

[6]  More specifically, Hall's mother testified at trial that Hall's father:

> was abusive towards her [Hall's mother] during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she

17

"uncontroverted testimony that Hall's father . . . beat Hall's mother throughout their marriage"). Moreover, we observe that in reviewing Hall's argument, "our principal concern . . . is not whether counsel should have presented a mitigation case" of the sort Hall envisions. <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003) (citing <u>Strickland</u>, 466 U.S. at 691). "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Hall's] background <u>was itself reasonable</u>." <u>Id.</u>

To support his current argument that his trial counsel's investigation was objectively unreasonable and therefore deficient, Hall has presented declarations from various experts purporting to show that his trial counsel fell short of then-prevailing professional norms requiring a wide-ranging and thorough inquiry into his family, medical, and social history. Hall believes that these expert declarations demonstrate that his trial counsel failed to conduct sufficiently extensive interviews with his family members about his alleged childhood abuse. At

---

> was dragged out of bed and beaten . . . after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police were called several times, but arrested [Hall's father] on only one occasion; that Hall would physically protect her from [Hall's father]; and that she stayed with [Hall's father] because she had small children and had no place to go . . . .

Dist. Ct. Op. at 27-28 (citing R. 18:113-116).

the very least, he argues that these declarations have created a fact question on this issue because they conflict with affidavits given by his trial counsel and submitted by the government defending the sufficiency of the mitigation investigation.

Even if these expert declarations are assumed to be true, no reasonable jurist could debate the district court's conclusion that the mitigation investigation of Hall's counsel was objectively reasonable. To begin, Hall's trial counsel spoke with Hall and presented him with a lengthy questionnaire. From the questionnaire and their initial conversations, Hall's trial counsel learned that Hall felt that he had a reasonably happy and peaceful childhood, although Hall also indicated that he had been whipped when he was bad. Hall's trial counsel also made use of a private investigator to help evaluate and investigate Hall's background. Hall's trial counsel also interviewed Hall's mother and sister Cassandra, who told him that Hall's father had extremely violent tendencies. Based on these interviews, Hall's trial counsel decided to call both women to testify. Hall's trial counsel also employed the services of a mitigation specialist named Tena Francis ("Francis"), who has since submitted multiple declarations castigating Hall's trial counsel for, inter alia, failing to employ her earlier and failing to adopt all of her tactical litigation suggestions. Notwithstanding her subsequent critical declarations, Francis

19

interviewed additional family members and a minister familiar with Hall's childhood and background while she was employed by Hall's trial counsel, and she sent summaries of these interviews to Hall's trial counsel before sentencing.[7]

Although Hall's experts have attacked some of the strategic and tactical litigation decisions made by Hall's trial counsel, they have not raised serious fact questions about the reasonableness of the investigation upon which those litigation decisions were made.  The crux of Hall's current argument is that Hall's trial counsel conducted an insufficient investigation either because counsel was unaware that Hall had been physically abused as a child or because counsel was unaware that the violent

---

[7]  Hall's trial counsel ultimately decided against calling these additional family members as witnesses for tactical reasons.  In denying Hall's § 2255 motion, the district court examined this decision and concluded that "[i]t was reasonable . . . not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial."  Dist. Ct. Op. at 30.
More specifically, Hall's father was opposed to testifying in large part because of his reluctance to admit to his extensive physical abuse of Hall's mother.  One of the two brothers in question had been incarcerated for firing a gun into a crowd and injuring nine people; the other brother was in prison for drug possession.  Finally, the sister in question was opposed to testifying because "she was very angry . . . at Hall for lying to her about his involvement [in Rene's kidnapping and death] and for involving [their brother] Demetrius Hall [in Rene's kidnapping and death]."  Dist. Ct. Op. at 30.  No reasonable jurist could debate the district court's conclusion that Hall's counsel acted reasonably in choosing not to call these additional witnesses.

20

discipline inflicted upon Hall constituted abuse.[8]  The

government has provided affidavits from Hall's trial counsel

which contradict these points,[9] but more importantly, this core

_____

[8]  This core of Hall's argument can be found in the declaration of Jill Miller ("Miller"), a forensic social worker, whose declaration was submitted along with Hall's second amended § 2255 motion.  In her declaration, Miller stated:

> First, this characterization--that the Hall children were not "abused"--was incorrect.  The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse. . . . [Furthermore,] the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." . . . Counsel's examination of these witnesses reflects a failure to grasp this basic principle . . . . At the same time, the true extent and severity of the physical beatings [visited on Hall's mother and her children] were not communicated by the testimony actually presented at [Hall's] penalty phase.

