**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

**UNITED STATES OF AMERICA**,
   *Plaintiff,*

  v.          **CRIMINAL NO. 4:94-CR-121-Y**
             **(Civil No. 4:00-CV-422-Y)**

**ORLANDO CORDIA HALL**,
    *Defendant.*

**DEFENDANT'S MOTION FOR AUTHORIZATION FOR FUNDS
TO PREPARE CLEMENCY APPLICATION
TO THE PRESIDENT OF THE UNITED STATES
AND BRIEF IN SUPPORT**

**EXPEDITED REVIEW REQUESTED**

_____

### I.  MOTION

Defendant ORLANDO CORDIA HALL ("Mr. Hall"), by counsel, moves this Court, pursuant

to 18 U.S.C. § 3599, the Fifth Amendment's due process clause, the Fourteenth Amendment's

guarantee of equal protection, and the Eighth Amendment's prohibition on cruel and unusual

punishments, to authorize funds for reasonably necessary expenses to be incurred in the preparation

and presentation of Mr. Hall's anticipated application for clemency to President Barack Obama, as

set forth in greater detail below.  Because of urgent time pressure created by the posture of this case

and short deadlines for filing Mr. Hall's clemency application under Department of Justice

regulations, *see infra*, Mr. Hall respectfully requests that the Court expedite its consideration of this

Motion.

1

## II. BRIEF IN SUPPORT

### *Factual background*

In November, 1995, a jury in this Court convicted Mr. Hall and sentenced him to death for his role in a kidnapping that resulted in the death of Lisa Rene. *See* 18 U.S.C. §§ 1201(a)(1). The judgment was affirmed on appeal. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999). Mr. Hall unsuccessfully sought relief from the judgment in this Court under 28 U.S.C. § 2255. *Hall v. United States*, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004). The Fifth Circuit denied leave to appeal. *Hall v. United States*, 455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

Mr. Hall and other death-sentenced federal prisoners are challenging on various legal grounds the lethal injection protocol the Government intends to use to kill them. *Roane, et al., v. Holder*, *et al.*, No. 1:05-CV-2337 (RWR/DAR) (D.D.C.). That case remains pending in the United States District Court for the District of Columbia but is likely to be decided soon. When *Roane* reaches its conclusion, there will be no legal impediment to the Government's setting of an execution date for Mr. Hall, and counsel expect that the Government will schedule Mr. Hall's execution. Once an execution date has been scheduled, Mr. Hall will have only forty-five (45) days to file his application for executive clemency and all supporting materials.[1]

---

[1] The Attorney General of the United States has promulgated regulations to govern clemency applications by death-sentenced federal prisoners. Section 1.10(b) of those regulations provides in relevant part:

> A petition for commutation of sentence should be filed no later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution. All papers in support of a petition for commutation of sentence should be filed no later than 15 days after the filing of the petition itself. Papers filed by the

Mr. Hall is indigent, and has been indigent at all times relevant to this proceeding, from his arrest in 1994 to the present date. He is in custody on the federal Death Row at the United States Penitentiary in Terre Haute, Indiana.

Mr. Hall is represented by undersigned counsel Marcia A. Widder and Robert C. Owen. Ms. Widder has represented Mr. Hall continuously since his direct appeal. Mr. Owen was appointed by this Court in May 1999 and has represented Mr. Hall continuously since that time.

### *The Court's legal authority to order reasonably necessary funds for clemency*

Because Mr. Hall was indigent at the time his direct appeal concluded (as he remains to this day), this Court appointed undersigned counsel to represent Mr. Hall in connection with his motion for relief from sentence under 28 U.S.C. § 2255. *See supra*. 18 U.S.C. § 3599(e) provides that an attorney appointed for that purpose "shall represent the defendant throughout every subsequent stage of available judicial proceedings, . . . and *shall also represent the defendant in such . . . proceedings for executive or other clemency as may be available to the defendant.*" *Id*. (Emphasis added). Thus, Mr. Hall has a right to the continued compensated services of undersigned counsel in seeking executive clemency from President Obama.

At the same time, because Congress understood that the promise of legal representation would be hollow if counsel lacked the funds for appropriate expert or investigative assistance, it enacted Section 3599(f). That section allows a court to provide funds for services "reasonably necessary [to such] representation." The plain language of these statutory provisions reflect

---

petitioner more than 15 days after the commutation petition has been filed may be excluded from consideration.