Miller Decl. (June 12, 2002) at 17.

[9]  According to one of his trial counsel's affidavits, Hall himself indicated that he had been whipped by his parents during counsel's first interview with Hall, and his subsequent, thorough investigation into Hall's background was based on his knowledge, resulting from extensive experience, "that defendants in that situation cannot necessarily be relied upon to be one-hundred percent truthful and forthcoming."  Ware Aff. (Jan. 15, 2003) at 3, 5.
Hall's counsel also stated that after he directed Francis to interview Hall's additional family members and conduct further background investigation, she "later reported . . . that she was sure that there must have been severe child abuse in the home, including abuse of the defendant . . . ."  However, despite subsequent interviews, counsel was unable to elicit any further information about this alleged abuse from Hall's mother and sister, the witnesses who were reasonably chosen to testify at Hall's sentencing.  Ware Aff. (Jan. 15, 2003) at 20 ("Although I spoke with them on additional occasions neither Cassandra [Hall's sister] nor [Hall's mother] nor the defendant ever said anything that supported Tena Francis's feeling that the defendant must have been physically abused as a child . . . . When I traveled to

21

of Hall's argument is also clearly and directly contradicted by the declarations that he has presented and upon which he now relies.  In both her declaration given on June 11, 2002, and her declaration given on March 11, 2003, after she reviewed one of Hall's counsel's affidavits, Francis repeatedly stated that Hall's trial counsel "was informed, by me [Francis] . . . that the Hall children had been subjected to serious domestic violence in the family throughout their childhoods," and she also repeatedly acknowledged that Hall's trial counsel subsequently and repeatedly tried to discuss this issue with Hall's mother, but that "her [Hall's mother's] answers lacked the kind of details I [Francis] had noted in my reports."  Therefore, even if the declarations presented by Hall are assumed to be true, Hall's central argument lacks support.  Contrary to the conclusory allegations found in Hall's application for a COA and Miller's declaration, it is clear that: Hall's trial counsel was aware that Hall had been subjected to physical discipline as a child; Hall's trial counsel was aware of expert opinions that this discipline constituted abuse; Hall's trial counsel personally conducted further investigation and also directed Francis to conduct further investigation into this issue; and finally,

---

Arkansas and again interviewed [Hall's mother], she did not indicate anything of much additional significance on those particular topics, although, once again I asked her about them specifically after . . . explaining the significance of such information.")

22

Hall's trial counsel attempted, albeit unsuccessfully, to elicit testimony about this issue from the family witnesses who were reasonably chosen to testify at Hall's sentencing.

In light of Hall's counsel's considerable prior experience and thorough efforts to investigate the potential mitigation case that Hall now describes, no reasonable jurist could debate the district court's conclusion that "Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance of counsel."  Therefore, Hall is not entitled to a COA on this issue.  Moreover, because this conclusion is supported not only by the subsequent affidavits submitted by the government <u>but also by the very declarations upon which Hall now relies</u>, no reasonable jurist could debate the district court's conclusion that the declarations submitted by Hall have failed to "create any contested fact issues." Accordingly, because Hall's expert declarations have failed to create a contested fact issue about the objective reasonableness of his trial counsel's mitigation investigation, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue.  As a result, Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

23

Contrary to the arguments advanced in Hall's reply brief, our recent decision in Smith v. Dretke, 422 F.3d 369, does not directly control this application for a COA.  In Smith, we granted an application for a COA based in part on our holding that "reasonable jurists could debate whether the [mitigation] investigation that supported trial counsel's strategy at sentencing was reasonable and adequate."  422 F.3d at 284.  In his reply brief, Hall argues that our opinion in Smith illustrates why Hall's application also merits a COA.  But whatever superficial similarities Hall's application may bear to the application we considered in Smith, several critical distinctions prevent the direct application of Smith's holding to this matter.  Unlike Hall's trial counsel, the trial counsel in Smith could not remember specific details about their background investigation, such as "exactly who they contacted or what was learned from the individuals they contacted," and the record in Smith tended to "support[] the conclusion that trial counsel only contacted those individuals who actually testified at trial," whereas the record in this matter indicates that Hall's trial counsel conducted a much broader investigation.  Id. at 277. Moreover, unlike Hall's trial counsel, the trial co-counsel in Smith provided substantive statements about the defendant's background which were directly "contrary to the actual testimony presented at sentencing . . . ."  Id. at 281.  Based on these and

24

other shortcomings without parallel in the matter at hand, we held in <u>Smith</u> that "reasonable jurists could debate whether trial counsel conducted a reasonable investigation."  <u>Id.</u>  But because these concerns are not raised by Hall's application for a COA, <u>Smith</u> does not control this application for a COA.