See http://www.usdoj.gov/pardon/clemency.htm#submission

Congress' intent that this Court authorize the expenditure of funds for such services as may be "reasonably necessary," in the unique circumstances of this case, for undersigned counsel meaningfully and fairly to pursue clemency on Mr. Hall's behalf.

### Particulars of Mr. Hall's request for funds

Mr. Hall will ask the President to commute his death sentence to a sentence of life imprisonment without the possibility of release. He expects to submit both written materials (*e.g.*, affidavits, reports of experts, and other documents) and supporting information in other formats (*e.g.*, photographs, video) in support of his clemency request. To investigate and prepare Mr. Hall's clemency request, counsel need funds for the following purposes:

*To allow counsel to hire an appropriately qualified investigator to interview potential clemency witnesses.* Although some of these witnesses were interviewed several years ago in connection with Mr. Hall's 2255 proceeding, a number of potentially important witnesses (*e.g.*, several of Mr. Hall's children) have never been interviewed in connection with his case. More important, the range of topics and information relevant to clemency is significantly different from, and broader than, the range of subjects covered during any earlier interviews. The interviews conducted previously focused on Mr. Hall's upbringing and on trial counsel's development of potential mitigation witnesses prior to Mr. Hall's 1995 trial. While those subjects are relevant to President Obama's assessment of whether to commute Mr. Hall's sentence, they do not exhaust the considerations relevant to the President's decision. For instance, a clemency decision properly may take account of how Mr. Hall's execution will impact his family, whether Mr. Hall's deep remorse for his involvement in Lisa Rene's murder justifies mercy, and whether Mr. Hall has made a

successful adjustment to incarceration since his conviction.  The costs associated with securing an investigator for this purpose include funds to pay the investigator for her time in locating the witnesses and preparing for and conducting the interviews, and also to pay for expenses the investigator will incur in conducting the interviews, such as travel costs.  We estimate these costs collectively at no more than $15,000 (this estimate assumes one trip to each of the relevant locations where Mr. Hall's family members and other relevant character and background witnesses reside – Texas, Arkansas, Louisiana, and Wisconsin – plus travel to Terre Haute, Indiana, to conduct interviews of Mr. Hall and of Bureau of Prisons personnel).

*To allow counsel to hire reasonably necessary experts*.  The assistance of at least two different types of experts may be necessary in preparing and presenting Mr. Hall's clemency application.  First, undersigned counsel need to retain an expert to review and evaluate Mr. Hall's incarceration records since his conviction in 1995, with an eye toward offering an opinion about Mr. Hall's adjustment to incarceration and to comment on the reliability of the "future dangerousness" prediction urged by the Government and found by the jury at the time of Mr. Hall's sentencing hearing in 1995.  Nearly fifteen years of additional data is now available, all of which tends to prove that Mr. Hall could safely be confined in federal prison for the rest of his life without endangering the lives or safety of others, and the views of an appropriately qualified expert regarding the weight such evidence deserves would be an important part of Mr. Hall's request for commutation.  We estimate these costs at no more than $7,500.  Counsel also need to retain a polygraph expert.  The Government's case at sentencing for Mr. Hall's "future dangerousness" rested substantially on allegations by jailhouse inmate Larry Nichols that Mr. Hall, while confined prior to trial, planned to attempt an escape by taking his own lawyers hostage.  Mr. Hall has always maintained, and

undersigned counsel's post-conviction investigation tends to show, that Nichols' allegations were false.[2]  Counsel need to retain a qualified polygraph examiner, to examine Mr. Hall about Nichols' allegations.   Counsel believe the results of such an examination will support Mr. Hall's denial that he ever contemplated, much less planned, any escape.  We estimate these costs at no more than $7,500.[3]

---

[2] *See* Mr. Hall's Second Amended Motion for Relief from Judgment under 28 U.S.C. 2255 (Dkt. 1069) at ¶¶ 183-186 (referencing affidavits from two other inmates from the same jail, Charles May and Javier Solis, both of whom flatly disputed Nichols' claims about Mr. Hall), *id.* at Exhibit 32 (May declaration), Exhibit 33 (Solis declaration).