> **b.   Hall's Additional Ineffective Assistance of Counsel Arguments**

In addition to the mitigation arguments discussed above, Hall has provided six additional specific ineffective assistance of counsel arguments which he believes merit a COA.  First, Hall argues that his trial counsel failed to adequately prepare for and cross-examine Larry Nichols, a former cellmate of Hall's. Second, Hall argues that his trial counsel failed to obtain an opportunity for allocution for Hall.  Third, Hall argues that his trial counsel failed to effectively argue several motions for a continuance.  Fourth, Hall argues that his trial counsel failed to effectively conduct voir dire.  Fifth, Hall argues that his trial counsel failed to present an effective closing argument. Sixth, Hall argues that his trial counsel failed to present adequate evidence of Hall's good conduct during his past incarceration.  The district court reviewed all of these claims individually and in detail before denying Hall's ineffective assistance of counsel claim, and no reasonable jurist could debate the district court's conclusions.  These arguments each "essentially come[] down to a matter of degrees[,]" and we have

25

held in the past that these sorts of questions "are even less susceptible to judicial second-guessing" than most ineffective assistance of counsel arguments.  Kitchens, 190 F.3d at 703; see also Dowthitt v. Johnson, 230 F.3d 733, 743 (5th Cir. 2000) (citing Kitchens and Strickland, and stating the need to be "particularly wary" of arguments that second-guess the performance of trial counsel by a matter of degrees).  Because Hall has offered little more than his displeasure with the outcome of his trial and sentencing hearing to support these arguments, no reasonable jurist could debate the district court's decision to deny him relief on these grounds, and no reasonable jurist could debate the district court's refusal to consider these grounds during its evidentiary hearing.  Therefore, Hall is not entitled to a COA on these substantive issues, and he is not entitled to a COA based on the district court's decision to limit the evidentiary hearing.

Hall also claims that he is entitled to a COA on his ineffective assistance of counsel claim because of the cumulative effect of the various errors he alleges.  Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.  See Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (stating that in the absence of specific demonstrated error, a defendant cannot, by definition, show that cumulative

error of counsel deprived him of a fair trial); <u>Yohey v. Collins</u>, 985 F.2d 222, 229 (5th Cir. 1993) (stating that because certain alleged errors did not rise to constitutionally ineffective assistance of counsel, and because certain other claims were meritless, a petitioner had "presented nothing to cumulate"). Accordingly, no reasonable jurist could debate the district court's conclusion that the cumulative effect of the alleged errors did not constitute ineffective assistance of counsel, and Hall is not entitled to a COA on this issue.

### 2.   Hall's Extraneous Influence on the Jury Claim

Hall's extraneous influence on the jury claim is based on two incidents that allegedly occurred during the trial.  First, Hall alleges that juror Jacqueline Holmes ("Holmes") had contact during Hall's trial with Hall's victim's mother.  This first allegation is based on letters allegedly written by Holmes to Hall in prison after the conclusion of Hall's trial.  Second, Hall alleges that at least one juror--who may or may not have been Holmes--attended an event at which prayers were offered for Hall's victim.

As discussed above, the district court conducted an evidentiary hearing to resolve this claim on June 7, 2004, and at this hearing, Holmes testified under oath.  With respect to Hall's first allegation, Holmes admitted that she had written letters to Hall after the trial.  She also admitted that in these

27

letters she stated that she had met Hall's victim's mother during the course of the trial. At the evidentiary hearing, however, Holmes maintained that these post-trial letters to Hall were not true: she testified that she had never met the victim's mother, and she claimed that she had lied in her letters in order to encourage Hall's correspondence with her. With respect to Hall's second allegation, Holmes testified that she had not attended any prayer ceremony of the sort described by Hall, nor was she aware of any other juror who had done so. Id.

With respect to Hall's first allegation, the district court found Holmes's testimony during the evidentiary hearing "to be credible," and therefore ruled that "Hall has not established that any inappropriate ex parte contact occurred." With respect to Hall's second allegation, the district court stated that even

> [a]ssuming that this allegation is indeed true, and [a juror] attended [a prayer ceremony], it is not evidence that there was any outside influence on the jury. Instead Hall offers merely speculation that there may have possibly been some unknown person at the [prayer ceremony] who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a [prayer ceremony], much less any prayer offered on behalf of the victim [during the jury's deliberations].

Id. at 66-67.