[3] There is "disagreement among state and federal courts concerning the admissibility and reliability of polygraph evidence" in trials generally.  *United States v. Scheffer*, 523 U.S. 303, 310-312 (1998) (upholding against constitutional attack Military Rule of Evidence 707's *per se* bar on admitting polygraph test results as evidence in a court-martial proceeding).  However, polygraph results are regarded as sufficiently reliable to be routinely employed for other purposes in the criminal justice system.  *See, e.g*., Oregon Revised Statutes Sec. 144.270 (3)(b)(F) and (J) (paroled sex offenders must agree to submit to polygraph testing).  More important for present purposes, the results of polygraph examinations are frequently weighed in clemency decisions.  For example, a favorable polygraph result preceded Ohio Governor Ted Strickland's decision to commute the death sentence of John G. Spirko in January 2008.  *See* "Spirko's Lawyers Say DNA Test Could ID Real Killer," Toledo Blade (Nov. 1, 2005) (noting that a polygraph examination pointed to another suspect); Governor's Statement Regarding Clemency Application of John G. Spirko (commuting Spirko's death sentence to life imprisonment without the possibility of parole, in part due to the weakness of the case against him and the doubts about his guilt) (January 9, 2008) (available at http://www.governor.ohio.gov/Default.aspx?tabid=578).  The same is true in non-capital cases.  *See, e.g*., Laurence Hammack, "Kaine's Decision in Carpitcher Clemency Petition Rests on Changing Testimony," The Roanoke (Va.) Times (October 24, 2009) (noting that "[o]ther Virginia governors, including tough-on-crime former Gov. George Allen, have granted clemency in cases where an accuser's recantation was supported by a polygraph test"); *see also* former Virginia Governor George Allen's official "List of Pardons, Commutations, Reprieves, and other forms of Clemency (January 1, 1997, through January 14, 1998)" (available at http://leg2.state.va.us/dls/h&sdocs.nsf/ fc86c2b17a1cf388852570f9006f1299/2c11de28ba6ef905852565a60054bc0a/$FILE/SD2_1998.PDF ) (issuing a full pardon to Yvonne Crittle Johnson after, *inter alia*, she "voluntarily submitted to a polygraph examination" and the results were consistent with her claim of innocence).  Some executives have even affirmatively required a convicted offender to undergo such an examination; for example, former Illinois Governor James R. Thompson ordered a polygraph of a convicted rapist as part of deciding whether to grant him clemency.  "Dotson Telling Truth, Examiner Says

*To allow counsel to hire a video production service to assist in the preparation of Mr. Hall's application for clemency.*   Counsel seek to hire a qualified professional videographer to videotape interviews with numerous witnesses, including but not limited to Mr. Hall's children and other family members, Mr. Hall's friends, correctional officers who have known Mr. Hall, experts who have opinions relevant to Mr. Hall's case, and others.  Such videotaped interviews and video presentations are now a routine part of the clemency process in capital cases.[4] Equally important, on information and belief, each of the other death-sentenced federal prisoners who has completed all post-trial appeals is represented by counsel who have adequate financial resources and are using them, *inter alia*, for this purpose.   In the absence of funding from the Court, Mr. Hall will not be able to make a comparably persuasive presentation to the President in support of his request for clemency.   The only thing placing Mr. Hall at such a disadvantage is his indigency, and it is unfair that he not have the same opportunities to present his case as other similarly situated federal defendants.  Counsel estimate that a professional clemency video could be prepared for no more than $20,000.

In addition to funds for these purposes, Mr. Hall also requests that the Court authorize counsel, their investigator, and any experts to obtain airline tickets at United States Government rates through Omega Travel for travel related to their work on Mr. Hall's clemency application.  As set out

---

Following Polygraph Test," *The Los Angeles Times* (May 7, 1985) (noting that Gov. Thompson "had requested the polygraph exam for a clemency hearing" for Dotson).  For all these reasons, the fact that polygraph results may not always be admissible in a court of law is irrelevant to Mr. Hall's funding request. Such test results are often taken into consideration in clemency decisions, and that makes funding for that purpose reasonably necessary here.