In his current application, Hall argues that he is entitled to a COA on this extraneous influence on the jury claim because

28

reasonable jurists could debate the district court's conclusion and with the limitations the district court imposed on the evidentiary hearing it held on this issue.[10]  But by holding the evidentiary hearing, the court provided Hall with sufficient opportunity to investigate his first allegation about Holmes's conduct, and it found Holmes's direct testimony credible.  No reasonable jurist could find fault with either the district court's method or conclusion, particularly in light of the limitations on a juror's testimony on any individual juror's deliberations or the jury's collective deliberations.  See, e.g., United States v. Ruggiero, 56 F.3d 647, 652 (5th Cir. 1995) (reviewing the limitations on subsequent testimony about juror deliberations set forth by this court's precedent and Federal Rule of Evidence 606(b)).  With respect to Hall's second allegation, no reasonable jurist could debate the district court's conclusion that Hall has merely offered speculative and conclusory allegations that "are insufficient to raise a

---

[10]  In particular, Hall argues that the evidentiary hearing was insufficient because Hall lacked access to videotaped interviews with the jurors.  In response, the government observes that "[s]ecuring a copy of the broadcast [interviews] . . . would bring Hall no closer to showing an illegal or prejudicial intrusion into the jury process" because Hall's allegations still fail to demonstrate "that any extraneous evidence was introduced into the jury's deliberations, or that any juror violated the court's instructions to forego discussion about the case outside of the deliberation process, especially given the testimony from Holmes."  Gov't Br. at 31 (citing, inter alia, United States v. Riley, 544 F.2d 237, 242 (5th Cir. 1976); United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989)).

29

constitutional issue."  <u>United States v. Pineda</u>, 988 F.2d 22, 23 (5th Cir. 1993) (quoting <u>United States v. Woods</u>, 870 F.2d 285, 288 n.3 (5th Cir. 1989)).

### 3.  Hall's Incomplete Indictment Claim

In his second amended § 2255 motion, Hall claimed that the original indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made him eligible for the death penalty.  The district court denied this claim for relief, after applying our recent precedent and the recent precedent of the Supreme Court.  <u>See</u> Dist. Ct. Op. at 13-16 (citing, inter alia, <u>Schirro v. Summerlin</u>, 542 U.S. 348 (2004), <u>United States v. Robinson</u>, 267 F.3d 278 (5th Cir. 2004), <u>United States v. Matthews</u>, 312 F.3d 652 (5th Cir. 2002), and <u>United States v. Brown</u>, 305 F.3d 304 (5th Cir. 2002)).  In his current application for a COA, Hall acknowledges the contrary precedent of this court and the Supreme Court cited by the district court--precedent that we must follow.  Because Hall concedes in a footnote that he has included this claim in his current application in order "to preserve this issue for further review[,]" we will not consider this claim any further.

### 4.  Hall's Prosecutorial Misconduct Claim

Hall's prosecutorial misconduct claim revolves around Larry Nichols ("Nichols"), one of Hall's fellow inmates who provided

testimony against Hall during the sentencing phase of Hall's trial.  More specifically, Hall now claims that the government concealed Nichols's full criminal history from Hall, violated Hall's Sixth Amendment rights by deliberately using Nichols to elicit information from Hall outside the presence of Hall's counsel, and encouraged or tolerated perjury by Nichols.

In denying Hall's § 2255 motion, the district court held that these claims of prosecutorial misconduct lacked factual support.  The district court found, based on a review of the trial record and an affidavit from Hall's trial counsel, that the government did not withhold any information about Nichols's prior criminal conduct from Hall's trial counsel.  The district court also recognized that Hall's Sixth Amendment rights were not violated for two reasons: first, because Nichols's testimony directly contradicts Hall's claims; and second, because the very text of the report Hall selectively cites undercuts his claims.  Finally, the district court found that Hall failed to show that Nichols's allegedly false statements about his prior criminal behavior or his prior contact with the government were material.  See, e.g., O'Keefe v. United States, 128 F.3d 885, 893-94 (5th Cir. 1997) (stating that a conviction obtained through the use of false testimony cannot be overturned unless the allegedly false statements were material).  Because no reasonable jurist could debate the district court's conclusions, no COA should issue on

31

Hall's claim of prosecutorial misconduct. Additionally, because Hall has failed to raise any contested fact issues about the alleged prosecutorial misconduct, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