[4] *See, e.g.*, the video produced for Texas death row inmate Jose Garcia Briseno, available at http://www.youtube.com/view_play_list?p=F49EDECB12BE7859.

above, preparation of Mr. Hall's clemency application will require travel by counsel, their investigator, and at least one expert to the federal Death Row in Terre Haute, Indiana. Counsels' investigator may also need to travel to/from Arkansas, Texas, Louisiana, and Wisconsin to locate and interview witnesses. Authorizing Mr. Hall's counsel and their representatives to obtain the necessary airline tickets through Omega Travel at U.S. Government rates will not only facilitate the preparation and filing of Mr. Hall's application for executive clemency, but will promote efficiency because tickets so obtained will cost less than those purchased directly from the airlines.

Title 18, U.S.C. § 3599(g) provides that no more than $7,500 may be authorized for "investigative, expert, and other reasonably necessary services," unless "payment in excess of that limit is certified by the court [as] necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit." For several reasons, the amounts requested in this motion satisfy this condition. First, the witnesses who must be located and interviewed in connection with the preparation of Mr. Hall's clemency application are widely geographically dispersed, being located variously in Texas, Arkansas, Louisiana, Indiana, and Wisconsin. That dispersal increases the time that will be necessary to find and interview them, and the travel expenses that will be incurred in doing so. Second, the contemplated services are of an "unusual character or duration" because the experts, in assisting counsel in preparing Mr. Hall's clemency application, must review and develop a substantial amount of new (and not previously relevant) information, including information from members of Mr. Hall's family (including his children) about their continuing relationships with Mr. Hall since his conviction in 1995, as well as extensive documentary evidence about his successful adjustment to incarceration in that same fifteen-year timespan. In addition, two of the varieties of

expert assistance for which Mr. Hall seeks funding in this motion – the polygraph expert and the videographer – constitute services of an "unusual character," in that they are not typically needed by a defendant on trial (or seeking relief from judgment under 28 U.S.C. §2255), but *are* reasonably necessary for purposes of seeking executive clemency. As explained *supra*, such information is regularly presented by prisoners seeking clemency and frequently relied upon by executive decision-makers in deciding whether mercy is warranted. For all these reasons, Mr. Hall's requests are necessary to provide "fair compensation for services of an unusual character" in the unique circumstances of his application for clemency to President Obama.

## CONCLUSION

Mr. Hall respectfully requests that the Court enter an order authorizing undersigned counsel to expend reasonably necessary funds for the purposes described above, in amounts not exceeding those identified above without further Order of the Court, and authorizing counsel and their retained experts and investigator to purchase tickets from Omega World Travel at United States Government rates for any air travel associated with preparing Mr. Hall's clemency application.

Finally, undersigned counsel stress that this motion is of the greatest urgency because Mr. Hall's execution may be scheduled anytime after the *Roane* litigation concludes, and the conclusion of that case is likely approaching. As noted *supra*, the very short (45-day) deadline imposed by Department of Justice regulations for filing Mr. Hall's clemency application and all supporting materials after an execution date is actually set means that undersigned counsel must undertake the work necessary to prepare Mr. Hall's application well in advance, *i.e.*, as soon as possible. Accordingly, Mr. Hall requests that the Court act on this Motion as promptly as possible.

RESPECTFULLY SUBMITTED,

  /s/ Robert C. Owen         

ROBERT C. OWEN
Texas Bar No. 15371950
Capital Punishment Clinic, School of Law
The University of Texas at Austin
727 East Dean Keeton Street
Austin, TX  78705-3224
(512) 232-9391
Fax: (512) 232-9171

MARCIA A. WIDDER
636 Baronne Street
New Orleans, LA 70113
(504) 558-9867
Fax: (504) 558-0378

ATTORNEYS FOR DEFENDANT
ORLANDO CORDIA HALL

10

## CERTIFICATE OF CONFERENCE

On October 28, 2009, Marcia Widder, attorney for Mr. Hall, spoke with Ms. Delonia A. Watson, counsel for the Government, who indicated that the Government TAKES NO POSITION with respect to whether the Court should grant the relief requested in this Motion.

/s/ Robert C. Owen
Robert C. Owen

## CERTIFICATE OF SERVICE

I, Robert C. Owen, hereby certify that on November 2, 2009, I caused to be electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record in the above-entitled case:

Delonia A Watson
U.S. Attorney's Office
Burnett Plaza
801 Cherry Street, Suite 1700
Fort Worth, TX 76102-6882
817/252-5249
817/252-5514 (fax)
delonia.watson@usdoj.gov

 /s/ Robert C. Owen_____
Robert C. Owen

11