### 5.   Hall's Selective Prosecution Claim

Hall also argues that a COA should issue because reasonable jurists could conclude the district court erred in denying Hall's selective prosecution claim. In denying Hall's § 2255 motion, the district court found that Hall's statistics fell short of establishing a prima facie selective prosecution case under the standard set forth in United States v. Armstrong, 517 U.S. 456 (1996). Armstrong requires a defendant such as Hall to show that federal prosecutorial policy had both a discriminatory effect and a discriminatory intent; in this matter, as the district court and the government both point out, Hall has not provided any direct evidence of discriminatory intent. Furthermore, the district court noted that Hall's statistical evidence is similar to evidence rejected by this court in the past. Dist. Ct. Op. at 86-87 (citing, inter alia, United States v. Jones, 287 F.3d 325, 333-35 (5th Cir. 2002); United States v. Webster, 162 F.3d 308, 333-35 (5th Cir. 1999)). Because no reasonable jurist could

32

debate the district court's conclusions, no COA should issue on this claim. Additionally, because Hall has failed to raise any contested fact issues about the alleged selective prosecution, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

**B.   Hall's Procedural Claims**

In addition to the substantive and procedural claims considered above, Hall has raised two other procedural claims in this application for a COA.[11] First, Hall argues that a COA is appropriate because reasonable jurists could debate the district court's blanket denial of discovery. Second, Hall argues that the district court's denial of Hall's request for funds to develop evidence merits a COA. In explaining why none of Hall's substantive claims merits a COA, we have also explained why the district court's decision to limit the evidentiary hearing does not merit a COA. Similarly, because Hall has not raised any contested fact issues that might entitle him to relief, no reasonable jurist could debate the district court's decisions to deny his motions for discovery.

---

[11]   In his application for a COA, Hall also argued that this case should be reassigned if a remand was necessary in order to foreclose any claim of waiver. Because we have denied his application for a COA without remanding any issue to the district court, this claim is mooted.

33

We now turn to Hall's final remaining claim, that a COA should issue because the district court denied him "reasonably necessary funds" to develop supporting evidence.  In responding to Hall's denial of funds claim, the government observes that Hall has wholly failed to identify any specific needs for additional post-conviction funded investigation.  Moreover, as the government also observes, despite this alleged lack of sufficient funding, Hall has provided several expert declarations and evaluations related to his ineffective assistance of counsel claim.  In the past, "this court has held that a COA is not necessary to appeal the denial of funds for expert assistance," reviewing such claims directly for abuse of discretion.  Smith, 422 F.3d at 288 (citing Hill v. Johnson, 210 F.3d 481, 487 n.3 (5th Cir. 2000)).

Most of our past holdings, however, relied on the text of 21 U.S.C. § 848(q)(4)(B), which was recently repealed by the USA Patriot Improvement and Authorization Act of 2005, Pub. L. No. 109-177, Title II, §§ 221(4), 222(c), 120 Stat. 192, 231-32 (2006).  See Smith, 422 F.3d at 287-88 (relying upon the text of 21 U.S.C. § 848(q)(4)(B)); Hill, 210 F.3d at 487 n.3 (stating that "[a] COA is not required for appeals under § 848(q)(4)(B)"); cf. Jackson v. Dretke, No. 05-70014, 2006 WL 1308063, at *10 (5th Cir. May 11, 2006) (citing Hill and Smith, without citing any statutory provision, and stating that a "COA is not required to

34

appeal the denial of funds for expert assistance"). Moreover, the government's brief, which predates the enactment of the USA Patriot Improvement and Authorization Act of 2005, does not request direct review and the abuse of discretion standard, but instead simply claims that Hall's claim for a COA based on insufficient funding lacks all merit. In any event, because Hall has not pointed to any specific needs or limitations caused by the alleged lack of funds, his funding claim fails whether it is considered as a claim for a COA or a claim on direct review. No reasonable jurist could debate the district court's funding decisions, and therefore the district court's decision to deny Hall's overbroad funding requests could not have been an abuse of discretion.

### III.   CONCLUSION

For the reasons discussed above, Hall's application for a COA is DENIED.

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**


July 5, 2006

Ms Karen S Mitchell, Clerk
Northern District of Texas, Fort Worth
United States District Court
501 W 10th Street
202 US Courthouse
Fort Worth, TX 76102

      No. 04-70050 USA v. Hall
          USDC No.  4:00-CV-422-Y
                 4:94-CR-00121-2

Dear Ms Mitchell:

Enclosed is a certified copy of an opinion-order entered on July
5, 2006.  We have closed the case in this court.

We will forward the record on appeal at a later date.

          Sincerely,

          CHARLES R. FULBRUGE III, Clerk

      By: _____
          Joseph Armato, Deputy Clerk


Enclosure
cc:  Honorable Terry R Means
     Mr Robert Charles Owen
     Ms Marcia Adele Widder
     Ms Delonia Anita Watson